MC–275

Name: **BENJAMIN SERRATOS III**

Address: **P.O BOX  7500**

**CRESCENT CITY CA. 95532**

( **PRO-PER**)

CDC or ID Number: **AM 3717**

# FILED

**JAN 1 2 2018**

**CLERK, U.S. DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
BY _____
**DEPUTY CLERK**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN JOAQUIN**
**222 EAST WEBBER AVE # 303**
**STOCKTON, CA. 95202**
*(Court)*

**2:18 - CV  0077  KJN**

---

**BENJAMIN SERRATOS III**

Petitioner

vs.

**PEOPLE OF THE STATE OF CALIFORNIA**

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**
COA C-072041 / C-085888
No. SF 115116A

*(To be supplied by the Clerk of the Court)*

EVIDENTIARY HEARING REQUESTED

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2017]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 8.380
*www.courts.ca.gov*

MC–275

**This petition concerns:**

[X] A conviction                    [ ] Parole

[ ] A sentence                      [ ] Credits

[ ] Jail or prison conditions       [ ] Prison discipline

[ ] Other *(specify):* _____

1. Your name:   BENJAMIN SERRATOS III

2. Where are you incarcerated?   PELICAN BAY STATE PRISON CRESCENT CITY, CA. 95532

3. Why are you in custody?   [X] Criminal conviction   [ ] Civil commitment

   *Answer items a through i to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
      SECOND DEGREE MURDER (WATSON) MURDER
      GROSS VEHICULAR MANSLAUGHTER WHILE INTOXICATED
      D.U.I OF ALCOHOL AND CAUSING INJURY
      DRIVING W/.08% OR HIGHER BLOOD ALCOHOL CONTENT / CAUSING INJURY
      HIT & RUN RESULTING IN DEATH OR INJURY

   b. Penal or other code sections: 187 W/667 (a) - 191.5 W/ VC 23558- VC 23153(a)-VC 23153(b
      VC 20001 W/PC 1170.12(b) - VC 14601.2(a)- PC 12022.7w667(
   c. Name and location of sentencing or committing court:
      SAN JOAQUIN COUNTY SUPERIOR COURT
      STOCKTON CALIFORNIA

   d. Case number:   SUPERIOR COURT # SF115116A

   e. Date convicted or committed:   MARCH 2, 2012

   f. Date sentenced:   AUGUST 28, 2012

   g. Length of sentence:   48 YEARS + 8 MONTHS TO LIFE

   h. When do you expect to be released?   _____

   i. Were you represented by counsel in the trial court? [X] Yes   [ ] No   *If yes, state the attorney's name and address:*

      JEROLD SCHULTZ   SBN 47309
      16255  VENTURA BLVD, SUITE 200
      ENCINO CA 91436

4. What was the LAST plea you entered? *(Check one):*

   [X] Not guilty   [ ] Guilty   [ ] Nolo contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

MC–275

6.  GROUNDS FOR RELIEF
**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

PETITIONER'S CONVICTION WAS OBTAINED AS THE RESULT OF EVIDENCE THAT IS INSUFFICIENT TO PERSUADE A PROPERLY INSTRUCTED JURY OF HIS GUILT BEYOND A REASONABLE DOUBT...

JACKSON v. VIRGINA, 443 U.S. 397 (1979)

a.  Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is, *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

SEE ATTACHED

b.  Supporting cases, rules, or other authority *(optional)*:
(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

SEE ATTACHED

1
2

PETITIONER'S CONVICTION WAS BASED ON LESS THAN
SUFFICIENT EVIDENCE

3
4
5

Petitioner's conviction was obtained as the result of evidence
that is insufficient to persuade a properly, instructed jury of
his guilt beyond a reasonable doubt....

6
7

JACKSON v. VIRGINA, 443 U.S. 397 (1979)

8

a. SUPPORTING FACTS:

9
10
11
12

Petitioner was convicted of violating penal code section 187,
murder in the second degree and penal code section 191.5 vehicular
manslaughter.

13

Both of these convictions were based upon a single car accident.

14
15

To support a conviction of second degree murder in this circumsta-
nce, the prosecution must prove implied malice.

16
17
18
19
20

There is insufficient evidence that petitioner had actual knowled-
ge of the risk created by his actions the evidence relied upon by
the prosecution to prove petitioners subjective awareness was a
prior conviction  attendance at an intake portion of a D.U.I class
and driving pattern that evening.

21
22
23
24
25
26

The rationale behind a prior conviction supporting an inference of
implied malice is because as in People v. Ortiz a conviction of
driving under the influence carries with it extenuating consequen-
ces. Such as educational classes that provide a defendant with an
awareness of the dangers of driving under the influence of Alcohol.

27
28

1. Petitioner had suffered a prior conviction for driving
under the influence on July 20, 2006. (III RT 807-810; 815) EXPT-D

but as testified to by Mack Myles and Sam Beasly petitioner did
not complete a 3-Month first offender class (III RT 807, 815-816)

2. In fact although ordered to complete a 3-month first
offender class petitioner only attended the sign up and first
class approximately 2 hours and 15 minutes (III RT 820)

3. The first class only discussed community support groups
such as N.A National Recovery and A.A it DID NOT cover the subject
of the dangers of driving while under the influence. (III RT 821)

4. When asked if either of the sessions attended by petitioner
discussed the dangers of drunk driving the peoples selected
witness Sam Beasly testified that "He did not know" (III RT 819)

To prove implied malice the people are required to show:
(a) At the time petitioner acted, he "Knew" his act was dangerous.
There must be affirmative evidence that the class actually imparted
knowledge of the danger of drunk driving

5. The evidence in this falls short of substantial evidence
that "infact" petitioner was actually "aware" of the risks involved
' in driving under the influence. (III RT 819-820)

The other evidence presented by the prosecution was that petitioner
was speeding while driving down a near deserted stretch of road
late at night.

Once again for the prosecutor to prove implied malice he is
required to show.

(b) The natural and probable consequences of the act were
dangerous to human life.

6. The evidence of driving available in this case prior to the accident is scant at best. The prosecution contends that petitioner was traveling at speeds in excess of 95 M.P.H (III RT 706-708).

7. However there is No substantial evidence of petitioner driving. Absolutely NO evidence of running lights, no swerving on the road, or in other way, driving erratically.
People falling short of showing petitioner .

   (a) Deliberately acted with conscious disregard for human life.
Although speeding may demonstrate gross negligence in support of vehicular manslaughter , the fact of speeding alone does not support implied malice.

8. Three different speeds were estimated, the peoples M.A.I.T. Team conceded they were unable to accurately determine a post impact speed as a result of collision with Honda. EXBT-2-R

9. One of Maits many admitted errors, and Inconclusive findings. EXBT Q

10. M.A.I.T. Pre-speeds were based on "the benefit of the doubt" theory inconsistent with scientific methods . (Daubert Test)

11. When reviewing cases that have found poor driving as support for a finding of implied malice, the conduct demonstrated in those cases far exceeds that found in this case to the point of uncomparability what so ever.

In citing(people v.watson (1981)  30. Cal 3d 290). Watson drove through a red light, nearly avoiding a collision with another car,

1  drove away at high speeds, approached another intersection and
2  struck a toyota sedan.

3    12. In sum there is absolutely no substantial evidence that
4  petitioner had any experience that must have made him subjectively
5  aware that speeding or driving while under the influence was
6  dangerous to human life and no evidence of reckless driving.
7  In this unique circumstance the evidence falls short in its entir
8  ety.
9  A finding of implied malice depends upon a determination that the
10 petitioner actually appreciated the risk invovlved, I.E., A
11 subjective standard. When the conduct in question can be characte-
12 rized as a wanton disregard for life, "and" the facts demonstrate
13 a subjective awareness of the risk created, then malice may be
14 implied. (188).
15 In other words , a driver who crosses the line from driving
16 dangerously to "knowing" and "understanding " that his or her
17 dangerous driving could result in the death of another  can be
18 considered implied malice.
19 In this case the threshold of even irresponsible negligence is sh-
20 ort of substantial evidence.
21 The people and court of appeals leap and make splattering junk arg-
22 uments such as that petitioner drove to his nephews house in a
23 "seperate vehicle from his wife and kids. Quote "thus the jury
24 reasonably could infer that defendant must have known that he would
25 have to drive the Honda later". (see L.O.A. unpublished opinion.)

26    13. This argument/analogy is beyond flawed in its attempt
27 to compare it to others in where ONE vehicle is referenced.
28 The court surfs right over the key phrase or chooses to ignore

GROUND #1  EXHIBIT A OF D

" Separate Vehicle_s_" and "Nephews house" therefore like-wise
a jury reasonably could infer the contrary that petitioner could
have thought of riding with his family or leaving his vehicle
at his nephews house thereby necessarily have to have 'Known"
he would have to drive the Honda, Not so.

14. Further this also serves to demonstrate the Court of
appeals opine of whether petitioner was subjectively aware of
the risk is best answered by "how could he not be?" This premise
also fails as demonstrated the prosecution only submits a prior
D.U.I conviction with a flawed colloquy, no proof that anyone
actually imparted this knowledge, as Mr.Beasely testified he
"did not know" whether in petitioners intake that involves the
financial assessment and payment plan of program, and the ONE
class, discussed the dangers of drunk driving. In this rare
circumstance in comparison to others petitioner did not complete
the program.

15. And as all witnesses testified, petitioner did not appear
intoxicated nor was that a concern of anyone whom seen or was
with petitioner prior to the accident, and further Pablo Sanchez
the peoples witness testified at pre-lim the same that petitioner
did not appear drunk, rather dazed and confused.. ..EXHIBIT A-1
as Mr.Rickner who also testified at pre-lim, so you basically have
everyone in essence stating petitioner did not appear intoxicated
Mr.Beasely testimony that washes the prosecutions assertions,
all that is left is the prosecutions triple hearsay on a flawed
and insufficient colloquy dating back to 2006, in a judicially
flawed lower superior court house that even court officials

deemed as having many woes, over-crowdedness court house and reasons why a new court house was recently built,. Specifically the over-crowded issues meant rushed proceedings.,. errors committed on many levels.

16. The court of appeals opine that , it takes no leap of logic for the jury to conclude that because "anyone" would be aware of the risk and that petitioner was aware of the risk, one who drives a vehicle while under the influence after having been convicted of that offense "knows" better" than most that his conduct is not only illegal, but entails a substantial risk of harm to himself and others, . (Peo v. McCarnes, (1986) 179 Cal app 3d 525,532.)

17. Petitioner  submits that **Moore**'s summary rejection of the insufficiency claim the objective negligence standard and the subjective implied malice standard.  The brief discussion is like a syllogism: "any person" would be aware of the risk. Moore is a person, therefore Moore was aware of the risk. In this syllogism, both premises are false,in the major premise, it is not necessarily true that "any person" would be aware of the risk, which is the objecitve negligence standard.

18. In the Minor premise although Moore was a person, there was no reason to think a reasonable person. His statements to the police after he was arrested were 'Callous' . Among other things when he resisted arrest and was asked why,he said, "I dont know, I just went wacky from tobacky."  Moore drove with extreme reck- lessness and caused great harm but that is not a reason to side- step the requirement of implied malice in murder, as even Moore

GROUND #1 ATTACHMENT 6 OF 10

1  acknowledges.

2    19. It is not enough that a reasonable person would have

3  been aware of the risk, citing(people v. Wasson Supra 30 Cal 3d

4  296-297)  it MUST be proven that this individual person was

5  subjectively aware of  the risk.

6    20. Even if Moore is correct on its facts, These are NOT the

7  facts of petitioners case what so ever.. Moores drove recklessly

8  in an "Urban Setting" his driving posed a threat of sudden, viole-

9  nt death to the population at large.

10

11    21. Petitioners driving on June 12, 2010 was not similar at

12  all to that in Moore, whether petitioner may have been speeding,

13  even if excessively,  there is no evidence that he ran any red  .

14  lights, crossed  into opposing traffic or otherwise drove in a

15  manner  that would demonstrate implied malice.

16    22. To the contrary only evidence is that petitioner obeyed

17  traffic lights, as Stephanie Loya  testified, and Pablo Sanchez

18  who testified the light at the intersection was Green, when he

19  saw sparks, indicating  the vehicles did not appear they were

20  going to run red lights.

21

22    23. For those reason in this case there is no evidence what-so-

23  ever of poor driving other than the speeding indicated by M.A.I.T.

24  whom admit   to being unable to accurately determine post impact

25  speeds and based pre-speeds on a guesstimation benefit of the

26  doubt theory/ Not a valid scientific method (Baubert Test) so

27  what you have is a speed that is with admitted errors in its

28  algorithms totality, and the accident, . EXHIBIT Q-R

The accident itself or mere speeding are insufficient to prove a subjective awareness of the risk or conscious disregard for human life.

24. Further-more  petitioner cites 2010 Bail Hearing in which the prosecution in a slip up or contradicting fashion stipulate petitioners lack of subjective awareness, thereby prosecution themselves make the case for petitioner that in fact mens rea was non-existant. The prosecution on 7/28/2010 in the bail hearing are arguing Quote" The DEFENDANT NEVER KNEW THAT HE HAD A 187 CHARGE BECAUSE THE MOMENT THAT I CHARGED HIM WITH THAT, AN ARREST WARRANT WAS SIGNED AND HE WENT AND PICKED HIM UP (prosecutor refering to a certain law enforcement officer) SO HE DID NOT KNOW HE COULD "NOT" HAVE POSSIBLY HAVE KNOWN UNLESS HE WAS IN MY OFFICE, THAT ....A....MURDER CHARGE....WAS COMING... DOWN!!!" EXHIBIT C

This statement is contradictory  prosecutors case is based on allegations petitioner was admonished of Watson, and that petitioner had intimate knowledge if he were to committ a secondary offense similar in nature, hence petitioner  knew exactly what he would face should this occur.

25. Why then is prosecutor vigorously stating he could not have possibly known a murder charge was coming down.!?

26. According to prosecutions theory of an admonishment proclamation and petitioners mens rea being existant , Petitioner absolutely should have known exactly what charges to ANTICIPATE! so is it the former or latter? as both together are a paradox.

27. What is demonstrated by prosecutions own words on bail

1  hearing is the fact that the prosecution from the onset knew

2  there was never a second degree murder case.

3

4                        CONCLUSION

5  Petitioner asserts that he was wrongly convicted of second

6  degree murder the conviction was based on insufficient evidence

7  to prove implied malice, and sustain a conviction of second

8  degree murder it is evident the charging of second degree murder

9  were based on irrational, prejudicial behavior and undue influence

10 the prosecution banked on numerous: " Errors and constitutional

11 hiccups" inorder for a sham trial.

12    29. Petitioner demonstrated a conscious of innocence when out

13 on bail. EXHIBIT L

14

15    30. Prosecution failed to establish a sufficient constitution-

16 ally valid colloquy of the prior 2006 D.U.I conviction, when

17 available hearing transcripts clearly show there was no reference

18 no mention or utterance of an Addendum Plea Waiver and certainly

19 no admonishment expressed ....    EXHIBIT D

20    31. The prosecution presented to testify one of the D.U.I

21 class program Director Sam Beasely who testified petitioner

22 DID not complete program, attended one class and financial

23 enrollment, and the class DID NOT discuss the dangers of of

24 driving while intoxicated. When asked if they discussed the

25 dangers of drunk driving Mr.Beasly testified "He did not Know"

26    32. The prosecutor in the bail hearing clearly sticks his

27 foot in his mouth by stating "Petitioner could not have possibly

28 known a murder charge was coming down"!! Thereby  indicating

GROUND # 1  ATTACHMT  9 OF 10

1    himself that petitioner had no subjective awareness of knowledge
2    of any admonishment of Watson

3    33. No evidence existed of driving reckless or     Human
4    disregard for life.

5    34. The evidence of driving is scant at best, no one witnessed
6    or testified to reckless driving, and to the contrary the people
7    witness Pablo Sanchez testified as he approached Armstrong Road
8    heading North Bound he saw sparks and the light was green, by
9    which means that vehicles did not or were not running red lights.
10   Stephanie Loya testified to safe driving and that petitioner
11   actually obeyed traffic lights.
12

13   It is well established that due process requires every ELEMENT
14   to be proven beyond a reasonable doubt.

15   This was certainly not the case,...for those reason stated
16   above , petitioner respectfully request an order to set aside
17   and vacate conviction, .

18

19
                    b.SUPPORTING CASES
20
IN RE WINSHIP ( 1979) 397 U.S. 358, 364,90 S. Ct 1068
21
IT IS WELL ESTABLISHED IN(PEOPLE V. WATSON ( 1981) 30. Cal 3d 290.)
22
IF THE ISSUE IS SUFFICENCY OF THE EVIDENCE TO SUSTAIN A CONVICTION
23
IN A CRIMINAL CASE, THE QUESTION FOR THE APPELLATE COURT IS
24
WHETHER A REASONABLE TRIER OF FACT COULD HAVE FOUND THE DEFENDANT
25
GUILTY OF THE CRIME BEYOND A REASONABLE DOUBT IN LIGHT OF "ALL"
26
THE EVIDENCE.
27

28

7. **Ground 2 or Ground** ___2___ *(if applicable):*

PETITIONERS CONVICTION WAS BASED ON LESS THAN PROOF BEYOND A
REASONABLE DOUBT OF EACH AND EVERY ELEMENT OF THE CHARGED CRIME.,

IN RE WINSHIP, 397 U.S. 358 (1970 )

a. Supporting facts:

SEE ATTACHED

b. Supporting cases, rules, or other authority:

SEE ATTACHED

GROUND TWO

REASONABLE DOUBT ELEMENTS OF CHARGE

Petitioner's conviction was based on less than proof beyond
A reasonable doubt of each and every element of the charged crime.

IN RE WINSHIP, 397 U.S. 368 (1970)

a. SUPPORTING FACTS:

Petitioner asserts that from that point on at Preliminary Hearing,
the charged crime of Hit & Run had no sufficient components,
lacked the required constituent parts of the crime, therefore
less than proof beyond a reasonable doubt of each and every
element of Hit & Run....

Preliminary Judge _quoted ' '' he ran between 200 and 300 yards
from his vehicle", " I think this is a significant distance "
in refering to petitioner fleeing or "attempting to flee"
the Judge further states " if it was 15, 20 feet, I don't know
that it would be a hit and run,." EXHIBIT A-1 Ph.H ¿.205

Preliminary Judge totally disregarded the facts or testimony
of the two eye witnesses who were first on the scene, chose to
pluck CHPs impractical testimony over Pablo Sanchez and Joeseph
Rickner, whom both testified contrary to CHP's testimony.
Which was false and unsupported. EXHIBIT A_A-1 & A-2

1. Both Pablo Sanchez and Joseph Rickner indicated proximates
of petitioners where-abouts on the scene where 50 feet, and less.

2. The courts acceptance of 200-300 yards is that of
technically impracticality, for numerous reasons.

3. Both Pablo Sanchez and Joseph Rickner stated and claimed
petitioner was in eye-sight. Reasonable to conclude Eye-Sight

GROUND # 2 ATTACHMENT 1 OF 4

1 | is observable. A_A-1

2 |     4. 200-300 yards is not eye-sight specifically on a dark
3 | deserted road , no road light and amongst vinyards _A-2

4
5 |     5. Both Pablo Sanchez and Joseph Rickner in essence stated
6 | petitioner appeared merely confused, "pacing within the canvas
7 | area and within eye-sight of both vehicles, the Honda and the
8 | Oldsmobile." A_A·1

9 |     6. Neither of Pablo Sanchez or Jeseph Rickner state running
10 | back and forth of this 200-300 yard distance nor walking of
11 | this distance.

12
13 |     7. Basically the eye-witness assesment was petitioner went
14 | to the side of the road as had everyone else and was seen pacing
15 | between the Honda and Oldsmobile, so going towards the Oldsmobile
16 | within 5, 10, 15 feet and back towards the Honda using a phone
17 | to call what Joseph Rickner assumed was the police,.. A_A2

18 |     8. Pablo Sanchez nor Joseph Rickner stated a call was for
19 | fleeing.

20
21 |     9. There was ample time for petitioner to flee the scene
22 | Petitioners family lived at close proximitys, Armando Serratos
23 | petitioners close cousin lived at the corner of West lane and
24 | Morada Lane, approx 3.8 miles from scene, further to add Israel
25 | Rodriguez petitioners nephew and house petitoner left lived at
26 | approx 2.5- 3 miles from Armstrong Road. And to also add and
27 | include petitioners brother in law Mario Loya lived literally
28 | within a mile of Armstrong Rd and West Lane. (Stephani Loya is
Petitioners commonlaw wife).(Mr. Loya & Mr. Rodriguez lived -

North of Armstrong Rd, Mr. Armando Serratos south of Armstrong Rd)
EXHIBIT A-2

10. Israel Rodriquez showed up to the scene with his family
wife and children, and were not there to aid petitioner in a
flee attempt that was a prejudicial assumption by the people,
as the Rodriguez family are law abiding middle class American
Citizens.

11. To further solidify the argument. Pablo Sanchez at
Preliminary states that he was about 100 feet   away from
the intersection of west lane and Armstrong when he saw sparks
he could not visually see one of the vehicles"which it is reasonable
to conclude are larger than a man of 5'10 185 pounds in stature.

12. That is reasonable to conclude then-it is impractical
that at night on a dark road officers statement that petitioner
was 200-300 yards 2 to 3"football fields", is false testimony.

A Hit and Run did not occur   based on the facts nephew showed
up and petitioner was still there as witnesses testified there
was atleast 15 to 20 minutes  in which petitioner was seen pacing
back and forth.  All witnesses claimed petitioner was in eye-
sight at all times. (A-1)

13. Petitioner asserts there is no substantial evidence to
support a Hit & Run and respectfully request the court vacate
the conviction, Petitioner also asserts the Hit & Run requires
a reversal due to its prejudicial effects, inflaming the Jurys
passions.

GROUND #2 ATTACHMENT 3 OF 4

GROUND TWO

b. SUPPORTING CASES

The prosecutor knowingly used perjured testimony to obtain a conviction, the prosecution knew or should have known the testimony was false, and prejudice resulted.
Napue V. Illinois, 360 U.S 264 (1959)

Petitioners conviction was based on evidence known to be false ...   Miller v. Pate, 386 1 (1967)

Petitioners conviction was obtained as the result of evidence that is insufficient to persuade a properly instructed, reas-onble jury of his guilt beyond a reasonable doubt..
Jackson v. Virginia, 443 U.S.307 (1979)

Material and prejudicial "testimonial" evidence was introduced against Petitioner without an opportunity for cross examination

Crawford v. Wah.  541 U.S 36 (2004)

Davis v. Wash. 126 S. Ct 2266 (2006)

Testimony of petitoner using phone, petitioners  nephew Israel Rodriguez showing up from a called phone call, the alledged distance ... denied petitioner the right to confrontation in trial of Joseph Rickner, who testified to his phone used in preliminary, to distances contrary to CHP...and to seeing petitioners Nephew Israel Rodriguez...

Pointer v Texas, 380 U.S 400 (1965)

GROUND #2 ATTACHMENT 4 OF 4

MC–275

7. **Ground 2 or Ground** ___3___ *(if applicable):*

> PETITIONER's COUNSEL WAS INEFFECTIVE IN FAILING TO CONDUCT A REASONABLE
> PRE-TRIAL INVESTIGATION...FURTHER THE I.A.C WAS THROUGHOUT THE CASE IN
> VIOLATION OF THE U.S. & STATE CONSTITUTION 6th AMENDMENT ..SPECIFICALLY
> FAILING TO HAVE MS. LITTLES CELLULAR PHONE FORENSICALLY EXAMINED AS IT
> CONTAINED EXCULPATORY EVIDENCE...
>
> WIGGINS v. SMITH, 539 U.S.510 (2003)

a. **Supporting facts:**

SEE ATTACHED

b. **Supporting cases, rules, or other authority:**

SEE ATTACHED

**PETITION FOR WRIT OF HABEAS CORPUS**

## GROUND THREE

### INEFFECTIVE ASSISTANCE OF COUNSEL
### FAILURE TO INVESTIGATE

Petitioner's counsel was ineffective in failing to conduct a reasonable pre-trial investigation...further the I.A.C was throughout the case in violation of the U.S. & State constitution 6th amendment Specifically failing to have Ms.Littles cellular phone forensically examined as it contained EXCULPATORY EVIDENCE.

WIGGINS V. SMITH, 539 U.S. 510 (2003)

a. SUPPORTING FACTS:

On January 31, 2012 Mr.Schultz petitioners trial attorney made a motion to continue the jury trial based upon him being unprepared ( I RT 2-3).

Schultz explained to the court that he had learned approximately

days prior that the AT&T records for Ms. Little contained exculpatory information

The records previously subpoenaed by prosecutor were for the wrong year 6/12/2011 correct year was 2010.

1. When the new records were finally provided they indicated Ms. Littles cell phone and internet was in fact in use at the time of the accident. (I RT 2-3)

Mr. Schultz requested an opportunity to investigate these records In addition Schultz indicated that he needed to have Ms. Little's cell phone produced to court or law enforcement custody so it could be examined ( I RT 3) .

2. Finally, Mr.Schultz explained that the phone was removed from s. Littles vehicle shortly after the accident, by Ms. Littles uncle who so happened to be a San Joaquin County Deputy Sheriff. who along with the phone removed some other    items(EXHIBIT F)

GROUND #3 ATTACHMENT 1 OF 5

1  Mr. Schultz indicated the cellular needed to be "investigated"

2  (I RT 3-4).

3  The court denied the motion, stating that there was insufficient

4  "offer of proof" that there would be any potentially exculpatory

5  evidence based on the defense theory of the case. (I RT-19)

6  This perverted ruling by the court forced Mr. Schultz to proceed

7  to trial, arguing in limine motions, selecting jury, ineffectively

8  relying on petitioners sister Brissa Garibay[2] produce Juror

9  instructions (Brissa Garibay had no legal training or legal

10  knowledge what-so-ever and was a Dental Assistant by trade).

11  Mr. Schultz had also recently filed a Destruction of evidence

12  motion ineffectively and incorrectly.

13

14      3. What occurred at trial was a shoddy presentation of

15  evidence that could have been very compelling, specifically

16  because the theory of the defense was that petitioner was

17  traveling in the Number One lane when Ms. Little's vehicle veered

18  slightly into petitioners lane, which caused the collision,

19  which resulted in the fatal accident,.(EXBT 6)

20      4. The AT&T cell phone records showed that Ms. Little's

21  phone showed a text message at 11:42 P.M. and a data usage

22  similar to FACEBOOK at 11:51 P.M (IV RT 1026-1028). This duration

23  was of 9 minutes and when the accident occured. Consequently any

24  actions by Ms. Little that directly precipitated the accident are

25  relevant specifically when in violation of V.C's. Thereby

26  potentially exculpatory. ( EXBT 6)

27  However without having the phone evaluated by a forensic examiner

28  the defense was unable to solidify the testimony which allowed

GROUND #3 ATTACHMENT 2 OF 5

1   the district deputy attorney whom with held this incriminating

2   evidence for over a year and a half to minimize this testimony

3   manipulate and shift the burden.

4       5. At the motion for a new trial, Stephanie Loya and Rossio

5   Garibay testified that during trial Mr. Schultz "ACTUALLY" tasked

6   them with going to an AT&T store to find an "expert" to "translate"

7   the records. (VI RT 1656-1657).

8   This is confirmed by the argument presented at the motion to

9   continue by Mr. Schultz where he explains to the court that the

10  family went to several AT&T stores to find a technician to assist

11  with these records. (I RT-12)

12

13      6. The record clearly demonstrates that Mr. Schultz directed

14  petitioners family to speak to AT&T and provided blank subpoenas

15  to petitioners family so that "they could do the investigation"

16  instead of a licensed investigator or Mr. Schultz himself.

17  Ms. Garibay ultimately decided petitioner needed an expert for

18  trial to explain the records as no one in petitioners family

19  were forensic experts . Ms. Garibay and some of petitioners

20  family were meeting with Mr.Schultz when they had noticed that

21  Mr.Schultz had obtained the AT&T records, Ms. Garibay upon review

22  realized the date on the records were incorrect were for the

23  wrong year (VI RT 1656-1657)  When this was discussed with Schultz

24  he ignorantly indicated he did not need an expert, he simply needed

25  AT&T to explain the records (VI RT 1658-1659). Ms. Garibay found

26  and retained Mr. Beagle, an expert.

27

28      7. Petitioners assertion is Mr. Schultz failure to bring in
    an investigator at that point, or request the records himself, .

EXHIBIT #3 ATTACHMENT 3 OF 5

1  was both unprofessional as well as inexplicable. To consciously
2  refuse to have the mobile phone, which belonged to Ms.Little,
3  was proven it was factually in   "full" usage. To not
4  have it examined for specific social media, content, and to
5  adhere to prosecutors and Judges reasoning that no such results
6  could have determined who was actually on the phone at the time
7  of the accident, was beyond incompetent deficient performance and
8  prejudice.

   8. A forensic examination of the phone could have shown
9  specific details, such as a social media site where someone had
10  sent a specidic message, or perhaps a text message or a message
11  via "Messenger", or other social media sites. Such information
12  might reveal specifically who was on the phone and who wasn't on
13  the phone. If Ms. Little had sent a message to someone in which
14  she clearly identified herself as being the sending party, then
15  it would have been reasonably established that it was she who was
16  on the phone at the time of the accident and not a passenger.
17  As such, Mr. Schultz would have been armed with crucial evidence
18  that would have negated the elements of murder. ExorCe
19

20  Further-more petitioner respectfully request that the court
21  issue an order to continue preserving the phone, and that an
22  expert be appointed to review the forensic footprint of the
23  phone, Petitioner further demands an evidentiary hearing to have
24  former counsels, explain why crucial investigation were refused.
25     9. The right to effective assistance of counsel includes an
26  obligation to investigate "Carefully" all defenses of fact and law
27  It is obvious that Mr. Schultz had failed to investigate a crucial
28  defense in this case; That of Causation, then the next question

1  becomes, is there a reasonable probability that the result would
2  have been different, the answer is an Unmitigated YES, .
3  If Ms. Little had in fact drifted/veered into petitioners lane
4  which is what caused the accident, rather than petitioner
5  speeding and colliding into Ms. Littles vehicle as the prosecutor
6  contended, it would have in fact resulted in a finding of not
7  guilty in counts one and two as such the petitioners respectfully
8  request habeas Relief to vacate the convictions remand to trial
9  courts as reasonable probability exist petitioner would have
10 received a different result but for the errors. Further more, Juror
11 foreman presented numerous question at deliberation, hence had
12 jury been informed of Cell Phone Evidence, High probability exist
13 the scale would have been tipped based on those question.....

b. SUPPORTING CASES

15 Petitioner's counsel was ineffective in failing to conduct
   a reasonable pre-trial investigation... of the Cell Phone
16 evidence... to obtain an expert in distracted driving, and
   or supporting documentation,..or investigate CHP protocols on
17 distracted driving or cell phone usage... policies in reporting
   ..
18                     Wiggins v. Smith 539 U.S. 510 (2003)
19 Petitioners trial counsel was inneffective because the performance
   was defient and the deficiency was prejudicial to the outcome.
20
                       Strickland v. Washington 466 U.S. 668 (1984)
21
22 COA unpublishedd opinion state Trial counsel caught the phone
   record error one month prior to the motion to continue on
23 Jan 31, 2012 but " failed" to inform the people of the incorrect
24 phone records the people provided the defense..shifting the
25 blame on trial counsel hence admiting counsel committed err...
26 COA further states Trial counsel also failed to renew motion to
27 continue these are  two concurrent of significance  that surpass
28 the threshold of prejudice(Hurd v. Terhune, 619 F.3d (9th Cir2010)

ONGOING #3 ATTACHMENT 5 OF 5

7.  **Ground 2 or Ground** __4__   *(if applicable):*

PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE BECAUSE THE LAWYER PERFORMED
DEFICIENTLY AND THE DEFICIENCY WAS PREJUDICIAL TO THE OUTCOME..

STRICKLAND v. WASHINGTON,  466 U.S.668 (1984)

SPECIFICALLY TRIAL COUNSELS FAILURE TO ARGUE & FILE A TIMELY MOTION OF
INEFFECTIVE ASSISTANCE OF COUNSEL OF INITIAL ARRAIGNMENT LAWYER FOR
CONCURRING TO RELEASE & DESTROY THE 1988 OLDSMOBILE IN A TRAFFIC COLLISION

WHERE HOMICIDE IS ALLEGED   & THE VEHICLE IS EXCULPATORY IN NATURE.

a.  Supporting facts:

SEE ATTACHED

b.  Supporting cases, rules, or other authority:

SEE ATTACHED

INEFFECTIVE ASSISTANCE OF COUNSEL'S

Petitioner's trial counsel was ineffective because the lawyer performed deficiently and the deficiency was prejudicial to the outcome...   STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984) Specifically trial counsels failure to argue and file a timely motion of ineffective assistance of counsel of initial arraignment lawyer for concurring and agreeing to release and destroy a 1988 Oldsmobile vehicle in a traffic collision where homicide is alledged and the vehicle is exculpatory in nature.

a. SUPPORTING FACTS;

During limine motions Mr.Schultz petitioner's trial counsel filed and attempted to litigate a Trombetta motion based upon the release of Ms. Littles 1988 Oldsmobile vehicle (I RT 70-186). For inexplicable reasons petitioner's initial arraignment counsel Mr.Pacheco (II RT 352) concurred with the prosecution to destroy Ms.Littles vehicle August 6, 2010 unbeknownst to the petitioner. (prior to preliminary March 28, 2011 and trial February 2012.) Evidence that would have exonerated petitioner of second degree murder.   (II RT 356).

1. Mr.Schultz failed to address this issue in a timely manner hence atleast minimize the extraordinary adverse affect it rendered the defense.

2.   Mr. Pacheco during the Trombetta motion testified he infact signed the questionable chickened scratch note paper that contained verbage regarding releasing the vehicle. EXHIBIT I II RT.357

3. Mr. Schultz rather than filing a timely motion of Gross Ineffective Assistance of Counsel regarding the inexplicable actions of Mr. Pacheco filed a Trombetta motion, the filing of Trombetta motion was nonsensical at that moment and at that, extraordinarily late. (I RT. TD 186)

4. The motion was denied as having been waived by Mr. Pachecos concurrence. (II RT 357)

5. Though the prosecution admitted that they sought out and Prosecutor personally approached Mr. Pacheco to solicit permission to release the vehicle early in the case. Mr. Schultz had little to no investigation as to the issue in its entirety or grasp the extent as to what the release and destruction of vehicle entailed.

6. The prosecution did temporarily preserve the vehicle, and still chose to approach and request from the Arraignment counsel to release vehicle as M.A.I.T. were still not concluded and their analysis still going. (EXHIBIT D)

7. A motion based upon Mr. Pachecos Ineffective assistance of counsel would have had merit, clearly the release of Ms. Littles vehicle was a tremendous loss to the defense and specifically due to the fact M.A.I.T. conceded to errors, and as testified in preliminary unable to determine initial impact, combined with the fact CHP had to call M.A.I.T. because they also after numerous attempts were unable to conclude to certain aspects, CHP also noted different lane assessment, so basically very attackable M.A.I.T., the vehicle destroyed inhibited petitioners ability to

1    fully attack the MAIT teams analysis and to present a defense
2    as to what actually did occur.

3       8. Accident Reconstructionist expert Dr.Russell Darnell
4    testified that part of the dynamics  were missing for the
5    Oldsmobile rotational sequence, and he did not have the vehicle
6    to measure.(IV RT 999).
7

8       9. Dr.Russell Darnell also  testified his analysis concluded
9    that the Oldsmobile was traveling 35 to 38 mph when it hit the
10   pole. (IV RT 1010.)

11   10. Dr.Darnell analysis were based on a point of impact
12   occuring in the number 1 lane. (IV RT 1011.) and as CHP first
13   initially had when they disclosed on their reports and to the
14   coroners petitioner was traveling in the number 1 lane.

15   MAIT.changed this analysis and that is one of the main reasons
16   the vehicle was critical in its totality,.
17

18   11. Mait failed to include an anlysis of cell phone usage initially
19   because they assumed no usage. this was relevant and further
20   enhanced the importance of the vehicle since MAIT. then excluded
21   distracted driving  veering and would explain why CHP had
22   petitioner driving in the number one lane, bottom line the
23   vehicle was critical and common sense not to destroy it when so
24   many lingering questions and factors existed.

25   12. Accident Reconstructionist Dr.Darnell also testified at
26   the motion for a new trial. He testified that he was first
27   contacted by petitioners family about case approximately 9 months
28   prior to trial. (VI RT 1683) after the initial contact he did not

GROUND # 4  ATTACHMENT 3 OF 7

1  hear from anyone about the case for approximately 6-7 months.
2  (VI RT 1684) . He was then re-contacted by petitioners family
3  who then asked him to contact Mr.Schultz, in which he did. (IV RT
4  1685) . From Dr.Darnells converstations with Mr.Schultz it became
5  apparent Mr.Schultz did not understand what an accident reconstr-
6  uctionist would do. (VII RT 1685-1686) .

7  13. Dr.Darnell informed Mr.Schultz that he would need to
8  see the accident site and btoh vehicles. Spoke with Mr.Schultz
9  several times about the need to see BOTH vehicles. (VI RT 1686).
10

11  14. During the conversations Mr.Schultz stated repeatedly to
12  Accident Reconstructionist Dr.Darnell  that he was working on
13  getting access to the Oldsmobile and would get back to Dr.Darnell.

14  15. It was not  until right before the trial that Schultz told
15  Dr.Darnell the vehicle was not available to review. (VI RT 1686-
16  1687).

17  16. Darnell explained that visiting the scene and viewing
18  both vehicles was crucial to (1) evaluate the M.A.I.T team report
19  and (2)  conduct a reconstruction. (VI RT 1687-1688) .
20

21  17. The trial court prevented extensive testimony about why
22  the release of the Oldsmobile was so significant to the case.
·23  (IV RT 1691-1692) .

24  18. Dr.Darnell also testified that in his conversations, with
25  Mr.Schultz he did not understand the evidence regarding the accid-
26  ent. In particular, Schultz seemed to obsess about non-issues.
27  For example, Darnell explained repeatedly to Schultz that an Item
28  the believed was a gouge mark was actually road kill.(VI RT1695)

GROUND #4 ATTACHENT  A OF 7

1    19. Despite numerous requests, Mr.Schultz failed to arrange

2    for Dr.Darnell to meet with petitioner. The only opportunity

3    to speak with petitioner was briefly in court at the counsel

4    table. (VI RT 1698-1699). Petitioner explained to Dr.Darnell

5    that he was traveling in the number one lane, saw no taillights

6    on Ms.Littles 1988 Oldsmobile, and that he did not see her until

7    the last minute. (VI RT 1698-1699).

8    20. Petitioner testified that when Mr.Pacheco was representing

9    him, he informed him that he wanted an accident reconstructionist

10   to review the evidence. ( VI RT 1709).

11

12   21. Petitioner submits exhibit that clearly shows Mr.Pacheco

13   billing for an accident reconstructionist. The date is also

14   of importance as it demonstrates it was months after Mr.Pacheco

15   alledgedly released the vehicle, and it also demonstrates that

16   MAIT REPORT was just forwarded..... EXHIBIT M_L

17

18   22. Thus petitioner was never informed of the release of the

19   vehicle by Mr.Pacheco. (IV RT 1709) First learning about the

20   release through petitioner's family shortly before trial.

     (VI RT 1710-1711).

21

22   Under Strickland the court must ask was it error for trial

23   counsel to file a baseless motion on the wrong law, regarding an

24   issue that would have brought relief if argued & presented

25   correctly? The answer is obviously yes, as to the second question

26   is it reasonably probable that there would have been a different

27   outcome, but for counsels errors? The answer is yes to this as

28   well. If the proper motion was filed and the trial court determined

GROUND #4 ATTACHMENT 5 OF 7

1  Mr.Pacheco was ineffective assistance of counsel, then the remedy
2  would have been a dismissal of charges. As there was no other way
3  to cure the harm.

4
5  Deficient performance: Were counsels actions objectively unreason-
6  able ? Mr.Pachecos action's defied reason as there was no conceiv-
7  able tactical reason to have stipulate and agreed with the
8  prosecution to allow potentially exculpatory evidence to be
9  deliberately destroyed. Contrary to what the court of appeals
10  assume that Mr.Pacheco after reviewing reports or that the
11  EVIDENCE GATHERED BY MAIT, INCLUDING NUMEROUS PHOTOGRAPHS OF THE
12  OLDSMOBILE, WAS SUFFICIENT AND THAT AN ACTUAL INSPECTION WAS
13  UNNECESSARY.ThIs is the point Mr.Pacheco did not have the M.A.I.T,
14  reports or M.A.I.T's "Gathered Evidence" The Report was finalized
15  6 MONTHS after the release, and as explained above Mr.Pacheco
16  was billing and stating to petitioner 6 months after he had
17  "signed a release" that he was going to hire an Accident -
18  Reconstructionist to view M.A.I.T Report...Thereby there could be
19  no·, satisfactory explanation. EXHIBIT L.M.Q_K
20
21  Mr.Pachecos actions almost appear deliberate to help the prose-
22  cution.

23  Prejudice:

24  But for counsels errors, the result of the proceeding would
25  have been different , this is an unmitigated yes, the vehicle
26  was in it self everything, the vehicle hit a pole, Ms. Little
27  was ejected, M.A.I.T. makes errors, no mechanical inspection and
28  a laundry list of hiccups.. including M.A.I.T. CHP failing to
    implement an analysis of the cell phone· usage . As later determined

1  to be in full usage. This was   critical and demonstrated the

2  lack of a proper accident reconstruction investigation, to

3  not factor or weigh in on such evidence creates a hole in

4  their analysis. And breaks CHP/M.A.I.T mandatory procedures..

5  For the reason specified and set forth petitioner respectfully

6  request appropriate habeas relief, be granted , set aside & vacate.
   conviction.                    b. SUPPORTING CASES

7

8  U.S v.Cronic, 466 U.S. 648 (1984)

9
   Wiggins v. Smith, 539 U.S. 510 (2003)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MC–275

7. Ground 2 or Ground ___5___ *(if applicable):*

PETITIONER'S TRIAL COUNSEL SO UTTERLY FAILED TO DEFEND AGAINST THE
CHARGES THAT THE TRIAL WAS THE FUNCTIONAL EQUIVALENT OF A GUILTY PLEA,
U.S. v.CRONIC 466 U.S.648 (1984)
SPECIFICALLY & INCLUSIVE IN CUMULATION THE GROSS INCOMPETENCE DISPLAYED
IN THE HANDLING OF THE DESTRUCTION OF EXCULPATORY EVIDENCE & FAILURE
TO ADEQUATELY INVESTIGATE & PREPARE.
                    GROUNDS THREE AND FOUR INTEGRATED.

a. Supporting facts:

SEE ATTACHED

b. Supporting cases, rules, or other authority:

SEE ATTACHED.

INEFFECTIVE ASSISTANCE OF COUNSEL CRONIC STANDARD

Petitioner's counsel so utterly failed to defend against the charges that the trial was the functional equivalent of a guilty plea, rendering counsel's representation presumptively inadequate.

U.S. V. CRONIC 466 U.S. 648 (1984)
Specifically and inclusive in cumulation  the gross incompetence displayed in the handling of the distruction of exculpatory evidence and failure to adequately investigate & prepare.
Grounds Three & Four Integrated.

a. SUPPORTING FACTS:

Petitioners assertion is that throughout the case Mr.Schultz was grossly inadequate and incompetent.

Mr. Schultz was from the Los Angeles area (Encino) had taken petitioners case and worked out of his venicle, that did not include a lap top nor access to a computer, nor a modern cell phone. The belongings of Mr. Schultz consisted of a cite book out-dated and likely older than the petitioner.
Mr. Schultz would have to bother the court Judge for his material
Mr.Schultz circumstance was not short of the Lincoln Lawyer.

1. At preliminary hearings and throughout Mr.Schultz would request petitioner take notes for him and would even request scratch paper from petitioner. EXHIBIT B

2. Petitioners continuously  pushed Mr. Schultz to obtain an affidavit or testimony from Petitioners 7/20/2006 counsel who represented petitioner in the D.U.I case where the Watson Murder Admonishment was alleged . The counsel in that proceeding

GROUND #5 ATTACHMENT 1 OF 5

1  Mr. Jeffrey Silva, had spoken to petitioner's family when
2  petitioner was repremanded off bail and charges enhanced to the
3  second degree murder Watson, Mr. Silva had stated to petitioner's
4  family that petitioner was not admonished back in 2006 that the
5  court house did not make practice to that, and went as far as to
6  direct family to obtain the transcript proceeding because the
7  D.U.I was held in felony court,..

8  Petitioner continuously direct Mr. Schultz to address Mr.Silva
9  Mr.Schultz response was that Mr. Silva stated he did not recall
10  whether petitioner was admonished,. Mr.Schultz was directed to get
11  that put on paper, and he failed to do so, petitioner claimed
12  that Mr.Silva could resolve the issue of the admonishment because
13  Mr.Silva was well aware that it did not occur or that the
14  colloquy was deficient.
15  Mr.Schultz failure to investigate and assume that he would be
16  able to dismiss the second degree watson was carelessness and
17  deficient performance to zealous represent petitioner.EXHIBIT B P
18  Mr. Schultz did not want to meet with petitioner nor obtain
19  experts nor investigators nor wanted to meet with them.
20
21  Petitioner informed the trial courts of Mr.Schultz deficiencies
22  via ex-parte which was ignored and was told he could not fire
23  Mr.Schultz.   ( EXHIBIT 1720-1721 )

24  Petitioner because of the panic and denial that he was unable
25  to replace Mr.Schultz attempted to bring on Julius Engle in
26  trial, to make up for the ineffectiveness of Mr.Schultz ,
27  however the court did not allow Julius Engle to perform any
28  cross examination nor did they accept him or acknowledge Mr.Engle

as counsel, Mr.Schultz also ignored Mr.Engle and would not
engage in defense strategy or any communication that discussed
the perimeters of the case. Was not allowed in Chambers basically
just took pp a seat space.

Mr.Schultz ineffectiveness and total character of incompetency
is demonstrated by the chain of e-mails with the prosecutor,
it is evident that in regards to the Vehicles he clearly was not
up to par with his representation nor did he know the actual
status of the vehicle in question. EXBT T

 In another e-mail late into the proceeding a couple months
from commencing trial Mr.Schultz is referencing missing
photos and not having the MAII.CD that contained the pictures.
combined with the fact there was no car to inspect no inspection
of the scene or understanding the layout, ... EXBT T

Mr.Schultz is addressing the proesutor about not being ready
for trial, and acknowledges he is worried about his I.A.C.!!!
or having case reversed on I.A.C.. this is if not beyond self
evident about his over-all conduct the functional equivalent
of a guilty plea at this point... EXBT T

Mr.Schultz then in such desperation and almost in what appears
to be contrary defense conduct informs the prosecutor his
intentions of eliciting testimony From petitioners wife about
the"B.B.Q" and the 2006 plea refering to the Murder Watson
admonishment. PETITIONERS WIFE REPEATEDLY INFORMED MR. SHULTZ THAT
NO ADMONISHMENT OCCURED.
Petitioner's family who by that point had grown beyond disgusted
by Mr.Schultz conduct and representation and believed that

GROUND #5 ATTACHMENT 3 OF 5

1  Mr.Schultz was displaying a sell-out representation or he was
2  just beyond grossly incompetent.
3  With so many opportunities to clearly dismantel the case,
4  and yet error after error was occuring, with·regards to not
5  contacting the 2006 prior Counsel , to clarify the Admonishment,
6  the destruction of the vehicle, the cell phone, and his care-
7  lessness of using the family to print out instruction or have
8  them obtain juror instruction, motions.
9  Mr.Schultz conduct was bizzare specifically for the fact that
10 he abandoned completely the petitioner the day before Jury went
11 to deliberate, did not appear nor was Mr.Schultz available for
12 Juror questions, Stipulating to discharge only african Juror.
13 Mr.Schultz abandonement rendered petitioner without council
14 For these reasons and inclusive to grounds 3 and 4 petitioner
15 request court vacate conviction and remand to the trial courts.
16
17
18                    b.UNDERLINE{SUPPORTING CASES}

19 Where a criminal defendant has with legitmate reason, completely
20 lost trust in his attorney, and the trial court fefuses to remove
21 the attorney, the defendant is constructively denied counsel"
22 Daniels v. Woodford, 428 F3d 1181, 1198 (9th Cir. 2005) (citing
23 United States v. Adelzo-Gonzalez, 268 F.3d 772, 779 (9th Cir.
24 2001)) "A defendant need not show prejudice when the breakdown
25 of a relationship between attorney and client from irreconcilable
26 differences results in the complete denial of counsel."
27 United States v. Moore, 159 F.3d 1154, 1158 (9th Cir.1998) see
28 also Perry v. Leeke, 488 U.S 272, 280 (1989)

GROUND #5 ATTACHMENT 4 OF 5

1  ("[A]ctual or constuctive denial of the assistance of counsel

2  altogether is not subject to prejudice analysis" (Strickland v.

3  Washington, 466 U.S. 668, 692 (1984))).

4  Petitioner was wrongfully denied his right to retained counsel

5  of his choice, and does not need to show that his first-choice

6  counsel would have obtained a better result.

7  U.S. v.Gonzalez-Lopez, 126 S.Ct. 2557 (2006)

8  Petitioner's counsel was ineffective in failing to conduct a

9  reasonable pre-trial investigation. Wiggins v. Smith,539 U.S.510

10  (2003)  Specifically Cellular and Ms.Littles Vehicle..

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROUND #5  ATTACHMENT 5 OF 5

7.  **Ground 2 or Ground** _6_ _(if applicable):_

PETITIONER WAS DENIED A FAIR TRIAL WHEN THE COURT IMPROPERLY RESTRICTED
THE RIGHT TO PRESENT EVIDENCE OF SIGNIFICANT PROBATIVE VALUE

WASHINGTON v. TEXAS 388 U.S.14 (1967)

a.  Supporting facts:

SEE ATTACHED

b.  Supporting cases, rules, or other authority:

SEE ATTACHED

DEFENSE EVIDENCE RESTRICTED

Petitioner was denied a fair trial when the court improperly restricted the right to present evidence of significant probative value.....        WASHINGTON v. TEXAS 388 U.S. 14 (1967)


a. SUPPORTING FACTS:


The defense received new AT&T records that showed that the phone that belonged to Ms.Little was on and engaged in Data usage activity similar to facebook a social network site Ms.Little typically used and constantly utilized when communicating with Mr.David Heirida.  ( Exhibit ∪)

This information could have been used by petitioner to support his defense that in fact the collision was not caused by him, but by Ms.Little who was driving while distracted via cell phone usage

This was information that defense counsel had only recieved within a few days of the hearing for a continuance, the trial court arbitrarly and capriciously denied  the motion because defense counsel failed to articulate that the evidence would be potentially exculpatory.

1. Petitioner asserts that he was restricted and denied to fully investigate, prepare and present evidence of significant probative value and exculpatory in nature.

This ruling was an abuse of discretion and denied petitioner due process and a fair trial as it was arbitrary and capricious, and judicially ill to shift burden when the owner and operator of the 1988 Oldsmobile was also owner and operator of her cell phone.

GROUND #6 ATTACHMENT 1 OF 8

It is obvious from the record that defense counsel  had only
recently received this explosive information and was frantically
and ineffectively trying to investigate the new records to demons-
trate to the court their value in its entirety, The records clear-
ly supported the defense.

2. specifically that of which the people had hidden throughout
the course of the case and who barely and only provided a couple
of weeks shortly from full commencement of trial.

3. It was absurd to shift burden on petitioner to prove it
was Ms. Little who was using her cell phone when accident occured
and not the passengers whom had their own phones. If Ms.Little
operated the 1988 Oldsmobile that belonged to Ms.Little , and
the passengers were not the operators of the vehicle, Ms.Little
than operated the Cell Phone that was in use and belonged to her.

4. To hold the petitioner to a standard of proof for the
peoples/prosecutions gross negligence in non disclosure *Brady v.
Maryland) when the people requested the phone records May 13 2011
over 11 months from charges presented  and then by "error" produce
inaccurate AT&T records a couple of weeks prior to trial is
beyond comprehension that until just prior to trial this is
not only surfacing, but the incorrect records are discovered
by a non legal expert.. this egregious act meet's the threshold of
criminal   neglegence by state officials. EXBT 5

5. The prosecution holds information for over 7 months aware
or not aware of the incorrect date is not the issue the issue
is its produced right prior to trial... and the outcome was an

1   adverse effect upon the petitioner. (RULE 5-110 SPECIAL RESPONSIBILITIES
    OF A PROSECUTOR.)& RULE 5-220

2

3   6. For Judge in essence to punish defense by denying petioner

4   the motion to continue who court knew what occured and that

    petitioner was then needing to obtain the whole evidence
5
    surrounding such explosive info. In fact deprived petitioner
6
    of due process and fair trial. (Specifically because Ms.Littles
7
    Uncle a San Joaquin County Sheriff Deputy was who removed phone.) EX 6
8
9   7. Petitioners trial counsel requested continuance Jan 31 2012

10  a few days from a sworn in jury, and in a case not common in

    superior Stockton Court, and of complexity due to the recent
11
    filing of the destruction of evidence, required a common sense
12
    ruling.
13

14

15  8. The prosecutors verbal game playing that Ms.Littles cell

16  phone was in fact in use at the EXACT TIME OF THE COLLISION ..BUT

    that petitioner could not reveal or cant prove the passengers did
17
    not use the phone for Ms.Little., is beyond reason, &(LEGAL PERVERTION
18
    Then the people assert on court of appeal respondant brief that
19
    petitioner could not have shown that distracted driving by Ms.Little
20
    (In violation of V.C 23123) as a result of her using cell phone
21
    proximately caused the collision.
22

23

24  9. That was and is the point in large part requesting a

25  continuance, seeking to gather expert testimony in that regard &

    demonstrating  that in fact studies support and indicate that
26
    the collison meets the elements almost to perfection of distracted
27
    driving , as distracted drivers do merge, veer into lanes,
28
    and cause accidents  the information would reveal who was or was

not on the phone. If Ms. Little had sent a message to someone in which she clearly identified herself as being the sending party then it would have been reasonably established that it was Ms. Little on her phone.

10. Had Jury heard this evidence then it would be contrary to what the people assert to court of appeals that jury "necessarly" determined petitioners driving was a "substantial factor in causing the collision. EXET G

11. The lane discrepencies to go with the distrected driving would have changed the outcome of the trial, or Jurors "Substantial factor. EXT N

12. The cell phone is not only an object in singularity it is within itself a pandoras box as the expert testified phone could reveal personal identifying information and that fact alone is "potentially exculpatory" our phones today carry within them our day to day lives.

13/ As cell phone expert Mr.Beagle testified would help correlate or confirm that it was a particular person.

14. There hass been a ban on Cell Phone usage since 2009 that CHP and Courts are familiar with and cases prosecuted throughout California.

15. In this particular case there was at least evidence that demonstrated to the courts of dangerous duration of cell-phone usage of (9) minutes (11:42 TXT Message) this means eyes off the road how studies suggest. ( 11:51 Social Media) this means

1  distracted inattentive mind, even per se peoples wiggle  argument

2  that . passengers could have used Ms.Littles cell phone for her

3  this is equally as valuable because studies suggest distracted

4  driving extends to "PASSENGERS USING PHONE, TALKING ETC.." EX37 C,

5  16. Because this does not prove Ms.Littles mind was not inatte

6  ntive as she could have relayed text info  which is still a

7  form of communication and MULTITASKING.  By such this is

8  and meets the distracted driving elements. EXBT G,,

9

10  In 2009 Virgina Tech Transportation Institute released a study

11  and found that collision risk were 23 times higher  when drivers

12  test. The research also measured the time drivers stopped looking

13  at the road and used their eyes to send/receive a text. It found

14  that drivers generally spend five seconds looking at their device

15  before or near a crash, a period long enough for a vehicle to

16  travel more than 100 yards at typical highway speeds. Liberty

17  Mūtual research institute for safety and students against destruc

18  tive decisions conducted a survey that indicated 37% of youth

19  state text messaging is extremely distracting 19% stated having

20  friends in the car was distracting. EXBT

21  The studies today solidify this information.

22  17. The court exceeded the bounds of reason and acted in an

23  arbitrary capricious and patently absurd manner in denying petiti-

24  oners motion to continue, comon sense due process was non existant

25  in the courts denial of a continueance ruling,. and fundamental

26  fairness requires a defendant be allowed to present such evidence.

27  18. Evidence that suffices to the threshold of "potentially"

28  exculpatory evidence.

1    The peolple/ unpublished COA opinion entangle the argument
2    and attempt to justify that defense had opportunity later to
3    re-submit a more sufficient offer of proof, the issue with that
4    is that common sense the phone records were sufficient based on
5    Ms. Little was in fact without a doubt the owner of the phone
6    in use.. Secondly denying defense the continuance handicapped
7    the defense, assuming that another request was made to continue
8    a week later when Jurors were SWORN in, is it reasonable that
9    an expert in one week have a full forensic analysis done, and
10   would the court when Jurors selected and everything that had
11   gone on be anymore reasonable in granting a continuance when
12   every motion was denied , juror instructions, bottom line, the
13   court acted in an arbitrary and capricious manner, their intentions
14   were patently absurd. It felt more like nothing would have stopped
15   the courts they cared less about the exculpatory evidence and
16   prefered to perform an experimental sham trial, and the rookie
17   court judge wanting more part of that then the prosecution them-s
18   elves it seemed.

19   20. It makes no sense to have a defendant charged and ultimately
20   convicted of a Homicide when the KNOWN fact exists that a CELL
21   PHONE BELONGING TO MS.LITTEE WAS IN USE & ENGAGED ON SOCIAL MEDIA
22   AT THE EXACT TIME THE COLLISION OCCURED.
·23

24   21. The fact that "in dispute are literally inches as to where
25   impact occured and who merged or veered into who?"

26   22. The fact CHP themselves had placed petitioner in the #1
27   lane as also defense reconstructionist concluded.

28   23. This is as any reasonable person would "or" should conclude

if not very exculpatory than at the very least "POTENTIALLY
or POSSIBLY EXCULPATORY" and a defendant should be afforded
the opportunity to predent evidence that would exonerate him,
in a manner that does not limit or handicapp him. Evidence that
at the very least mitigates and reduces culpability, significantly

24. In this day and age when distracted driving now supercedes
Drunk Drivers, and Speeding as the #1 factor of deadly crashes.,
The question from the court should have been "Was it possible
that Ms. Little (via distracted & unattentive driving ) veered
or slightly allowed her vehicle merge into the #1 lane as she
for either a couple seconds took her eyes off the road to glance
at her phone, or allowed mind blindness to occur by having her
focus on her"personal phone" communications via her passengers."?
Rather than for the courts to simply and capriously deny motion.

Where innocence may exist justice shoiuld not be denied.

25. For the reasons set forth above  petitioner respectfully
and impassionately request the appropriate Habeas Relief, set
aside and vacate the conviction, and to remand to the trial court
for an evidentiary hearing.


b.SUPPORTING

Petitioner was denied a meaningful opportunity to present a
complete defense.  In violation of the due process gauranteed by
the 14th Amendment... ( Holmes v. South Carolina 547 U.S. 319 2006)

Hand-icapping the defense by denying motion to continue on the

recently provided Cell phone evidence denied petitioner a

meaningful opportunity to present a complete defense,.

Restricting the right to present evidence of significant

probative value (Distracted Driving)  denied a fair trial.

Washington v . Texas 388 U.S. 14 (1967)

Judicial bias contributed to petitioners conviction, ..

Arizona v. Fulminante, 499 U.S. 279 (1991)

to prejudicially assume distracted driving did not possibly play

a significant factor/role in cause and to assume Ms.Little did not

use her own phone was bias...

7. Ground 2 or Ground ___7___ *(if applicable):*

PETITIONER'S CONVICTION RESULTED FROM STATE COURT ERRORS WHICH
TAKEN TOGETHER DENIED PETITIONER A FAIR TRIAL...

ESTELLE V. McGUIRE, 502 U.S 62 (1991)

a. Supporting facts:

SEE ATTACHED

b. Supporting cases, rules, or other authority:

SEE ATTACHED.

STATE ERRORS DENIED A FAIR TRIAL

Petitioners conviction resulted from state court errors which
taken together denied petitioner a fair trial.

ESTELLE v. McGUIRE, 502 U.S. 62

and in specifically violating Rule 43 answering (3) Juror questions

a. SUPPORTING FACTS:

Petitioner asserts this case is marred by multiple errors from
the onset & throughout. In-large part due to the tidal wave of
emotional distress causing judicial ill-equipped court and prosec-
ution to act rashly , without forethought driven by environmental
community and personal ("undue-influence").

Petitioner asserts that this type of case required diligent
protection of his constitutional and statutory rights. The state
negligently failed to provide this.

1. There was insufficient evidence of hit & run. The    court
erred in allowing perjured/misleading and impractical testimony
that petitioner was 300 yards, away from the incident, when
witness acounts at pre-lim were contrary and state within the
proximity of 50 feet within reason, 600-900 feet was impractical
2-3 football fields on a road that has a curvature renders the
claim of Hit & Run as insufficient based on no one stated walking
or running or seeing petitioner of this distance, and or the
200-300 yard is an inaccurate assessment.. This charge and Pablo
Sanchez scattered confused and insufficient testimony only served
to prejudice the petitioner and ultimately the outcome.EXBT A,A1,A2

2. Trial Court erred in minimizing trial counsels articulation
of establishing bad faith on the Trombetta Motion, in particular
because  court was made aware and informed that the prosecution/
prosecutor "approached the Arraignment Defense attorney Mr.Pacheco
to request releasing the vehicle basically solicited the release"
hence by such act complicating & intertwined a critical issue,
The trial court was aware that no formal request was sought by the
court regarding the release, no process and or done so unbeknownst
to the petitioner, and by such information the court should have
allowed further proceedings into an evidentiary hearing, and
not abruptly deny motion, regardless if it was filed on the -
incorrect law, the court heard testimony that prosecutor personally
sought out the arraignment attorney in the court hall way, to sign
the chicken scratch release note, that was sufficient to protect
petitioners fair trial and due process rights, when its blatent
that an issue of constitutional dimension may have been trampled.
( EXST  J,O,N,O )

3. Court erred and by such denied petitioner a fair trial when
denying trial counsels motion to continue to have newly discovered
(AT& T CELL PHONE RECORDS) evidence excupatory,in nature, thourg-
ughly and without restrictfons, fully investigated, shifting the
burden to petitioner, court claiming in essence, " The cell phone
in fact was used and infact belonged to Ms.Little and not just
over 9 minutes of data usage was found, two separate types of
data usage -Text Messaging & Social Media, None-the-less defendant
has the burden to PROVE MS. LITTLE did not pass it to the passen-
gers and passengers were not the ones who  sent and fully engaged

in the usage of MS. LITTLES cell phone.

4. This was an absurd reaction from the court, the court was aware that prosecutor recently provided the AT&T records, and that prosecutor had provided inaccurate records at first, once again like in the approaching of the arraignment attorney to solicit the release of the vehicle the prosecution is amidst questionable conduct, though prosecution alledged they for months did not know the phone records were incorrect and that it took them a year to even request, the court continued to handicap the defense by _ bias rulings, the court should have reasoned that the cell phone evidence could open a pandora box, thereby being exculpatory in nature.

5. Trial court ignores and directs to continue in trial pro-eedings with many omitted issues/questions, bombarding trial with lingering issues unresolved, by such the trial was infected because the approach of the defense was discombobulated, legally decapitated by its eggregious ruling on the Vehicle, and the Cell phone, issues, in a traffic collision the cumulative effect was detrimental. Further more the trial court was aware of the I.AC. issues of Mr. Schultz which furhter hindered the spirit of the defense. The majority of the Defense Juror instructions denied and inwhich Trial counsel relied on petitioners sister who has zero legal experiende or training in law.

6. Court errors in allowing potential Juror make prejudicial statements influencing voir dire process, specifically potential juror who was friends with Ms. LIttle whos sister was with

Ms. Little the night in question, and stated so, compounded

by another potential juror pyschologically imprinting that in

D.U.I Vehicular Manslughter cases both families lo-se..


7. The trial court kicked out petitioners children under a

prejudicial assumption that petitioners children did not have

a valid excuse of absence from their school and that they should

be in school, Thus denying petitioners right to a public trial,

This was absolutely prejudicial because it painted an impression

or stereotype  that defendant and family are careless of childrens

education welfare and endeavors, and that it was inappropriate

to have ones children in trial, as a latino family it is cultural

to be close-knit in this fashion. The children were not attending

the entirety of the trial, and the school did in fact provide

an excuse to attend trial.

8. The court and the people in conducting themselves and

physically ushering out the children from the court room did

in fact umbrella the entire court and future proceeding in

prejudice and awkward tentions,. the Judge himself later questioned

under constitutionality whether he was able to kick out defendant

kids, when Defense argued they should be allowed to attend their

fathers trial, and had a valid excuse from the school to attend.

Never-the less the damage was done, because the Judge stated

"they should be in school" it was dramatic made defendants family

appear " Ghetto/Ignorant" or that was the courts intentions ,

The court was cloaked and blanketed in prejudicial tension along

with the fact that Ms.Littles public comprised of 99.9 percent

of a white attendance, and the people further ecacerbated the

1  the situation_by having all prosecution staff sit on Ms.Littles
2  side of the public., Which infact had an adverse affect and
3  infected the trial the environment_was stale/poisoned and by such
4  dispirited by such act the tensions were obvious and the prejudic-
5  ial aroma existed  throughout, as Jurors took notice,. Petitioners
6  public comprised of a diverse public     .

8  9. ' The prosecution had a team of individuals who would
9  enter the courtmom and sit on the side where the Littles sat,
10  this in the presence of the Jurors the entrance was pychologically
11  detrimental to defendant because the prosecution team, would
12  enter after regular public and in a dramatic fashion grandstanding
13  per-se, clearly making statements, none would sit on defense
14  side. This was a mental imprint , and the equivalent of a
15  prejudicial argument. The court errored in allowing this display
16  go on throughout the trial.

17  ·10. Trial court erred in not acknowledging the I.A.C ex-parte
18  and defendants numerous attempts to fire MR.Schults and restric-
19  ting Mr.Engle who was brought on late as co-counsel to minimize
20  the gross I.AC of Mr.Shultz and his poor performance, the court
21  den–ied co-counsel from participating in any cross examination
22  or from treating him with the attorney dignity,Mr.Engle was
23  non existent.

24  11. Court erred in allowing Mr.Nesbitt Ms.Littles uncle and
25  a San Joaquin County Deputy Sheriff hover over Jurors and breach
26  Counsels area, as if a baliff , Jurors witnessed Mr.Nesbitt
27  communicate with Court Staff, Balliff, and when Trial Counsel-

addressed the issue, the harm was further excerbated by
Mr.Nesbitt seating with and near the prosecution side.

12. The trial court erred in dismissing the only african
American juror for calling in sick, near deliberations.
petitioner was informed he could not wait for Juror that the
court was not going to wait, the court did not demonstrate
good cause.

13. The court errored when answering juror questions, and
petitioner was without counsel as counsel had abandoned and
left out of town at deliberation, . the court in not allowing
petitioner to wait and have counsel of record denied petitioner
the right to counsel. Specifically court violated rule 43
when Trial Judge response to (3) juror questions at mid
deliberation was structural in nature and the error was not
harmless beyond a reasonable doubt. " A courts message to a
deliberating jury inevitably influences the jurys analysis,
" Particularly in a criminal trial, the judge's last word is
apt to be the decisive word." Frantz, 533 F3d at 742(quoting B
Bollenback v. United States, 326 U.S.607,612 (1946). For that re
reason when a court receives a jury note, how the courts "reply
...[is] worded" can have just as much impact as the courts decisi
ion, . Even " analytically correct answers to a jury may
unnecessarily-an-improperly-influence a jury" Id. (quoting
Arizonal. V. Johnson, 351 F.3d 988,994 (9th Cir.2003).
In petitioner's circumstance the foreman presented 3 questions
and the Trial court judge answered all of them,..
The trial court violated Rule 43. and the Sixth Amendment.

14. The state contradicts its process and commits hypocracy when it allows to have the Release note authenticated by arraignment defense counsel, and that he signed the release note, yet the court did not allow to authenticate the Plea Form Waiver of Rights ("ADDENDUM"), specifically when the trial court asserts that he is unaware whether in 2006 the court did or didnt per-sel make practice.

15. The trial court errored and abused its discretion when it arbitrarily cut short the motion for new trial, denying petioner an ability to adequetly establish the evidence to support the motion, thereby denying his rights to due process under 6th and 14th amendments and the california constitution.

16. Petitioner presented Robert Storey, Stephanie Loya , Brissa Garbay, Rossio Garibay, and Russel Darnell and petioner himself in support of the motion ( VI RT 1584-1738) Throughout the hearing the court denied counsel the opportunity to present witnesses and in the middle of Mr.Darnells testimony announced that petitioner would only have 45 minutes to present evidence regarding a motion for a new trial.

17. This arbitrary time limit not only took defense by surprise in the middle of presention of evidence to support the motion for a new trial but was random and arbitrary act that prevented petitioner from fully presenting evidence from the accident reconstructionist. and petitioner himself.

18. The time limits and restrictions imposed by the court

1  along with the errors all in combinations and in their

2  entirety denied petitioner a fair trial.

3  Petitioner respectfully, request that this court set aside

4  and vacate the conviction, remand for an evidentiary

5  hearing , new trial or appropriate relief.

6

7

### b.SUPPORTING

8  Petitioner was denied trial counsel at deliberation,

9  and during Juror questions,

10           Gideon v. Wainwright,  372 U.S 335 (1963)

11  Rule 43

12

13  Judicial bias contributed to petitoner conviction

14  Denying New Trial Motion and limiting evidence.,
    Denying Motion to continue on Newly discovered Cell Phone
15  evidence,.

16           Arizona v. Fulminante, 499 U.S. 279 (1991)

17  Washington v. Texas, 388 U.S  14 (1967)

18  The public was improperly excluded from petitioners trial

19  Petitioners family was denied the ability to attend trial

20           Inn re Oliver 333 U.S. 257 (1948)

21

22

23

24

25

26

27

28

MC–275

7. Ground 2 or Ground ___8___ *(if applicable):*

PETITIONER'S CONVICTION WAS OBTAINED AS A RESULT OF OUTRAGEOUS
GOVERNMENT MISCONDUCT...

U.S. v. RUSSELL 411 U.S. 423 (1973)

a. Supporting facts:

SEE ATTACHED   (A)

SEE ATTACHED   (B)

b. Supporting cases, rules, or other authority:

SEE ATTACHED

GROUND EIGHT

## OUTRAGEOUS GOVERNMENT MISCONDUCT

Petitioner's Conviction was obtained as a result of outrageous Government Misconduct.....

U.S. v. RUSSELL 411 U.SL 423 (1973)

a.SUPPORTING FACTS:

1. By prosecutors own admission the petitioner had no sub-jective awareness.(EXBT E.) During the bail hearing the prosecutor argues adamantly that the defendant "could not have possibly known a murder charge was coming down"!!. Prosecutions theory,basis and foundation thereby deteriorated and negated watson. Prosecution continued unconstitutionally a selective prosecution.

2. Prosecution encourged perjured testimony by CHP officer inre: to HIT & RUN allegations, prosecution knew the testimony was exagerated and contrary to witness accounts. Who testified at prelim that the petitioner was within a reasonable distance, and did not RUN...remained within eye sight and for prosecutor to allow a testimony of petitioner being 300 yards out is impractical specifically on a dark deserted road, its sole purpose was to prejudice the petitioner., Further the petitoner was not presented the opportunity to confront Joseph Rickner who testified in preliminary and prosecution injected circums-tances that rendered Rickner necessary to be present at trial. ( EXBT A1 , A2)

3. Prosecutor put a blind eye to the deliberate removal of Ms. Littles cell phone by Ms.Littles uncle a San Joaquin

county Deputy Sheriff who concealed facts and evidence specifically
that the phone was in use at precise time the accident occured,
this concealment lasted over a year, denying and hindering
petitioner critical time to properly investigate.(Brady V.Maryland)
this Deputy was reluctant and made it nearly impossible to have
the phone returned to evidence. Manipulated his authority through
power and entitlement to illegally obtain the cell phone and
did not return it until one week or so prior to trial.

4. The prosecution did little to nothing and made no effort
to have this phone returned and to the contrary attempted to
deceive the defense and courts by stating phone was not in use.

5. Prosecution deliberately provided incorrect AT&T records
in a feeble attempt to fool the defense, & to delay the explosive
truth that Ms.Little was in fact on the phone., hence distracted
driving was a contributer. (Evidence that would have changed the
outcome of the trial via reasonable doubt),.

6. The prosecution finally conceded that Ms. Littles cell
phone was in fact in full data usage, yet prosecution continued
a sham trial, because it was either that or dismiss the case in
it's entirety.
Studies prove that distracted driving via hand held or hands free
cell phone communication are a leading cause in crashes, and
a serious concern on our road ways, specifically more so when
those acts are done by young adults, ranging in the ages similar
to Ms.Littles . The prosecutions concealment therefore hindered
and infected the trial with unfairness in violation of Due process.

7. The prosecution admitted to "approaching"(soliciting) arraignment defense lawyer Mr.Charles Pacheco on August 6, 2010. "requested permission" to release/destroy Ms.Littles 1988 Oldsmobile. Conduct which is inexplicable and incomprehensible in a case that involved a traffic collision with a fatality where cause was an issue, and Murder was alleged.

8. Prosecution approached defense with full knowledge that that defense had yet to inspect the vehicles  impounded or defense including prosecution had yet to receive the final MAI. reports, accident reconstruction investigation. MAI. completed   and forwarded MAIT. reports January 2011. "5 months" after prosecution had approached defense to release the vehicle. and to further note prosecution initially had CHP reports and a complete different assessment of lane travels for petitioner,

9. The 1988 Oldsmobile was critical to have, the prosecution had full knowledge of it's value and importance to the defense for numerous reasons, yet still decided on soliciting arraignment lawyer to release it so early on in case, had it had any favorable value to the prosecution they would have not released it. The Littles family mechanic testified in trial to numerous repairs MAIT. failed to perform a mechanical inspection, and thereby if with one or  a combination of any faulty repairs  could have contributed to the accident. Such as faulty motor mounts, which cause veering unbalancing., of weight of vehicle, which require absolutely no displacing eyes off the road or lane of travel. ,  loose lap belts fail to function as a result of everyday wear and tear., in particular older type vehicles. Rear View

H A

mirrors not properly aligned lead to treacherous blind spots,
poor illumination extremely relevant as a result of a dark road.
Coroners reported Ejection, and illumination of the Oldsmobile
were noted.

The condition of the 1988 Oldsmobile was extremely pertinent.
Therefore made no sense for prosecution to even approach the
defense attorney to release and destroy the vehicle and to do so
without a formal court process was misconduct.

10. Prosecution carelessly disregarded petitioners due process
being aware of the all the errors from the onset, that CHP had
went out to scene to peform numerous investigation, even before
MAIT. was called in, atleast 3 different times CHP went out to
scene, and placed petitioner in the #1 lane .Prosecution put
a blind eye to the removal of the cell phone, was aware of the
mishandling of the Alch analysis that went over 6 days out of chain
of custody. Knowing these issues existed still proceeding in getting
rid of the vehicle.

11. Reasonable doubt exists when multiple theorys are rendered
more so when peoples agencies concede to numerous errors and many
hiccups of significants when combined. MAIT, report renders legally
insufficient for reasons of numerous times condeded to errors or
inconclusive findings, and failure to perform a thorough investigate
ion (left Honda Hub Cap on scene). No trajectory analysis.
Post Speed Mait unable to accurately determine.
Failure to include Cell Phone usage analysis even when later determ.
ined Ms.Littles phone was in use.. Violating their protocols and
proce-lures..

CHP/MAIT conceded to no mechanical inspection.

Mait Steve Ruppert admits to chaning his theory at prelim and No Evidence of initial impact. Used a patrol vehicle to perform analysis of a foreign made vehicle. Different in weight and in its totality.   Dyanmics were missing from the Oldmobile, sequence.

MAIT. pre-speeds for petitioner were based on a "Benefit of the doubt theory. Deriving the scientific method to subjectiveness not proven or bound to an objective scientific methodical approach , Hence MAIT. speeds and conclusions  are prejudicial and of no scientific soundness. Certainly not verifiable by a scientific method, or mathematically sound, solid data, (Daubert Test) would exclude MAIT.S basis.

12. The prosecutions tunnel vision to obtain a sham conviction through  a sham trial prevented full disclosure of numerous issues from the delaying phone evidence, to jurors falsity in voir dire and contact communications  not disclosed to courts or defense.

For the reasons set forth petitioner request the appropriate habeas relief, set aside and vacate conviction.

## b.SUPPORTING CASES

The charges which resulted in petitioners conviction were the product of discriminatory enforcement of the law....

                Yick Wo v. Hopkins, 118 U.S 356 (1886)
In specific to the Hit&RUN and Murder Watson.)

Petitioner was convicted as the reult of an unconstitutionally selective prosecutions.

                U.S. v Armstrong 517 U.S. 456 (1996)

                                            ↑
                                (GROUND #2 ATTACHMENT PAGE

the charges which resulted in petitioners conviction are
the result of prosecutorial vindictiveness in w

Blackledge v. Percy 417 U.S 21 (1974)

U.S. v. Goodwin, 457 U.S. 368 (1982)

The state failed to disclose evidence favorable to the defense.

Brady v. Maryland, 373 U.S 83 (1963)

Kyles v. Whitley, 514 U.S 419 (1995)

The state destroyed  material exulpatory evidence in bad faith

Arizona v. Youngblood, 488 U.S 51 (1988)

Califonia v. Trombetta 467 U.S  479 (1984)

Prosecution misled defense deliberately about evidence the
the defense intended to present.   ) Cell Phone Evidence..)

Gray v. Netherland, 516 U.S 152 (1996)

Prosecution knowingly used perjured testimoney to obtain a
conviction, the prosecution knew or should have known the testimony
was false, and prejudice resulted...

The Hit & Run, and Watson admonishment lack of colloquy.
and Subjective Awareness.

Napue v. Illinois, 360 U.S 264 (1959)


Prosecutor committed Misconduct and misrepresentation throughtout
case.

Darden v. Wainwright, 477 U.S.168 (1986)

Parker v. Matthews 132 S.Ct. 2148 (2012)

Berger v. U.S., 295 U.S 78 (1935)

Jury outside influences, raised a presumption of prejudice ,
Jurors made intentionally false and misleading statements.
Potential juror bias existed...

Turner v.Murray, 476 U.S.28 (1986)
Irvin v. Dowd, 366 U.S.717 (1961)
Remmer v.U.S., 347 U.S. 227 (1954)

Petitioners conviction was based on evidence known to be false
Miller v. Pate, 386 U.S. 1 (1967)

GROUND EIGHT  (B)

OUTRAGEOUS GOVERNMENT MISCONDUCT

PETITIONER"S CONVICTION WAS OBTAINED AS A RESULT OF OUTRAGEOUS GOVERNMENT MISCONDUCT...

U.S. v. RUSSELL 411 U.S. 423 (1973)

a. SUPPORTING FACTS:

PETITIONER ASSERTS THAT THE INTEGRITY OF THE CONVICTION IN ITS TOTALITY AMOUNTS TO MISCONDUCT, FROM THE ON SET OF THE CASE NUMEROUS ERRORS OF CONSTITUTIONAL DIMENSION OCCURED IN WHERE THERE IS NO QUESTION THE PROSECUTION MUST HAVE KNOWN THAT PROCEEDING CONSTITUTED A SHAM PROSECUTION, EVERYTHING IN ALMOST ALL ASPECTS IS OF QUESTION AND THEREBY RISES TO THE LEVEL OF REASONABLE DOUBT..

1) THE PROSECUTION FAILED IN NOT HAVING THE CELL PHONE OF MS.LITTLE RETURNED INTO EVIDENCE CUSTODY WHEN THEY WERE INFORMED THAT MS. LITTLES UNCLE A SAN JOAQUIN COUNTY SHERIFF DEPUTY RETRIEVED IT DID NOT PROVIDE PROPER DUE PROCESS BY THIS BLIND EYE ACT.. FURTHER ALLOWING MS.LITTLES UNCLE TO INTERVENE THROUGHOUT THE PROCESS, INFLUENCING THE PROSECUTION.

2.) chief medical  examiner DR.OMALU AND FORENSIC PATHOLOGIST REPORTS A HISTORY OF MISCONDUCT BY SHERIFF DEPT OFFICIALS AND OTHER LAW ENFORCEMENT AND BY SUCH MERIT AN EVIDENTIARY HEARING BASED ON THE FACT THAT IN FACT MS.LITTLES UNCLE A SHERIFF DEPUTY INTERVENED - INTERFERED- AND INFACT REMOVED EVIDENCE EXCULPATORY IN NATURE, BASED ON THE REPORTED ISSUES OF THE SEAT BELT AND IN COMBINATION WITH PHONE USAGE, THE LANE REPORTED DISCREPENCIES

GROUND 8-B  1 OF 2

INITIALLY BY CHP, AND NOT ALL TRUE AND CORRECT FACTS REPORTED
TO DR.OMALU AND OR MANIPULATED, PETITIONER ASSERTS THIS REQUIRES
AN EVIDENTIARY HEARING TO DETERMINE THE INTEGRITY OF THE FINDINGS
IF MR.NESBIT A SAN JOAQUIN COUNTY DEPUTY SHERIFF AND UNCLE TO
MS.LITTLE INFLUENCED THE FINDINGS OF CORONER ....

DR.OMALUS RESIGNATION LETTER PROVES THAT THE INTEGRITY OF HIS
FINDINGS IN CASES THAT INVOLVE POTENTIAL COVER UP OR LINKS OF
BENEFICIARY FACTORS TO LAW ENFORCEMENT MAY HAVE BEEN COMPROMISED
AND FURTHER STATES THAT THIS DATES BACK TO 2008.

(see exhibit V )

 FOR ALL THE REASONS STATED ABOVE PETITIONER RESPECTFULLY
DEMANDS AN EVIDENTIARY HEARING OR VACATE OF CONVICTION BASED
ON ALL THE CIRCUMSTANCES  THAT OCCURED RENDER THIS CASE LACKING
INTEGRITY,.IN ITS CONVICTION(REASONABLE DOUBT)

                    supporting cases

See GROUND EIGHT (A) SUPPORTING CASES

SEE EXHIBIT V...
SEE EXHIBIT O...

GROUND 8-B  2 OF 2

MC–275

7. Ground 2 or Ground __9__ *(if applicable):*

> PETITIONER'S CONVICTION WAS OBTAINED AS THE RESULT OF EVIDENCE
> THAT IS INSUFFICIENT TO PERSUADE A PROPERLY INSTRUCTED, REASONABLE
> JURY OF HISGUILT BEYOND A REASONABLE DOUBT..
>              JACKSON V. VIRGINA 443 U.S.307 (1979)

a. Supporting facts:

> see attached

b. Supporting cases, rules, or other authority:

> See Attached.

Jackson v. Virginia, 443 U.S.307 (1979)

Petitioner was convicted of violating a statue that was unconstitutionally vague and overbroad....

kolender v. Lawson, 461 U.S. 352 (1983)

Johnson v. U.S [135 S.Ct 2551] (2015)


a. SUPPORTING FACTS:


Petitioner asserts that the record of a prior D.U.I 2006 conviction hearing demonstrates a lack of a meaningful colloquy, there was No valid or adequate expressed Watson Murder Admonishment(EXBT D)

   1. The record demonstrates there was no reference to the Addedum in question: (Addendum to Advisement, Waiver, and Plea Form) that contains verbage that states in quote.

" I understand the following: being under the influence of alcohol or drugs, or both, impairs my ability to safely operate a motor venicle. It is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both,and as a result of that driving, someone is killed, I 'can' be charged with murder."

By such prosecution in 2010 assert that based on the Addendum in question petitioner had intimate knowledge of the dangers of D.U.I and that one "can" be charged with murder.  (EXBT C)

   2. But as the record demonstrates add reflects there is no sufficient advisement.(EXBT D)

   3. There must be a reliable showing that defendant was advised and that defendant has read and understood what was admonished and discussed with counsel.

GROUND #9 ATTACHMENT 1 OF 4

The record reflects no discussion of the murder admonishment, and what is demonstrated by the record is petitioner throughout proceeding is giving " head nods" inwhich put the entirety of the pleas, in question as silence can not be presumed to constitute a valid waiver.

4. The prosecution solely relies on a signature on addendum that appears to contain the name of petitioner and dated the same day as the other plea form waivers, "HOWEVER" the signature on addendum that prosecution relies on is signed different than the other two waivers that are alle-ged to accompany the addendum.(EXBT C )

5. The record also reflects there is no succint, clear, and explicit Watson admonishment, thereby in valid..

6. Petitioner was never afforded the opportunity to confront, or authenticate the trustworthiness of the document.(EXBT B)

7. Prosecution never proved the addendum which was fundamentally flawed in its totality, it lacked authentication and the entry of addendum was without proper foundation, falling under and meeting the false evidence standard.(EXBT B )

8. The prosecution failed to establish that the addendum was in fact a legally attached document to the accompanied waivers. Specifically because the two  Misdemeanor Advisement , Waiver and plea forms are said separate Superior court documents (Sup Ct 90) and the"Attached Addendum" are (Sup Ct 61) the prosecution made no linkage or explained the distinguishing factors.of the said forms. and since the record does not address or reference an addendum by such it becomes null, unbinding, non existant...it's simply a loose document no one to validate or attest its validness and genuiness.

9. Further more the court accepts that the trustworthiness
of the Addendum Murder Admonishment"cant be know forsure"and
stipulates"that is not the standard" (EXBT B) but in a case that
alleges homicide every element of a crime must be proved beyond
a reasonable doubt.

10. This created a flawed foundation throughout and a presumpt
ion of it's validness, when infact failed in every aspect legally
and constitutionally. (Failed Boykin Thal Requirement, adn suffi-
ced to illegal evidence, and violation of the 6th Amendment.

11. Business & Official records exeption does not theoretically
apply to Addendum/Attachemtns, legislation did not intend for such.

12. The courts presumption that petitioner was admonished is
based on another presumption (inference on Inference) and by such
can not serve as an ultimate fact.

13. Furhter more petitioner asserts that the Watson Admonisnment
is plaqued by vagueness and ambiquity, rendering it unconstitutional
specifically when no verbal expression/colloquy accompanies, a
secondary document that contains numerous paragraphs, and those
paragraph contain vague or Ambiquos wording, such "Can"be charged....
with Murder.. better put in U.S. v.Rodriquez-Vega (9th Cir. 2015)
797 F.3d 781, 790 ["warning of the possibility of a dire consequence
is no substitute for waming of its virtual certainty, As Judge Robert
L.Hinkle explained, 'Well, I know every time that I get on an airpla
ne that it  could crash, but if you tell me it's going to crash, I'm
not getting on.' "

14. The wording in paragraph 6 of Addendum to advisement waiver & plea form, can not be construed as that in it self placing a defendant on notice.

15. For the numerous reasons set forth petitioner respectfully, request the appropriate Habeas relief, set aside and vacate the conviction, as not only was there insufficient evidence, the Watson Murder Admonishment renders unconstitutional in every aspect. In this case. An Evidentiary Hearing is requested as one was not afforded to demonstrate prior 2006 D.U.I conviction lacked in providing a meaningful colloquy.

### b. SUPPORTING

Boykin V.Alabama, supra, 395 U.S.238 [23 L.Ed 2d 274, 89 S.Ct.1709])

Pointer v.Texas 380 U.S.400 (1965)

In Re Winship, 397 U.S.358 (1970)

7. **Ground 2 or Ground** __10__ *(if applicable):*

PETITIONER WAS PUNISHED MORE THAN ONCE FOR THE SAME OFFENSE.

BROWN v. OHIO 432 U.S. 161 (1977)

BENTON v. Md., 395 U.S. 784 (1969)

a. Supporting facts:

See ATTACHED

b. Supporting cases, rules, or other authority:

SEE ATTACHED

GROUND TEN

DOUBLE JEOPARDY

Petitioner was punished more than once for the same offense.

BROWN v. OHIO   432 U.S. 161 (1977)

BENTON v. Md.,   395 U.S 784 (1969)

a. UNDERLINE SUPPORTING FACTS:

Petitioner asserts that the finding of Murder and Gross Vehicular Manslaughter was Multiplicitous and violated the fifth amendment, While the government can prosecute a defendant for both a greater and a lesser included offense, "entering judgement against him is multiplicitous and a double jeopardy violation when it is based on the same conduct." United States v. Schales, 546 F.3d 965, 978 (9th Cir.2008).

The fifth Amendments prohibition on double jeopardy protects against being punished twice for a single criminal offense. U.S. Const.

When multiple sentences are imposed in the same trial, "the role of the constitutional guarantee is limited to assuring that the dourt does not exceed its legislative authorization by imposing multiple punishments for the same offense. "Brown, 432 U.S at 1654, 97 S.Ct. 2221. When a defendant has violated two different criminal statutes, the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other. Rutledge v. United States 517 U.S. 292 , 297, 116 S. Ct 1241, 134 L.Ed.2d 419 (1996). To determine whether two statutory provisions prohibit the same offense, we must each provision to determine if it "requires proof of an [additional] fact which the other does not."

THIS ATTACHMENT 1 OF 3

Blockburger v. United States, 284 U.S. 299 , 304 , 52 S.Ct 180

76 L.ED. 306 (1932); Ball v. united States, 470 U.S. 856,861,

105, S.Ct. 1668, 84 L.Ed.2d 740 (1985); United States v. Williams

291 F. 3d 1180, 1186037 (9th Cir 2002) overruled onother grounds

by United States v. Gonzales, 506 F.3d 940 (9th Cir.2007) (en Banc)

 The Blockburger test, is also empliyed to determine whether one

offense is lesser included offense of another. Rutledge, 517 U.S

at 297, 116 S.Ct 1241. If two different criminal statutory

provisons indeed punish the same offense or one is a lesser included

offense of the other, then conviction under both is presumed to

violate congressional intent. See Missouri v. Hunter, 459 U.S

359, 366-67, 103 S.Ct. 673, 74 L.Ed. 2d 535 (1983).

Penal Code 191.5 (a) reads: "Gross vehicular manslaughter while

intoxicated  is the unlawful killing of a human being without

malice aforethought, in the driving of a vehicle, where the

driving was in violation of section 23140,23152, or 13153 of the
vehicle
vehicle Code, and the killing was either the proximate result

of the commission of an unlawful, act, not amounting to a felony,

and with gross negligence, or the proximate==result of the

commission of a lawful act that might produce death, in an unlawful

manner, and with gross negligence."

While the elements for gross vehicular manslaughter and second

degree murder are worded differently, that both resulted from

the same act:  One single accident,Petitioner was found guilty of

 both second-degree murder and gross vehicular manslaughter, essent-

ially sentenced to two separate and distinct prison terms.

Violating the Double Jeopardy Clause for those reasons set forth

Petitioner request the appropriate habeas releef, vacate the sentence

& conviction.

## b.SUPPORTING

Petitioner was given unconstitutional multiple sentences
for committing a single criminal act...

Benton v. Md,. 395 U.S. 784 (1969)

Petitioners sentence was increased on the basis of facts found
by the judge rather than by a jury..

Blakely v. Washington 542 U.S. 296 (2004)

Petitioner was sentenced to the upper teem of the three terms
provided by California legislature without supporting jury findings
to justify the upper term...

Cuningham V.Ca 126 S.Ct 855 (2007)

GROUND #10 ATTACHMENT 3 of 3

7. Ground 2 or Ground __11__ *(if applicable):*

PETITIONERS ENHANCEMENTS ARE ILLEGALLY IMPOSED.

Benton V. Md,, 395 U.S 784 (1969)
People v. Cook (2015) 60 Cal 4th 922

a. Supporting facts:

SEE ATTACHED

b. Supporting cases, rules, or other authority:

SEE ATTACHED

PETITIONERS ENHANCEMENTS ARE ILLEGALLY IMPOSED.

PEOPLE v. Cook (2015) 60 Cal 4th 922

Benton v. Md., 395 U.S 784 (1969)

a. SUPPORTING FACTS:

Petitioner contends that the great bodily injury enhancements attached to his convictions for second degree murder and gross vehicular manslaughter are illegally imposed and must be stricken

The California Supreme court held that under Penal Code section 12022.7 Subdivision (g) "great bodily injury enhancements simply do not apply to murder or manslaughter"

Cook,supra, 60 Cal.4th 922,) recognized asstatutory rule which the Legislature had adopted when it enacted Penal Code section 12022.7 sub,Div (g) .

furthermore petitioner asserts the sentencing scheme applied by the tourts  is incorrect and excessive.

Petitoiner respecfully request the appropriate relief be granted.

b. SUPPORTING CASES.

Petitioners sentence was increased on the basis of facts found by judge rather than by the jury..

Blakely v. Washington, 542 U.S.296 (2204)

Petitioner was sentenced to the upper term of the three terms provided by the California Legislature without supporting jury findiings to justify the upper term..

Cunningham v. Ca 126 S.Ct 856 (2007)

Petitioners sentence was disproportionate to other sentences for the same conduct. Solem V. Helm 463 U.S 277 (1983) .

MC–275

8. Did you appeal from the conviction, sentence, or commitment? [X] Yes   [ ] No   <u>If yes, give the following information:</u>

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):

COURT OF APPEAL OF THE STATE OF CALIFORNIA THIRD APPELLATE DISTRICT

b. Result:   AFFIRMED- IN PART(COUNT III/IV VACATE)   Date of decision: MAY 05,2016

d. Case number or citation of opinion, if known:   C072041

e. Issues raised: (1)   PROSECUTION FAILED TO PRESENT SUFFICIENT EVID.FOR IMPLIED MALICE/& UNDERSTAND THE SUBTLE DIFFERENCE (IMPLIED VS.GROSS NEG)

(2) VEHICLE CODE 23153 IS DESIGNED TO PUNISH THE ACT OF DRIVING UNDE INFLUENCE NOT THE NUMBER OF VICTIMS.

(3) COUNTS 4-6 ARE PUNISHING A SINGLE COURSE OF CONDUCT/THEREFORE MAY ONLY BE PUNISHED ONCE PURSUANT P.C Sect 654

(4) DEFENDANT RECEIVED I.A.C "THROUGHOUT"CASE IN VIO OF CONSTITUTION

f. Were you represented by counsel on appeal? [X] Yes   [ ] No   If yes, state the attorney's name and address, if known:

KELLY LYNN BABINEAU SBN 190418
455 CAPITOL MALL, SUITE 802 SACRAMENTO CA. 95814

9. Did you seek review in the California Supreme Court? [X] Yes   [ ] No   <u>If yes, give the following information:</u>

a. Result:   DENIED                                          b. Date of decision: AUGUST 11,2016

c. Case number or citation of opinion, if known:   C072041

d. Issues raised: (1) Court of Appeals affirmance of Judgement should be vacated as prosecution failed to present sufficient evidence for implied.Ma

(2) Serratos received I.A.C THROUGHOUT CASE .

(3) The court denied Serratos Due Process & fair trial denying motio to continue,& adequately prepare.For newly discovered Cell Phone evid.

(4) The trial court abused its discretion arbitraily cutting short motion for new trial.

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

THE ISSUES RAISED ARE BASED ON MATTERS OUTSIDE THE RECORD, ATTORNEY OVER CONFIDENT HER DIRECT APPEAL CLAIMS WOULD PREVAIL,

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review:

b. Did you seek the highest level of administrative review available?   [ ] Yes   [ ] No

*Attach documents that show you have exhausted your administrative remedies.*

**MC–275**

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? [X] Yes *If yes, continue with number 13.*    [ ] No *If no, skip to number 15.*

13 a. (1) Name of court: California Supreme Court

(2) Nature of proceeding (for example, "habeas corpus petition"): Writ of Habeas Corpus Petition

(3) Issues raised: (a) See Attached Writ.

(b) _____

(4) Result (attach order or explain why unavailable): Pending

(5) Date of decision: _____

b. (1) Name of court: In The Court of Appeals Third Appellate District

(2) Nature of proceeding: Writ of Habea Corpus Petition

(3) Issues raised: (a) See Attached Writ

(b) _____

(4) Result *(attach order or explain why unavailable):* Denied W/out prejudice to filing in Superior Court Inre Steele & Hillary.

(5) Date of decision: 11/21/2017

c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) Unique case with noval circumstances, involving numerous errors from the on-set & through out, "INEXPLICABLE" DESTRUCTION OF EVIDENCE, Exculpatory evidence restricted, compounded by my lack of legal training & in the very Restricted custody of Pelican Bay,scarce legal resources.

16. Are you presently represented by counsel? [ ] Yes [x] No *If yes, state the attorney's name and address, if known:*

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? [ ] Yes [ ] No *If yes, explain:*

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: December 8 2017

(SIGNATURE OF PETITIONER)

<u>TABLE OF EXHIBITS</u>

1. EXHIBIT  A ...  Preliminary Transcripts Excerpts
                   Pablo Sanchez Testimony

2. EXHIBIT  A-1..  Preliminary Transcripts Excerpts

                   Josehp Rickner Testimony

3. EXHIBIT  A-2.   Pablo Sanchez & Joseph Rickner Canvased Testimony Map
                   Layout Assessment.
                   Google Maps Depiction
                   Bing Maps Aerial View

4. EXHIBIT  B...   Preliminary Transcript Excerpts"Counsel Request Defendant
                   to write notes for him:"
                   Arguments of the initial entry of Prior 2006 D.U.I Conviction
                   Pleas Waiver Forms/Addendum. Counsel raises argument as to
                   trustworthiness/foundation....

5. EXHIBIT  C...   Misdemeanor Advisement of Rights, Waiver and Plea form.
                   Addendum to Advisement , waiver & plea form...

                   Signature 1 & 2 Signed "BEN"
                   Signature 3 (Addendum) Signed "Benjamin"

6. EXHIBIT  D...   Prior D.I.I Conviction 7/20/2006 Transcripts.

                   NO ADDENDUM REFERENCED....
                   NO EXPRESSED WATSON ADMONISHMENT....

                   COURT PROVIDES NO COLLOQUY/DISCUSSION inre:Paragraph 6

7. EXHIBIT  E...   Bail Transcript Excerpts
                   "
                    IN PROSECUTORS OWN WORDS NO SUBJECTIVE AWARENESS BY SERRATO?

                   " COULD NOT HAVE KNOW (UNLESS IN OFFICE) A MURDER CHARGE WAS
                     COMING DOWN"!!!!!

8. EXHIBIT  F...   Cell Phone Evidence Removed by Deputy Sheriff Mr.Nesbitt
                   Ms. Littles (uncle)

9. EXHIBIT  G...   Distracted Driving Facts..
                   1.) Cell Phone belonging to Ms.Little engaged Social Media/T
                   2.) McDOnalds Fast Food Take OUt
                   3.) Make-Up Kit
                   4.) Friends

10. EXHIBIT H...  Cell Phone Records AT&T 11 months after incident

11. EXHIBIT I...  Bail Hearing Transcropts Excerpts "July 28, 2010
                  Discussion between counsel prosecutor courts inre:
                   Prosecutor going on vacation first two weeks of Aug 2010


12. EXHIBIT J...  Release note of Vehicle...

Continued.. <u>TABLE OF EXHIBITS</u>

13. EXHIBIT K ... Mait report indication investigations and analysis
                  still being conducted after the release note note.Date.
                  Release vehicle note dated August 6, 2010
                  as of November 2010 Mait .Analysis occuring.

14. EXHIBIT L... Motion to continue preliminary
                 Proof Pacheco yet to review Mait Report Jan 24,2011
                 Mait Report Provided to counsel Jan 3, 2011
                 Release of Vehicle was 5 months prior.

15. EXHIBIT M ... Mr. Pachecos Attorney letter to Benjamin Serratos Re:
                  Hiring Traffic Reconstructionist Expert Ted Kobayashi.
                  Dated Jan 27, "2011" 5 ½ months after release of vehicle
                  note.
                      See also the Format template of Attorney Letter v.Note

16. EXHIBIT N... CORONERS REPORT
                 CHP EXPERT INDICATE SERRATOS IN THE # 1 LANE CONTRARY
                 TO MAITS LATER REPORT...

17.  EXHIBIT O... CORONER CAUSE OF DEATH
                  DOES NOT DETERMINE DUE TO?
                  STIPULATES EJECTIONS...

                  DR.OMALU HISTORY OF BEING MISLED BY STOCKTON D.A OFFICE
                  CHP & SHERIFF IN AREA...

                  DR.OMALU NOT AWARE OF CELL PHONE USAGE.

18. EXHIBIT P.... HISTORY OF GOVENMENT MISCONDUCT IN STOCKTON AREA..
                  DR. OMALU IMPLICATES SHERIFFS, CHP WITHHOLDOING INFO
                  MISLEADING HIM PRESSED HIM TO DETERMINE CAUSE OF DEATH
                  ON FALSE FACTS...INFO..
                  CONDUCT OF D.A & CHP HIDING INFO.
19
19. EXHIBIT Q.... DEFENSE EXPERT RECONSTRUCTIONIST REPORT
                  MAIT UNABLE TO DETERMINE SPEED "GUESSTIMATION"
                  MAIT CONCEDES DID NOT PERFOMR A MECHANICAL INSPECTION
                  MAIT CONCEDES TO CHANGING HONDA LANE TRAVEL
                  MAIT CONCEDES TO INITIALLY AT PRELIM NO DETERMINATION OF
                  IMPACT..
                  MAIT LEAVES EVIDENCE OUT ON SCENE (HONDA HUBCAP)CRITICAL
                  TO TRAJECTORY.

20. EXHIBITRR... MAIT REPORTS USING 2006 Crown Vic July 1st 2010.
                 Vehicle differs in weight/totality
                 Mait calculated velocity based on weight.
                 Mait legally insufficient.

21. EXHIBIT S.... TRIAL COUNSEL MOTION TO DISMISS FOR INTENTIAL DESTRUCTTONN
                  OF EXCULPATORY EVIDENCE.

                      CHIEF MEDICAL EXAMINER DR.OMALU ADMITS TO MISCONDUCT

22. EXHIBIT.. V  CHIEF MEDICAL EXAMINER FORENSIC PATHOLOGIST RESIGNATION
                 LETTER ASSERTING MISCONDUCT ON SHERIFF CORONER ET..AL..
                 SUPPORTS GOVERNMENT OUTRAGEOS MISCONDUCT CLAIM AND
                 SAN JOAQUIN COUNTY LACK OF INTEGRITY IN PROSECUTING

PABLO SANCHEZ TESTIMONY:

PAGE   31   line 28 "Serratos did not appear drunk"

PAGE   32   line 9-10 "Didn't know if Serratos was going to leave"

PAGE   41   line 16-22 " Couldn't see far enough to identify people"

PAGE   43   line 3  " Dont know what he told police"

PAGE   45   line 1-9 "Seen vehicle rotate counter clockwise full 360 deg.."

PAGE   46   line 4-5 "Does not know what Serratos did after..."

PAGE   46   line 22-28 "States a time span of about 20 minutes"  Pg 37

PAGE   48   line 18-23 " Serratos DIDN'T RUN"

PAGE   49   line 19-21 "Able to see Police detain Serratos"

PAGE   49   line 22-27 " States 30 feet!from car when police detain" 30 feet!!
                                    Pg 37
PAGE   49 line  4-14  " seen debris in #1 Lane DID NOT SEE Cars engage."

Testimony demonstrates NO HIT & RUN Pablo had eyesight of Serratos at

begining and end, and claimed always seen Serratos within Reasonable

Distance.

Pablo states unable to see people in oldsmobile upon approach reasonably

to say within 100 feet , therefore if unable to see people at this

distance  IT WOULD BE IMPRACTICAL TO SEE 200 YARDS..+ ON A DARK DESERTED

ROAD.       PABLO MAKES NO MENTION OF WALKING, RUNNING, OR SEEING
            ANYONE AT THIS DISTANCE.. ....



# EXHIBIT A

12 Pages...

GROUND # 1 , 2 ,7 , 8

1  you first contacted him?

2  A.    As far as I can remember, they were.

3  Q.    And did he ever respond to any of your questions when you

4  first contacted him?

5  A.    I don't remember if he did or not.

6  Q.    Okay.  You described his demeanor a little bit.  What else

7  did you notice about his demeanor?

8  A.    He -- he -- he seemed a little, like, dazed.  He seemed a

9  little confused.  He -- he had red eyes.  I don't know that --

10  if -- but, yeah.

11  Q.    Could you smell anything?

12  A.    Yes, I did.

13  Q.    What could you smell?

14  A.    Something like alcohol.

15  Q.    Okay.  And where was that coming from?

16  A.    Him.

17  Q.    Okay.  Have you seen drunk people before?

18  A.    Yes, I have.

19  Q.    Did he seem drunk to you?

20            MR. SCHULTZ:  I'll object as calling for an

21  opinion not from a reliable witness.

22            THE COURT:  It's not what it says in the book.

23  Overruled.

24            MR. RASMUSSEN:  Q.  You can answer.

25  A.    What was the question again?

26  Q.    Did he seem drunk to you?

27  A.    He wasn't really like staggering or falling over to the

28  side or anything, but -- but, no.  No, not really.

1  Q.   Okay.  And how long did you stay there with him?

2  A.   Until the CHP showed up.  And then they took him and

3  handcuffed him.

4  Q.   Okay.  When you were there with him at the car --

5  A.   Uh-huh.

6  Q.   -- was there anyone else there with the two of you?

7  A.   Yes.  One of my friends that was riding with me came up to

8  me.  I told him to stay with him, kind of watch him, make sure

9  he didn't walk away because he smelled like alcohol.  I didn't

10  know if he was going to leave or anything, like to...

11  Q.   Okay.  I want you to look around the courtroom and let me

12  know if you see this person that was in the Honda Accord in

13  court here today.

14  A.   Yes, I do.

15  Q.   Okay.  Could you point to him and describe what he's

16  wearing?

17  A.   He's wearing orange shirt with white T-shirt underneath

18  (indicating).

19              THE COURT:   Indicating the defendant.

20              MR. RASMUSSEN:   Q.   And you said you told a

21  friend of yours to stay with the defendant?

22  A.   Yes.

23  Q.   And did you go somewhere?

24  A.   Yes.  I -- I tried to -- I ran back towards the -- towards

25  the intersection, try to see if I can find the other car.

26  Q.   Okay.

27  A.   I thought it was going to be on the road, but it wasn't.

28  It was towards -- off to the side.

1    Q.   And you found the other car?

2    A.   Yes, I did.

3    Q.   Okay.  Were there any occupants inside the car?

4    A.   Yes, there was.                          *CROSS REFERENCE OF STATES

5    Q.   Who was inside the car?                  FEMALE RIGHT FRONT
                                                   MALE MIDDLE REAR

6    A.   I don't know their names, but there was a -- in the front

7    passenger it was a guy.  In the back passenger was a girl.

8    Q.   Okay.  What was the guy doing?

9    A.   He was -- he was moving and he was pinned up against the

10   door.

11   Q.   Okay.  Could he get out?

12   A.   As far as I know he couldn't.

13   Q.   And what about the girl, where was she?

14   A.   She was in the back seat, also pinned to the door.

15   Q.   What was she doing?

16   A.   She was moving around.

17   Q.   Okay.  Was she awake?

18   A.   Yes, they were.  Both of them were.

19   Q.   And did you see anyone else inside the car?

20   A.   No.

21   Q.   Did you see anyone else outside of the car?

22   A.   Yes, I did.

23   Q.   Okay.  And where did you see that person?

24   A.   She was laying next to the car on the left-hand side

25   towards the back of the car.

26   Q.   Okay.  And was she alive?

27   A.   As --

28                   MR. SCHULTZ:  Calls for a conclusion, Your Honor.

1  Q.   All right.  So that was Mr. Heredia, you talked with

2  Mr. Heredia?

3  A.   No.  I -- I haven't met him.

4  Q.   No, but you talked with him and he said that there were

5  four people in the car?

6                  MR. RASMUSSEN:  Objection as to "him".

7                  THE COURT:  Why don't you clarify who "him" is.

8                  MR. SCHULTZ:  Yes.

9  Q.   Did you see four people in the vehicle that wound up in the

10  Oldsmobile?

11  A.   In the vehicle there was only two, and the girl that was

12  laying on the outside.

13  Q.   No.  I'm talking now at the time that you saw sparks, did

14  you tell the police -- did you tell the police that you saw four

15  people in the vehicle?

16  A.   I couldn't see if there was four people at the time of the

17  sparks.

18  Q.   There were four people at the time of the sparks; is that

19  correct?

20  A.   No.

21  Q.   In the Oldsmobile?

22  A.   I couldn't see that far.

23  Q.   But did you tell the police you saw four people in the

24  vehicle?

25                  MR. RASMUSSEN:  Objection, Your Honor.  He's

26  asked and answered that.

27                  THE COURT:  Overruled.

28                  MR. SCHULTZ:  Q.  You can answer the question.

1   A.   Oh, I -- at the time of the sparks, I couldn't see if there

2   was four people in there.  What I said was I -- I asked the guy

3   that was pinned in the car how many people were in the car.  He

4   told me there was four, but I couldn't see the fourth person.

5   Q.   All right.  And did you also tell the police that there was

6   a male passenger --

7               MR. RASMUSSEN:  Objection, Your Honor.  Misstates

8   the evidence.  He said "also".  He said he did not tell the

9   police that.

10              THE COURT:  That's all right.  I'll allow it.

11              MR. SCHULTZ:  Q.  Did you tell the police that

12  the passenger in the right front passenger seat was a male?

13  A.   In the --

14  Q.   Of the Oldsmobile.

15  A.   Yes.

16  Q.   And you saw that; is that correct?

17  A.   Yes.

18  Q.   And did you tell the police, however, that it was a female?

19  A.   I -- there was a female and a male.  I know the female was

20  in the back seat.

21  Q.   But you told the police the female was in the front seat as

22  well, correct?

23              MR. RASMUSSEN:  Judge, can we approach.

24              THE COURT:  Yes.

25                   (Discussion at the bench, off the record.)

26              MR. SCHULTZ:  Q.  Did you tell the police you saw

27  a female, a lady, a young lady in the front seat of the

28  Oldsmobile?

1   A.    I believe I didn't because -- because what I -- from what I
2   can remember, it was the guy sitting in the front seat.   I don't
3   know what I told them that day at the time.
4   Q.    All right.   Did you tell them you saw a male in the back
5   seat of the vehicle?
6   A.    As far as I know, no.
7   Q.    Now, the conditions were dark; is that correct?
8   A.    Yes.
9   Q.    And you did not -- did you hear any cars accelerate before
10  you -- before you saw the lights going out of control?
11  A.    No.
12  Q.    Did you see any cars before you saw the lights go out of
13  control going southbound on West Lane?
14  A.    I -- I wasn't really paying attention on the other -- on
15  the other lanes.   I just kind of focusing on mine.
16  Q.    So I take it the answer is no, correct?
17  A.    (Nods head.)
18  Q.    Is that correct?
19  A.    Yes.
20  Q.    Now, was the pavement wet?
21  A.    No, it wasn't.
22  Q.    Was it warm that night?
23  A.    I believe so.
24  Q.    And were there -- was there precipitation or any wetness on
25  the ground?
26  A.    As far as I know there wasn't.
27  Q.    Now, when you first saw the sparks, how far -- well, you
28  were, what, maybe 200 to 300 feet from --

1  A.    Yes.

2  Q.    -- the intersection of -- well, let me be more correct.

3  You were about a football field away from the intersection of

4  West Lane and Armstrong Road when you saw the sparks, correct?

5  A.    Yes.

6  Q.    And these vehicles were not in the intersection -- I'm

7  sorry, they were in the intersection when you saw them, correct?

8  A.    I couldn't really tell where they were.  All I saw was one

9  of the cars spinning out of control coming towards me and I knew

10  there was another car, but I couldn't see where -- where it had

11  stopped.

12  Q.    All right.  So the thing that drew your attention to what

13  was going on is you saw sparks and then you saw a car coming

14  toward you; is that correct?

15  A.    Yes.  Sparks and then headlights going out of control and

16  then the car coming towards me.

17  Q.    Now, the headlights that you saw going out of control, were

18  those the headlights on the vehicle that was coming toward you?

19  A.    Yes.

20  Q.    You -- did you see the headlights on the Oldsmobile, the

21  other vehicle?

22  A.    I knew there was another car because -- because there

23  was -- there was another set of lights, but, I mean -- but once

24  I saw the other car coming toward me, spinning out of control, I

25  didn't really focus on those lights.  I didn't see where they

26  went.

27  Q.    Now, when you say the car was spinning out of control, can

28  you describe what you saw?

```
 1   A.   It was -- it was spinning in circles.

 2   Q.   Was it going clockwise or counterclockwise?

 3   A.   I believe it was going counterclockwise.

 4   Q.   And you saw it do a complete 360 degree turn?

 5   A.   Yes, I did.

 6   Q.   I'm sorry -- yeah, complete 360 degree turn?

 7   A.   Yes, I did.

 8   Q.   And how many times did it turn?

 9   A.   I couldn't say.  Maybe one.

10   Q.   Now, did you see it hit the -- hit anything in the roadway?

11   A.   It stopped up on the -- up on the center divider.

12   Q.   And the vehicle came to rest there on the center divider?

13   A.   Yes.

14   Q.   And when you approached the vehicle, the vehicle was still

15   on the center divider?

16   A.   Yeah, I -- yeah.

17   Q.   Now, you say you saw the fire department show up?

18   A.   Yes.

19   Q.   And did they ask you any questions?

20   A.   No, they didn't.

21   Q.   Did they tell you -- did you tell them anything?

22   A.   All I said, I -- I believe I told them there was two people

23   in the car and I think that was all I told them.

24   Q.   Now, when Mr. Serratos got out of the car, he walked

25   directly across -- I'm sorry, he walked toward the intersection

26   of West Lane and Armstrong initially; is that correct?

27   A.   Not that I know of.

28   Q.   He walked across the street directly from where his car
```

1  was?

2  A.   When -- when he was sitting in his car and he got out, he

3  was standing next to his car and that's when I left him with my

4  friend.   When I came back, he was on the side of the road.   I

5  don't know what he did after that.

6  Q.   Okay.   When you say he was on the side of the road, he was

7  on the west side of the road that you were traveling on in the

8  dirt; is that correct?

9  A.   He was on the right-hand side.

10  Q.   Yes.   He was on the southbound side of West Lane --

11  A.   Yes.

12  Q.   -- correct, in the dirt?

13  A.   Yes, he was.

14  Q.   And he was -- this was -- and you were gone from his car

15  about 15 minutes you said; is that correct?

16  A.   I wouldn't be able to tell you how long.

17  Q.   And he was pacing back and forth when you saw him, correct,

18  in the dirt?

19  A.   I don't remember if he was pacing back and forth.   I just

20  know he was standing there for maybe a few seconds when I got to

21  him and then he started to walk away.

22  Q.   And this was about 20 minutes after you saw the sparks; is

23  that correct?

24  A.   I wouldn't know exactly.   Probably.

25  Q.   And he took about four or five steps going southbound on

26  West -- on West Lane?

27  A.   Uh-huh.

28  Q.   And then you saw him bend down; is that correct?

1    A.    I believe it was more than like -- than five steps.

2    Q.    Ten steps?

3    A.    I wouldn't remember how many it was.

4    Q.    Were you with him at that time?

5    A.    Yes, I was.

6    Q.    And were you in front of him, that would be further south,

7    or were you north of him?

8    A.    I was either in front of him or to the side.  I was kind of

9    walking with him, just trying to talk to him.  And then a few

10   times I stood in front of him.

11   Q.    · He wasn't making sense at that time, correct?

12   A.    No.

13   Q.    In fact, he told you that you were the driver of the car,

14   correct?

15   A.    Yes.

16   Q.    Now, you said·you smelled, what, something like an

17   alcohol -- alcoholic beverage?

18   A.    Yes.

19   Q.    Okay.  And did you know what kind of alcoholic beverage it

20   was?  Could you tell?

21   A.    No.

22   Q.    And when you first approached the vehicle, you didn't smell

23   it, correct?

24   A.    From the outside, no.

25   Q.    It was only when you got close to him and talked to him

26   that you could smell it?

27   A.    Yes.

28   Q.    And it wasn't strong enough for you to detect what kind of

1  alcohol; is that correct?

2  A.   No.

3  Q.   So it is correct you could not tell -- the alcoholic

4  beverage that you smelled was not strong enough for you to

5  detect what kind of beverage, correct?

6  A.   Yes, correct.

7  Q.   Now, is it fair to state that he was in the same condition

8  he was, in terms of being dazed and confused, when you saw him

9  on the side of the road that he was when you saw him in the

10 vehicle?

11 A.   He was talking a little bit more.  He wasn't really

12 answering any -- like any of my questions.  I wasn't really

13 asking him questions.  I was just trying to -- trying to get him

14 to stay, but, yeah, he was -- he was actually talking to me.

15 Q.   What did he tell you?

16 A.   He was just saying that he needed a cell phone.  That he

17 wasn't the driver.  I was the driver.

18 Q.   Okay.  Now, he never got more than 10 feet south of his

19 vehicle on the dirt road; isn't that correct?

20 A.   I believe so.  I don't remember exactly how far he was

21 away.

22 Q.   He didn't run?

23 A.   No.  He was just walking.

24 Q.   Now, did you notice any debris on the southbound lanes of

25 Church Lane when you either went back to your truck or when you

26 went up to the corner of Armstrong and West Lane?

27 A.   Yeah.  There was -- there was broken glass on the road.

28 Q.   And that was in the number one lane and the left turn lane;

```
 1   is that correct?
 2   A.    As far as I can remember, it was actually scattered
 3   everywhere.
 4   Q.    But most of it was in the number one lane; is that correct?
 5   A.    I believe so, yes.
 6   Q.    Now, did you see -- so you saw glass.  Did you see metal?
 7   A.    I saw pieces of cars laying on the road.
 8   Q.    And you saw them in the number one lane, the fast lane,
 9   right next to the left turn lane?
10   A.    There was a couple there and then there was a couple off to
11   the side of the road.
12   Q.    And you never saw the cars -- you never saw how the cars
13   became engaged, correct?
14   A.    No.
15                 MR. SCHULTZ:  I have nothing further.
16                 THE COURT:  Mr. Rasmussen?
17                      REDIRECT EXAMINATION
18                 BY MR. RASMUSSEN:  Q.  Mr. Sanchez, how far was
19   the defendant when -- did you see the police detain Mr. -- the
20   defendant?
21   A.    Yes, I did.
22   Q.    And how far further south from his car, or the car that he
23   was in, was he when they detained him?
24   A.    I wouldn't be able to tell you.  Maybe -- from his car?
25   Q.    Yes.
26   A.    Maybe about -- I would say maybe something like 30 feet,
27   maybe.
28   Q.    Okay.  Did you see anyone move any of the debris that you
```

JOSEPH RICKNER TESTIMONY:

PAGE   53 line 25-27 " Sees Serratos walking in center median"

PAGE   54 line    1 " States Serratos about 10 feet from Honda"

PAGE   55 line 10-12 " Leaves Serratos with Cell Phone"

PAGE   55 line 16      " States Oldsmobile about 30 Feet From Honda"

PAGE   55 line 27-1 of 56 " States able to see Serratos STILL"

PAGE   56  line  2-9  "States Serratos still in middle of intersection
                      walking back and forth "pacing""

PAGE. 56 line 23-24 " never heard Serratos talk on the phone"

PAGE 57 line 10-11  "Kept eye on Serratos"

PAGE 58 line 7-17    " Seen Serratos walking back South ( Meant north)
                     seen CHP take Serratos into custody ."

PAGE 59 line 10-22   " Clarifys NORTH & SOUTH"

PAGE 59 line 23-28   " States his car was 50 feet from the intersection
                     where Oldsmobile was located. Pablo stated HONDA
                     was 30 feet from the Intersection / OLdsmobile.

PAGE 60 line 2-5     " states his car was on side of the road all right
                     their " meaning close to eachother or other cars.
                     not 200 feet nor 200 yards away .

PAGE 61 line 20-22   " Serratos was apprehended next to his car " as
                     stated on Page 58 line 15-16. Police on scene
                     Serratos walking south (Clarified to North).

PAGE 62 line 2-6  "Serratos DID NOT WALK FURTHER SOUTH"!!

PAGE 64 line 1-24 " Serratos pacing back & forth on median appeared confused

PAGE 71 line 11-13 " Judge states 200 yards huge discrepency from what

                    Pablo Sanchez and Joseph Rickner testified too

                    basing account on CHP unsupported claim.


JOSEPH RICKNER TESTIMONY DEMOSTRATES NO HIT & RUN, SERRATOS ALWAYS IN SIGHT
NEVER RAN, OR FURTHER SOUTH OF WHERE HIS CAR AND OTHERS WERE, ALWAYS
REMAINED WITHIN AN APPROPRIATE CANVASED AREA, PACING BACK AND FORRTH OF
AND BETWEEN OLDSMOBILE AND HONDA/RICKNER's PARRELLEL PARKED CAR. AND
WITHIN A TIME SPAN THAT ALLOTTE ENOUGHTIME TO FLEE BUT DID NOT .
RATHER REMAINED ON SCENE MERELY APPEARING CONFUSED , RETURNED CELL PHONE
THAT IS NOT A DISPLAY OF A MALIGNANT HEART..



GRAVOS# 1,2,7,8

16 Pages.

1   Q.   Were you northbound or southbound on West Lane?

2   A.   South.

3   Q.   And do you recall what lane you were in?

4   A.   I believe the left lane.

5                 THE COURT:  Please keep your voice up,

6   Mr. Rickner.

7                 MR. RASMUSSEN:  Q.  The fast lane?

8   A.   I believe so.

9   Q.   Okay.  And did you notice anything when you approached --

10  before you got to the intersection, did you see anything

11  unusual?

12  A.   Well, we saw the Honda sitting there, driver's door open,

13  the horn going off.

14  Q.   Before you got to the intersection, did you already see the

15  Honda?

16  A.   No, it was kind of -- it was dark and I don't think the

17  lights were on.

18  Q.   At some point, the first thing you noticed was a Honda?

19  A.   Yeah.  We saw kind of like some sparks and stuff like that.

20  And I didn't notice it, the passenger did.  He said, "What was

21  that?"  And kept proceeding, came up and we saw the car.

22  Q.   Where did --

23                MR. SCHULTZ:  I move to strike the testimony,

24  Your Honor, as no personal knowledge.

25                THE COURT:  Sustained.

26                MR. RASMUSSEN:  Q.  When you first saw the Honda,

27  what did you guys do?

28  A.   I went to the Honda to see -- that's the only vehicle I

Tami S. Brown, CSR 5118          *         Superior Court Reporters
222  E. Weber Ave., #69        Stockton, CA 95202       209-468-2840

1   saw.

2   Q.   Okay.  Did you pull to the side of the road?

3   A.   Yeah.

4   Q.   And was there anyone around the outside of the Honda when

5   you got there?

6   A.   No.  There was a gentleman walking in the middle of the two

7   lanes and I asked who was driving the car.  He said he didn't

8   know, and asked to use my phone.

9   Q.   Okay.  Describe what this person looked like.

10  A.   Mexican, I guess.  I don't know, about five seven.

11  Q.   Okay.  Do you recall what he was wearing?

12  A.   No.

13  Q.   Okay.  How old?

14  A.   Mid 20's.

15  Q.   Okay.  Looking around the courtroom, do you see that person

16  here?

17  A.   Yes.

18  Q.   And could you point to him, describe what he's wearing?

19  A.   The gentleman in the orange.

20              THE COURT:  Point to him, please.

21              THE WITNESS:  (Indicating).

22              THE COURT:  Indicating the defendant.

23              MR. RASMUSSEN:  Q.  And where was he located when

24  you first saw him?

25  A.   Walking, like I said, he was in the center median.

26  Q.   Center median?

27  A.   Yeah.

28  Q.   How close to the Honda was he?

1  A.   I'd say, like, 10 feet or so.

2  Q.   And was he north, south, east or west of it?

3  A.   On the driver's side.

4  Q.   On the driver's side of it?

5  A.   Yeah.

6  Q.   And where was he walking, what direction?

7  A.   Back south.

8  Q.   South?

9  A.   Yeah.

10  Q.   Okay.  And no one else was around when you saw him?

11  A.   Another gentleman that was on the other side going the

12  opposite way.

13  Q.   You saw another person and he was going the opposite way.

14  Was he in a car or was he walking?

15  A.   I didn't even really -- still was kind of in shock and

16  trying to find out what happened.  I didn't even notice that the

17  other car was sitting in the vineyards.

18  Q.   Okay.  Did you see anyone else walking around is my

19  question.

20  A.   No.

21  Q.   And you said that the defendant asked to use your cell

22  phone?

23  A.   Correct.

24  Q.   And was he still walking when he was asking you this?

25  A.   (Nods head) Yes.

26  Q.   You have to answer out loud so the court reporter --

27  A.   Sorry.

28  Q.   That's okay.

1      And did you have a cell phone?

2   A.   Yes.

3   Q.   And did you let the defendant use it?

4   A.   Yes.

5   Q.   Okay.  And you are still walking southbound?

6   A.   Yes.  And then that's when I noticed the other car, and I

7   proceeded over there to see if they were okay.

8   Q.   Okay.  Does the defendant still have your cell phone?

9   A.   Yes.

10  Q.   Okay.  So you left the defendant with your cell phone and

11  walked back to the intersection?      NORTH

12  A.   Correct.

13  Q.   How far was that from the defendant's car or -- excuse me,

14  misstates the evidence -- the car that you saw, the Honda Accord

15  and the other car?

16  A.   Pretty far.  I'm not sure.  Probably 30 feet at least.

17  Q.   Okay.  And you left the defendant with the cell phone, you

18  went back to the other car, how long did you stay at that car?

19  A.   Not very long.

20  Q.   Okay.  And then did you proceeded back?

21  A.   To get my phone.

22  Q.   Did you see where the defendant was?

23  A.   What's that?

24  Q.   When you left the other car, do you know what kind of car

25  that was?

26  A.   A Buick, I believe.

27  Q.   Okay.  When you were at that car, could you still see the

28  defendant?

DEFENDANT IN SIGHT

1  A.  Yes.

2  Q.  And where was he now?

3  A.  Still " in the middle of the intersection.

4  Q.  Was he walking or standing still?

5  A.  Walking.

6  Q.  Which way was he walking?

7  A.  Kind of back and forth.

8  Q.  He was pacing right there?

9  A.  Yeah.

10  Q.  Did you walk back toward him?

11  A.  Yeah.  Grabbed my phone.  I asked if he called the police,

12  which I assumed that's what he was doing with my phone to begin

13  with.

14  Q.  And what did he say?

15  A.  He didn't -- I don't call recall his answer.

16          MR. SCHULTZ:  I'm sorry, Your Honor.  I'm having

17  difficulty hearing the witness.

18          THE COURT:  Please keep your voice up.

19          MR. SCHULTZ:  Could I have the last answer read

20  back?

21          THE COURT:  "I don't recall his answer."

22          MR. RASMUSSEN:  Q.  Did you ever hear the

23  defendant talking on your phone?

24  A.  No.

25  Q.  And did you ever look at the number on your cell phone to

26  see what number he called?

27  A.  No.

28  Q.  And did you stay with the defendant?

1  A.  Somewhat.

2  Q.  What do you mean "somewhat"?

3  A.  It was kind of, you know, talking to someone else that was

4  going the other way and trying to figure out what had happened

5  and...

6  Q.  So there were other people on the scene now?

7  A.  Yeah.  At that time, yes.

8  Q.  And you started talking with them?

9  A.  Yes.

INSIGHT AT
ALL TIMES.

10  Q.  Did you keep an eye on the defendant?

11  A.  Yes.

12  Q.  Okay.  And what was the defendant doing?

13  A.  Walking.

14  Q.  Where was he walking?

15  A.  Back north, this time towards our parked vehicle.

16  Q.  Okay.  And did he get to it?

17  A.  Yeah.

18  Q.  Okay.  What happened when he got to your car?

19  A.  Somebody said he had tried to steal it.  Looked in, seeing

20  if there was keys.  I didn't personally see that.

21        MR. SCHULTZ:  Move to strike, calling for

22  hearsay.

23        THE COURT:  Sustained.

24        MR. RASMUSSEN:  Q.  You saw him at the car that

25  you had come in?

26  A.  Correct.

27  Q.  And did you see what he did when he got to that car?

28  A.  No.

1   Q.   Did you see --

2   A.   I just saw him around it and another -- our passenger had

3   said --

4               THE COURT:   No.   The question is what did you

5   see.

6               MR. RASMUSSEN:   Q.   What did you see?

7   A.   I gust saw him walking.

8   Q.   And did you hear him say anything there?

9   A.   No.

10  Q.   How long did he stay at the car that you were in?

11  A.   Not very long, couple minutes, if that.

12  Q.   Then where did he go?

13  A.   Continued walking.

14  Q.   Which direction?

15  A.   Back south.   And then, by then, the police were on scene.

16  Q.   Okay.   And did you see the police take him into custody?

17  A.   Yes.                    CHP

18  Q.   Did you ever see anyone calling out for the defendant?

19  A.   Yes.

20  Q.   And describe this person.

21  A.   Can't really recall.

22  Q.   Do you recall what race?

23  A.   Mexican.

24  Q.   Age?

25  A.   Probably around the same age, mid 20's.

26  Q.   And what did this person say?

27  A.   He had received a phone call.

28  Q.   Did he say who it was from?

```
 1    A.    No.

 2    Q.    Okay.  Did he say why he was there?

 3    A.    No.

 4    Q.    Was this person a police officer?

 5    A.    No.

 6                MR. RASMUSSEN:  Nothing further, usual.

 7                THE COURT:  Mr. Schultz?

 8                MR. SCHULTZ:  Thank you very much, Your Honor.

 9                        CROSS-EXAMINATION

10                BY MR. SCHULTZ:  Q.  Mr. Rickner, you said you

11    saw Mr. Serratos walking northbound on West Lane; is that

12    correct?

13    A.    Yes.

14    Q.    And where was your vehicle parked in relationship to the

15    intersection of Armstrong Road and West Lane?

16    A.    Further north.

17    Q.    So you were north of the intersection; is that correct?

18    A.    Yes.

19    Q.    And --

20    A.    Or south, I'm sorry.

21    Q.    South?

22    A.    Yes.

23    Q.    Okay.  How far from the corner?  Ten feet?  Five feet?

24    A.    We were quite a ways down.

25    Q.    How far from the corner then?

26    A.    At least 50 feet.

27    Q.    Fifty feet.

28          And where was your car parked in relationship to the car
```

1 | that you saw on the median?

2 | A.    On the right-hand side on the shoulder.

3 | Q.    And you were perhaps maybe 200 feet further north; is that

4 | correct?

5 | A.    No.

6 | Q.    How many feet further north?

7 | A.    I'm not sure.  I mean...

8 | Q.    But, clearly, your vehicle was parked closer to the

9 | accident scene than was the car in the median, correct?

10 | A.    No.  I mean, it was all kind of "right there."  I mean, we

11 | parked, like I said, on the right-hand side.

12 | Q.    I understand that, but on the right-hand side of the road,

13 | where were you in relationship to the car that was parked on the

14 | median?  Were you north of it?  South of it?  Right across from

15 | it?

16 | A.    South.

17 | Q.    South.

18 | But didn't you say on direct examination that you saw the

19 | driver of the vehicle walking north towards your vehicle?

20 | A.    Yes.  He was walking towards my vehicle, but I believe I

21 | got mixed up with north and south.

22 | Q.    And how is it now -- why didn't you tell us you were mixed

23 | up when you were asked on direct examination which way

24 | Mr. Serratos walked?

25 | A.    No answer.  I don't understand.

26 | Q.    What caused you to remember now that you were south rather

27 | than north?

28 | A.    Because Lodi is north, Stockton is south.

1  Q.   But you testified originally that you saw Mr. Serratos walk

2  north towards your vehicle, correct?

3  A.   I assume so.

4  Q.   And that would indicate that you were parked closer to the

5  intersection than the vehicle that was on the median; is that

6  correct?

7  A.   I don't understand.

8  Q.   All right.  You don't know which direction the vehicle was

9  parked in relationship -- your vehicle was parked in relation to

10  the vehicle on the median, do you?  It could have been north, it

11  could have been south, correct?

12  A.   No, it was parked south.

13  Q.   And how far south from where the vehicle on the median was?

14  A.   Fifty feet, like I said.

15  Q.   And how much time did Mr. Serratos spend by your vehicle?

16  A.   A few minutes.

17  Q.   And did he leave your vehicle?

18  A.   Somewhat.

19  Q.   And then he went back to his vehicle, correct?

20  A.   No.  He was then apprehended by sheriff.

21  Q.   Right next to your vehicle?

22  A.   Yes.

23  Q.   And you are proceeding northbound on West Lane; is that

24  correct?

25  A.   When we saw it?

26  Q.   Yes.

27  A.   No, we were going south.

28  Q.   Oh, okay.

1  A.   We were traveling the same direction.

2  Q.   Now, did -- did Mr. Serratos walk further south from your

3  vehicle at any time?

*[handwritten: DEFENDANT NEVER WAS FURTHER SOUTH OF RICKNER VEHICLE]*

4  A.   "Not really."

5  Q.   And did the police apprehend him next to your vehicle?

6  A.   Yes.   *[handwritten: REFER TO PAGE 71. CHP STATE 200 YARDS]*

7  Q.   And did you physically touch Mr. Serratos?

8  A.   No.

9  Q.   Did you get the impression that he was confused because of

10  the accident?

11  A.   Possible.

12  Q.   Now, you -- you testified, as I understand it, that you

13  never saw anybody walking with Mr. Serratos, correct?

14  A.   Correct.

15  Q.   You never saw anybody walking with him on the gravel?

16  A.   No.  Not that I can recall.

17  Q.   I'm sorry?

18  A.   Not that I can recall, no.

19  Q.   Now, did you see Mr. Serratos try and get into your

20  vehicle?

21  A.   Yes.

22  Q.   How did he do that?

23  A.   Just looked in.

24  Q.   He looked into the vehicle?

25  A.   Correct.

26  Q.   Did he touch the vehicle?

27  A.   I can't recall.

28  Q.   And you thought by looking into the vehicle, that that was

1   suspicious?

2   A.   Yes.

3   Q.   Did you think he was -- may have been confused as to where

4   his car was?

5   A.   No.

6   Q.   Now, was he -- did he talk to you at all?

7   A.   Slightly.   Just asked to use the phone.

8   Q.   And was this by your vehicle?

9   A.   By his.

10   Q.   By his vehicle?

11   A.   Yes.

12   Q.   And that's all he said to you; is that correct?

13   A.   Yes.

14   Q.   And what did you -- did you say anything to him while was

15   at his vehicle?

16   A.   I asked who was driving the vehicle in the median.

17   Q.   I'm sorry?

18   A.   I asked who was driving the Honda Accord.

19   Q.   And what -- was there any answer?

20   A.   He said he didn't know.

21   Q.   Now, did you infer from that that he may have been hurt in

22   the accident?

23   A.   No, I didn't know anything yet.   I had just arrived.

24   Q.   Did you see him get out of the vehicle on the median?

25   A.   No.

26   Q.   Now, when Mr. Serratos was over by your vehicle, you stayed

27   with him at that time; is that correct?

28   A.   No.

```
 1    Q.   You walked back to the -- to your -- to the intersection?

 2    A.   Yes.

 3    Q.   And how long were you gone?

 4    A.   Couple minutes.

 5    Q.   And where was Mr. Serratos during these two minutes?

 6    A.   Still by my vehicle.

 7    Q.   Was he pacing back and forth?

 8    A.   Yes.

 9    Q.   Going north, south, east and west?

10    A.   Yeah.

11    Q.   Looked like he was confused?

12    A.   I'm not sure.

13    Q.   What did you think he was doing when he was pacing in all

14    directions?

15    A.   I have no clue.

16    Q.   Did you think he had a clue?

17    A.   Couldn't tell you.

18    Q.   Now, how long is he walking in the median when you first

19    saw him, if you know?

20    A.   Maybe a minute.

21    Q.   And he was walking up and down?

22    A.   Yes.

23    Q.   Did he appear confused at that time?

24    A.   Yeah, I'd say confused.  I don't know.

25              MR. SCHULTZ:  I have nothing further.

26              THE COURT:  Mr. Rasmussen?

27              MR. RASMUSSEN:  Yes.  Thank you, Your Honor.

28
```

1  A.    Correct.

2  Q.    Looking around this courtroom, do you see that person in

3  this courtroom?

4  A.    I do.

5  Q.    And could you point to him and describe what's wearing?

6  A.    It's the person in the orange jumpsuit (indicating).

7              THE COURT:   Indicating the defendant.

8              MR. RASMUSSEN:   Q.   Approximately how far south

9  from the Honda Accord was the defendant when you saw him after

10  you had passed the first two?

11  A.    How far was he from the Honda Accord?

12  Q.    Yes.          *IMPRACTICAL*          CONTRADICTS

13  A.    Maybe 200 yards.   Two football fields.    RICHNER
                                                    ARREST NEXT
                                                    TO RICHNERS CAR.
14  Q.    And the two individuals that were near him, how close were

15  they?

16  A.    They were behind him probably by, maybe, 20 yards.

17  Q.    Do you recall what the defendant was wearing?

18  A.    I believe he was wearing a white polo shirt, black shorts,

19  I think it was.

20  Q.    Okay.   Did you try to stop and talk to the defendant?

21  A.    We did.

22  Q.    Could you describe that?

23  A.    As we approached him, I was on -- I was the passenger in

24  our patrol car.   My partner was driving.   I used the PA, public

25  address system, the loud speaker.   Told him to stop as we were

26  approaching him.   He turned around, made eye contact, turned

27  around, continued walking southbound away from us.   We pulled up

28  right up behind him, got out, detained him, put him in

1                        (People's Exhibit 11 received in evidence.)

2                    THE COURT:  It shows -- what does it show,

3   Mr. Rasmussen?

4                    MR. RASMUSSEN:  At the date of the offense, the

5   defendants driver's license was suspended.

6                    THE COURT:  Okay.

7                    MR. SCHULTZ:  I'll object.  Just so it's clear,

8   no foundation.  Hearsay.

9                    THE COURT:  All right.  It will be received.

10  Overruled.

11      Any other evidence by the People?

12                   MR. RASMUSSEN:  No, Your Honor.  I believe all my

13  exhibits have been entered into evidence except for People's

14  Exhibit 2.  And People would rest.

15                   THE COURT:  Any evidence by the defense?

16                   MR. SCHULTZ:  No, Your Honor.

17                   THE COURT:  Any comments?

18                   MR. SCHULTZ:  Yes.  There would be a motion to

19  dismiss based upon insufficiency of the evidence, particularly,

20  as to the homicide and particularly as to the hit and run.  I

21  don't believe there's sufficient evidence to say that there is a

22  homicide here.

23                   THE COURT:  Well, as far as hit and run, the

24  testimony is he ran between -- or he went between 200 and 300

25  yards from his vehicle than.  I think that's a significant

26  distance.  If it was 15, 20 feet, I don't know that it would be

27  a hit and run, but, here, he was headed in the other direction

28  and it's pretty clear he didn't stop and follow the rules as far

1   as identification. So I think we have a hit and run.

2       As far as the 187, in light of the defendant's prior

3   driving under the influence, also the fact that he acknowledged

4   being told that he could be charged with murder in the future if

5   someone died as a result of driving under the influence, I think

6   that's enough to hold him to answer on that.

7       So as to Count 1, I find reasonable and probable cause to

8   believe that a felony violation of 187 occurred. I also find

9   191.5(a), the vehicular manslaughter while intoxicated with

10  gross negligence against. I also find multiple victims.

11      I find, Count 3, driving under the influence of alcohol

12  with injury.

13      As far as Chaunnel Renberg --

14              MR. RASMUSSEN: Your Honor, we would withdraw --

15  dismiss the enhancement under her name, the 12022.7(a).

16              THE COURT: Doesn't seem like there was great

17  bodily injury as to her. I think she was injured, but not great

18  bodily injury.

19      Count 4, I find 23153(b) was true.

20      Count 5, driving under the influence with injury as to

21  David Heredia. There was great bodily injury as to Mr. Heredia.

22      Also, Count 6, driving at .08 or above with injury of David

23  Heredia, also great bodily injury. I also find that -- the hit

24  and run to be true.

25      Also a misdemeanor violation of 14601.2.

26      Also reasonable and probable cause to believe the defendant

27  is guilty thereof. He will held to answer to appear.

28              MR. SCHULTZ: Your Honor, I would ask, because of

PABLOSSANCHEZ & JOSEPH RICKNER

CANVASED TESTIMONIO ASSESSMENT.

MAP LAYOUT.

GOOGLE MAPS DIPICTION

BING MAPS AERIAL VIEW

# EXHIBIT A -2

3 pages.

GROUND #1,2,7,8



CITY OF LODI

ISRAEL RODRIGUEZ
HOME APROX 2.5
MILES

WEST LANE NORTH BOUND

ARMSTRONG RD

PABLO SANCHEZ
DROVE NORTH BOUND
WITNESSED STARKS

WEST LANE NORTH BOUND

VEST LANE SOUTH BOUND

#1 LANE

#2 LANE

TURN LANE

WOOD BRIDGE FIRE DEPT.

WFD

MARIO LOYAS
HOME "
APPROX 1 "ONE MILE "

SERRATOS BROTHER IN LAW.

ARMSTRONG RD

PABLO PARKED
TRUCK

OLDSMOBILE

SERRATOS
HAD AMPLE TIME
TO FLEE -
DID NOT FLEE

RICKNER -
NEVER STATED SERRATOS CAR
WAS ALWAYS WITHIN FIRE SIGHT
BASED ON TESTIMONY ONLY
DEMONSTRATED PACING
BACK + FORTH BETWEEN
VEHICLES - (HONDA + OLDSMOBILE)

SANCHEZ -
MAKES SIMILAR ASSESSMENT

WEST LANE SOUTH BOUND

HONDA

RICKNER
CAR

SOUTHBOUND

**Google** Maps   Armstrong Rd, Lodi, CA to N W Ln, Lodi, CA     Drive 1.7 miles, 2 min



**Google** Maps   Armstrong Rd, Lodi, CA to Morada Ln, Stockton, CA    Drive 4.0 miles, 6 min



Both Pablo Sanchez/Joseph Rickner
testified Serratos within eyesight
no running,walking of distances
of 2 to 3 FOOTBALL FIELDS 200/300
Yards..

#2    Map data ©2017 Google   United States    1 mi

Benjamin's brother in law Mario Loya
residence was within ONE MILE of Armstrong

Benjamin's cousin Armando Serratos
Residence was within approx 4 miles..

0.4 mi



Nephews
Israel
Rodriguez
Residence

bing maps

Notes

West lane and Harney Lane

In-Law
Mario
Loya
Residence

Oldsmobile
Honda

Armstrong



esidence
of
titioner
other
Law...
rio Loya
1080
adford
CIR
odi Ca.
240.

Armstrong

Page 4 line 1-2 " Counsel request defendant to write notes for him"


Page 4 line 9 Thru Page 6 line 10 : Discusses the initial entry of

Prior 2006 D.U.I conviction &

Admonishment.

This Preliminary Hearing was Held 3/28/2011

9 months from charges alledged,  6/18/2010

Counsel raises argument of Trustworthiness, authentication and foundation.



# EXHIBIT B

3 Pages

1  possible that Mr. Serratos can be unhandcuffed during the

2  preliminary hearing so that he can write notes for me?

3              THE COURT:  Any reason not to?

4              THE BAILIFF:  We'll undo his right hand if he's

5  right-handed.

6              MR. SCHULTZ:  Thank you.

7                  (People's Exhibit 1, Document, marked for

8                  identification.)

9              MR. RASMUSSEN:  Before we get started, Your

10 Honor, I've shown People's Exhibit Number 1 to the defense and

11 we'd ask that People's Exhibit Number 1 be entered into

12 evidence.  It's the defendant's prior DUI conviction and it has

13 the admonishment in there, initialed by the defendant.

14             THE COURT:  Any objection?

15  (2)      MR. SCHULTZ:  Yes, Your Honor.  There's no

16 foundation at this particular time.

17             THE COURT:  Let me see that.  People's Number 1

18 is a certified copy of a docket from this court, Benjamin

19 Serratos, 23152(b), shows a conviction July 20th, 2006.

20    Where is the -- which part shows the acknowledgment about a

21 possible 187 charge?

22             MR. RASMUSSEN:  Not page number, but number 6,

23 Your Honor.

24             THE COURT:  And, let's see, number 6 on the plea

25 form initialed by the defendant, "I understand the following:

26 Being under the influence of alcohol or drugs or both impairs my

27 ability to safely operate a motor vehicle.  It is extremely

28 dangerous to human life to drive while under the influence of

1   alcohol or drugs or both.  If I continue to drive while under

2   the influence of alcohol or drugs or both and, as result of that

3   driving someone is killed, I can be charged with murder."

4       So this is a certified copy of a docket from this court.  I

5   think it's therefore self authenticating, that will be received.

6                       (People's Exhibit 1 received in evidence.)

7               MR. SCHULTZ:  Is it being received under an

8   exception to the hearsay rule?  And, if so, is it the

9   official --

10              THE COURT:  Under the Evidence Code.  The

11  Evidence Code provides if it's a certified copy of a docket,

12  it's received.

13              MR. SCHULTZ:  But it must be made by a public

14  employee in the course and scope of their employment where they

15  have a duty to keep those records.

16              THE COURT:  It's a court docket.  Court docket.

17  I mean, it's this court and all of our clerks have a duty to

18  record court records.

19              MR. SCHULTZ:  But I don't think it was made by

20  our particular clerk, who I know is excellent at --

21              THE COURT:  She doesn't do drunk drivings, but

22  that's the beauty of the business records exception and the

23  official records exception.

24              MR. SCHULTZ:  But how do we know --

25              THE COURT:  It doesn't have to be the individual.

26              MR. SCHULTZ:  But how do we know that the

27  custodian, the one -- or the affiant who is signing that, how do

28  we know that she can testify to the trustworthiness of that

1   particular document?

2                   THE COURT:  We don't know for sure.

3                   MR. SCHULTZ:  Right.

4                   THE COURT:  But that's -- but that's not the

5   standard.

6                   MR. SCHULTZ:  But that's why she should be here.

7                   THE COURT:  She doesn't have to.  I'll tell you

8   what, since it's so close to Christmas, since it's part of the

9   court's record, I'll take judicial notice of that because it is

10   a record of this court.

11     Mr. Rasmussen.

12                   MR. RASMUSSEN:  Thank you.

13                   **DIRECT EXAMINATION**

14                   BY MR. RASMUSSEN:  Q.  Good morning.

15   A.   Good morning.

16   Q.   Could you state your full name, spelling your last name for

17   the record.

18   A.   David Matthew Heredia, H-e-r-e-d-i-a, Jr.

19   Q.   I'd like to talk to you about June 12th of last year.

20   A.   Okay.

21   Q.   Do you recall that date?

22   A.   I do.

23   Q.   I want to talk to you about the evening.  Did you go

24   somewhere that evening?

25   A.   I did.

26   Q.   Who did you go with?

27   A.   I went with Destanee Little and Chaunnel Renberg.

28   Q.   And how old is Destanee or was Destanee at that time?

1.            MISDEMEANOR ADVISEMENT OF RIGHTS, WAIVER AND PLEA FORM

    Case#  S006-15962 (P.C 417.4)    7/20/2006


2.            MISDEMEANOR ADVISEMENT OF RIGHTS, WAIVER AND PLEA FORM

    Case#  ST 043049A  ( 23152 (b) ) 7/20/2006


3.            ADDENDUM TO ADVISEMENT, WAIVER AND PLEA FORM

                                    7/20/2006



Signitures of  1. & 2. are signed    short name"BEN"

Signiture of  3.   is signed      extended name  " BENJAMIN"



# EXHIBIT C

                6 Pages




GROUND # 1, 8,9

FILED
SUPERIOR COURT
Rose Junqueiro, Clerk

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN JOAQUIN

By: _____
Deputy

**PEOPLE OF THE STATE OF CALIFORNIA**

**vs**

Benjamin Serrates

Case No. SO06-15962

## MISDEMEANOR ADVISEMENT OF RIGHTS, WAIVER AND PLEA FORM

1. I hereby freely and voluntarily plead _____ guilty or ✓ no contest to: 4/17.4 _____

_____

2. I understand that a plea of no contest (nolo contendere) will have exactly the same effect in this case as a plea of guilty, but it cannot be used against me in a civil lawsuit.

3. I understand that if I am not a citizen, a plea of guilty or no contest can and will result in my deportation, exclusion from admission to this country or denial of naturalization. I also understand that if I am a foreign national, I have the right to have my consular representative contacted and I hereby waive that right.

4. I have been advised of, understand and knowingly and intelligently waive each of the following constitutional rights:
   a. To an attorney to represent me at all stages of the proceeding. If I cannot afford to hire an attorney, the court will appoint one to represent me free of charge.
   b. To have a speedy and public trial by court or by jury. At the trial I am presumed to be innocent and the prosecution has the burden of proving me guilty beyond reasonable doubt.
   c. To confront and cross-examine all witnesses testifying against me.
   d. To present evidence and to have the Court issue subpoenas to bring into court witnesses or evidence favorable to me, at no cost.
   e. To testify on my own behalf if I choose, or to remain silent and not incriminate myself. By pleading guilty or no contest I am incriminating myself.

5. I understand the charge(s) against me and the possible pleas and defenses.

6. I understand the minimum and maximum penalties for the offense(s) I am charge with.

7. My decision to enter this plea has been made freely and voluntarily. No promises or inducements have been made in connection with this plea except: _____

_____

_____

Sup. Ct. 91 (07/04)

8. I understand that this conviction could be used against me in the future as a prior conviction, to increase any penalties for future convictions, or  could be used to violate my probation or parole which has been granted in another case.                                                                     BS

9. If applicable - I understand that I have the right to enter my plea before, and to be sentenced by, a Judge. I give up this right and agree to enter my plea before, and be sentenced by, a Superior Court Commissioner.                                                                                  BS

## DEFENDANT'S STATEMENT

I am aware of and understand each of the above items. I have initialed those items as proof thereof. I hereby freely and voluntarily waive my rights and enter a plea to the listed charge(s).

Defendant's signature: _____     Dated: 7/20/06

## ATTORNEY'S STATEMENT

I am the attorney of record for the defendant. I have reviewed the form (and addendum if applicable) with my client. I have explained each of the defendant's rights to the defendant and answered all of the defendant's questions with regard to this plea. I have also discussed the facts of the case with the defendant, explained the consequences of this plea, the elements of the offense(s) and the possible defenses. I concur in this plea and in the defendant's decision to waive his or her constitutional rights.

Attorney signature: _____     Dated: 7-20-06

Type or print name: _____

## INTERPRETER'S STATEMENT (If applicable)

I certify that I translated this form to the defendant in ____ Spanish ____ Other: _____ and that the defendant stated (s)he understood the contents of the form and then initialed and signed the form in my presence.

Interpreter's signature: _____     Dated: _____

Type or print name: _____

## COURT'S FINDINGS AND ORDER

The Court finds that the defendant has expressly, knowingly, voluntarily and intelligently waived his or her constitutional rights. The Court finds that the defendant's plea(s) and admission(s) are freely and voluntarily made and that there is a factual basis for the plea(s). The Court accepts the defendant's plea(s) and admission(s), if any, and orders this form and any applicable addendum filed and incorporated in the docket by reference.

_____     Dated: JUL 20 2006
Judge of the Superior Court

FILED
SUPERIOR COURT
Rose Junqueiro, Clerk

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN JOAQUIN

By: _____
Deputy

**PEOPLE OF THE STATE OF CALIFORNIA**

**vs**

Benjamin Santos

**Case No.** ST0430 49A

**MISDEMEANOR ADVISEMENT OF RIGHTS, WAIVER AND PLEA FORM**

1. I hereby freely and voluntarily plead ____ guilty or ✓ no contest to: 23152(B) ____    BS
   _____    BS

2. I understand that a plea of no contest (nolo contendere) will have exactly the same effect in this case as a plea of guilty, but it cannot be used against me in a civil lawsuit.    BS

3. I understand that if I am not a citizen, a plea of guilty or no contest can and will result in my deportation, exclusion from admission to this country or denial of naturalization. I also understand that if I am a foreign national, I have the right to have my consular representative contacted and I hereby waive that right.    BS

4. I have been advised of, understand and knowingly and intelligently waive each of the following constitutional rights:    BS
   a. To an attorney to represent me at all stages of the proceeding. If I cannot afford to hire an attorney, the court will appoint one to represent me free of charge.    BS
   b. To have a speedy and public trial by court or by jury. At the trial I am presumed to be innocent and the prosecution has the burden of proving me guilty beyond reasonable doubt.    BS
   c. To confront and cross-examine all witnesses testifying against me.    BS
   d. To present evidence and to have the Court issue subpoenas to bring into court witnesses or evidence favorable to me, at no cost.    BS
   e. To testify on my own behalf if I choose, or to remain silent and not incriminate myself. By pleading guilty or no contest I am incriminating myself.    BS

5. I understand the charge(s) against me and the possible pleas and defenses.    BS

6. I understand the minimum and maximum penalties for the offense(s) I am charge with.    BS

7. My decision to enter this plea has been made freely and voluntarily. No promises or inducements have been made in connection with this plea except: _____
   _____
   _____    BS



Sup. Ct. 91 (07/04)

8.  I understand that this conviction could be used against me in the future as a prior conviction, to increase any penalties for future convictions, or could be used to violate my probation or parole which has been granted in another case.



9.  If applicable - I understand that I have the right to enter my plea before, and to be sentenced by, a Judge. I give up this right and agree to enter my plea before, and be sentenced by, a Superior Court Commissioner.

## DEFENDANT'S STATEMENT

I am aware of and understand each of the above items. I have initialed those items as proof thereof, I hereby freely and voluntarily waive my rights and enter a plea to the listed charge(s).

Defendant's signature: _____     Dated: _____

## ATTORNEY'S STATEMENT

I am the attorney of record for the defendant. I have reviewed the form (and addendum if applicable) with my client. I have explained each of the defendant's rights to the defendant and answered all of the defendant's questions with regard to this plea. I have also discussed the facts of the case with the defendant, explained the consequences of this plea, the elements of the offense(s) and the possible defenses. I concur in this plea and in the defendant's decision to waive his or her constitutional rights.

Attorney signature: _____     Dated: 7-20-06

Type or print name: _____

## INTERPRETER'S STATEMENT (If applicable)

I certify that I translated this form to the defendant in ____ Spanish ____ Other: _____ and that the defendant stated (s)he understood the contents of the form and then initialed and signed the form in my presence.

Interpreter's signature: _____     Dated: _____

Type or print name: _____

## COURT'S FINDINGS AND ORDER

The Court finds that the defendant has expressly, knowingly, voluntarily and intelligently waived his or her constitutional rights. The Court finds that the defendant's plea(s) and admission(s) are freely and voluntarily made and that there is a factual basis for the plea(s). The Court accepts the defendant's plea(s) and admission(s), if any, and orders this form and any applicable addendum filed and incorporated in the docket by reference.

_____     Dated: JUL 20 2006
Judge of the Superior Court

## ADDENDUM TO ADVISEMENT, WAIVER AND PLEA FORM

### ADDITIONAL CONSEQUENCES OF PLEA TO V.C. 23152 and 23103/23103.5

| SENTENCES FOR DRIVING UNDER THE INFLUENCE OF ALCOHOL AND/OR DRUGS | | |
|---|---|---|
| **Offense** | **Min./Max. When Probation Granted** | **Min./Max. Without Probation** |
| **First Offense in 10 yrs.** | Fine of $1,053 to $2,700 (including penalty assessments) and attendance at a 3-month alcohol/drug program (or 9 month program if my blood-alcohol content was .20 percent or more), or if I refused a chemical test at arrest, plus either: <br>(a) 48 hrs. to 6 months in jail, and a 6 month driver's license suspension; or <br>(b) A 90-day driver's license restriction for work and alcohol/drug program attendance, if authorized by DMV. | 96 hours to 6 months in jail, $1,053 to $2,700 fine (including penalty and assessments) and a 6-month driver's license suspension. |
| **Second Offense in 10 yrs.** | Fine of $1,053 to $2,700 (including penalty assessments) plus either: <br>(a) 10 days to 1 yr. in jail and a 2 yr. license suspension; or <br>(b) 96 hrs. to 1 yr. in jail (96 hrs. to be served in 2 increments of 48 hrs. each); and 18-mo. (or 30 mo.) alcohol/drug program, and a driver's license restriction allowing driving only for work and program attendance for the duration of the program, if authorized by DMV. My license shall be suspended for 2 yrs. | 90 days to 1 yr. in jail, $1,053 to $2,700 fine (including penalty assessments) and a 2-yr. driver's license suspension. |
| **Third Offense in 10 yrs.** | 120 days to 1 yr. in jail; $1,053 to $2,700 (including penalty assessments), 3-yr. driver's license revocation and an 18-month alcohol/drug program. | 120 days to 1 yr. in jail, $1,053 to $2,700 fine (including penalty assessments) and a 3-yr. driver's license suspension. |
| **Fourth Offense in 10 yrs.** | 180 days to 1 yr. in jail, $1,053 to $2,700 fine (including penalty assessments), a 4-yr. driver's license revocation and an 18-month alcohol/drug program. | 16 months or 2 or 3 years in prison (180 days to 1 yr. in county jail), $1,053 to $2,700 fine (including penalty assessments) and a 4-yr. driver's license suspension. |
| **Reckless Driving (reduced from 23152(a)/(b)** | A maximum of 90 days in jail or $1,000 fine or both, plus attendance at a treatment program. If alcohol or drugs are involved, this conviction will act as a separate DUI conviction if I commit a subsequent DUI offense within 10 yrs. | 5 days to 90 days in jail. |

1. I have read and understand the above penalty chart that lists the minimum and maximum sentences for the offense I am charged with.

2. I understand that the DMV may restrict, suspend or revoke my driver's license under a procedure which is separate from this criminal action and I understand that DMV's action, if any, will be in addition to the Court's sentence and that I must obey it.

3. I understand that the DMV may consider any of my other convictions for DUI or reckless driving, even those that are not charged in this proceeding, and may impose a more severe license restriction, suspension or revocation as a result.

4. I understand that the DMV will not issue a restricted driver's license or restore my driving privilege following a restriction, suspension or revocation unless I have proof of insurance for 3 years. DMV will suspend my driver's license: (1) until proof of insurance is provided to the DMV and (2) upon my failure to maintain such proof during the 3-year period.





5. I understand that I must successfully complete an alcohol/drug program in order to have my driving privilege reinstated following any license restriction, suspension or revocation which is imposed on me, even if I am not ordered to attend such a program by the Court.

6. I understand the following: being under the influence of alcohol or drugs, or both, impairs my ability to safely operate a motor vehicle. It is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving, someone is killed, I can be charged with murder.

7. If applicable: I understand that if my blood-alcohol level was .15 percent or above, or if I refused to submit to a chemical test, the Court will consider this in determining whether to enhance the penalties, grant probation or impose additional terms of probation.

8. If applicable: I understand that if I am the registered owner of the vehicle used in the offense:

   A: The Court will impound my vehicle for up to 90 days, unless it is in the interests of justice not to do so. The Court may also declare my vehicle to be a nuisance and ordered it sold following a hearing if I have 2 or other more convictions for DUI, vehicular manslaughter or any combination thereof, in the past 10 years.
   B. I may be required to install an ignition interlock device (IID) for up to three years. Installation of this device, which prevents the vehicle from starting if I have alcohol in my body, does not authorize me to drive without a valid driver's license.
   C. If I am convicted of a second or subsequent violation of driving with a suspended or revoked license or driving without a license, my vehicle will be subject to forfeiture as a nuisance.

9. If applicable: I understand that if I was under the age of 21 at the time of my arrest, my driver's license will also be suspended for 1 year, and I must surrender my license to the Court. If I do not have a valid driver's license, the Court will order the DMV to delay issuing a license to me for 1 year after I become eligible to drive.

## DEFENDANT'S STATEMENT

I am aware of and understand each of the above items regarding the above additional consequences of my plea in this case. I have initialed those items as proof thereof.

Defendant's signature: _____   Dated: _____

## INTERPRETER'S STATEMENT (if applicable)

I certify that I truly translated this form to the defendant in ___ Spanish ___ Other: _____ and that the defendant stated the (s)he understood the contents of the form and then initialed and signed the form in my presence.

Interpreter's signature: _____   Dated: _____

Type or print name: _____

PRIOR D.U.I CONVICTION 7/20/2006 TRANSCRIPTS

CASE # ST 043049A

Page 2 line 6-21   " NO ADDENDUM IS REFERENCED OR DISCUSSED AS
                    INCLUSIVE OR ATTACHMENT TO
                    MISDEMEANOR ADVISEMENT OF RIGHTS WAIVER."

page 2-4   demonstrate NO   ADMONISHMENT OF WATSON.

The court has no COLLOQUY 7 DISCUSSION

Regarding : paragraph 6 on Addendum

Being under the influnce of alcohol or drugs, or both,
impairs ability to safely operate a motor vehicle. It is extremely
dangerous to human life to drive while under the influence of alcohol
or drugs, or both. If one drives under the influence and as a result
someone is killed one can be charged with murder.

# EXHIBIT D

4 Pages

GROUND # 1,7,8,9.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

--ooOoo--

PEOPLE OF THE STATE OF CALIFORNIA, )
)
                                   )
              Plaintiffs,          )     No. **ST043049A**
                                   )
     vs.                           )     Dept. No. 16
                                   )
**BENJAMIN SERRATOS,**             )
                                   )
              Defendant.           )
                                   )
_____    )

**July 20, 2006**

          The above-entitled matter came on regularly for hearing at the date and time above set forth, before **HON. STEPHEN DEMETRAS,** Judge of said Superior Court.


                    APPEARANCES OF COUNSEL

          **CINDY DE SILVA,** Deputy District Attorney, 222 East Weber Avenue, Room 202, Stockton, California 95202, appeared as counsel for and on behalf of the People.

          **J. SILVA,** Address unavailable, appeared as counsel for and on behalf of the Defendant.



REPORTED BY:  LINDA BLYTHE, C.S.R. No. 10422

LINDA L. BLYTHE CSR 10422  (209) 953-7340

1    (The above-named parties being present, the following
2    proceedings were had:)

3                              --ooOoo--

4                  THE CLERK:  Benjamin Serratos.

5                  MR. SILVA:  Good morning, Your Honor.  Mr.
6    Serratos is present before the Court this morning.  We've
7    submitted two plea forms, one of which is in case number
8    S00615962, which is currently charged as a felony.  And there's
9    going to be an amendment by the prosecution to amend Count Two to
10   a misdemeanor violation of 417.4.

11       And, um, he's going to enter a plea to that.  And the
12   penalty is going to be 30 days, which is the mandatory minimum
13   for that offense with a recommendation to the Alternative Work
14   Program.  And then there's another file, which is a driving under
15   the influence offense stemming out of the same course of conduct.
16   And he's executed that form as well.  Standard first time driving
17   under the influence.  In addition to that, there is a new
18   complaint that he's being arraigned on today, and that's
19   ST043237A.  He's going to enter a plea of not guilty to that,
20   waive formal reading and ask that that be set for a pretrial
21   conference.

22                  THE COURT:  Okay.  Is that agreeable with the
23   People?

24                  MS. DE SILVA:  Yes, Your Honor.  Also, on that,
25   what is currently charged as a felony, we're asking for three
26   years of informal probation, alcohol terms and search, and search
27   and seizure for dangerous weapons.

28                  THE COURT:  Okay.  On case ST43237A, that's the

1     misdemeanor boating case, we'll continue that three weeks to -- I

2     think they do these in 17 along with --

3                 MR. SILVA:  Yes.

4                 THE COURT:  It has to be a Monday, Tuesday or

5     Wednesday.

6                 MR. SILVA:  Okay.

7                 THE COURT:  How about the 16th of August?

8                 MR. SILVA:  That's perfect.

9                 THE COURT:  Okay.  August 16th at 8:30 in

10    Department 17 on that case.  Mr. Serratos, on your other cases,

11    as you've heard the agreement, is this your agreement?

12                THE DEFENDANT:  Yes, sir.

13                THE COURT:  Do you give up your right to have a

14    jury trial?

15                THE DEFENDANT:  (Nods head affirmatively).

16                THE COURT:  Do you give up your right to

17    cross-examine and confront witnesses?

18                THE DEFENDANT:  (Nods head affirmatively).

19                THE COURT:  Do you give up your right to bring

20    your own witnesses to court utilizing the subpoena power of the

21    court?

22                THE DEFENDANT:  (Nods head affirmatively).

23                THE COURT:  And do you give up your privilege

24    against self-incrimination?

25                THE DEFENDANT:  Yes.

26                THE COURT:  You're charged with a violation of

27    23152(b), driving with a .08 or higher blood alcohol on June the

28    3rd, a misdemeanor.

1    How do you plead to that?

2            THE DEFENDANT:  No contest.

3            THE COURT:  And is it just going to be Count One

4    that's amended, Ms. De Silva?

5            MS. DE SILVA:  I think -- in that file, I think

6    there's a Count Two.

7            MR. SILVA:  Count Two and --

8            THE COURT:  Oh, it already is.  Thank you.  Count

9    Two you're charged with then a violation of -- 417.4 now is

10   amended.  How do you plead to that?

11           THE DEFENDANT:  No contest.

12           THE COURT:  Remaining counts and enhancements?

13           MS. DE SILVA:  We move to dismiss.

14           THE COURT:  Motion granted.  Any legal cause why

15   judgement should not now be pronounced?

16           MR. SILVA:  None.

17           THE COURT:  Then the DUI is informal probation for

18   three years.  Obey all laws.  Don't commit the same or similar

19   offense.  Don't drive without a valid license, insurance or

20   registration.  Serve two days in jail.  He's got one day credit

21   against that.  This can be concurrent with his 30 over here.

22       He's to pay a fine of $2,260 through Revenue and Recovery.

23   He's not to drive without a valid license, insurance or

24   registration.  He's to complete the First Offender Program on

25   that matter.

26               (Whereupon proceedings continued,

27               not reported; proceedings concluded.)

28                     --ooOoo--

LINDA L. BLYTHE CSR 10422   (209) 953-7340

BAIL TRANSCRIPT EXCERPTS

(3 PAGES)  48,49, 50

"" PAGE  50 ""

LINE   3 - 7..      IN PROSECUTORS OWN WORDS HE PROVES PETITIONERS

ARGUMENT THAT THERE WAS NO SUBJECTIVE AWARENESS
also   ( see Ground one attachment page 1 )

" he could not have possibly have KNOWN unless he ("Serratos") was

in my office, "that a murder charge WAS COMING DOWN." " !!!

# EXHIBIT E

3 Pages

GROUNDS # 1, 8, 9

48

1    Those are not unusual circumstances.  They have to be unusual

2    circumstances.  And nothing has been set forth in this court

3    that we should deviate from the bail schedule.

4        And the People would submit it.

5             MR. PACHECO:  If I may, Judge.

6             THE COURT:  You may.

7             MR. PACHECO:  I did come into the case late.

8    And Mr. Rasmussen put on the record that -- that Mr. Serratos'

9    bail now, knowing that he had a 187 and knowing he had the

10   priors and knowing that he was charged with 191 of the Penal

11   Code, yet Mr. Serratos didn't make an attempt to get a

12   passport, get on an airplane, get out of here.  He stayed in

13   this county, subjected himself to the jurisdiction of this

14   court.

15        He -- the argument about, you know, this is a serious

16   crime, a 187, the second degree, is a relatively new concept

17   that it has become something to do these days as a result of

18   DUI's involving accidents.  I -- I -- I don't -- I -- you

19   know, I don't disagree.  I don't agree.

20        It's just that in my days as a highway patrolman back in

21   the sixties and up until just recently in specializing in DUI

22   cases, as well as homicide cases, and I think the Court will

23   agree, that it's unusual.  This is a different kind of case.

24   And it's just been recently that cases have been charged with

25   second degree.  So this is a -- a -- a new type of field that

26   we're entering into.

27        The -- all right.  So he didn't attempt to leave.  Also

28   when you take a look at the -- the prosecutor's motion in

49

1  opposition of the reduction of bail, and on page seven, when

2  you take a look at the 191.5, 23153(a) and (b), and the

3  enhancements, a lot of these, Your Honor, are -- are 654

4  issues.  I mean if -- if a guy goes and -- and -- and gets

5  convicted, let's say of -- of murder two, then the Court knows

6  that under 654 of the Penal Code, all these other matters

7  are -- are not -- are set aside and/or the sentencing scheme,

8  the sentences run concurrent and things of this nature.

9      So taking -- taking a look at that -- taking -- and also

10 considering 654 of the Penal Code, I'm going to ask that the

11 Court again to reconsider and reducing the bail to what the

12 Court feels that it's a comfortable amount that will ensure

13 Mr. Serratos will appear before this Court when he's required

14 to appear before this Court.

15     Submit it.  And  --

16               THE COURT:  Go ahead.

17               MR. PACHECO:  --  and also, Judge, you know,

18 another thing I thought about and -- and was, you know, hey,

19 is this guy an escape risk, you know, is he going to go to

20 Mexico?  Is he going to Europe or some place like that?

21     And -- and I just think I am aware of it since 911.  And

22 I've had buddies and -- or clients.  I mean you get past the

23 border, with regards to criminal records and pending criminal

24 cases, these guys know about it.

25     And so a person -- the fact that the guy is going to

26 leave the US, for instance, and not face the charges, I think

27 like it will never happen.

28               MR. RASMUSSEN:  Well, I want to just touch on

50

1  some things because he brought up some new items.  I will only

2  touch on those.

3       The defendant never knew that he had a 187 charge because

4  the moment that I charged him with that, an arrest warrant was

5  signed and he was -- he went and picked him up.  So he did not

6  know.  He could not have possibly have known unless he was in

7  my office, that a murder charge was coming down.

8       Second, with a Watson advisement, it's a -- it --

9  charging these as murder cases has been around for over a

10  decade.  It -- it's -- to say that they are actually new is --

11  is not true.

12       While -- you know, a gross vehicular is not a lesser of a

13  murder case.  The DUI's are not 654 because there are

14  multiple victims in this case.  To say that those are 654's is

15  misleading the Court.

16       And I forgot to touch on that, that the defendant, when

17  he was out at the -- the jail, he claimed that he was a

18  Norteno.  And that would also say that he is a threat to the

19  community.

20       And the People would submit it on that.

21            MR. PACHECO:  Your Honor, with -- with regards

22  to Norteno -- now, I take -- I take issue with that.

23       The problem is, in -- in -- in California, and I'm doing

24  a gang case --

25            THE COURT:  And --

26            MR. PACHECO:  --  in Woodland --

27            THE COURT:  And, Mr. Pacheco, that wasn't

28  alleged in the Complaint.  And I didn't hear any testimony on

CEEL PHONE   EVIDENCE REMOVED BY DEPUTY NESBITT MS. LITTLE's UNCLE

# EXHIBIT F

1 page

GROUND 3, 6, 7, 8

| DATE OF INCIDENT | TIME (2400) | NCIC NUMBER | OFFICER ID | NUMBER |
|------------------|-------------|-------------|------------|--------|
| 06-12-2010       | 2350        | 9265        | 15174      |        |

Supplemental RE: Follow-up

Summary:

On July 7, 2010, I spoke to San Joaquin County Sheriffs Deputy John Nesbitt.  Deputy Nesbitt is the uncle of Destanee Little.  Deputy Nesbitt informed me that after the collision he called CHP and spoke to someone who informed him Ms. Little's vehicle was not impounded and was presently at Plummers tow yard in Lodi.  Deputy Nesbitt responded to the tow yard and removed the following items from the Chrysler:

- A red formal dress
- Pair of black slippers
- 1 cell phone
- 1 square from a makeup kit.

He gave them to Ms. Little's mother.

| PREPARER'S NAME AND NUMBER | DATE | REVIEWER'S NAME |
|----------------------------|------|-----------------|
| M. Petricevich    10374    | 07-06-2010 | |

DISTRACTED DRIVING   FACTS

EVIDENCE THAT Cell phones used in vehicle constitute Distracted

driving ... as well as friends, in car, make, up, food also

contributing factors..

All factors that were present in case.

1. CELL PHONE THAT ENGAGED ON SOCIAL MEDIA, AND TEXT...

2. McDONALDS FAST FOOD TAKE OUT,

3. MAKE UP KIT

4. FRIENDS .

# EXHIBIT G

(9 Pages)

GROUND # 3, 4, 5, 6, 7, 8

**LIFE 3D**

**HEALTH**

# Teens who text, drive also take other risks

## More likely to drink and drive, skip seat belts

**Michelle Healy**
@ByMichelleHealy
USA TODAY

If your teen texts while driving, chances are he or she has other dangerous habits in motor vehicles — including failing to buckle up and driving after drinking, a new federal analysis finds.

In 2011, 45% of all students 16 and older said they had texted or e-mailed while driving in the past 30 days, according to the study by researchers at the Centers for Disease Control and Prevention. It's reported in June's *Pediatrics* and is released online today.

Teens who texted while driving were five times more likely than those who didn't to drive when they had been drinking alcohol. And the more they texted, the worse their seat belt habits: Teens who texted every day while driving in the past month were 40% more likely to not always wear seat belts than those who texted while driving once or twice in the past 30 days.

It's not surprising that young people who take such risks in one area would do the same in other areas, says CDC director Thomas Frieden. "But the big picture is that the greatest single risk to teenagers in this country is getting hurt or killed in a

**TEENS AND TEXTING**

MS.LITTLE WAS EJECTED FROM VEHICLE,

CHP/MAIT CONCLUDED THE

THE DURATION FROM McDONALDS WHERE MS.LITTLE ORDERED TAKE OUT ᵀO ARMSTRONG ROAD WAS APPROXIMATELY 8 MINUTES

THE CELL PHONE USAGE DURATI ᴼN WAS 9 MINUTES FROM WHEN A TEXT MESSAGE DATA APPEARE TO SOCIAL MEDIA.

AT THE EXACT TIME OF THE ACCIDENT.

**NHTSA**

# TRAFFIC SAFETY FACTS
### Research Note

DOT HS 812 132                    Summary of Statistical Findings                    April 2015

# Distracted Driving 2013

The Department of Transportation works to reduce the occurrence of distracted driving and raise awareness of the dangers of distracted driving. This risky behavior poses a danger to vehicle occupants as well as nonoccupants such as pedestrians and bicyclists. Driver distraction is a specific type of driver inattention. Distraction occurs when drivers divert their attention from the driving task to focus on some other activity. Oftentimes, discussions regarding distracted driving center around cell phone use and texting, but distracted driving also includes other activities such as eating, talking to other passengers, or adjusting the radio or climate controls, to name but a few. A distraction-affected crash is any crash in which a driver was identified as distracted at the time of the crash.

- Ten percent of fatal crashes, 18 percent of injury crashes, and 16 percent of all police-reported motor vehicle traffic crashes in 2013 were reported as distraction-affected crashes.
- In 2013, there were 3,154 people killed and an estimated additional 424,000 injured in motor vehicle crashes involving distracted drivers.



- Ten percent of all drivers 15 to 19 years old involved in fatal crashes were reported as distracted at the time of the crashes. This age group has the largest proportion of drivers who were distracted at the time of the crashes.
- In 2013, there were 480 nonoccupants killed in distraction-affected crashes.

## Methodology

The data sources include NHTSA's Fatality Analysis Reporting System (FARS) and National Automotive Sampling System (NASS) General Estimates System (GES). FARS contains data on a census of fatal traffic crashes from all 50 States, the District of Columbia, and Puerto Rico. NASS GES contains data from a nationally representative probability sample of police-reported crashes of all severities, including those that result in death, injury, or property damage. The national estimates produced from GES data are subject to sampling errors.

As defined in the *Overview of the National Highway Traffic Safety Administration's Driver Distraction Program* (Report

No. DOT HS 811 299), distraction is a specific type of inattention that occurs when drivers divert their attention from the driving task to focus on some other activity instead. That document describes that distraction is a subset of inattention (which also includes fatigue, and physical and emotional conditions of the driver). However, while NHTSA may define the terms in this manner, inattention and distraction are often used interchangeably or simultaneously in other material, including police accident reports. It is important that NHTSA and NHTSA's data users be aware of these differences in definitions.

There are inherent limitations in the data for distraction-affected crashes and the resulting injuries and fatalities. These limitations are being addressed through efforts within and outside of NHTSA as detailed in the Overview. The appendix of this document contains a table that describes the coding for distraction-affected crashes for FARS and GES as well as a discussion regarding limitations in the distracted driving data.

## Data

### Fatalities in Distraction-Affected Crashes

In 2013, there were a total of 30,057 fatal crashes in the United States involving 44,574 drivers. As a result of those fatal crashes, 32,719 people were killed.

In 2013, there were 2,910 fatal crashes that occurred on U.S. roadways that involved distraction (10% of all fatal crashes). These crashes involved 2,959 distracted drivers, as some crashes involved more than one distracted driver. Distraction was reported for 7 percent (2,959 of 44,574) of the drivers involved in fatal crashes. In these distraction-affected crashes, 3,154 fatalities (10% of overall fatalities) occurred. Table 1 provides information on crashes, drivers, and fatalities involved in fatal distraction-affected crashes in 2013.

Much attention across the country has been devoted to the use of cell phones and other electronic devices while driving. In 2013, there were 411 fatal crashes reported to have involved the use of cell phones as distractions (14% of all fatal

Table 1
**Fatal Crashes, Drivers in Fatal Crashes, and Fatalities, 2013**

| | Crashes | Drivers | Fatalities |
|---|---|---|---|
| **Total** | **30,057** | **44,574** | **32,719** |
| Distraction-Affected (D-A) | 2,910 (10% of total crashes) | 2,959 (7% of total drivers) | 3,154 (10% of total fatalities) |
| Cell Phone in Use | 411 (14% of D-A crashes) | 427 (14% of distracted drivers) | 445 (14% of fatalities in D-A crashes) |

Source: National Center for Statistics and Analysis (NCSA), FARS 2013 (ARF)

distraction-affected crashes). For these distraction-affected crashes, the police accident report stated that the driver was talking on, listening to, or manipulating a cell phone (or other cell phone activity) at the time of the crash. Cell phones were reported as a distraction for 14 percent of the distracted drivers in fatal crashes. A total of 445 people died in fatal crashes that involved the use of cell phones or other cell phone-related activities as distractions.

Table 2 presents 2013 fatal crash data for distraction-affected crashes by driver age. Ten percent of all drivers 15 to 19 years old involved in fatal crashes were distracted at the time of the crash. This age group is the group with the largest proportion of drivers who were distracted.

The comparison of the proportion of drivers involved in fatal crashes and those involved in distraction-affected fatal crashes points to overrepresentation of drivers under 40. For all fatal crashes, only 6 percent of the drivers in the fatal crashes were 15 to 19 years old. However, for distracted drivers in fatal crashes, 10 percent of the distracted drivers were 15 to 19 years old. And 11 percent of all the distracted drivers using cell phones were 15 to 19 years old. Similarly, drivers in their 20s are 23 percent of drivers in all fatal crashes, but are 27 percent of the distracted drivers and 38 percent of the distracted drivers that were using cell phones in fatal crashes.

Figure 1 illustrates the distribution of drivers by age for total drivers involved in fatal crashes, distracted drivers involved in fatal crashes, and distracted drivers on cell phones during fatal crashes.

Figure 1
**Percent Distribution of Drivers Involved in Fatal Crashes By Age, Distraction, and Cell Phone Use, 2013**



Source: NCSA, FARS 2013 (ARF)

In 2013, 85 percent of the fatalities in distraction-affected crashes involved motor vehicle occupants or motorcyclists.

Table 2
**Drivers Involved in Fatal Crashes by Age, Distraction, and Cell Phone Use, 2013**

| Age Group | Total Drivers | | Distracted Drivers | | | Drivers Using Cell Phone | | |
|---|---|---|---|---|---|---|---|---|
| | # | % of Total | # | % of Total Drivers | % of Distracted Drivers | # | % of Distracted Drivers | % of Cell Phone Drivers |
| 15-19 | 2,839 | 6 | 294 | 10 | 10 | 45 | 15 | 11 |
| 20-29 | 10,427 | 23 | 803 | 8 | 27 | 161 | 20 | 38 |
| 30-39 | 7,598 | 17 | 517 | 7 | 17 | 84 | 16 | 20 |
| 40-49 | 7,321 | 16 | 423 | 6 | 14 | 61 | 14 | 14 |
| 50-59 | 7,079 | 16 | 384 | 5 | 13 | 46 | 12 | 11 |
| 60-69 | 4,483 | 10 | 258 | 6 | 9 | 22 | 9 | 5 |
| 70+ | 3,951 | 9 | 252 | 6 | 9 | 6 | 2 | 1 |
| **Total** | **44,574** | **100** | **2,959** | **7** | **100** | **427** | **14** | **100** |

Source: NCSA, FARS 2013 (ARF); Note: The total includes 56 drivers 14 and younger, 7 of whom were noted as distracted. Additionally, the total includes 820 of unknown age, 21 of whom were noted as distracted.

Table A-1
**Attributes Included in "Driver Distracted by" Element and Indication of Inclusion in Distraction-Affected Definitions, GES and FARS**

| Attribute | Examples | Distraction-Affected Crashes | |
|---|---|---|---|
| | | 2010–2011 | 2012–2013 |
| Not distracted | Completely attentive to driving; no indication of distraction or noted as Not Distracted | | |
| Looked but did not see | Driver paying attention to driving but does not see relevant vehicle, object, etc. | | |
| By other occupant | Distracted by occupant in driver's vehicle; includes conversing with or looking at other occupant | X | X |
| By a moving object in vehicle | Distracted by moving object in driver's vehicle; includes dropped object, moving pet, insect, cargo. | X | X |
| While talking or listening to cellular phone | Talking or listening on cellular phone; includes talking or listening on a "hands-free" or Bluetooth enabled phone | X | X |
| While manipulating cellular phone | Dialing or text messaging on cell phone or any wireless email device; any manual button/control actuation on phone qualifies | X | X |
| Other cellular phone-related | Used when the police report indicated the driver is distracted from the driving task due to cellular phone involvement, but none of the specified codes are applicable (e.g., reaching for cellular phone, etc.). This code is also applied when specific details regarding cellular phone distraction/usage are not provided. | X | X |
| While adjusting audio and/or climate controls | While adjusting air conditioner, heater, radio, cassette, using the radio, using the cassette or CD mounted into vehicle | X | X |
| While using other component/ controls integral to vehicle | Manipulating a control in the vehicle including adjusting headlamps, interior lights, controlling windows, door locks, mirrors, seats, steering wheels, on-board navigational devices, etc. | X | X |
| While using or reaching for device/object brought into vehicle | Radar detector, CDs, razors, music portable CD player, headphones, a navigational device, a laptop or tablet PC, etc.; if unknown if device is brought into vehicle or integral, use Object Brought Into Vehicle | X | X |
| Distracted by outside person, object, or event | Animals on roadside or previous crash, non-traffic related signs. Do not use when driver has recognized object/event and driver has taken evasive action | X | X |
| Eating or drinking | Eating or drinking or actively related to these actions | X | X |
| Smoking related | Smoking or involved in activity related to smoking | X | X |
| No driver present/unknown if driver present | When no driver is in this vehicle or when it is unknown if there is a driver present in this vehicle at the time of the crash | | |
| Distraction/Inattention | Used exclusively when "distraction/inattention" or "inattention/distraction" are noted in case materials as one combined attribute | | X |
| Distraction/Careless | Used exclusively when "distraction/careless" or "careless/distraction" are note in case materials as one combined attribute | | X |
| Careless/Inattentive | Used exclusively when "careless/inattentive" or "inattentive/careless" are noted in case materials as one combined attribute | | X |
| Distraction/inattention, details unknown | Distraction and/or inattention are noted on the PAR but the specifics are unknown | X | |
| Distraction (distracted), details unknown | Used when "distraction" or "distracted" are noted in case materials but specific distraction(s) cannot be identified | | X |
| Inattention (inattentive), details unknown | Used when "inattention" or "inattentive" are noted in the case materials but it cannot be identified if this refers to a distraction | | X |
| Not reported | No field available on PAR; field on PAR left blank; no other information available | | |
| Inattentive or lost in thought | Driver is thinking about items other than the driving task (e.g., daydreaming) | X | |
| Lost in thought/Daydreaming | Used when the driver is not completely attentive to driving because he/she is thinking about items other than the driving task. | | X |
| Other distraction | Details regarding the driver's distraction are known but none of the specified codes are applicable | X | |
| Unknown if distracted | PAR specifically states unknown | | |

due to potential under-reporting in some States and over-reporting in others.

The following are potential reasons for underreporting of distraction-affected crashes.

- There are negative implications associated with distracted driving—especially in conjunction with a crash. Survey research shows that self-reporting of negative behavior is lower than actual occurrence of that negative behavior. There is no reason to believe that self-reporting of distracted driving to a law enforcement officer would differ. The inference is that the reported driver distraction during crashes is lower than the actual occurrence.

- If a driver fatality occurs in the crash, law enforcement must rely on the crash investigation in order to report on whether driver distraction was involved. Law enforcement may not have information to indicate distraction. These investigations may rely on witness account and oftentimes these accounts may not be available either.

- Technologies are changing at a rapid speed and it is difficult to update the PAR to accommodate these changes. Without broad-sweeping changes to the PAR to incorporate new technologies and features of technologies, it is difficult to capture the data that involve interaction with these devices.

The following is a challenge in quantifying external distractions.

- In the reporting of distraction-affected crashes, oftentimes external distractions are identified as a distinct type of distraction. Some of the scenarios captured under external distractions might actually be related to the task of driving (e.g., looking at a street sign). However, the crash reports may not differentiate these driving-related tasks from other external distractions (looking at previous crash or billboard). Currently, the category of external distractions is included in the counts of distraction-affected crashes.

Limitations in the data can be seen in a quantifiable manner in a research paper titled, *Precrash Data Collection in NHTSA's Databases* by Mark Mynatt and Greg Radja, published in 2013 for the ESV Conference. In this research paper, Mynatt and Radja reviewed crashes that were common in the National Motor Vehicle Crash Causation Survey (NMVCCS), an on-site investigations crash survey; the GES (police report data); and the Crashworthiness Data System (CDS), data from follow-on vehicle and crash scene inspections and driver interviews along with the police report. A total of 379 crashes involving 653 vehicles were determined to be present in all three programs. Mynatt and Radja looked at specific data for distraction in the common cases to quantify the difference in reporting of distracted driving behaviors due to additional sources of information as can be seen in the following excerpt from the paper:

Table A-2 shows the percentage of the common vehicles with a coded Distraction in each of the programs.

Table A-2
**Common Vehicles With a Distraction Present (Percentages rounded)**

| Distraction | NASS-GES | NASS-CDS | NMVCCS |
|---|---|---|---|
| Yes | 11% | 14% | 28% |
| No | 60% | 46% | 48% |
| Unknown | 30% | 40% | 24% |

As Table A-2 indicates, in these same vehicles a distraction was coded in the on-scene program twice as often as in the follow-on program; and 2½ times more often than in the PAR-based program. The on-scene based program also had a lower percentage of Unknown Distraction coding.

While these findings cannot be expanded to quantify the potential underreporting in FARS and GES, they are valuable in understanding the potential underreporting that the FARS and GES data may experience for driver distraction.



U.S. Department
of Transportation
**National Highway
Traffic Safety
Administration**

This research note and other general information on highway traffic safety may be accessed by Internet users at: www-nrd.nhtsa.dot.gov/CATS/index.aspx

## Summary

In January 2004, at 4:00 p.m., in Grand Rapids, Michigan, a 20-year-old woman ran a red light while talking on a cell phone. The driver's vehicle slammed into another vehicle crossing with the green light directly in front of her. The vehicle she hit was not the first car through the intersection, it was the third or fourth. The police investigation determined the driver never touched her brakes and was traveling 48 mph when she hit the other vehicle. The crash cost the life of a 12-year-old boy. Witnesses told investigators that the driver was not looking down, not dialing the phone, or texting. She was observed looking straight out the windshield talking on her cell phone as she sped past four cars and a school bus stopped in the other south bound lane of traffic. Researchers have called this crash a classic case of inattention blindness caused by the cognitive distraction of a cell phone conversation.

Vision is the most important sense for safe driving. Yet, drivers using hands-free phones (and those using handheld phones) have a tendency to "look at" but not "see" objects. Estimates indicate that drivers using cell phones look but fail to see up to 50 percent of the information in their driving environment.[1] Distracted drivers experience what researchers call inattention blindness, similar to that of tunnel vision. Drivers are looking out the windshield, but they do not process everything in the roadway environment that they must know to effectively monitor their surroundings, seek and identify potential hazards, and respond to unexpected situations.[2]

Today there are more than 280 million wireless subscribers in the U.S. And although public sentiment appears to be turning against cell phone use while driving, many admit they regularly talk or text while driving. The National Highway Traffic Safety Administration estimates that 11 percent of all drivers at any given time are using cell phones, and the National Safety Council estimates more than one in four motor vehicle crashes involve cell phone use at the time of the crash.

Cell phone driving has become a serious public health threat. A few states have passed legislation making it illegal to use a handheld cell phone while driving. These laws give the false impression that using a hands-free phone is safe.

The driver responsible for the above crash was on the phone with her church where she volunteered with children the age of the young boy who lost his life as the result of her phone call. She pled guilty to negligent homicide and the lives of two families were terribly and permanently altered. Countless numbers of similar crashes continue everyday.

This paper will take an in-depth look at why hands-free cell phone use while driving is dangerous. It is intended that this information will provide background and context for lawmakers and employers considering legislation and policies.

**CONTENTS**

Summary

The Distracted Driving Problem

Multitasking: A Brain Drain

Multitasking Impairs Performance

Driving Risks of Hands-Free and Handheld Cell Phones

Are Drivers Able to Reduce Their Own Risk?

What are Possible Prevention Steps?

Appendix A

References



# Understanding
## the distracted brain

*Why driving while using hands-free cell phones is risky behavior*



*National Safety Council*

***White Paper***
***March 2010***

But there's a troubling common thread to these prevention efforts:

- Nearly all legislation focuses on banning only handheld phones or only texting while driving.

- All state laws and many employer policies allow hands-free cell phone use.

- Public opinion polls show people recognize the risks of talking on handheld phones and texting more than they recognize the risks of hands-free phones.[19]

- Many drivers mistakenly believe talking on a hands-free cell phone is safer than handheld.[20]

A hands-free device most often is a headset that communicates via wire or wireless with a phone, or a factory-installed or aftermarket feature built into vehicles that often includes voice recognition. Many hands-free devices allow voice-activated dialing and operation.

Hands-free devices often are seen as a solution to the risks of driver distraction because they help eliminate two obvious risks – visual, looking away from the road and manual, removing your hands off of the steering wheel. However, a third type of distraction can occur when using cell phones while driving – cognitive, taking your mind off the road.

Hands-free devices do not eliminate cognitive distraction.

The amount of exposure to each risk is key. Crashes are a function of the severity of each risk and how often the risk occurs. Most people can recognize when they are visually or mechanically distracted and seek to disengage from these activities as quickly as possible. However, people typically do not realize when they are cognitively distracted, such as taking part in a phone conversation; therefore, the risk lasts much, much longer. This likely explains why researchers have not been able to find a safety benefit to hands-free phone conversations.

The National Safety Council has compiled more than 30 research studies and reports by scientists around the world that used a variety of research methods, to compare driver performance with handheld and hands-free phones. All of these studies show hands-free phones offer no safety benefit when driving (Appendix A). Conversation occurs on both handheld and hands-free phones. The cognitive distraction from paying attention to conversation – from listening and responding to a disembodied voice – contributes to numerous driving impairments. Specific driving risks are discussed in detail later in this paper. First, let us look at why hands-free and handheld cell phone conversations can impair your driving ability.

*Hands-free devices offer no safety benefit when driving.*

*Hands-free devices do not eliminate cognitive distraction.*

## The Distracted Driving Problem

Motor vehicle crashes are the No. 1 cause of death in the United States for 3- to 34-year-olds. Crashes are among the top three causes of death throughout a person's lifetime.[3] They also are the No. 1 cause of work-related death.[4] Annually, more U.S. soldiers are killed in crashes in privately-owned vehicles than all other Army ground accidents combined.[5]

Each year since 1994, between 39,000 and 46,000 people have been killed in motor vehicle crashes.[6] That's more than 650,000 lives lost during the past 15 years. It includes people inside and outside of vehicles, as well as motorcyclists, bicyclists and pedestrians who were struck by vehicles. There are activities people tend to think are riskier than driving, such as flying in an airplane, but consider this: The lives lost on U.S. roadways each year are equivalent to the lives that would be lost from a 100-passenger jet crashing every day of the year.

In addition to the thousands of fatalities, many more people suffer serious life-changing injuries in motor vehicle crashes. More than 2.2 million injuries resulted from vehicle crashes in 2008.[7]

**To reduce this toll, prevention must focus on the top factors associated with crashes.** Driver distractions have joined alcohol and speeding as leading factors in fatal and serious injury crashes. The National Safety Council estimates 25 percent of all crashes in 2008 involved talking on cell phones – accounting for 1.4 million crashes and 645,000 injuries that year.[8]

Cell phone use has grown dramatically over the past 15 years. In 1995, cell phone subscriptions covered only 13 percent of the U.S. population; by 2008, that had grown to 87 percent.[9]

The National Highway Traffic Safety Administration estimates that at any point during the day, 11 percent of drivers are talking on cell phones.[10] More than half of respondents to a AAA Foundation for Traffic Safety survey reported talking on cell phones while driving during the previous 30 days.[11] Seventeen percent admitted they engaged in this behavior "often or very often." Because text messaging has grown dramatically – an almost 10,000-fold increase in 10 years – and because there is already near-public consensus that it's a serious driving safety risk, texting receives a great deal of attention. About 14 percent of people admitted to texting while driving in the past 30 days.[12] Although texting is clearly a serious distraction, NSC data shows drivers talking on cell phones are involved in more crashes. More people are talking on cell phones while driving more often, and for greater lengths of time, than they are texting. Thus, in 2008, an estimated 200,000 crashes involved texting or e-mailing, versus 1.4 million crashes involving talking on cell phones.[13]

During 2009, cell phone distractions while driving hit our nation's political and media agendas. Webster's Dictionary named "distracted driving" its Word of the Year.[14] In 2009:

- More than 200 state bills were introduced to ban cell phone use – texting and talking – while driving.[15] Laws passed were front-page news.

- The U.S. Department of Transportation convened a Distracted Driving Summit, which the Secretary of Transportation called the most important meeting in the Department of Transportation's history.

- President Barack Obama issued an Executive Order banning federal employees from texting while driving.[16]

- A National Safety Council membership survey showed employers of all sizes, sectors and industries are implementing employee policies banning talking and texting while driving.[17]

- Public opinion polls show a majority of the public support these efforts.[18]

*Distractions now join alcohol and speeding as leading factors in fatal and serious injury crashes.*

## Multitasking: A Brain Drain

This section provides the foundation to understand the full impact of driving while engaging in cell phone conversations on both handheld and hands-free phones. It explains how cognitively complex it is to talk on the phone and drive a vehicle at the same time, and why this drains the brain's resources.

Multitasking is valued in today's culture, and our drive for increased productivity makes it tempting to use cell phones while behind the wheel. People often think they are effectively accomplishing two tasks at the same time. And yes, they may complete a phone conversation while they drive and arrive at their destination without incident, thus accomplishing two tasks during the same time frame. However, there are two truths to this common belief.

1. People actually did not "multitask."
2. People did not accomplish both tasks with optimal focus and effectiveness.

**Multitasking is a myth.** Human brains do not perform two tasks at the same time. Instead, the brain handles tasks sequentially, switching between one task and another. Brains can juggle tasks very rapidly, which leads us to erroneously believe we are doing two tasks at the same time. In reality, the brain is switching attention between tasks – performing only one task at a time.

In addition to "attention switching," the brain engages in a constant process to deal with the information it receives:

1. **Select** the information the brain will attend to
2. **Process** the information
3. **Encode,** a stage that creates memory
4. **Store** the information.

Depending on the type of information, different neural pathways and different areas of the brain are engaged. Therefore, the brain must communicate across its pathways.

Furthermore, the brain must go through two more cognitive functions before it can act on saved information. It must:

5. **Retrieve** stored information
6. **Execute** or act on the information.[21]

When the brain is overloaded, all of these steps are affected. But people may not realize this challenge within their brains (see sidebar).



**Figure 1. Inattention blindness and encoding.**
**Source: National Safety Council**

---

### Why do drivers miss important driving cues?

Everything people see, hear, feel taste or think – all sensory information – must be committed to short-term memory before it can be acted on. Short-term memory can hold basic information for a few seconds. However, to get even very basic information into short-term memory, the brain goes through three stages to prioritize and process information. The first stage is called "encoding."

Encoding is the step in which the brain selects what to pay attention to. Encoding is negatively affected by distractions and divided attention. During this first stage, the brain will "screen out" information as a way to deal with distraction overload (Figure 1).

All human brains have limited capacity for attention. When there is too much information, the brain must decide what information is selected for encoding. Some decision processes are conscious and within a person's "control," while other decisions are unconscious so we're not aware of them. Therefore, people do not have control over what information the brain processes and what information it filters out.

For example, a person who is talking on a cell phone while driving has a brain that's dealing with divided attention. The brain is overloaded by all the information coming in. To handle this overload, the driver's brain will not encode and store all of the information.[22, 23]

Some information is prioritized for attention and possible action, while some is filtered out. The driver may not be consciously aware of which critical roadway information is being filtered out.

Performance is impaired when filtered information is not encoded into working short-term memory.[24] The brain doesn't process critical information and alert the driver to potentially hazardous situations. This is why people miss critical warnings of navigation and safety hazards when engaged in cell phone conversations while driving.

**The brain not only juggles tasks,** it also juggles focus and attention. When people attempt to perform two cognitively complex tasks such as driving and talking on a phone, the brain shifts its focus (people develop "inattention blindness") (page 9). Important information falls out of view and is not processed by the brain. For example, drivers may not see a red light. Because this is a process people are not aware of, it's virtually impossible for people to realize they are mentally taking on too much.

When we look at a view before us – whether we are in an office, restaurant or hospital, at the beach, or driving in a vehicle – we believe we are aware of everything in our surroundings. However, this is not the case. Very little information actually receives full analysis by our brains. Research shows we are blind to many changes that happen in scenery around us, unless we pay close and conscious attention to specific details, giving them full analysis to get transferred into our working memory.[25]

**Brain researchers have identified "reaction-time switching costs,"**[26] which is a measurable time when the brain is switching its attention and focus from one task to another. Research studying the impact of talking on cell phones while driving has identified slowed reaction time to potential hazards are tangible, measurable and risky (page 10). Longer reaction time is an outcome of the brain switching focus. This impacts driving performance.

The cost of switching could be a few tenths of a second per switch. When the brain switches repeatedly between tasks, these costs add up.[27]

Even small amounts of time spent switching can lead to significant risks from delayed reaction and braking time. For example, if a vehicle is traveling 40 mph, it goes 120 feet before stopping. This equals eight car lengths (an average car length is 15 feet). A fraction-of-a-second delay would make the car travel several additional car lengths. When a driver needs to react immediately, there is no margin for error.

**Brains may face a "bottleneck"** in which different regions of the brain must pull from a shared and limited resource for seemingly unrelated tasks, constraining the mental resources available for the tasks.[28, 29] Research has identified that even when different cognitive tasks draw on two different regions of the brain, we still can have performance problems when trying to do dual tasks at the same time. This may help explain why talking on cell phones could affect what a driver sees: two usually unrelated activities become interrelated when a person is behind the wheel. These tasks compete for our brain's information processing resources. There are limits to our mental workload.[30]

**The workload of information processing can bring risks** when unexpected driving hazards arise.[31] Under most driving conditions, drivers are performing well-practiced, automatic driving tasks. For example, without thinking about it much, drivers slow down when they see yellow or red lights, and activate turn signals when intending to make a turn or lane change. These are automatic tasks for experienced drivers. Staying within a lane, noting the speed limit and navigation signs, and checking rear- and side-view mirrors also are automatic tasks for most experienced drivers. People can do these driving tasks safely with an average cognitive workload. During the vast majority of road trips, nothing bad happens, as it should be. But that also can lead people to feel a false sense of security or competency when driving. Drivers may believe they can safely multitask; however, a driver always must be prepared to respond to the unexpected.

A driver's response to sudden hazards, such as another driver's behavior, weather conditions, work zones, animals or objects in the roadway, often is the critical factor between a crash and a near-crash. When the brain is experiencing an increased workload, information processing slows and a driver is much less likely to respond to unexpected hazards in time to avoid a crash.

The industrial ergonomics field has been able to identify physical workload limits and, in the same way, the workload limits of our brains now are being identified. The challenge to the general public is the bottlenecks and limits of the brain are more difficult to feel and literally see than physical limits.

### Multitasking Impairs Performance

We can safely walk while chewing gum in a city crowded with motor vehicles and other hazards. That is because one of those tasks – chewing gum – is not a cognitively demanding task.

When chewing gum and talking, people still are able to visually scan the environment for potential hazards:
- Light poles along the sidewalk
- Boxes suddenly pushed out a doorway at ground level before the delivery man emerges
- Moving vehicles hidden by parked vehicles
- Small dog on a leash
- Uneven sidewalk

People do not perform as well when trying to perform two attention-demanding tasks at the same time.[32] Research shows even pedestrians don't effectively monitor their environment for safety while talking on cell phones.[33-35] The challenge is managing two tasks demanding our cognitive attention.

Certainly most would agree that driving a vehicle involves a more complex set of tasks than walking.



**Figure 2. The four lobes of the brain.**
**Source: National Institutes of Health**

**What are primary and secondary tasks? What happens when people switch attention between them?**

When people perform two tasks at the same time, one is a primary task and the other a secondary task. One task gets full focus (primary) and the other moves to a back burner (secondary). People can move back and forth between primary and secondary tasks.

Secondary, or back-burner status, doesn't mean people are ignoring the task. When a person stands before a stovetop full of pots, all pots and burners can be monitored at the same time. But one pot is getting primary attention, such as a front pot being stirred. While stirring the right front pot, the person sees the covered left back burner pot begin to boil and bubble over. Quickly, the person must remove the hot lid, remembering to grab a potholder first. The person also must keep his or her hand away from steam as the lid is lifted. It is difficult to continue evenly stirring the right front pot while switching attention and attending to the back burner pot. A person may or may not be aware that the stirring pattern has changed in the front pot, which was supposed to be the primary task getting full attention. Or a person may have even put the spoon down, knowing he or she can't do two potentially harmful tasks at one time and stay safe.

Certainly, driving a vehicle is a more cognitively complex activity than cooking. The human brain does the same switching between primary and secondary tasks when a person is driving a vehicle (primary task) while talking on a handheld or hands-free cell phone (secondary task).

Should driving a vehicle ever be a "back burner" task?

The brain is behind all tasks needed for driving: visual, auditory, manual and cognitive. Recent developments in functional magnetic resonance imaging (fMRI) now allow researchers to see the brain's reactions to specific challenges and tasks.

A Carnegie Mellon University study produced fMRI pictures of the brain while study participants drove on a simulator and listened to spoken sentences they were asked to judge as true or false.[36] The pictures below show that listening to sentences on cell phones decreased activity by 37 percent in the brain's parietal lobe (Figure 2), an area associated with driving. In other words, listening and language comprehension drew cognitive resources away from driving. This area of the brain is important for navigation and the type of spatial processing associated with driving. Because this study involved listening and thinking of an answer and not actual cell phone conversation, the researchers concluded the results may underestimate the distractive impact of cell phone conversation.

**Driving alone**

L                        R


**Driving with sentence listening**
L                        R

**Figure 3. Functional magnetic resonance imaging images.**
**Source: Carnegie Mellon University**

The same study also found decreased activity in the area of the brain that processes visual information, the occipital lobe (Figure 2). While listening to sentences on cell phones, drivers had more problems, such as weaving out of their lane and hitting guardrails. This task did not require holding or dialing the phone, and yet driving performance deteriorated. The scientists concluded this study demonstrates there is only so much the brain can do at one time, no matter how different the two tasks are, even if the tasks draw on different areas and neural networks of the brain. The brain has a capacity limit. These fMRI images provide a biological basis of the risks faced by drivers.

***How do cell phones differ from talking to passengers or listening to music while driving?***

While this paper shows the distraction of cell phone conversation, many people understandably wonder how this risk compares to talking with passengers or listening to a radio.

Drivers talking on cell phones make more driving errors than drivers talking with passengers.

Drivers are more likely to drift out of lanes and miss exits than drivers talking with passengers. Why? Adult passengers often actively help drivers by monitoring and discussing traffic.[37] Passengers tend to suppress conversation when driving conditions are demanding.[38, 39] Although some studies found that passengers did not reduce conversation distraction, so research evidence is mixed.[40]

Talking on cell phones has a different social expectation because not responding on a cell phone can be considered rude. In addition, callers cannot see when a driving environment is challenging and cannot suppress conversation in response.[41, 42] Passengers can see the roadway and may moderate the conversation.[43, 44]

Listening to music does not result in lower response time, according to simulator studies. But when the same drivers talk on cell phones, they do have a slower response time. Researchers have concluded that voice communication influenced the allocation of visual attention, while low and moderate volume music did not.[45]

This discussion does not mean that listening to music or talking with passengers is never distracting. Loud music can prevent drivers from hearing emergency sirens, and cognitive processing can lead to a decrement in vehicle control.[46] Some conversations with passengers can be distracting to drivers.[47] Any task that distracts a driver should be avoided.

**Driving Risks of Hands-Free and Handheld Cell Phones**

We now understand how our brains have difficulty juggling multiple cognitive tasks that demand our attention. Next we will discuss specific risks that cell phone conversations bring to driving, with an overview of crash risks and driver errors most often associated with both hands-free and handheld cell phones.

**Inattention Blindness** – Vision is the most important sense we use for safe driving. It's the source of the majority of information when driving. Yet, drivers using hands-free and handheld cell phones have a tendency to "look at" but not "see" objects. Estimates indicate drivers using cell phones look at but fail to see up to 50 percent of the information in their driving environment.[48] Cognitive distraction contributes to a withdrawal of attention from the visual scene, where all the information the driver sees is not processed.[49] This may be due to the earlier discussion of how our brains compensate for receiving too much information by not sending some visual information to the working memory. When this happens, drivers are not aware of the filtered information and cannot act on it.

Distracted drivers experience inattention blindness. They are looking out the windshield, but do not process everything in the roadway environment necessary to effectively monitor their surroundings, seek and identify potential hazards, and to respond to unexpected situations. Their field of view narrows.[50] To demonstrate this, Figure 4 is a typical representation of where a driver would look while not using a phone. Figure 5 shows where drivers looked while talking on hands-free cell phones.[51]

Drivers talking on hands-free cell phones are more likely to not see both high and low relevant objects, showing a lack of ability to allocate attention to the most important information.[52] They miss visual cues critical to safety and navigation. They tend to miss exits, go through red lights and stop signs, and miss important navigational signage.[53] Drivers on cell phones are less likely to remember the content of objects they looked at, such as billboards. Drivers not using cell phones were more likely to remember content.[54]

The danger of inattention blindness is that when a driver fails to notice events in the driving environment, either at all or too late, it's impossible to execute a safe response such as a steering maneuver or braking to avoid a crash.[55]

To explore how cell phone use can affect driver visual scanning, Transport Canada's Ergonomics Division tracked the eye movements of drivers using hands-free phones, and again when these drivers were not on the phone. The blue boxes in Figures 4 and 5 show where drivers looked.[56] In addition to looking less at the periphery, drivers using hands-free phones reduced their visual monitoring of instruments and mirrors, and some drivers entirely abandoned those tasks. At intersections, these drivers made fewer glances to traffic lights and to traffic on the right. Some drivers did not even look at traffic signals.[57]



**Figure 4.**
**Where drivers not using a hands-free cell phone looked.**
**Source: Transport Canada**

**Figure 5.**
**Where drivers using a hands-free cell phone looked.**
**Source: Transport Canada**

**Slower Response Time and Reaction Time** – Response time includes both reaction time and movement time. Reaction time involves attentional resources and information processing, while movement time is a function of muscle activation. Cell phone use has been documented to affect reaction time.[58]

Due to the "attention switching" costs discussed earlier, it makes sense that driver reactions may be slower when using cell phones. For every information input, the brain must make many decisions: whether to act on information processed, how to act, execute the action and stop the action. While this process may take only a fraction of a second, all of these steps do take time. When driving, fractions of seconds can be the time between a crash or no crash, injury or no injury, life or death.

Numerous studies show delayed response and reaction times when drivers are talking on hands-free and handheld cell phones (Appendix A). Reaction time has shown impairment in a variety of scenarios:

- A University of Utah driving simulator study found drivers using cell phones had slower reaction times than drivers impaired by alcohol at a .08 blood alcohol concentration, the legal intoxication limit.[59] Braking time also was delayed for drivers talking on hands-free and handheld phones.

- Drivers talking on hands-free phones in simulated work zones took longer to reduce their speed when following a slowing vehicle before them and were more likely to brake hard than drivers not on the phone. Many braking scenarios included clues that traffic was going to stop. Side-swipe crashes also were more common. Work zones are challenging environments for all drivers, and rear-end collisions are a leading type of work zone crash, putting workers and vehicle occupants at risk. Driver distraction is a significant contributing factor to work zone crashes.[60]

- Hands-free phone use led to an increase in reaction time to braking vehicles in front of drivers, and reaction time increased more and crashes were more likely as the traffic density increased.[61]

- Testing of rear-end collision warning systems showed significantly longer reaction time during complex hands-free phone conversations.[62]

Drivers in reaction time studies tended to show compensation behaviors by increasing following distance. However, drivers in three studies who attempted to compensate for their reduced attention this way found increased headway often was not adequate to avoid crashing.[63]

**Problems Staying in Lane** – "Lane keeping" or "tracking" is the driver's ability to maintain the vehicle within a lane. While most cell phone driver performance problems involve significant reaction time impairment, there are minor, less significant costs with lane keeping. It is suggested that lane keeping may depend on different visual resources than responding to hazards by reacting. In addition, avoiding hazards requires drivers to watch for unexpected events, choose an appropriate response and act. This requires information processing and decision-making that is more cognitively demanding than lane keeping tasks, which is more automatic.[64]

Still, when we are driving at roadway and freeway speeds with vehicles spaced less than a few feet from each other in parallel lanes, the margin of error for decision-making and response time to avoid a crash is very small. Perhaps drivers who create a hazard by straying from their lanes must depend on other drivers around them to drive defensively and respond appropriately, and it may be those reacting drivers whose cell phone use should be of concern.

Texting by teens was also the subject of an August 2006 Teens Today survey conducted by the Liberty Mutual Research Institute for Safety and Students Against Destructive Decisions. The survey showed that teens considered sending text messages via cellphones to be their biggest distraction. Of the teens surveyed, 37 percent said that text messaging was extremely or very distracting, while 20 percent said that they were distracted by their emotional states and 19 percent said that having friends in the car was distracting.

**Talking on Cellphones**: A study released in January 2010 by the Highway Loss Data Institute (HLDI), an affiliate of the Insurance Institute for Highway Safety (IIHS), shows that the number of traffic crashes have not declined in California, Connecticut, New York and Washington, DC, the three states and jurisdiction that prohibit drivers from using handheld cellphones. The study was based on an analysis of insurance claims for crash damage. Officials said more research is needed to clarify the findings, which run counter to the result of other IIHS research.

In January 2010 the National Safety Council (NSC) released a report that estimates that at least 1.6 million crashes (28 percent of all crashes) are caused each year by drivers talking on cellphones (1.4 million crashes) and texting (200,000 crashes). The estimate is based on data of driver cellphone use from the National Highway Traffic Safety Administration and from peer-reviewed research that quantifies the risks using cellphones and texting while driving.

In September 2009 the National Highway Traffic Safety Administration and the National Center for Statistics and Analysis released the results of their National Occupant Protection Use Survey (NOPUS), which found that in 2008, 6 percent of drivers used hand-held cellphones, the same percentage as in 2007. Hand-held cellphone use was highest among 16 to 24 year olds (8 percent in 2008, down from 9 percent in 2007) and lowest among drivers 70 and older (1 percent in both 2007 and 2008). Hand-held cellphone use by drivers in the West increased from 6 to 7 percent from 2007 to 2008, but fell in the Northeast (from 5 to 4 percent), the Midwest (from 6 to 5 percent) and the South (from 8 to 7 percent). Data on driver cellphone use were collected at random stop signs or stoplights only while vehicles were stopped and only during daylight hours.

In May 2008 the Public Policy Institute of California released a study, "What to Expect from California's New Hands-Free Law," which looks at the potential effect of a new state law prohibiting drivers from using hand-held cellphones. Based on the experience of the three states (New York, New Jersey, Connecticut) and Washington, D.C., where similar laws are already in effect, researchers concluded that the ban will reduce traffic deaths by about 300 a year, but only in adverse conditions, such as on wet or icy roads. The analysis also found that because of the relatively modest penalties for using hand-held phones and no prohibition against dialing and texting, even strict enforcement of the law might not discourage drivers from using their cellphones while driving.

**State and Federal Initiatives**: On April 7, 2010 Transportation Secretary Ray LaHood announced a pilot program to stop motorists from texting or talking on cellphones. Drivers in Syracuse, New York, and Hartford, Connecticut, will be targeted by ticketing blitzes and ads that emphasize the dangers of distracted driving. The one-year program will be funded by $2.2 million in federal and state money. The program's slogan is "Phone in One Hand. Ticket in the Other." The initiative will also encourage automakers to reconsider the installation of hands-free communications systems in cars.

On March 3, 2010 the Treasury Department proposed that an interim plan prohibiting texting by drivers of interstate buses and trucks over 10,000 pounds announced by Transportation Secretary LaHood in January be made permanent. On October 1, 2009 President Obama signed an executive order prohibiting federal employees from texting while driving. The order applies to employees using cars or cellphones provided by the government or using their own cars or phones for government business. The order applies to some 4.5 million federal employees, including the military.

The number of state legislatures debating measures that address the problem of cellphone use while driving and other driver distractions continues to rise.

As of May 2010 seven states—California, Connecticut, New Jersey, New York, Oregon, Utah and Washington State—plus the District of Columbia, had laws on the books banning the use of hand-held cellphones while driving. Except

# Cellphones and Driving

**w wnins.com**/resources/personal/features/texting.shtml

(800) 862-6070



**WESTERN NATIONAL**
INSURANCE

*The relationship company*

## RESOURCES F BLOG F Special Feature

Increased reliance on cellphones has led to a rise in the number of people who use the devices while driving. There are two dangers associated with driving and cellphone use, including text messaging. First, drivers must take their eyes off the road while dialing. Second, people can become so absorbed in their conversations that their ability to concentrate on the act of driving is severely impaired, jeopardizing the safety of vehicle occupants and pedestrians. Since the first law was passed in New York in 2001 banning hand-held cellphone use while driving, there has been debate as to the exact nature and degree of hazard. The latest research shows that while using a cellphone when driving may not be the most dangerous distraction, because it is so prevalent it is by far the most common cause of this type of crash and near crash.:

### Recent Developments

**Research**: Studies about cellphone use while driving have focused on several different aspects of the problem. Some have looked at its prevalence as the leading cause of driver distraction. Others have looked at the different risks associated with hand-held and hands-free devices. Still others have focused on the seriousness of injuries in crashes involving cellphone users and the demographics of drivers who use cellphones. Of increasing concern is the practice of texting. The following is a summary of some recent research on the issue.

**Texting**: In response to a growing body of research showing the dangers of texting while driving, highlights of which are discussed below, at the end of August 2009 the Governors Highway Safety Association changed its position and called for a ban on the practice. The association had previously said that such a ban would be difficult to enforce.

In July 2009 Virginia Tech Transportation Institute released a study showing that the risk of texting while driving is far greater than previous estimates found and far exceeds the hazards associated with other driving distractions. Researchers used cameras in the cabs of trucks traveling long distances over a period of 18 months and found that the collision risk became 23 times higher when the drivers were texting. The research also measured the time drivers stopped looking at the road and used their eyes to send or receive texts. Drivers generally spent nearly five seconds looking at their devices before a crash or near crash, a period long enough for a vehicle to travel more than 100 yards at typical highway speeds.

A Pew Internet & American Life Project survey of 800 young people called "Teens and Distracted Driving" found that 75 percent of all American teens ages 12 to 17 have a cellphone. The survey, conducted during the summer of 2009, found that 26 percent of American teens ages 16 to 17 have texted while driving and 43 percent have talked on a cellphone while driving. Forty-eight percent of teens ages 12 to 17 say they have been in a car when the driver was texting and 40 percent say they have been in a car when the driver used a cellphone in a way that put themselves or others in danger.

CELL PHONE
AT&T RECORDS   REQUEST
11 MONTHS AFTER INCIDENT.

# EXHIBIT H

(3 PAGES)

GROUND# 3, 5, 6, 7, 8



## OFFICE OF THE DISTRICT ATTORNEY
### S A N   J O A Q U I N   C O U N T Y

222 East Weber Avenue, Suite 202  Stockton, California
P.O. Box 990, Stockton, California  95201
Telephone: (209) 468-2400   Fax: (209) 465-0371

**JAMES P. WILLETT**
DISTRICT ATTORNEY

**EDWARD J. BUSUTI**
ASSISTANT DISTRICT ATTO

# FAX COVER SHEET

DATE: _5·13·11_

To: _ATT / custodian of Records._

Agency: _____

Fax Number: _888-938-4715_

From: _Glenda / MJR_

Agency:  SAN JOAQUIN COUNTY DISTRICT ATTORNEY'S OFFICE
Fax: 209-468-9618
Phone: 209-468-2400

RE: _cell phone records._

Total number of pages (including cover): _____

**SPECIAL INSTRUCTIONS**:

_Please contact our office if you_
_have any questions._
_Thank-you!_

CONFIDENTIALITY NOTICE:  This communication with its contents may contain confidential and/or legally privileged
information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use or disclosure is
prohibited and may violate applicable laws in including the Electronic Communications Privacy Act.  If you are not the
intended recipient, please contact the sender and destroy all copies of the communication.

 1 | James P. Willett
   | District Attorney
 2 | State Bar Membership No. 88837
   | San Joaquin County
 3 | By: MICHAEL J. RASMUSSEN
   | Deputy District Attorney
 4 | Courthouse
   | Stockton, CA  95202
 5 | DT:gc / Serratos

 6 | Phone: (209) 468-2400

 7 | Attorneys for Plaintiff

 8 |        SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

 9 |                        STOCKTON BRANCH

10 | The People of the State of California,     )    No. SF115116A
                                               )
11 |                        Plaintiff,         )    SUBPOENA DUCES TECUI
                                               )
12 |              v.                            )
                                               )
13 |                                            )
   | BENJAMIN SERRATOS                          )
14 |                                            )
   |                    Defendant(s).           )
15 |
   | TO: CUSTODIAN OF RECORDS
16 |     FAX: 888-938-4715

17 |
   | YOU ARE COMMANDED TO APPEAR before the Superior Court of the Stat
18 | of California, in and for the County of San Joaquin, Department :
   | thereof, at the courtroom of the said Superior Court at STOCKTON
19 | CA, on 6/3/11, at 8:30 a.m., as a witness in the above-entitled
   | criminal action on the part of the People, and you are required
20 | also to bring with you the following articles:

21 | PLEASE BRING ALL PHONE RECORDS INCLUDING TEXTS BY CELL PHONE
   | #(209)954-2268 on 6/12/10 at approximately 11:30 p.m. - 11:59 p.r
22 |
   | Given under my hand May 13, 2012.
23 |
24 |                                         MICHAEL J. RASMUSSEN
25 |                                         Deputy District Attorney
26 |
27 |
28 |

1                              A F F I D A V I T
STATE OF CALIFORNIA      )
2                        )
COUNTY OF SAN JOAQUIN )
3
I, MICHAEL J. RASMUSSEN, hereby declare, as a Deputy District
4 Attorney for the County of San Joaquin, that upon information an
belief, the witness whose name and address are described in the
5 foregoing subpoena has the articles specified above in his
possession and under his control, and that there is good cause f
6 producing them before the Superior Court.

7 That the above-described articles are material to the trial of t
above-entitled matter for the following reasons:
8
TO PROVE THAT THE VICTIM WAS NOT USING HER CELL PHONE WHEN THE
9 DEFENDANT REAR-ENDED HER AT HIGH SPEEDS.

10 Dated at Stockton, CA, May 13, 2012. _____ 2011

11 I declare under penalty of perjury under the laws of the State o
California that the foregoing is true and correct.
12

13                              MICHAEL J. RASMUSSEN
                               Deputy District Attorney
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      2.

BAIL HEARING TRANSCRIPTS EXCERPTS

"JULY 28 2010"

DISCUSSION BETWEEN COUNSEL, PROSECUTOR, COURTS REGARDING
PROSECUTOR GOING ON VACATION FIRST COUPLE OF WEEKS OF AUGUST.

THE PROSECUTOR LATER NEAR TRIAL INDICATED HE APPROACHED COUNSEL
AUGUST 6, 2010 and personally obtained the Release vehicle note.
on August 6, 2010   BASICALLY ON HIS VACATION...

ONE WEEK FROM HEARING INWHICH PROSECUTOR HIMSELF HAS YET TO VIEW EVIDENCE
OF VEHICLES IN WHOLE... AS INDICATED IN HEARING 7/28/2010/.

Prosecutor WAS SET TO RETURN AUGUST 16 2010 10 days AFTER HIS REQUEST
TO RELEASE OLDSMOBILE AND HAS YET TO RECEIVE HONDAS ASSESSMENT OF BLACK BO:
REGARDING HONDA SPEED.. (

# EXHIBIT I

(4 PAGES)

GROUND # 8, 6, 7

54

1         (Off-the-record discussion between

2              Mr. Rasmussen and Mr. Pacheco.)

3

4         THE COURT:  Going back on the record on the

5    matter of Benjamin Serratos.

6         MR. PACHECO:  Yes, Judge.  We've discussed this

7    matter.  And I think there was also a difference -- in CHP?

8         MR. RASMUSSEN:  Yes.

9         MR. PACHECO:  CHP's and about when my client's

10   to appear.  So what we're going to do is set this matter in --

11   in court, set it for court for August the 16th at 1:30.

12

13                      (Off-the-record discussion between

14                      Mr. Rasmussen and Mr. Pacheco.)

15

16         MR. PACHECO:  2:30 is fine.

17         THE COURT:  And what's that type of hearing set

18   for?

19         MR. PACHECO:  That'd be for a prelim setting.

20         THE COURT:  Is there going to be a plea entered

21   here today?

22         MR. PACHECO:  No.  Let me --

23         THE COURT:  For further arraignment.

24         MR. PACHECO:  Further arraignment and

25   preliminary hearing setting.

26         THE COURT:  Okay.  The matter's going to be

27   continued to August 16th at 2:30, back in this department.

28   The defendant will be ordered present for a further

R. LOW, C.S.R. NO. 8564    *    SUPERIOR COURT REPORTERS
222 EAST WEBER AVE., RM. B-69, STOCKTON, CA (209) 468-2840

55

1  arraignment for further arraignment and pre-preliminary

2  hearing.

3            MR. PACHECO:  And let me brief -- let me put on

4  the record, if you don't mind, Judge --

5            THE COURT:  No, not at all.

6            MR. PACHECO:  The -- the reason why we set it

7  for a preliminary hearing setting is because Mr. Rasmussen is

8  going to be gone on vacation for -- well, probably too long.

9  But for a couple of weeks at least.  And when he gets back, he

10 needs some time to review the evidence that's come in since he

11 has been on vacation.

12       Also, there's a -- an item taken from Mr. Serratos' car,

13 which is being analyzed.  And I would like an opportunity

14 to -- it's -- it's also referred to and called the black box.

15 And I'd like to be able to be -- have a chance to review that.

16 And then so when we come back on the 16th, we should have more

17 information and then I can set a preliminary hearing.

18            THE COURT:  Mr. Rasmussen, does that give your

19 office enough time?

20            MR. RASMUSSEN:  No.  But if that's what Mr.

21 Serratos wants to do, we will do that.  I don't know how I

22 will be able to contact the CHP on the morning of the 16th to

23 find out what I'm going to need and when that's going to be

24 delivered.  But we can do that, though.

25            MR. PACHECO:  One suggestion would be that --

26 since the officer's here and he knows that that's what we're

27 looking for, among other evidence, that maybe he can have it

28 delivered for when Mr. Rasmussen gets back.

56

1          THE COURT:  Do you return from vacation on the

2   16th?

3          MR. RASMUSSEN:  The 16th.

4          THE COURT:  If we do make it the 18th, I

5   realize it's two days beyond what we talked about, but make it

6   Wednesday the 18th to make sure, because I don't want to waste

7   a court appearance to make sure we have everything that we

8   need at that time.

9

10                     (Off-the-record discussion between

11                     Mr. Pacheco and Benjamin Serratos.)

12

13          MR. PACHECO:  Yes.

14          THE COURT:  That will be August 18th.  And that

15   will be at 2:30 back in this department for further

16   arraignment and pre-preliminary hearing and preliminary

17   hearing setting.  The defendant ordered present.

18      Thank you.

19          MR. RASMUSSEN:  Thank you, Your Honor.

20          THE COURT:  That concludes the calendar.

21

22          (The proceedings concluded at 4:04 p.m.)

23

24                     ---oOo---

25

26

27

28

57

1    STATE OF CALIFORNIA      )
                              )   ss.
2    COUNTY OF SAN JOAQUIN    )

3

4         I, ROSE ANN LOW, **Official Court Reporter** of

5    the Superior Court of the State of California, in and for the

6    County of San Joaquin, do hereby certify:

7         That I was present in the Superior Court of

8    the State of California, in and for the County of San Joaquin,

9    at the time of the proceedings had in the above-entitled

10   matter; that at said time and place, I took down in shorthand

11   notes all the testimony given and proceedings had, and that I

12   thereafter caused said shorthand notes to be transcribed by

13   computer-aided transcription, the above and foregoing being a

14   full, true and correct transcription thereof, and a full, true

15   and correct transcript of that testimony taken and proceedings

16   had.

17

18

19

20                    _Rose Ann Low_
                      ROSE ANN LOW, C.S.R. No. 8564

21

22

23

24

25

26

27

28

R. LOW, C.S.R. NO. 8564       *    SUPERIOR COURT REPORTERS
222 EAST WEBER AVE., RM. B-69, STOCKTON, CA (209) 468-2840

RELEASE ? DESTRUCTION OF VEHICLE

NOTE...

# EXHIBIT J

( 1 PAGE)

GROUNDS # 4, 5, 7, 8



People v. Benjamin Servetes                    SF 115116A

The defense has elected not to inspect
Distinee Little's vehicle (Oldsmobile). Further,
they have agreed to allow the CHP
to release the car from impound.

3/6/10

MAIT REPORT INDICATING   INVESTIGATIONS & ANALYSIS

STILL   CONDUCTED AFTER THE RELEASE NOTE DATE.

THE RELEASE OF VEHICLE NOTE DATED  August 6 2010

MAIT AS OF EVEN NOVEMBER (2010!!)   ARE STILL

CONDUCTING INVESTIGATION AND ANALYSIS OF

BOTH VEHICLES...

# EXHIBIT K

GROUND # 4 ,7, 8

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE/DIAGRAM**
CHP 558D (Rev. 9-08)  OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-12-10 | 2350 | 9265 | 15174 | 201006101 | VL-008-10 | 13 |

**Evidence Collection Log** (continued)

| EVIDENCE NUMBER | LOGGED BY | DATE BOOKED | DESCRIPTION |
|---|---|---|---|
| E2010-0152 Item #1 | Coady | 07-28-10 | Supplemental Restraint System (SRS) retrieved from the Honda Accord by Engineer Pursell, pursuant to a search warrant, on July 27, 2010. |
| E2010-0156 Item #1 | Ferguson | 08-05-10 | One CD containing a direct download copy of the 87 digital photographs of the Honda Accord at Sam Berri Towing, taken on August 4, 2010. (Labeled CD #5) |
| E2010-0162 Item #1 | Ruppert | 08-11-10 | One CD containing a direct download copy of the 270 digital photographs of the lamps collected from the Honda Accord and Oldsmobile Cutlass, taken on August 9 and 10, 2010. (Labeled CD #6) |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE/DIAGRAM**

CHP 558D (Rev. 9-08)  OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-12-10 | 2350 | 9265 | 15174 | 201006101 | VL-008-10 | 51 |

**Calculations** (continued)

Vehicle Weights

On November 2, 2010, MAIT Investigators Ruppert, Coady, and MCS-I Ferguson met CHP Mobile Road Enforcement (MRE) Officers T. Wold, ID 17845, and M. Kraemer, ID 15274, at Sam Berri Towing in order to weigh the Honda and the Oldsmobile. The results were as follows:

| Tire Location | Oldsmobile Weight (lbs) | Honda Weight (lbs) |
|---|---|---|
| Right Front | 950 | 800 |
| Left Front | 850 | 1100 |
| Right Rear | 600 | 750 |
| Left Rear | 250 | 500 |
| **Total** | **2650** | **3150** |

The total weight of the vehicles, for use in the momentum analysis, must include the weights of the occupants of the vehicles. The following weights of the vehicle occupants were obtained from California Department of Motor Vehicle records:

| Occupant Location | Oldsmobile Weight (lbs) | Honda Weight (lbs) |
|---|---|---|
| Driver | 160 | 190 |
| Right Front | 195 | |
| Right Rear | 170 | |
| **Total** | **525** | **190** |

The total weight of the Honda and its occupant was 3340 lbs. The total weight of the Oldsmobile and its occupants was 3175 lbs.

MOTION TO CONTINUE PRELIMINARY

PROOF MR.CHARLES PACHECO HAD YET TO REVIEW THE MAIT REPORT  1-24-2011

&

WAS HAVING TO NEED A RECONSTRUCION EXPERT VIEW REPORTS ..

ALSO SHOWS WHEN MAIT REPORT WAS PROVIDED TO COUNSEL...      1-3-2011


THE RELEASE OF THE VEHICLE WAS 5 MONTHS PRIOR ...

THIS CLEARLY DEMONSTRATES THE INEXPLICABLE    I.A.C  OF MR.PACHECO

IT ALSO DEMONSTRATES THE PROSECUTION CULPABILITY..




# EXHIBIT L

5 PAGES

GROUNDS # 4, 7, 8

FILED
SUPERIOR COURT-STOCKTON

2011 JAN 26 PM 12:52

ROSA JUNQUEIRO, CLERK

B_____
DEPUTY

1   Charles A. Pacheco, SB #129630
    **PACHECO & SOMERA**
2   A Professional Law Firm
    8031 Freeport Boulevard
3   Sacramento, California  95832

4   (916) 665-5103
    (916) 665-5107 fax
5
    Attorney for Defendant
6

7

8                **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN**

9

10  PEOPLE OF THE STATE OF                )   **CASE NO.:  SF115116A**
    CALIFORNIA,                           )
11                                        )   **NOTICE OF MOTION, MOTION,**
                Plaintiff,                )   **DECLARATION AND POINTS AND**
12                                        )   **AUTHORITIES IN SUPPORT OF**
                                          )   **MOTION TO CONTINUE**
13          vs.                           )   **PRELIMINARY EXAMINATION**
                                          )
14  BENJAMIN SERRATOS, III,               )
                                          )   **DATE: JANUARY 31, 2011**
15              Defendant.                )   **TIME: 9:30 A.M.**
                                          )   **DEPT: 23**
16                                        )
                                          )
17  _____)

18  TO: SAN JOAQUIN COUNTY DEPUTY DISTRICT ATTORNEY RASMUSSEN:

19                                      **NOTICE**

20          PLEASE TAKE NOTICE that on the above date and time, or as soon thereafter as the

21  matter can be heard, in the designated department of the above-entitled court, defendant herein

22  through his attorney, Charles A. Pacheco, will move this court for an order continuing the

23  preliminary examination in this matter.

24          This motion will be based on this notice of motion, upon the documents and papers on

25  file in this action, and upon the attached declaration and points and authorities in support

26  thereof.

27  /

28  //////

                                          - 1 -
            NOTICE OF MOTION, MOTION, DECLARATION AND POINTS AND AUTHORITIES
            IN SUPPORT OF MOTION TO CONTINUE PRELIMINARY EXAMINATION

1

## MOTION

2          The defendant, by and through his attorney, Charles A. Pacheco, hereby moves the court

3    for an order granting a continuance of the preliminary examination in the above-entitled matter

4    set as indicated hereinabove.

5    DATED: January 24, 2011                    PACHECO & SOMERA

6

7                                              BY: _____
                                                    CHARLES A. PACHECO
8                                                   Attorney for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION IN SUPPORT OF MOTION TO CONTINUE

I, CHARLES A. PACHECO, declare:

1.      I am an attorney duly licensed to practice law before all courts in the State of California.

2.      I am the attorney of record for defendant herein.

3.      The instant action is presently scheduled for preliminary examination on January 31, 2011, in the above-entitled court.  I am moving for a continuance pursuant to Penal Code section 1050.

4.      I am unable to proceed with preliminary examination of this action for the reasons set forth below.

5.      (A)     On or about January 3, 2011, the District Attorney's Office prepared a CD containing the long-awaited, 65-page MAIT report.  This CD was provided to counsel on or about January 4.

(B)     On January 10, 2011, counsel started a one-week civil trial in the San Joaquin Superior Court in the matter of *Allgoewer v. City of Tracy.*  (Also on this date, the *Serratos* case was set for a preliminary examination which was continued to January 31.)

(C)     Counsel requires additional time to allow his traffic reconstruction expert to examine the reports in this matter and consult with defense counsel.

6.      For the foregoing reasons, counsel requests that the preliminary examination in this action be continued.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of January, 2011, at Sacramento, California.

PACHECO & SOMERA

BY: _____
CHARLES A. PACHECO
Attorney for Defendant

- 3 -

## POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CONTINUE

Defendant submits the following points and authorities in support of his motion to continue the preliminary hearing in this matter:

**I.     THE TRIAL COURT MAY GRANT A CONTINUANCE UPON A SHOWING OF GOOD CAUSE THAT THE ENDS OF JUSTICE REQUIRE A CONTINUANCE.**

Penal Code section 1050 provides, in pertinent part:

    (a)    The welfare of the people of the State of California require that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time; ...

    (e)    Continuances shall be granted only upon showing of good cause.

**II.    THE RIGHT TO COUNSEL INCLUDES THE RIGHT TO HAVE EFFECTIVE AID IN THE PREPARATION AND TRIAL OF ONE'S CASE AND DENIAL OF THIS AID CONSTITUTES A DEPRIVATION OF DUE PROCESS BY LAW.**

Pursuant to *People v. Bourland* (1966) 247 Cal.App.2d 26, a continuance should be granted to permit a defendant to secure counsel of his own choice where it may be granted without disruption of the orderly process of justice.

For reasons set forth in the Declaration of Charles A. Pacheco, defendant requests the court continue the trial of this action.

DATED: January 24, 2011               PACHECO & SOMERA

                                  BY: _____
                                  CHARLES A. PACHECO
                                  Attorney for Defendant

**PROOF OF SERVICE**   FILED
SUPERIOR COURT-STOCKTON

2011 JAN 26  PM 2: 52

I am a citizen of the United States, over the age of 18 years and not a party to or interested in the within action. I am employed in the County of Sacramento and my business address is 8031 Freeport Boulevard, Sacramento, California 95832. R. JUNQUEIRO, CLERK

BY _____ DEPUTY

On the date set forth below, I served the following documents: NOTICE OF **MOTION, MOTION, DECLARATION AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CONTINUE TRIAL** to the following person(s):

| INTERESTED PARTY | MAIL | PERSONAL | OVER-NIGHT | EMAIL | FAX |
|---|---|---|---|---|---|
| Michael Rasmussen, DDA<br>San Joaquin District Attorney's Office<br>P.O. Box 990<br>Stockton, California  95201<br>Michael.Rasmussen@sjcda.org | XX | | | XX | |

MAIL:          U.S. Postal Service.  Placing a true copy of said document(s) in an envelope(s) addressed as set forth above, with postage thereon fully prepaid, and then placing said envelope(s) in the designated area for outgoing mail in accordance with this office's practice, whereby the mail is deposited in a U.S. mailbox in the County of Sacramento, California, on the date set forth below.

PERSONAL:    By placing a true copy thereof in a sealed envelope and causing said envelope to be delivered by hand to the address(es) noted above during normal business hours.

OVERNIGHT:  By placing a true copy thereof in a sealed envelope addressed to the interested party and depositing said envelope with the overnight courier service.

FAX:            By personally transmitting same via electronic facsimile machine to the address(es) noted above at the facsimile number shown.

EMAIL:         By personally transmitting same via electronic service to the address(es) noted above.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on **JANUARY 24, 2011,** at Sacramento, California.

SUSAN GARDNER

NOTICE OF MOTION, MOTION, DECLARATION AND POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO CONTINUE PRELIMINARY EXAMINATION

MR.PACHECOS ATTORNEY LETTER TO BENJAMIN SERRATOS

INRE: TO THE HIRING OF A TRAFFIC RECONSTRUCTION EXPERT

TED KOBAYASHI..OF BOSTER KOBAYASHI & ASSOCIATES..

DATED JANUARY  27, 2011   (5) Five and a half months

after Mr. PACHECO RELEASE OF VEHICLE SCRATCH PAPER NOTE.


SEE ALSO EXHIBIT   J   FORMAT TEMPLATE AND STYLE

 OF RELEASE NOTE ... IT IS NOT IN PROFESSIONAL FORMAT

 IN COMPARRISON TO EXHIBIT M


# EXHIBIT M

(1 PAGE)

I.A.C   GROUND  4,


GROUND # 4, 5



# PACHECO&SOMERA
### A PROFESSIONAL LAW FIRM

*Reply to: Sacramento*

January 27, 2011

Mr. Benjamin Serratos, III
Booking no. 10-12965
999 W. Mathews Road
French Camp, California   95231

> RE:   **People v. Benjamin Serratos, III**
> **San Joaquin Superior Court no. SF115116A**

Dear Mr. Serratos:

By now you should have had an opportunity to review the CHP MAIT report which was recently mailed to you.  I have filed a motion to continue the preliminary examination set for Monday, January 31, in order to allow time to retain an expert witness to review the report.  The expert witness I would like to retain is Ted Kobayashi with the firm Boster Kobayashi & Associates.  He is a traffic reconstruction expert, and I have used his services several times in the past.  He charges $275 per hour and it is estimated that it will take approximately 4 hours to review the MAIT report and then consult with me.  These expert fees are in addition to my attorney fees, pursuant to our contract.  Therefore, I am requesting that your family forthwith remit payment to me of $1,100.  We will have a limited time between now and the continued hearing date, so I would like to receive payment by no later than Friday, February 4, 2011.

Very truly yours,

CHARLES A. PACHECO

CAP:stg

Stockton Office
215 North San Joaquin Street, Stockton, CA 95202
Telephone: (209) 465-6633  Facsimile: (209) 465-6635

Sacramento Offi
8031 Freeport Boulevard, Sacramento, CA 958
Telephone: (916) 665-5193  Facsimile: (916) 665-51

CALIFORNIA HIGHWAY PATROL  REPORT  SERRATOS/HONDA TRAVELED ON # 1 LANE.

CHP REPORTS AND DEFENSE RECONSTRUCTION EXPERT ALL INDICATE SERRATOS
ON # 1 LANE..

CONTRARY TO MAIT TEAMS REPORT. WHO LEFT EVIDENCE ON THE SCENE (HUB CUP)
THAT AIDS IN TRAJECTORY OF VEHICLES..

_____

# EXHIBIT N

( 2 PAGES)

Serrano #1, 4, 7, 8.

CORONER'S REPORT                                                Case #    2010-1194

**Investigator: Gary Yip**

**Decedent: Destanee Arlene LITTLE**                                      Page 2

### Synopsis

Date and time recorded 06/13/10 at 0429 hours

On 06/13/10 at 0105 hours I, Deputy FELBER responded to North West Lane and East Armstrong Road in Lodi to conduct an investigation into the death of Destanee LITTLE, who was positively identified by her California driver license that was obtained by California Highway Patrol officers on scene.

The preliminary investigation shows on 06/12/2010 the decedent was the driver of an Oldsmobile sedan bearing California license #2JXC856 that was struck by a drunk driver driving a vehicle bearing California license #6EZK884. American Medical Response arrived on scene and no life saving measures were performed due to obvious signs of death. Determination of death was noted at the scene by Paramedic LINTHIEUM at 2355 hours.

The remains were removed to the Forensic Pathology Facility where a postmortem examination was performed to determine the exact cause of death; report on file, this office.

### Narrative

I first viewed the decedent lying supine on the southwest corner of North West Lane and East Armstrong Road in Lodi. The decedent was covered by a yellow tarp and was lying near the trunk of her vehicle that was facing south on North West Lane. The decedent was clad in a black tank top and a white colored skirt. The decedent had multiple lacerations on her body due to the vehicle accident. Major lacerations include the left wrist area of the decedent that was exposed down to the bone and muscle. There was a large laceration on the decedent's left hip. Both the decedent's right and left legs were nearly severed from her body. The decedent had a large laceration to the left triceps area of her arm. The decedent had cuts and blood on her face from the accident.

According to the pre hospital care report, American Medical Response Medic #28 was dispatched on 06/12/2010 at 2353 hours to North West Lane and East Armstrong Road in Lodi for a report of a vehicle traffic accident. They arrived on scene and found the decedent on the ground, behind a vehicle, unresponsive with obvious signs of death. The decedent was determined non-resuscitable and no life saving measures were performed. Determination of death was noted by paramedic LINTHIEUM at 2355 hours.

According to CHP Officer COFFMAN, ID #15174 report, the decedent was traveling south bound on West Lane, north of the intersection with Armstrong Road, in her Oldsmobile vehicle, in the #2 lane, ahead of the other vehicle at a speed of 55 mph. The other vehicle, a (Honda), was traveling south bound on West Lane, north of the

Narrative Author                                   Approved by

_____                            _____

Gary Yip Deputy Coroner                            Sgt A. Mondavi Supervising Deputy Coroner

**CORONER'S REPORT**                                                    Case #    2010-1194

Investigator: Gary Yip
Decedent: Destanee Arlene LITTLE                                                    Page 3

intersection with Armstrong Road, in the #1 lane, at an unknown high rate of speed. The other Vehicle was overtaking the decedent at a significantly high rate of speed. The driver of the other vehicle, due to his high level of intoxication, allowed his vehicle to drive into the #2 lane and rear end the decedent's left rear bumper with the front right portion of his vehicle, just north of the intersection. The force of this impact caused the decedent's vehicle to rotate clockwise approximately 90 degrees as it went though the intersection.

The decedent collided with the raised asphalt curb on the southwest corner of the intersection with its left side tires. This caused a weight transfer of the decedent's vehicle to the driver's side door area and the vehicle collided with a signal light pole on the western dirt/gravel shoulder.

After the decedent vehicle had collided with the pole, it continued to spin in a clockwise manner and came to rest facing southbound, on the shoulder, south of the pole. The other vehicle came to a stop in the #1 lane of West Lane, south of Armstrong Road. The driver of the other vehicle attempted to flee the scene on foot; however, was detained by other California Highway Patrol Officers. Upon Officer COFFMAN"S arrival, he located the decedent at the scene lying on the ground directly behind her vehicle deceased.

Notification was made to the decedent's mother, Barbara LITTLE.

Narrative Author                                    Approved by

Gary Yip Deputy Coroner                             Sgt A. Mondavi Supervising Deputy Coroner

CORNER DOES NOT STATE  WHAT CAUSE OF DEATH IS DUE TO???

LABELES DRIVER EJECTED....

DR. BENNET OMALU    CHIEF MEDICAL EXAMINER &
PATHOLOGIST HAS A HISTORY OF CLAIMING BEING MIS-LEAD BY THE

SAN JOAQUIN COUNTY STOCKTON D.A OFFICE

CHP AND SAN JOAQUIN SHERIFF.

CLAIMS CONSIST OF CRITICAL INFORMATION BEING WITH HELD.


DR.BENNET OMALU WAS NOT MADE AWARE OF THE CELL PHONE USAGE.. DISTRACTED

DRIVING  BY MS. LITTLE....

# EXHIBIT O

( 1 PAGE)

Grounds # 1, 8



San Joaquin County Office of the Coroner
7000 S. Michael N. Canlis Blvd
French Camp, California 95231
Steve Moore,
Sheriff-Coroner

**Destanee Arlene LITTLE**                    **Coroner Case Number: 2010-1194**

| CLASSIFICATION | Manner of Death | | Sub Manner of Death | | | | | Deputy Coroner | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Accident (Vehicle)** | | **Automobile vs Automobile** | | | | | **Gary Yip** | | |
| | Type of Medical Examination | | Time Departed | | Time Arrival | | Date of Death | | Time of Death | |
| | **Autopsy** | | | | | | **FND 06/12/2010** | | **2355** | |
| DECEDENT PERSONAL DATA | Name-First | | Middle | | Last | | | | Marital Status | | |
| | **Destanee** | | **Arlene** | | **LITTLE** | | | | **Never Married** | | |
| | Age | Date of Birth | | Place of Birth | | Height | Weight | Hair | | Eyes | |
| | **18** | **09/28/1991** | | **Stockton , CA** | | | | | | | |
| | Sex | Teeth | | Race | | | | | SSN | | |
| | **F** | | | **White** | | | | | **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** | | |
| | Scars, Marks, Tattoos | | | | | | | | | | |
| RESIDENCE | Address | | | | | City | | State | Zip | | |
| | **2212 Michigan Avenue** | | | | | **Stockton** | | **CA** | **95204** | | |
| PLACE OF DEATH | Place | | | | | | | County | | | |
| | **Found Roadway** | | | | | | | **San Joaquin** | | | |
| | Address | | | | | City | | State | | | |
| | **North West Lane/East Armstrong Road** | | | | | **Lodi** | | **CA** | | | |
| REPORTING INFORMATION | Death Reported By | | Agency | | | Date | Time | Removed From Scene To | | | |
| | | | **CHP-Stockton** | | | **06/13/2010** | **0013** | **Coroner's Facility** | | | |
| | Report Received By | | | | | | | | | | |
| | **Deputy Felber #151813/Dep Mutchler #6713** | | | | | | | | | | |
| CAUSE OF DEATH | Immediate Cause: | **Blunt Force Trauma of the Head and Trunk and extremities** | | | | | | | | | |
| | Due to: | | | | | | | | | | |
| | Due to: | | | | | | | | | | |
| | Due to: | | | | | | | | | | |
| OTHER SIGNIFICANT CONDITIONS | | | | | | | | | | | |
| INJURY INFORMATION | Place of Injury | | | | Injury at Work? | Date of Injury | | Time | | Estimated | |
| | **Roadway** | | | | **No** | **06/12/2010** | | **2350** | | | |
| | Address of Injury | **North West Lane/East Armstrong Road** | | | City | | County | | State | | |
| | | | | | **Lodi** | | **San Joaquin** | | **CA** | | |
| | Injury Description | | | | | | | | | | |
| | **Motor vehicle collision, decedent was driver of vehicle. Driver ejected.** | | | | | | | | | | |
| IDENTIFICATION | Identification Method | | | | Identified By | | | | | | |
| | **Visually – Photo** | | | | **CHP Officer Coffman/CDL** | | | | | | |
| NOTIFIED | Name | | Relationship | | Mailing Address | | | | | | |
| | **Barbara  Little** | | **Mother** | | **2212 Michigan Avenue  Stockton, CA 95204** | | | | | | |
| | Notified By | | | How Notified | | | | Date | | Time | |
| | **Deputy Felber #151813** | | | **In Person** | | | | **06/13/2010** | | **0302** | |
| ADDITIONAL INFORMATION | Pathologist | | Other Investigation | | | Funeral Home | | | | | |
| | **Dr. Bennet Omalu** | | | | | **Cherokee Memorial Funeral Home** | | | | | |

Steve Moore, Sheriff-Coroner

Gary Yip Deputy Coroner                    Sgt A. Montavi Supervising Deputy Coroner

HISTORY OF GOVERNMENT MISCONDUCT..

DR.BENNET OMALU CHIEF MEDICAL EXAMINERS...

IMPLICATES SAN JOAQUIN COUNTY STOCKTON DISTRICT ATTORNEY

CALIFORNIA HIGHWAY PATROL AND SAN JOAQUIN COUNTY SHERIFFS IN

WITH HOLDING CRITICAL INFORMATION AND MISLEADING HIM ...AND

PRESSED HIM TO DETERMINE CAUSE OF DEATH ON FALSE INFO....

THE CONDUCT OF THE DISTRICT ATTORNEY OFFICE AND CHP AND THE HIDING

OF CRITICAL INFO   WAS WELL WITHIN  THE CASE OF SERRATOS...

# EXHIBIT P

(3 PAGES)

Serratos 3,4,6,7,8

Case 2:18-cv-00077-MCE-KJN   Document 1   Filed 01/12/18   Page 183 of 206

# **Recordnet.com**
News worth sharing *online*

## **Questions linger in '08 death**

**By Jason Anderson**
Posted Feb 27, 2014 at 12:01 AM

STOCKTON - San Joaquin County's chief medical examiner said in a sworn deposition that investigators misled him, withheld critical information and pressed him to determine a cause of death in a case involving a man who died after being tased by a California Highway Patrol officer.

STOCKTON - San Joaquin County's chief medical examiner said in a sworn deposition that investigators misled him, withheld critical information and pressed him to determine a cause of death in a case involving a man who died after being tased by a California Highway Patrol officer.

Dr. Bennet Omalu conducted an autopsy on Daniel Lee Humphreys, who died July 26, 2008. Humphreys was tased by Officer Roberto Iniguez when he attempted to flee on foot after leading CHP officers on a high-speed pursuit that ended when he crashed his motorcycle on Interstate 5.

"There's a story behind this case," Omalu said in a sworn deposition dated Feb. 7. "When I did the autopsy, the entirety of the story was not revealed to me. ... At the time of the autopsy, what I was told was he was tased only twice."

About two years later, Omalu learned that Humphreys had been tased 31 times over a span of about 7 minutes and 30 seconds, according to the deposition.

"That changed the game for me," said Omalu, who subsequently amended the cause of death from mild traumatic brain injury caused by the motorcycle collision to "repeated conducted electrical excitation."

Attorney Peter Williamson is representing Humphreys' daughters in a wrongful death lawsuit against the state of California and the California Highway Patrol. Williamson is seeking more than $1 million in damages. The case is set for trial April 14, but there is a settlement conference scheduled for Monday, Williamson said.

Williamson is accusing the CHP, the San Joaquin County Sheriff's Office and the San Joaquin County District Attorney's Office of engaging in a cover-up. Each of those agencies is involved in a standard multiagency protocol investigation into Humphreys' death, and all three were aware that Humphreys was tased more than twice before Omalu conducted the autopsy, Williamson said.

Case 2:18-cv-00077-MCE-KJN   Document 1   Filed 01/12/18   Page 184 of 206

"I think all three are complicit in covering up the information and failing to disclose it to the medical examiner," Williamson said.

Williamson said the officer's actions were criminal, but the District Attorney's Office has yet to rule whether the use of force was justified. Robert Himelblau, a spokesman for the District Attorney's Office, said the report has not been completed because of pending litigation and a staff shortage in the District Attorney's Office.

"I don't think this is a murder, but it's probably manslaughter," Williamson said. "One of our theories - and I want to stress that this is a theory - is that they don't want to charge the officer with a crime and they're waiting for the statute of limitations to run out before they issue a report."

Williamson said he doesn't know when the statute of limitations will expire.

Melissa Humphreys, 24, said her father's death and the ongoing investigation have shaken her faith in law enforcement officers.

"It just hurts to know that you can't trust any of them anymore," she said. "If they're willing to cover up something as bad as this, what else would they do?"

The California Highway Patrol declined to comment, saying only that the matter is under review. The Sheriff's Office and the District Attorney's Office denied Williamson's allegations.

"Cover-up is a pretty strong term to use, and I wouldn't use that term lightly," Himelblau said. "In this particular case, (Omalu) was given a certain amount of information at the autopsy itself, and then at a later time he was given further information, which then had an impact on his report, so what was withheld from him?"

Omalu said he had not yet completed his autopsy when Detective Brian Barnes, a member of the Sheriff's Office who led the protocol investigation, visited him in his office.

"(Barnes said, 'Oh, the case has been closed. They determined that tasing was not involved,'" Omalu said. "And I was troubled by that. I said to him ... 'How could you close a case without the autopsy report being completed?'"

Williamson said Iniguez stated that he tased Humphreys "a lot" in a recorded interview about five hours after the incident. The next evening, CHP investigators downloaded information showing how many times the Taser had been discharged, but that information was not given to Omalu, Williamson said.

"The number of times he was tased was very forensically significant," Omalu said. "And (Barnes) said, 'Well, they have determined that he was tased only twice.' I asked him, 'Could somebody give me a report?' It was never given to me. I kept on asking for the report. ... No report was given.

"To be honest with you, I did not have a cause of death. I didn't really have a reasonable cause of death. So I examined his brain. There was mild traumatic brain injury, so-called concussion, grade-one concussion. The blunt force trauma of his trunk and extremities were of no forensic significance. They were all superficial, ... but I couldn't call it an undetermined cause of death because we had trauma. Concussions can kill. Concussions are very well established to cause sudden, unexpected death. So I put that in as my cause of death in the original report."

Omalu said he changed the cause of death after receiving new information from Assistant District Attorney Tori Verber Salazar, "who may have suspected that some information (was) kept back from me."

"(Verber Salazar) reached out to me and asked me ... if I had been made aware of a report from Taser. And I said, 'No.' She said she thought as much."

Omalu amended Humphreys' death certificate in July 2010, about two months after he received the Taser report.

In his sworn deposition, Omalu opined that the manner of death was homicide, noting that homicide is defined as death as a result of the actions of another human being. But Sheriff Steve Moore, in his role as coroner, concluded that the manner of Humphreys' death was accidental, explaining Wednesday that Iniguez's intent was to gain compliance and not to kill.

Williamson said it's time for authorities to release their official findings, asserting that the District Attorney's Office, the Sheriff's Office and the CHP are committing "obstruction of justice.

"Those are harsh words, but I believe this was a crime," Williamson said. "Those officers had an obligation to disclose that information to Dr. Omalu, and they failed to do so."

Contact reporter Jason Anderson at (209) 546-8279 or janderson@recordnet.com. Follow him at recordnet.com/crimeblog or on Twitter @Stockton911.

**MOST POPULAR STORIES**

‹ Previous                 Next ›

DEFENSE EXPERT RECONSTRUCTIONIST REPORT

THE VALUE OF THIS REPORT IS THAT MAIT  CONCEDED THAT THEY WERE

UNABLE TO DETERMINE AN ACCURATE POST IMPACT SPEED AND

ADMIT TO ASSUMPTION AND GUESTIMATION...

MAIT CONCEDES THEY ALSO DID NOT PERFORM A MECHANICAL INSPECTION

MAIT ALSO ADMITS THEY DID NOT HAVE A DETERMINATION AS TO IMPACT

....AT PRELIMINARY ....

MAIT CONCEDES TO CHANGING HONDA LANE TRAVEL...

YOU HAVE THE ISSUES OF LIGHTS, AND EJECTION ....REPORTED ON CORNER REPORT.

# EXHIBIT Q

(3 PAGES)

CRamos #1, 4, 6, 7,8

# GLOBAL SOLUTIONS

**Russell E. Darnell, Ph.D., Ed.D, MBA, BSE, CAI**
**P.O. Box 5586**
**El Dorado Hills, CA 95762**
**(916) 825-5592**
**globalcto@comcast.net**

12-1-2011

Jerry Schultz
Kavinosky Law Firm
People v Serratos

Dear Mr. Schultz,

I have attached my CV which lists my qualifications, experience and education.    In   brief, I
have 37 years experience in the field of accident investigation and reconstruction.
I have reconstructed more than 1,000 vehicle accidents involving motorcycles, cars, trucks,
buses, motorhomes, scooters, bicycles, RV's, and trailers.   I have participated in and led
programs involving fully-instrumented crash testing of cars, SUV's, pickups, trucks, and
motorcycles.   I am a contract accident reconstruction expert for the State of California, the
State of Arizona, and the United States Justice Dept.     I have testified in more than 200 jury
trials in state, federal, and international courts.

I have read the file materials you sent in the above-captioned action including the deposition
transcripts, the original Accident Report, and the MAIT report.   On 9-15-2011,
I conducted a vehicle inspection of the Serratos Honda and the accident scene.   I was informed
that the Oldsmobile Cutlass which was being driven by decedent Destanee Little at the time of
the accident no longer exists.

If called upon to testify, I will give testimony in the following areas where I disagree with
conclusions drawn by MAIT:

    1- The speeds of both cars before and after impact:



        a. MAIT has assumed a 55 mph pre-collision speed of the Oldsmobile; I
            strongly disagree with both MAIT's assumptions and calculations
        b. MAIT investigators have "collectively agreed" that the Honda was
            travelling at either 95 mph or 109 mph when it struck the Oldsmobile.   I
            strongly disagree with MAIT's assumptions, calculations, and their
            "collective" agreement approach which lacks scientific basis.



        c. Since MAIT "could not accurately determine" the post-impact speed of
                the Oldsmobile, they made an assumption based upon the

"calculated"

post-impact speed for the Honda, and used that calculation to "determine" the speed of the Oldsmobile.   Both their assumption and

their calculations in this regards are incorrect.

2- The areas of impact.
    a. Contrary to MAIT, my opinion is that the collision occurred just inside the #1 lane and not   in the #2 lane.

3- The lane positions of the two vehicles immediately prior to impact.
    a. In the initial Traffic Collision Report, Officer Stephen Coffman reported that Mr. Serratos was traveling in the #1 lane and overtaking Ms. Little who was traveling in the #2 lane.   In the Supplemental report, MAIT investigators *changed* this evidence and reported that, "Little was driving the Oldsmobile south in the #2 traffic lane...Concurrently, Serratos was driving the Honda south in the #2 traffic lane..."

This is a

substantial change which affects every part of the reconstruction.

    b. Contrary to MAIT, my opinion is that the collision occurred just inside the right portion of the #1 lane and not   in the #2 lane.

4- The skidmark evidence.
    a. Some of the conclusions reached by MAIT regarding the skid mark evidence are incorrect.
    b. Some of the skid marks included in the MAIT reconstruction were not related to this accident and were caused by other vehicles at other times.

5- The road gouge evidence supports my conclusion that the collision occurred in lane #1 and not in lane #2.

6- The EDR data retrieved from the Serratos Honda do not support a speed for the Honda of 95 mph or above at impact; not does the frontal damage pattern found on the Honda.

7- The injuries which caused Destanee Little's death neither occurred from the impact with the Honda, nor were they associated with the secondary impact with the light pole.   Ms. Little died because she was ejected from the car when her seat belt anchor failed.   AS PER MEDICAL EXAMINE

8- Considering the MAIT investigator's examination of the light bulbs in the Oldsmobile, it is highly likely that rear light illumination on the Oldsmobile Cutlass was at a *minimum* just prior to this night-time collision.   This may have been a substantial factor in the collision if Serratos could not see the Oldsmobile drifting over into his lane.



9- The right front wheel cover on the Honda was missing when I inspected the Honda.   The MAIT investigators did not notice the wheel cover at the accident site; I found the wheel cover during my site inspection and preserved the evidence for trial.   This important piece of evidence will help to demonstrate both the relative severity of the impact, and the dynamic movement of the Honda during the last 100' of its travel post-collision.

10- I strongly disagree with the proposition put forth in the MAIT Report (page 55) wherein it was decided that the skidmarks indicated a condition where the "left front and right rear tires were locked during a segment of the Honda's post-collision travel while the right front and left rear tires were free rolling."   This conclusion is not based in either mechanics or dynamics.

Respectfully submitted,


Russell E. Darnell, PhD

MAIT    REPORTS

USING A 2006 FORD CROWN VICTORIA....CHP VEHICLE  ON JULY 1 2010

a vehicle different in weight  and in totality in comparison to

2008 HONDA ACCORD...

MAIT CALCULATED VELOCITIES BASED ON WEIGHTS...

FURTHER A PRE_COLLISION SPEED FOR OLDSMOBILE WAS ESTIMATED..

IN COMBINATION THESE ERRORS ARE FLAWED SCIENTIE METHODS..

RENDER MAIT ANALYSIS LEGALLY INSUFFICIENT..

        NOT WITHIN DAUBERT TEST STANDARDS...


# EXHIBIT R

( 2 PAGES)



STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE/DIAGRAM**
CHP 558D (Rev. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-12-10 | 2350 | 9265 | 15174 | 201006101 | VL-008-10 | 52 |

**Calculations** (continued)

Drag Factor Testing

The drag factor for a passenger vehicle with locked tires traveling over the asphalt concrete (AC) roadway at the collision scene was tested on July 1, 2010, between 0948 and 0952 hours. The drag factor was determined by means of a Vericom VC3000 recording accelerometer owned by the California Highway Patrol (CHP) and assigned to Valley Division MAIT.

A 2006 Ford Crown Victoria Police Interceptor CHP patrol vehicle, license number 1239832, was used to perform the tests. The Ford was equipped with Goodyear Eagle RS-A tires, size P235/55R17.

Prior to conducting the tests, the anti-lock braking system (ABS) of the Ford was disabled and the accelerometer was secured to the interior of the windshield. Investigator Ruppert set up the accelerometer per the manufacturer's operating instructions and zero-adjusted the device at the test location. Three tests were conducted within the southbound lanes of West Lane, in the intersection with Armstrong Road, in the immediate area of the collision location. The Ford was driven into the test location at approximately 42, 48, and 49 miles per hour (mph).

In each test, the service brakes of the Ford were applied with maximum effort and the vehicle slid to a complete stop as it concurrently created locked-wheel tire friction marks on the roadway. The accelerometer subsequently recorded the deceleration forces experienced by the Ford as a result of the vehicle's tires sliding across the asphalt concrete roadway.

During the tests, Sergeant Day drove the Ford while Investigator Ruppert operated the accelerometer.

Upon completion of the tests, Investigator Ruppert used the Vericom Profile Software to download the data recorded by the accelerometer. The graphs on the following page depict the results of the three tests.

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE/DIAGRAM**
CHP 558D (Rev. 9-08)  OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-12-10 | 2350 | 9265 | 15174 | 201006101 | VL-008-10 | 60 |

## Calculations (continued)

### Conservation of Linear Momentum

In order to calculate a range of at-collision velocities for the Honda, a range of pre-collision velocities for the Oldsmobile were utilized in conjunction with the total weights of both vehicles and the post-collision velocities of the vehicles.  Once calculated the momentum-based Honda $\Delta V$'s were compared to the $\Delta V$ obtained from the SRS control unit download.  The following calculations utilize an eastimated pre-collision speed of 30 mph for the Oldsmobile.

$$V_{Honda1} = \frac{(W_{Honda})(V_{Honda2}) + (W_{Olds})(V_{Olds2}) - (W_{Olds})(V_{olds1})}{W_{Honda}}$$

$$V_{Honda1} = \frac{(3340)(75.7) + (3175)(75.7) - 3175(30)}{3340}$$

$$V_{Honda1} = 119.2 \text{ mph}$$

The momentum-based change in velocity ($\Delta V$) for each vehicle can be calculated as follows (again, utilizing a 30 mph pre-collision velocity):

$$\Delta V_{Honda} = (V_{Honda1}) - (V_{Honda2})$$

$$\Delta V_{Honda} = (119.1) - (75.7)$$

$$\Delta V_{Honda} = 43.4 \text{ mph}$$

$$\Delta V_{Olds} = (V_{Olds1}) - (V_{Olds2})$$

$$\Delta V_{Olds} = (30) - (75.7)$$

$$\Delta V_{Olds} = 45.7 \text{ mph}$$

TRIAL COUNSELS MOTION TO DISMISS

FOR INTENTIONAL DESTRUCTION OF EXCULPATORY

EVIDENCE.   CELL PHONE...

MOTION ADDRESSED  THE ISSUE OF NO FORMAL REQUEST FROM THE COURT

WAS SOUGHT    ....

WITHIN THE MOTION THERE ARE SEVERAL ISSUES ... OF CONSTITUTIONAL

DIMENSION...

A RELATIVE TO MS.LITTLE INTERVENED AND RETRIEVED THE CELL PHONE IN

QUESTION , THE PHONE WAS NOT RETURNED BACK INTO EVIDENCE FOR OVER

AN UNREASONABLE EXTENDED TIME..

# EXHIBIT S

(3 PAGES)

MOTION WAS FILED JANUARY 31 2012 , one week prior to a sworn in jury..

GROUND

3, 6, 7, 8

**THE KAVINOKY LAW FIRM**
JEROLD M. SCHULTZ, SBN: 47309
16255 Ventura Blvd., Suite 200
Encino, California 91436
(818) 439-0750 Telephone
(818) 346-4660 Facsimile

Attorneys for Defendant,

**BENJAMIN SERRATOS**


# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN JOAQUIN

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>vs.<br><br>**BEMJAMIN SERRATOS** | ) Case No.: SF115116A<br>)<br>) **NOTICE OF MOTION AND MOTION TO**<br>) **DISMISS FOR INTENTIONAL**<br>) **DESTRUCTION OF EVIDENCE**<br>) Date: 1-31-12<br>) Time: 8:30 P.M.<br>) Place: Department 21<br>)<br>)<br>)<br>) |

To the Honorable Judge in the above entitled court and to the District

Attorney of San Joaquin County:

**PLEASE TAKE NOTICE** that on January 31, 2012, or as soon thereafter as the

matter may be heard, in Department 25 of the above-entitled court, the Defendant herein,

through his counsel, will and hereby does move the court for an order DISMISSING the

Information in this case because of intentional destruction or negligent preservation of

exculpatory evidence.

## DECLARATION OF COUNSEL IN SUPPORT OF

## MOTION FOR DISMISSAL OR ADVERSE FINDINGS

I, Jerold M. Schultz, declare as follows:

This case involves a traffic fatality where fault is an issue. Within days of the traffic accident the victim's uncle, a San Joaquin County Sheriff's Deputy, retrieved a cell phone from the tow yard where the vehicle was being stored. No formal request from the court was sought, nor was CHP protocol followed for the release of obviously material evidence. The evidence is crucial because it has obvious exculpatory value. A distracted driver presents a danger on the roadway and her driving in the defendant's lane of travel was the proximate cause of her death. A request for evidence of cell phone usage documents from the service provider originally informed the parties there was no usage during the appropriate time period. However, the search was apparently conducted for a date other than the date and time of the traffic accident. A new search was conducted and usage was found for the relevant time period. The prosecution team is apparently now investigating this usage. The uncle of the decedent driver is a Deputy Sheriff for San Joaquin County by the name of John Nesbitt. After the collision he called CHP and spoke to someone who informed him that Miss Little's vehicle was not impounded and was at Plummer's Tow Yard. Deputy Nesbitt went to the tow yard and removed several items from the vehicle, including the cell phone. This evidence had obvious exculpatory value for the accused and was intentionally not preserved in police custody and released from police custody without regard to its exculpatory value.

I declare under penalty of perjury, according to the laws of the State of California, that the foregoing is true and correct.

Executed at Encino, California, on January 27, 2012.

**Jerold M. Schultz**
Attorney for Defendant,
**Benjamin Serratos**

This motion is made based upon the attached declaration of counsel, the court file, and evidence and argument to be presented at the hearing.

Dated:  1-26-12

Respectfully submitted,

By: _____

        Jerold M. Schultz
        Attorney for Defendant,
        **Benjamin Serratos**

SAN JOAQUIN COUNTY CHIEF MEDICAL EXAMINER TOTENS PCR ANTHONY'S

RESIGNATION LETTER ASSERTING "MISCONDUCT" ON BEHALF OF SHERIFF

CORONER STEVE MOORE ET· ..AL.. AS IN PRIOR CLAIMS ...THIS

DEMONSTRATES LACK OF INTEGRITY OF GOVERNMENT OFFICIALS.. IN

SAN JOAQUIN COUNTY,...

SUPPORTS AND MERITS AN EVIDENTIARY HEARING...

# EXHIBIT V

# Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP

## bennetomalu@bennetomalu.com

December 5, 2017

Monica Nino
County Administrator
44 North San Joaquin Street
Sixth Floor Suite 640
Stockton, CA 95202

Dear Ms. Nino,

### RE: NOTICE OF RESIGNATION FROM SAN JOAQUIN COUNTY

With tears in my eyes and with a very heavy heart, I hereby submit my notice of resignation from San Joaquin County as the County's forensic pathologist. According to the terms of my contract with our beloved county, I have to give a three month notice of resignation, which shall begin on December 5, 2017 and end with the termination of my employment on March 5, 2018. I must stop performing autopsies on December 5, 2017 in order to have sufficient time to complete and close the over 150 pending and open cases I may have.

When I joined this most lovely county in September 2007, I fell in love with it and gave my utmost best to elevate the standards and quality of practice of forensic pathology and death investigation in the County, which had fallen apart. Today, we have collectively done a wonderful job in turning the trajectory of the Coroner's Office and providing the best standards of autopsy, pathology and medico-legal services to the good people of the County. I planned to continue to serve the people of this County until my retirement. In the dark and difficult days of 2005 – 2007, while I was living through my CTE quagmire, I was running away from Pittsburgh and felt homeless, hopeless and afraid. This County offered me a home and gave me hope. For this I am deeply grateful, faithful and loyal to you and the good people of San Joaquin County. I will always remain part of you.

On November 27, 2017, my colleague, Dr. Sue Parson, submitted her letter of resignation. In her letter she stated the following:

> "Despite the privilege of working with Dr. Omalu, the behavior of San Joaquin County Sheriff Steve Moore and the working environment he created within the Coroner's Office made my day-to-day experience in the County personally unbearable and professionally unsustainable. Sheriff Moore's retaliatory behavior, arrogant expectations and of those under his employ, created an utterly untenable work environment – a complete hindrance to my professional growth and development in medicine and the discharging of my duties in a safe, non-threatening work environment, which is due all persons employed by the County under law.
>
> In general terms, Sheriff Moore's intrusion into physician independence ranges from forcefully taking over physician scheduling to inserting himself into how and when Dr. Omalu and I perform our medical duties with attempts to control and influence our professional judgment and conclusions.  This ultimately undermines the overall

competence of the Coroner's Office in conducting objective death investigation for the County.

Sheriff Moore's leadership style orders physicians to report, behave, and respond to him like rank-and-file sheriff's officers, producing an intolerable work environment for medical professionals in any stage of her or his career. Despite the framework Dr. Omalu built to enhance and elevate the quality of medicolegal death investigation for the County, I am certain that he too will be unable to continue to work at the Sheriff-Coroner's Office under such conditions, resulting in a massive and wholly avoidable loss to the County."

I must unfortunately stand by and support what Dr. Parson has most succinctly and precisely said. It is extremely unfortunate that it took us over ten years to hire a competent, intelligent and highly qualified forensic pathologist like her, and in less than one year, the Coroner's Office is forcing her to leave due to highly avoidable and unnecessary issues. The office has no concern or issue with Dr. Parson's job performance or competence and she served the County extremely well. This is important because there are less than 1000 board-certified forensic pathologists like her in the United States.

Since I joined the County as a physician employee assigned to the Coroner's Office, Sheriff Steve Moore has always made calculated attempts to control me as a physician and influence my professional judgement. I first experienced this with Sheriff Steve Moore in 2007 when he prevented me from attending crime scenes, which detectives from police departments of other cities may have wanted me to attend, or scenes I wanted to attend, especially on complicated and/or unusual cases. The standards of practice of pathology require forensic pathologists to attend all types of scenes. I wanted to leave then but I believed this interference would stop the longer I stayed in the office and exhibited the highest and exemplary standards of practice. Unfortunately, it did not stop despite the high level of services I performed. In fact, in the past year or two, and especially since Dr. Parson joined the County, it has gotten even worse.

Recently, I became frigidly afraid that in continuing to work under the circumstances Sheriff Steve Moore has created in his office, that I may be aiding and abetting the unlicensed practice of medicine. This would jeopardize my medical license. On many occasions, I met with him privately and provided him written memorandums trying to explain to him that the law does not allow him to insert himself in the duties of a physician unless he is a licensed physician. He dismissed me and stated that Dr. Parson and I work for him, and as long as we were his workers, that we must do anything and everything he asks us to do, even when we considered his actions acting against our standards of practice and the generally accepted principles of medicine. For example, Sheriff Steve Moore decided to cut off the hands of bodies at the morgue after the autopsies had been completed without the knowledge of any of the pathologists in the office.

I recently testified to the truth and scientific facts on a high-profile case involving the County. My testimony was not what the Sheriff wanted me to testify to. Promptly after this occurred, Sheriff Steve Moore retaliated against us and took over the scheduling of physicians in the office in order to control when we work, how we work, what cases we do or not do, and approve or deny our requests for time off or vacation. For the past decade, the physicians in the office handled this scheduling to ensure that the office was fully and properly staffed. Sheriff Steve Moore took this action even though prominent county

officials, including leading county physicians, advised him that only a licensed physician can control the working hours of physician employees as required by the guidelines of the Medical Board of California.

I have also witnessed Sheriff Steve Moore humiliate and bully Dr. Parson. Dr. Parson filed a harassment complaint against one of the sergeants in the department. Sheriff Steve Moore summoned a meeting that was supposed to address his effort to take control of the physician's scheduling. However, Sheriff Steve Moore used the meeting to demonstrate his control over us as physician employees. During the meeting, he flung Dr. Parson's complaint at her and condescendingly reminded her that she worked for him and he had the final say on every complaint that is submitted in his office. I was stunned. He retaliated and instructed us that he would remove us as physician employees of the San Joaquin General Hospital, to which both Dr. Parson and I are contractually mandated to have staff privileges, and convert us to Sheriff Forensic Pathologists so that we would lose our physician privileges at the hospital. The Union of American Physicians and Dentists [UAPD], which represents all doctors that work for the County, interjected on our behalf and demanded that the Sheriff cease and desist in his threats and retaliatory action. Dr. Parson and I are both members of UAPD like all of the other doctors in the County.

Unfortunately, this is not the first time that the Sheriff has treated us very differently from other County physicians. For years, Sheriff Steve Moore has refused to afford the pathologists in the Coroner's Office the same benefits and privileges that all other County physicians enjoy. Sheriff Steve Moore withheld and refused to pay Dr. Parson and myself the professional physician benefits to which every physician employee of San Joaquin General Hospital is entitled following a negotiated salary agreement between the UAPD and San Joaquin County in December 2016. While all other County physicians have long been receiving the professional benefits, we unfortunately have been denied the same treatment. In doing so, Sheriff Steve Moore has repeatedly informed us that he does not believe our salaries and benefits should be greater than what he receives because "we work for him" and "he is our boss." We have been forced to pursue this matter through the County merely to ensure that we are treated equally.

While the foregoing has occurred, I reached out to a neighboring county to find out if our experience with Sheriff Steve Moore was similar to that of their forensic pathologist. I was shocked to learn that the forensic pathologist in the other county had met with their Sheriff privately only 2 or 3 times in the ten years in which he has been the county forensic pathologist and that their Sheriff affords him complete independence to perform his job duties. For Dr. Parson and I, Sheriff Steve Moore routinely inserts himself in our daily duties as physicians, routinely summons us to meetings, sometimes privately, to question our autopsy reports and findings, and, on occasion, requests that I modify my autopsy reports. One such case involved an individual who died during a physical altercation with the police. I refused to comply with this request because it was not proper. After we completed and closed autopsy cases, an attorney, a family member or a physician sometimes contact us directly to ask questions about our conclusions in the Coroner's report. We learned that changes were made to the Coroner's report without any form of consultation or expert advice from any of the pathologists employed in the office. Some of these changes may go against the generally accepted principles, standards of practice and common knowledge of medicine. It was our professional duty as physician employees of the office to advise the office on such matters and to guarantee that the office adheres to these standards and principles.

Several months ago, I received a phone call from an attorney who was representing the family of a man who had recently died in a motor vehicle crash. The family wanted to do a second autopsy after my autopsy because they did not believe and trust that my eventual conclusions and opinions would not be

influenced by Sheriff Steve Moore. That phone call bothered me and caused me to begin to suspect that the pervasive and adversarial environment in which I was working could be influencing my professional judgement, opinions and conclusions, without me knowing it. At this moment I realized that I had to leave to seek employment in another County in California where the Sheriff is not like Sheriff Steve Moore.

I want to thank you and the good people of San Joaquin County for supporting me, believing in me and giving me a home for over ten years. I feel like we are all part of the greater San Joaquin Family. I will remain in the Central Valley and will make myself available to assist you in any way I can to serve the residents of the County. Together we can do unimaginable things.

Thank you.

Very truly yours,

Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Anatomic Pathologist/Clinical Pathologist/Forensic Pathologist/Neuropathologist/Epidemiologist

12/6/2017    'Concussion' doctor quits San Joaquin County job; says sheriff interferes in death investigations | The Sacramento Bee

Case 2:18-cv-00077-MCE-KJN   Document 1   Filed 01/12/18   Page 202 of 206

🔖 BOOKMARK FOR LATER                                                                MY BOOKMARKS ➤

 

▶

**Doctor says concussions aren't the issue for NFL players, it's brain damage**   0:54

LOCAL

# Hands removed, findings changed: Pathologists say San Joaquin sheriff 'does whatever he feels like doing'

BY BENJY EGEL, ANITA CHABRIA AND ELLEN GARRISON
*begel@sacbee.com*

DECEMBER 05, 2017 10:46 AM

Hands chopped off bodies; corpses left to deteriorate; doctors pressured to classify officer-involved deaths as accidents rather than homicides: San Joaquin County's two forensic pathologists resigned in recent days over what they said was intolerable interference by Sheriff-Coroner Steve Moore.

Dr. Bennet Omalu Tuesday announced his resignation as San Joaquin County's chief medical examiner. Last week, Omalu's colleague Susan Parson announced her resignation. Under Moore, they said, the county has failed to adequately investigate deaths in the Central Valley.

The two pathologists have been documenting events inside the Sheriff-Coroner's operation for months. The pair publicly released more than 100 pages of memos this week detailing their allegations, in addition to sending them to the San Joaquin County Board of Supervisors and the county district attorney in a push for a broader investigation.

ADVERTISING

12/6/2017       'Concussion' doctor quits San Joaquin County job; says sheriff interferes in death investigations | The Sacramento Bee

Case 2:18-cv-00077-MCE-KJN    Document 1    Filed 01/12/18    Page 203 of 206



"The sheriff does whatever he feels like doing as the coroner, in total disregard of bioethics, standards of practice of medicine and the generally accepted principles of medicine," Omalu wrote in a memo dated Aug. 22.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

Omalu is a nationally recognized forensic pathologist best known for his work on concussion-related brain injuries sustained by many football players. He is also a volunteer associate clinical professor at the University of California, Davis. His work was turned into the 2015 film "Concussion," starring Will Smith as Omalu.

"The sheriff is interfering with the doctors' ability to do their job and he is trying to influence their decisions," said Patricia Hernandez, the union representative for both Omalu and Parson, who declined to be interviewed. "I would call it rogue mismanagement."

San Joaquin County Sheriff's office public information officer Dave Konecny did not return a call for comment. Moore posted a statement on Facebook on Nov. 28 that said he takes "my job extremely seriously."

"As Coroner, the law requires me to make the final determination in the manner of death of each case processed here at the Office," Moore wrote. "I want to make it clear that at no time did I attempt to control or influence (Parson's) professional judgment and conclusions."

Moore has served as the county sheriff since 2007. He will be up for re-election in November 2018.

Omalu alleges the sheriff on multiple occasions asked him to change his findings on the manner of death in officer-involved cases – including three officer-involved deaths in 2016.

"Before I began my documentation in May 2017, I had observed long before this that the sheriff was using his political office as the coroner to influence the death investigation of persons who die while in custody or during arrest by the police," Omalu wrote in the Aug. 22 memo. "I had thought that this was initially an anomaly, but now, especially beginning in 2016, it has become routine practice."

Omalu said the first time Moore asked him to change his finding in an officer-involved case was in 2008, when Omalu wrote that "information was intentionally withheld from me by the sheriff in order to mislead me from determining the case was a homicide."

Omalu ruled that death an accident, but revised his finding to homicide after receiving the additional information.

In 2016, Omalu said the sheriff again pressured him to change his finding in an officer-involved case, this one involving the death of Filberto Valencia, 26.

Valencia's family told media he was a schizophrenic having a mental episode. The family called police for help, but Valencia left the home and attempted to enter other nearby houses before eventually gaining access to a residential facility. There, he barricaded himself in a bathroom with a 10-year-old girl and three women, according to the family's attorney, Walter Walker.

**RELATED STORIES FROM THE SACRAMENTO BEE**

'Concussion' doctor Omalu receives top sports medicine award

Case 2:18-cv-00077-MCE-KJN    Document 1    Filed 01/12/18    Page 204 of 206





UC Davis researchers: It doesn't take a concussion to cause long-term brain injury

Walker said a Stockton police officer hit Valencia over the head twice with the butt of a gun before repeatedly punching him. A second officer hit him with a baton, while a third officer shot him four times with a Taser, said Walker. Valencia became unresponsive and died.

Omalu found Valencia's death was due to blunt force trauma and ruled it a homicide – a medical finding meaning death at the hands of another human. The medical ruling of homicide is different from a legal ruling, but Omalu wrote that the sheriff wanted it changed.

"The sheriff called me into his office and told me that he wanted to make it an accident since officers were involved," wrote Omalu. "I told him that he may have died from the trauma he suffered in the first fight involving other citizens who were not police officers. ... He said that I should amend my report and state that he died from the civilians and not the police officers. I told him I could not do it, first it was unethical and wrong."

The Valencia family has filed a federal civil rights lawsuit in the case.

Then, on Aug. 21, Omalu alleged Moore came to him again, asking him to change his finding in a case that had happened about a year earlier, in 2016. Samuel Augustine, 57, died after what media described as a "violent fight" with officers. Augustine, a sex offender, had been attempting to light a fire near a bridge and was armed with a sledgehammer and machete, though he dropped them as officers approached, according to media reports.

Omalu found Augustine had died as a result of "traumatic brain and spinal cord injury during police arrest." Moore disputed that.

Omalu recalled that Moore told him in a meeting that "he did not see what the police did wrong in their arrest of the individual, and there was nothing in the medical records to support the autopsy findings," he wrote. "In his mind, he seems to believe that every officer involved death should be ruled an accident because police did not mean to kill anyone."

Parson and Omalu also allege that the sheriff's staff ordered the hands be cut off of at least five corpses this year to be sent to a forensics lab to identify the deceased. Omalu and Parson both said that in some instances, the victims' identity was already known and in others, police failed to attempt to identify the dead by investigative means.

"These individuals were found dead at their residences and were positively identified by either a neighbor or a family member," Omalu wrote in a May 25 memo. "In my opinion, taking out the hands of these cases, was a form of body mutilation, which we should not be doing."

Independent forensic pathologist Judy Melinek, who consults on legal cases from San Francisco, said removing the hands for identification was "bizarre" and confirmed it was not a standard practice.

"I have no idea why that would be medically necessary or forensically necessary," Melinek said. "You don't need to do this for identification purposes. You could just take fingerprints."

12/6/2017      'Concussion' doctor quits San Joaquin County job; says sheriff interferes in death investigations | The Sacramento Bee

Case 2:18-cv-00077-MCE-KJN   Document 1   Filed 01/12/18   Page 205 of 206

Omalu also charged that staff at the coroner's office, under the sheriff's control, often took months to do routine paperwork and at times failed to account for the bodies in the morgue. In dozens of instances, the two pathologists said sheriff's staff failed to provide even basic information about deceased people such as the circumstances and location where they were found, impeding the ability of the doctors to investigate.

Parson wrote that she was told she was requesting too many medical records on her patients.

Omalu and Parson said the delays meant families regularly had to wait weeks or even months to claim bodies, and that the corpses often decomposed before proper autopsies could be done – making it harder for the pathologists to determine the cause of death.

"This goes way outside and beneath the standards of practice of medicine in the State of California and across the world," Omalu wrote. "For every patient, autopsy or case, information, medical records, police reports and other professional reports must be ready for the physician to review."

Parson and Omalu allege the sheriff and his staff tried to intimidate and harass the pair into cooperating.

In an email from Omalu and Parson to Sgt. Mike Reynolds with the subject line "scheduling of work hours of physicians, physician independence, physician professional judgment and unbiased credibility" sent Aug. 20, Parson and Omalu objected to the sheriff's office forcing them to surrender planning of their schedules, among other conflicts.

"As physicians we are beginning to feel extremely intimidated, harassed, threatened and controlled by some of the practices, cultures and traditions of the Sheriff's Office," the email said. "(They) are beginning to erode our independence as physicians and are beginning to influence our professional judgments, analyses, conclusions and opinions on each and every case we do in the office."

Omalu will continue serving in his role through March 5, according to his letter of resignation. He plans to stop performing autopsies effective immediately to focus on 150 pending and open cases before his departure. Hernandez said both Omalu and Parson have spoken with other counties about new jobs.

Dr. Reed Mellor, a Stockton-based pediatrician and president of the San Joaquin County Medical Society, called the allegations "alarming" and urged authorities to conduct a full investigation of Moore's actions in a statement distributed via the California Medical Association.

"Physician independence is paramount to avoid improper influence on the practice of medicine," Mellor said in the statement. "Physicians have the unique obligation to put the patient first, and thus, they must be empowered to work independently in serving the best needs of the patient."

The San Joaquin County District Attorney's office issued a statement that said it was in receipt of the doctors' allegations and "is in the process of gathering information concerning homicide cases, including deaths relating to law enforcement officer involvement."

## Omalu's resignation letter

LAW & ARGUMENT GROUNDS TABLE

1. GROUND/LAW & ARGUMENT.

   PETITIONER'S CONVICTION WAS BASED ON LESS THAN SUFFICIENT
   EVIDENCE.
            JACKSON V. VIRGINA 443 U.S. 397

2. GROUND/LAW & ARGUMENT

            REASONABLE DOUBT ELEMENTS OF CHARGE
            IN RE WINSHIP , 397 U.S.368 (1970)

3. GROUND/LAW & ARGUMENT

      INEFFECTIVE ASSISTANCE OF COUNSEL FAILURE TO INVESTIGATE
         WIGGINS V. SMITH, 539 UUS 510 ( 2003)

4. GROUND/LAW & ARGUMENT
      INEFFECTIVE ASSISTANCE OF COUNSEL FAILURE TO FILE AN I.A.C.
      MOTION ON PRIOR COUNSEL FOR DESTRUCTION OF EXCULPATORY EVID.
         STRICKLAND V. WASHINGTON, 466 U.S 668 (1984)

5. GROUND/LAW & ARGUMENT

      INEFFECTIVE ASSISTANCE OF COUNSEL CRONIC STANDARD.
         U.S V. CRONIC 466 U.S. 648 (1984)

6. GROUND/LAW & ARGUMENT

      DEFENSE EVIDENCE RESTRICTED
         WASHINGTON V. TEXAS, 388 U.S/ 14 (1967)

7. GROUND/LAW & ARGUMENT

      STATE ERRORS DENIED A FAIR TRIAL
      ESTELLE V. McGUIRE, 502 U.S 62 ( 1991)

8. GROUND/LAW & ARGUMENT

      OUTRAGEOUS GOVERNMENT MISCONDUCT.

      U.S V. RUSSELL 411 U.S. 423 (1973)

9. GROUND/LAW & ARGUMENT

      REASONABLE DOUBT ELEMENTS OF THE CHARGE
      INRE WINSHIP, 397 U.S.368 (1970)
      UNConstitutionally Vague
      Kolender V.LAWSON 461 U.S. 352 (1983)

10. GROUND/LAW & ARGUMENT

      MULTIPLICIOUS DOUBLE JEOPARDY
      BROWN V. OHIO 432 U.S. 161 (1977)

11. GROUND/LAW & ARGUMENT

      SENTENCE & ENHANCEMENTS ILLEGALLY IMPOSED
      (Peo v.COOK)   (BENTON V. Md,.)   (BLAKELY V. WASHINGTON)