BENJAMIN SERRATOS, #AM 3717

PBSP                    (B-1-132)
P.O BOX                 7500
CRESCENT CITY, CA.      95532

In Pro Se

FILED

JUL 26 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BENJAMIN SERRATOS III                    ) NO. 2:18-CV-0077 MCE KJN
                                         )
    PETITIONER                           ) MOTION REQUEST FOR :
                                         ) The appointment of Counsel
V.                                       )
                                         ) Discovery   RULE 6
THE PEOPLE OF THE STATE OF CALIFORNIA    )
                                         ) and Evidentiary Hearing.
    RESPONDENT                           )
_____)

TO: MAGISTRATE JUDGE KENDALL J.NEWMAN

A request for counsel was previously sought from this court and a denial was issued 03/09/18 this is a re-newed separate request implementing a new issue to justify support of claims and an issue to be taken into consideration that the appointment of counsel should be provided in the interest of justice for the scope of this issue and within the parameters of the issues attached.

1 of 11

On December 5,2018. The San Joaquin County Forensic
Pathologist Dr.Bennet Omalu & a Co-Forensic Meical Expert
Dr.Sue Parson, submitted a lengthy resignation letter(see exb
1 DR), which included a 113 page memoranda (see exb 2 DR)
detailing the reasons for their departure and resignation,
both experts base their claims on alleged misconduct on behalf
of San Joaquin County Sheriffs/Steve Moore Etl.

The allegations in the resignation letter (1 DR) go to the
heart of whether the INTEGRITY, ACCURACY & RELIABILITY of the
prosecutions case & theory of CAUSATION are without compromise,
Inre: People V. Serratos III (SF115116A).
[fundamentally unreliable evidence] (using unreliable evidence
violates Due Process regardless of legal sufficiency).

The San Joaquin County Forensic Expert Dr.Omalu injects &
alleges misconduct was prevalent during the time period &
commencement of Inre; People V.Serratos III (SF115116A).(1 DR)
(see exb 3P) also;..

Dr.Omalu in a sworn deposition stated investigators misled
him, withheld critical information"and" PRESSED him to deter-
mine a cause of death in a case involving a man who died after
being tased by a CHP officer. (EXB 3P) (Inre; Daniel Lee
Humpreys V. State of Cal.). noting District Attorney, CHP, &
San Joaquin County Sheriff complicit and engaged in cover up.

The prosecutions Forensic Chief Medical Examiner Dr. Bennet
Omalu & Dr. Sue Parson make damning allegations, Dr.Sue Parson
asserts in her allegations against the Sheriff; quote:
"It is entirely possible that there are additional cases".
(Exb 2P, page 2/4).

Dr.Omalus resignation letter (1 DR page3-4) lead to a reas-
onable conclussion some cases were compromised.

1   Throughout memos (2 DR) Dr.Omalu cites numerous occassions
2   & instances of outrageous  gross misconduct, out side the
3   standards of practice & in violation of Due Process investig-
    ative methods, ultimately infringing, compromising the accur-
4   acy, integrity & reliability of evidence gathered & assessed.

5   The declarations made by the prosecutions forensic expert
6   are of constitutional magnitude and have core implications in
7   this case (inre Serratos v. The State of California).

8   The prosecution utilized Dr.Bennet Omalus testimony,findings
9   and opinion in (People v. Serratos SF115116A) . Which played
    a huge role & had a substantial injurious affect in influencing
10  and determining the verdict. (Went to the issue of guilt).

11  Dr.Bennet Omalu was the only Forensic Medical Examiner /
12  Expert who provided his account and statements which included
13  velocity and impact of vehicles, his testimony was essential
14  to the prosecution who relied on that testimony and Dr.Omalus
    "renowned expertise" (Dr.Omalu is the infamous NFL National
15  Football League CTE concussion expert.)

16
17  This case involved a traffic accident in which CAUSATION
    is an issue and the integrity of the States facts & its evid-
18  ence should be under constitutional scrutiny.Whether Dr.Omalus
19  evidence is[solid, reliable , & accurate and of the entire
    narrative.]
20
21  The decedent Ms. Little was related in specific to a
22  Deputy named, John Nesbit, whom was and is employed by the
    San Joaquin County Sheriffs.
23  This deputy did in fact interfere throughout the case, & of
24  fatal consequence to the defense, by removing Ms.Littles
25  Cell Phone, that infact was determined to be in use at the
    EXACT time of the accident and throughout a 9 minute duration
26
27
28                              (See COA 3rd App Cal exb I RT 1026, I RT 2-3)

                           3 of 11

This is of fundamental defect & of constitutional dimension, because the Cell Phone evidence ( operating a motor vehicle while driving down a dark deserted road & engaged on any use of social media, txt or talk, studies support is extremely dangerous) the intereference by deputy Nesbit in removing such evidence of exculpatory value  thereby demonstrates case commenced on an ill and misdirected foundation, & narrative, an unconstitutional "Due Process Error" that questions the total affect in compromising a complete defense and its exculpatory value.

[It is well settled that a defendant in a criminal proceeding has a right to present a defense (Michigan v. Lucas (1991) 500 U.S. 145; Taylor v. Illinois (1988) 484 U.S. 400, 422; Rock v. Arkansas (1997) 483 U.S. 44, 49; Chambers V. Mississippi (1973) 410 U.S. 284 Green v. Georgia (1979) 442 U.S. 95)

As the High Court explained in California v. Trombetta (1984) 467 U.S. 479, "We have long interpreted [the due process] standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a COMPLETE DEFENSE" (id. at 485).

The High Court revisited the issue in Crane v. Kentucky (1986) 476 U.S. 683, " Whether rooted directly in the Due Process Clause... or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment..., the Constitution guarantees criminal defendants a meaningful opportunity to present a COMPLETE DEFENSE"" (id. at 690).

[ The State " must take steps to assure that the defendant HAD a fair opportunity to present his defense" Ake v. Oklahoma (1995) 470 U.S. 68, 76)].

Under Brady v. Maryland, a prosecutor must disclose " evidence that is BOTH favorable to the accused & material either to guilt or punishment." here failure to disclose from the on-set disadvantaged defense and reasonable probability existed a different outcome would have produced if not for concealment.

1   The cell phone usage played a critical role in the defense
2   which is what caused the decedent to slightly veer or merge as
    opposed to the prosecutions theory, evidence that diminishes the
3   prosecutions theory.

4
5   Dr.Omalus testimony becomes critical and since Dr.Omalu did not
    factor cell phone evidence more so.

6
7   This may be a case inwhere Dr.Omalu objected to aspects of
    findings, & or was requested to ommit, falsify, & provide mislea-
8   dding testimony and or was aware, yet provided testimony lacking
    scientific sufficiency. (Napue) (Daubert)
9

10  In    Dr.Omalus resignation and memoranda Dr.Omalu asserts
11  that ignorance of investigations in cases is an issue and chron-
    icled instances in which Sheriff Steve Moore changed his findings
12  to cover for officers either because of cover up or due to the
13  incompetency of officers. THIS IS THE IMPORTANCE OF legally inje-
14  cting decedents Uncle, Sheriffs Deputy John Nesbit, his actions
    and interference in case is conflict of interest and obstruction
15  of justice, (Deputy John Nesbit removed the decedents cell phone
16  and was reluctant to return into evidence until subpoena  days
17  before trial). This should at the very least illustrate the mis
    conduct   of the functions of the Sheriffs Department at that time
18  and the fact that "some" deputies either through gross incompete-
19  nce or simple abuse of power feel above the law and can choose to
20  inject or tailor a narrative that is false and to their prejudices.

21
22  These type of actions and conduct have occured as asserted and
    declared by the peoples prosecutions very own forensic witness
23  expert Dr.Bennet Omalu. Who was a testifying expert for the prose-
24  cution in this case (People V. Serratos ) (SF115116A)

25  Dr. Omalus recent declarations (1 DR) are clearly injecting
26  questionable methods, and showing   compromised evidence & false
    narratives exist in prior cases , (the fact that CHP allowed
27  Sheriffs Deputy John Nesbit to remove cell phone who should not
28  have interefered in investigation  due to his close relationship
    did infact through incompetency or misconduct change the narrative

1  removing decedent cell phone, evidence that is material and
2  potentially exculpatory in a traffic accident/collision     →
3  specifically because it can determine actual causation, this is
   the gross incompetence Dr.Omalu is speaking of in his resignation
4  letter/memos, infact in Dr.Omalus memo (2 DR page 27) he explains
5  the kind of negligent incompetence that occured in a vehicle
6  crash that undermined the integrity of a case.

7  There was no report of use of cell phone to Dr.Omalu it seems
   like, use was later determined near trial therefore evidence was
8  omitted from Dr.Omalu and hence that narrative not factored or
9  assessed. For this reason an evidentiary hearing should be provi-
10 ded because the Cell Phone its use is potentially exculpatory,
   and will   —   likely produce evidence regarding this issue,.
11

12 In addition the prosecution in this case soliciting the arrai-
13 ment defense attorney (Charles Pacheco) to consent to release the
   decedents Ms.littles vehicle, does not negate additional ignorance
14 from and on behalf of the prosecution and its agencies, " to
15 solicit a release of such material evidence  so early on in a case
16 that involves a life sentence, and the charge is Murder, to do so
   without the prosecutions reconstruction experts complete analysis,
17 findings and investigation is beyond prejudicial ignorance and
18 links to a failure to preserve, regardless if (Pacheco) agreed,
19 or consented to the release of vehicle, ( the consent note was
20 not produced till a couple weeks prior to trial produced out of
   nowhere and the date of the consent is a date inwhich the prose-
21 cutor Michael Rasmussen was said to be on vacation) (see writ exh
22 ibit I) the unethical conduct to approach arraignment lawyer
   knowing no inspections had occured && No proper procedure, court
·23 process to release such critical evidence is unjustifiable and
24 prosecutorial misconduct.

25
   The car obviously in a traffic accident is of material value,
26 specifically when there is No witnesses to defendant  driving as
27 " prosecution asserts with no evidence to support "dangerous
28 or wreckless driving". The evidence of driving is scant at best.!

1    Courts have refused to admit in evidence, expert opinions in

2    traffic accident cases where the factors involved are too varying

3    and indefinite to constitute the basis of an opinion for example;

4    Where the opinion sought to be elicited dealt with the probable

5    course of the cars after impact or with the speeds of the vehicles

6    and the manner in which the accident occured or with the nature,

     points of application, magnitude and effect of forces invovled in

7    the collision of automobiles.

8

9    The rationale of these decisions is that in this particular

10   area there are too manny indefinite factors, including the behav-

    ior and reactions of the drivers involved, to permit a conclusion

11   to be reached after the fact with any quantum of certainty.

12   As the court stated in Burch v. Valley Motor Lines, Inc., supra

13   78 Cal. App. 2d 834, 844, 179 P.2d. 47, the foregoing cases

14   represent      unsuccessful attempts 'to reconstruct what had

    happened, by persons who were not eyewitness and with nothing on

15   which to base their opinions but the position of the cars after

16   they had come to rest'.

17

    (See writ exhibit Q)

18

19   In this instant case the question still remains why would the

20   prosecution approach arraignment lawyer and request consent to

21   release vehicle?_ a vehicle prosecution knew the following:

22   1. Operated by a young adult.

23   2. On a dark deserted road.

    3. Who had passengers in vehicle.

24   4. Take out (food) in vehicle.

25   5. Wore prescription glasses.

26   6. Owned and possessed a Cellular Phone.

    7. Most importantly knew the decedent had been ejected.

27   This all being obvious elements to evidence that go to addressing

28   "CAUSATION"!

And the type of conduct Dr. Omalu addresses as negligent incompence or intentional omitted evidence by prosecution and its agencies, in some instances specifically where there is officer involvement or an interest to an officer. (Sheriffs Deputy John Nesbit is Ms.Littles Uncle.)

As demonstrated there was undeniable use of NOT the passengers Cellular phone rather the operator of the vehicle cell phone and not minimal use but dangerous duration of usage talk,text,and social media which require eyes off the road looking at screen, even slight use or a glance has been proven to be dangerous and in many cases deadly. Evidence that is highly regarded and supported by National Safety Council a widely recognized organization that CHP themselves are familiar with, and forensic experts like Dr. Bennet Omalu as well. Therefore additionally re-enforces the reason an evidentiary is respectfully demanded.

Dr. Omalus resignation & previous assertions  that evidence in cases have been omitted and he given inaccurate information by law enforcement and in some circumstances requests for him to "modify-alter and change his findings" have occured Dr.Omalu admitting that he is questioning his judgement or whether subtle influences had occured and him obstructed from performing his job with integrity (1 DR) is sufficient prima facie that supports distortion unreliable evidence on behalf of the prosecutions theory in              (People v. Serrtos , SF115116)  which may be cause for relief.

For the reasons forementioned this court should appoint counsel for effective use of discovery., and grant an evidentiary hearing.

Numerous issues have been cited, all that go to CAUSATION in a traffic accident.

1. you have a destroyed vehicle.

2. Cell phone in use ( see I RT 2-3 & 3-4 of petition for review)

3. Prosecutions Expert witness Dr. Omalus admission that in cases that involve allegations against law enforcement of wrong doing or instances were interest to an officer exist there have been request to alter , modify, or change narrative.

This is vital to consider because what then does the prosecution evidence consist of? Or arrive at for "proximate cause" if all the prosecutions evidence is unrelieable, phony, or flawed almost in its entirety.

Penal Code § 1473 covers "false evidence unreliable expert testimony"    "evidence that is__ substantially material or probative  on the issue of guilt" here the cell phone evidence meets the standard. And a hearing or new trial should be granted based on the expert Omlus ommissions of and his newly declarations that point to the undermining of his prior testimony or unreliable scientific principles.

This new evidence of Dr.Bennet Omalus resignation letter and memos is of such decisive force and value that it would have more likely than not changed the outcome at trial. (Cal.Pen.Code § 1473 (b) (3) (A).

Dr.Omalus allegations or on going issues with the Sheriffs prosecutors he states in his resignation were occuring at the time when People V. Serratos was ongoing would have been admissible because it is evidence that has a tendency to prove or disprove a fact. & has a bearing on some disputed fact in case which is admissible under Cal. rules of evidence. Specifically    when to prove material facts that are hotly contested and central to the case , and sufficiently important in the ascertainment of the truth and in the interests of justice.

Dr. Omalus adversary role now against the people must tilt the balance in favor of defence evidence.

1. Inexplicable destruction of vehicle.

2. Ejection occuring(Seat belt failure/or Negligent use)

3. Cell Phone usage cell phone belonging to operator of vehicle.

4. No witnesses to any dangerous/wreckless driving of defendant.

5. Ignorance and misconduct asserted by the San Joaquin County forensic expert and corroborated by another peoples expert. Dr.Sue Parson.

6. No mechanical inspection performed of destroyed vehicle.

7. Hub Cap evidence and peoples investigators incompentent techniques/methods compromised integrity of their findings Hub Cap evidence is vital and address trajectory of vehicles.

8. MAIT conceding that in their report they could not accurately determine a post impact velocity as a result of the collision with Honda. (III RT 731)

9. The interference of decedents uncle Sheriffs Deputy John Nesbit and the removal of evidence.

For all the reasons stated and referenced I plead upon this court in the interest of justice to provide the appointment of counsel and or that an evidentiary hearing be granted.

The San Joaquin County (D.A.) District Attorneys office has publically stated that ongoing investigation into Dr.Bennet Omalu allegations are proceeding has not defined as to what cases or the scope of the investigations, nor has the D.A office replied to a request for conviction review submitted Jan/2018.

There is a reasonable probability that had the concealed evidence (Brady v. Maryland) (Dr.Omalus ongoing issues at that time 2010-2012) not been withheld the jury would have reached a different outcome. Dr.Omalu was viewed by jury almost error free and this denied a right to have a jury properly decide culpability and condlude all this beyond a reasonable doubt.

A constitutional right violation- the right to confrontation and a right to compulsory process U.S Constitution Sixth Amendment.

Furthermore the failure of the prosecutor to disclose Dr. Omalus
serious allegations and claims at the time and all other relev-
ant evidence attached at that time is blatent disregard of their
responsibility under Brady," prosecutors are responsible for
disclosing "evidence that is both favorable to the accused and
material either to guilt or to punishment."" United States v.
Bagley, 473 U.S. 667, 674 (1985) The failure to turn over evi-
dence violates due process. Wearry v. Cain, 136 S.Ct 1002,1006
(2016) The prosecutor's duty to disclose material evidence
favorable to the defense "is applicaple even though there has
been no request by the accused, and...encompasses impeachement
evidence as well as exculpatory evidence." Strickler v. Greene,
527 U.S 263, 280 (1999).

In addition prosecution allowing Dr.Omalus testimony without
the entire narrative including Dr. Omalus allegations at  that
time is infact misleading knowing misrepresentation of mislead-
ing testimony is a violation of the NAPUE standard.

Brady imposes a duty on prosecutors to learn of material excul-
patory and impeachment evidence in the possession of state
agents, such as police officers. (CHP/Sheriffs) See Youngblood
v. West Virginia, 547 U.S. 867, 869-70 (2006)


For all the reasons stated above petitioner request Counsel
be assigned immediately, a private investigator, and to compel
the San Joaquin County District Attorneys Office and its agents
to produce all and full discovery pertaining to Dr. Omalu,
all associates, and all linked relevant-court deemed relevant
information, memos, e-mails, notes, etc. etc.. and that this
court grant an evidentiary hearing.

POINTS   AND   AUTHORITIES

PENAL CODE § 1473 , (1) (3) (A) (e) (1)

BRACY v. GRAMLEY, 520 U.S.899 (1997)

PHAM v. TERHUNE, 400 F.3d 740, 743 (2005)

18 U.S.C. § 3006(A) authorizes the appointment of counsel
at any stage of the case "if the interest of justice so require"
Rule 8 (c), Fed.R. Governing 2254.

CHANEY v. LEWIS   (9th Cir 1986) 801 F.2d. 1191, 1196 Fed Rules
 of habeas corpus, rule 6 (a) (discovery)

ESKRIDGE v. RHAY   (9th Cir 1965) 345 F. 2d 778, 782
(DUE PROCESS):

DILLION v. U.S. (9th Cir. 1962) 307 F. 2d 445, 447 (Due Process)

Respectfully, submitted

Benjamin Serratos

Petitioner in Pro-Per.

10  B

SAN JOAQUIN COUNTY FORENSIC PATHOLOGIST   DR. BENNET OMALU

NOTICE OF RESIGNATION LETTER

CITING INFLUENCED PROFESSIONAL JUDGEMENT AND CONCLUSIONS
ALTERED, MODIFIED FINDINGS.

ISSUES DATING BACK TO THE TIME OF PEOPLE V. SERRATOS SF115116A.

# Exhibit 1 DR

# Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP

December 5, 2017

Monica Nino
County Administrator
44 North San Joaquin Street
Sixth Floor Suite 640
Stockton, CA 95202

Dear Ms. Nino,

## RE: NOTICE OF RESIGNATION FROM SAN JOAQUIN COUNTY

With tears in my eyes and with a very heavy heart, I hereby submit my notice of resignation from San Joaquin County as the County's forensic pathologist. According to the terms of my contract with our beloved county, I have to give a three month notice of resignation, which shall begin on December 5, 2017 and end with the termination of my employment on March 5, 2018. I must stop performing autopsies on December 5, 2017 in order to have sufficient time to complete and close the over 150 pending and open cases I may have.

When I joined this most lovely county in September 2007, I fell in love with it and gave my utmost best to elevate the standards and quality of practice of forensic pathology and death investigation in the County, which had fallen apart. Today, we have collectively done a wonderful job in turning the trajectory of the Coroner's Office and providing the best standards of autopsy, pathology and medico-legal services to the good people of the County. I planned to continue to serve the people of this County until my retirement. In the dark and difficult days of 2005 – 2007, while I was living through my CTE quagmire, I was running away from Pittsburgh and felt homeless, hopeless and afraid. This County offered me a home and gave me hope. For this I am deeply grateful, faithful and loyal to you and the good people of San Joaquin County. I will always remain part of you.

On November 27, 2017, my colleague, Dr. Sue Parson, submitted her letter of resignation. In her letter she stated the following:

> "Despite the privilege of working with Dr. Omalu, the behavior of San Joaquin County Sheriff Steve Moore and the working environment he created within the Coroner's Office made my day-to-day experience in the County personally unbearable and professionally unsustainable. Sheriff Moore's retaliatory behavior, arrogant expectations and of those under his employ, created an utterly untenable work environment – a complete hindrance to my professional growth and development in medicine and the discharging of my duties in a safe, non-threatening work environment, which is due all persons employed by the County under law.
>
> In general terms, Sheriff Moore's intrusion into physician independence ranges from forcefully taking over physician scheduling to inserting himself into how and when Dr. Omalu and I perform our medical duties with attempts to control and influence our professional judgment and conclusions.   This ultimately undermines the overall

\b

competence of the Coroner's Office in conducting objective death investigation for the County.

Sheriff Moore's leadership style orders physicians to report, behave, and respond to him like rank-and-file sheriff's officers, producing an intolerable work environment for medical professionals in any stage of her or his career. Despite the framework Dr. Omalu built to enhance and elevate the quality of medicolegal death investigation for the County, I am certain that he too will be unable to continue to work at the Sheriff-Coroner's Office under such conditions, resulting in a massive and wholly avoidable loss to the County."

I must unfortunately stand by and support what Dr. Parson has most succinctly and precisely said. It is extremely unfortunate that it took us over ten years to hire a competent, intelligent and highly qualified forensic pathologist like her, and in less than one year, the Coroner's Office is forcing her to leave due to highly avoidable and unnecessary issues. The office has no concern or issue with Dr. Parson's job performance or competence and she served the County extremely well. This is important because there are less than 1000 board-certified forensic pathologists like her in the United States.

Since I joined the County as a physician employee assigned to the Coroner's Office, Sheriff Steve Moore has always made calculated attempts to control me as a physician and influence my professional judgement. I first experienced this with Sheriff Steve Moore in 2007 when he prevented me from attending crime scenes, which detectives from police departments of other cities may have wanted me to attend, or scenes I wanted to attend, especially on complicated and/or unusual cases. The standards of practice of pathology require forensic pathologists to attend all types of scenes. I wanted to leave then but I believed this interference would stop the longer I stayed in the office and exhibited the highest and exemplary standards of practice. Unfortunately, it did not stop despite the high level of services I performed. In fact, in the past year or two, and especially since Dr. Parson joined the County, it has gotten even worse.

Recently, I became frigidly afraid that in continuing to work under the circumstances Sheriff Steve Moore has created in his office, that I may be aiding and abetting the unlicensed practice of medicine. This would jeopardize my medical license. On many occasions, I met with him privately and provided him written memorandums trying to explain to him that the law does not allow him to insert himself in the duties of a physician unless he is a licensed physician. He dismissed me and stated that Dr. Parson and I work for him, and as long as we were his workers, that we must do anything and everything he asks us to do, even when we considered his actions acting against our standards of practice and the generally accepted principles of medicine. For example, Sheriff Steve Moore decided to cut off the hands of bodies at the morgue after the autopsies had been completed without the knowledge of any of the pathologists in the office.

I recently testified to the truth and scientific facts on a high-profile case involving the County. My testimony was not what the Sheriff wanted me to testify to. Promptly after this occurred, Sheriff Steve Moore retaliated against us and took over the scheduling of physicians in the office in order to control when we work, how we work, what cases we do or not do, and approve or deny our requests for time off or vacation. For the past decade, the physicians in the office handled this scheduling to ensure that the office was fully and properly staffed. Sheriff Steve Moore took this action even though prominent county

officials, including leading county physicians, advised him that only a licensed physician can control the working hours of physician employees as required by the guidelines of the Medical Board of California.

I have also witnessed Sheriff Steve Moore humiliate and bully Dr. Parson. Dr. Parson filed a harassment complaint against one of the sergeants in the department. Sheriff Steve Moore summoned a meeting that was supposed to address his effort to take control of the physician's scheduling. However, Sheriff Steve Moore used the meeting to demonstrate his control over us as physician employees. During the meeting, he flung Dr. Parson's complaint at her and condescendingly reminded her that she worked for him and he had the final say on every complaint that is submitted in his office. I was stunned. He retaliated and instructed us that he would remove us as physician employees of the San Joaquin General Hospital, to which both Dr. Parson and I are contractually mandated to have staff privileges, and convert us to Sheriff Forensic Pathologists so that we would lose our physician privileges at the hospital. The Union of American Physicians and Dentists [UAPD], which represents all doctors that work for the County, interjected on our behalf and demanded that the Sheriff cease and desist in his threats and retaliatory action. Dr. Parson and I are both members of UAPD like all of the other doctors in the County.

Unfortunately, this is not the first time that the Sheriff has treated us very differently from other County physicians. For years, Sheriff Steve Moore has refused to afford the pathologists in the Coroner's Office the same benefits and privileges that all other County physicians enjoy. Sheriff Steve Moore withheld and refused to pay Dr. Parson and myself the professional physician benefits to which every physician employee of San Joaquin General Hospital is entitled following a negotiated salary agreement between the UAPD and San Joaquin County in December 2016. While all other County physicians have long been receiving the professional benefits, we unfortunately have been denied the same treatment. In doing so, Sheriff Steve Moore has repeatedly informed us that he does not believe our salaries and benefits should be greater than what he receives because "we work for him" and "he is our boss." We have been forced to pursue this matter through the County merely to ensure that we are treated equally.

While the foregoing has occurred, I reached out to a neighboring county to find out if our experience with Sheriff Steve Moore was similar to that of their forensic pathologist. I was shocked to learn that the forensic pathologist in the other county had met with their Sheriff privately only 2 or 3 times in the ten years in which he has been the county forensic pathologist and that their Sheriff affords him complete independence to perform his job duties. For Dr. Parson and I, Sheriff Steve Moore routinely inserts himself in our daily duties as physicians, routinely summons us to meetings, sometimes privately, to question our autopsy reports and findings, and, on occasion, requests that I modify my autopsy reports. One such case involved an individual who died during a physical altercation with the police. I refused to comply with this request because it was not proper. After we completed and closed autopsy cases, an attorney, a family member or a physician sometimes contact us directly to ask questions about our conclusions in the Coroner's report. We learned that changes were made to the Coroner's report without any form of consultation or expert advice from any of the pathologists employed in the office. Some of these changes may go against the generally accepted principles, standards of practice and common knowledge of medicine. It was our professional duty as physician employees of the office to advise the office on such matters and to guarantee that the office adheres to these standards and principles.

Several months ago, I received a phone call from an attorney who was representing the family of a man who had recently died in a motor vehicle crash. The family wanted to do a second autopsy after my autopsy because they did not believe and trust that my eventual conclusions and opinions would not be

influenced by Sheriff Steve Moore. That phone call bothered me and caused me to begin to suspect that the pervasive and adversarial environment in which I was working could be influencing my professional judgement, opinions and conclusions, without me knowing it. At this moment I realized that I had to leave to seek employment in another County in California where the Sheriff is not like Sheriff Steve Moore.

I want to thank you and the good people of San Joaquin County for supporting me, believing in me and giving me a home for over ten years. I feel like we are all part of the greater San Joaquin Family. I will remain in the Central Valley and will make myself available to assist you in any way I can to serve the residents of the County. Together we can do unimaginable things.

Thank you.


Very truly yours,



Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Anatomic Pathologist/Clinical Pathologist/Forensic Pathologist/Neuropathologist/Epidemiologist

MEMOS OF DR. BENNET OMALU SAN JOAQUIN COUNTY FORENSIC PATHOLOGIST
AN EXPERT  IN PEOPLES V. SERRATOS SF 115116A


MEMOS CITE OUTRAGEOUS!!! UNETHICAL CONDUCT AND MALPRACTICE OF
MEDICINE, GROSS ILLEGAL AND INCOMPETENT PRACTICE .

CITE 4 OTHER PATHOLOGIST AND EXPERTS AS AFFIRMING THE GROSS CONDUCT
OUTSIDE THE STANDARD OF PRACTICE. AND TO CONTINUE WILL RESULT IN

LOST OF LICENSE...

# Exhibit 2 DR

# DR. BENNET OMALU'S MEMOS

MEMORANDUM OF EVENTS

**THE NEED FOR MEMORANDA OF EVENTS**

May 30, 2017

I began work at the San Joaquin County Sheriff-Coroner's Office on September 1, 2007. In my first month of work I began to encounter and experience critical flaws in the way the office was administered by Sheriff Steve Moore, which undermined my standards of practice as a physician, and the generally accepted principles and standards of practice of medicine and science, some of which were unethical. Sheriff Steve Moore ran the office like a dictator and intruded upon my autonomy and independence as a physician. He ran the coroner's office as a Sheriff's office, which went against the law regarding consolidated offices. For such consolidated offices each division must be administered separately from the other. The Sheriff was influencing and controlling my work in subtle ways, for example he determined what scenes I visited and did not visit even when I wanted to visit scenes and sometimes even ordered me not to attend a scene of a crime. I almost left the office in 2008, but I chose to stay, naively believing that with my presence in the office, and with patient and persistent prodding and exemplary professionalism, he would begin to change slowly and the people of San Joaquin County will begin to get the service they deserved, slowly and progressively. I was wrong.

Ten years later, things have not changed, and are ironically getting worse. I began to ask myself questions about what I could do to bring about change and serve the people of the county better. The easiest thing for me to do was to leave. After all, several cities had approached me to apply to become their chief medical examiner. I chose not to leave. One person can make a difference. In May 2017, when I sought professional advice from a respected colleague of mine, she advised me to begin documenting adverse events occurring in the office. Documentation, documentation, documentation. I did what she advised me to do. These memos are products of that documentation. The good people of the State of California and the County of San Joaquin deserve the very best service we can give them. They deserve the best that we can offer them, which should not be anything less than the state of the art. This is the spirit of America that I so much cherish.

**MEMORANDUM OF EVENTS**

**Systemic and systematic subtle but potent influence and control of physician judgements and opinions especially when it comes to officer involved deaths.**

August 22, 2017, 4:04 A.M.

I have been in the San Joaquin County Sheriff-Coroner's Office for over ten years now. I have always believed that the longer I spent in the office the better the office would become. I was wrong. This was why I began documenting the systemic and systematic flaws and biases in the office beginning May 2017. The Sheriff does whatever he feels like doing as the coroner, in total disregard of bioethics, standards of practice of medicine and the generally accepted principles of medicine.

Before I began my documentation in May 2017, I had observed long before this that the Sheriff was using his political office as the coroner to influence the death investigation of persons who die while in custody or during arrest by the police. I had thought that this was initially an anomaly, but now, especially beginning in 2016 it has become routine practice.

In 2008 I noticed a case of a 47 year old man [A08-1552] who had died during police arrest. Information was intentionally withheld from me by the Sheriff in order to mislead me from determining the case to be a homicide. The deputy district attorney working on the case, DDA Tori Verber, suspected that this was the case, and provided the information I needed to me. Upon receiving this information, I changed my cause and manner of death and classified it to be a homicide. The Sheriff still went behind my back months later and changed the manner of death to an accident to minimize the seriousness of the case.

In 2016, there was another officer-involved death case I did, [A16-0148], a 26 year old man who died during police arrest. Before he fought with the police he had been involved in a fight with the residents of a home. The cause of death was blunt force trauma and the manner of death was a homicide. The Sheriff called me into his office and told me that he wanted to make it an accident since officers were involved. I told him that he may have died from the trauma he suffered in the first fight involving other citizens who were not police officers. He said that I did not indicate that in my autopsy report. I replied that I do not have to provide such opinions in

autopsy narratives, that such opinions are reserved for deposition, grand jury, preliminary hearing or trial testimonies. He said that I should amend my report and state that he died from the civilians and not the police officers. I told him that I could not do it, first it was unethical and wrong. An unlicensed person should not be telling me, a licensed physician, how to do my work and what to include in my autopsy report or other physician work products. Second, it was unethical, and may be perceived or interpreted as bias or partisanship. I left it at that. I do not know what he ended up making the manner to be. I will check on a later date and update this report.

But what really began troubling me was the latest development, which happened yesterday, August 21, 2017. It was in reference to another officer involved death [A16-1212], a 57 year old man who suffered traumatic brain and spinal cord injury during police arrest. The autopsy showed that he died as a result of his injuries and the manner of death was a homicide. I completed, finalized and closed the autopsy report on September 30, 2016. Almost one year later, Sgt Mike Reynolds, who is now the "agent" of the Sheriff, called me around 5:15 P.M. after a long day of autopsies [two homicides and two motor vehicle crashes] to ask me about this case. He said that the Sheriff wanted to change the manner of death to an accident since it was an officer involved death. I was shocked. First why is he reviewing this case after one year. The Sgt. began to question my professional judgement on how I interpreted his traumatic brain and spinal cord injuries that it was not an intentionally inflicted injury. I told him that as a coroner's office our duty was to provide a medical manner of death and not a legal manner of death. Legal manner of death was under the duty, jurisdiction and purview of the district attorney and not us. And for medical manners of death you do not have to consider intent and/or motivation depending on what type of case it is. He said well, that the Sheriff is the coroner and he has the final say. I left it at that.

September 13, 2017, 6:03 A.M.

I was summoned to a meeting on Tuesday, September 12, 2013 at 3:00 P.M. by the Sheriff at the conference room next to the Sheriff's office. I completed an autopsy around 2:50 P.M. and went up to the conference room. I met with the Sheriff, Sgt. Reynolds and Assistant Sheriff Annette Mondavi. During the meeting the Sheriff told me that he wanted to change the manner of death of a case, A16-1212, which was an officer involved death, and had been closed and finalized over one year ago. That he did not see what the police did wrong in their arrest of the individual and there was nothing in the medical records to support the autopsy findings. He stated that the conventional CT scans were negative. And that he watched the video tape of the arrest and did not see how the injury I saw at autopsy could have occurred. He pretty much told me that my opinion wrong and that the autopsy findings were wrong. I first told him that as a coroner he had the authority to make the manner of death whatever he wanted to make it,

that I could not challenge that, however, just like I did not challenge his authority, he should not challenge or question my professional judgment. That as a physician, my role and duty as a forensic pathologist is to provide scientific opinions based on prevailing autopsy findings on each case, and based on generally accepted principles and standards of medicine and science. I was not here to speak on behalf of the police or defend the police, and my opinions should not be based on a video recording. He ordered me to view a video recording of the arrest because he believed that the injuries I observed at autopsy were not sustained during the arrest. I told him that I did not have to view the video recording to provide an opinion, and the autopsy findings are the gold standard in evidentiary medicine. He did not understand the types of injuries suffered by the deceased, and did not understand the mechanisms of sustenance of these injuries. However, I viewed the video and pointed out to him the numerous occasions during the arrest when the injury suffered by the deceased could have been sustained. I schooled him on the generally accepted principles of medicine and advised him that he must adhere to these principles in his capacity as a coroner, that I did not want to see him and the office ridiculed. We went back and forth and at some point I told him that we should stop, and he should make it whatever he wanted to make it, but I was not going to change my opinion. I stood my ground and gave him examples of scenarios of officer involved deaths, which were homicides, and explained to him why it would be ridiculous to make this case an accident. For some reason, he believed that making it a homicide meant we were pointing fingers at the police. I tried my best to explain to him the professional circumstances and implications of a medical homicide as it pertains to the functions of the coroner, that a medical homicide is not a judgment of guilt or intent or motivation. For some reason, he simply could not understand the distinction. In his mind, he seems to believe that every officer involved death should be ruled an accident because the police did not mean to kill anyone. This goes against the standard of practice. I again explained to him that this was not the standard of practice of medicine, and we must adhere to the standards of practice and not exhibit or manifest any conflict of interest. At this time, I was very flustered and extremely mentally tired. I should not be in this conference room, and I should not be engaging in this very unethical discussion. It is deplorable. I cannot and should not be engaging in a medical review of a case with unlicensed physicians who do not know what they are talking about. The Sheriff said he reviewed the medical records, meanwhile he is not a physician who should be reviewing medical records.


He then moved on to the next case, which was simply another disaster. It was the case of a possible feticide which had been missed by the coroner's office. Sgt Reynolds said the hospital never reported the death to the coroner's office, and I requested that he contacted the hospital and have it in writing why this case was not reported to the coroner's office. He said he would provide it to me.

OCTOBER 3, 2017, 7:43 A.M.


On Tuesday, October 31, 2017, Dr. Judy Melinek, a highly respected forensic pathologist called me to discuss two police-officer involved deaths, that I had performed autopsies on. I had opined that the two cases were homicides going by the standard of practice of medicine. The two cases were:

A16-0148
Filiberto Carrillo Valencia
Date of death: 1/19/2016
Cause of death: Blunt Force Trauma of the Head, Neck and Trunk
Manner: Homicide

A16-0520
Abelino Cordova-Cuevas
Date of death: 3/7/2016
Cause of death: Mechanical asphyxiation due to compression of neck due to blunt force trauma of head, neck and trunk
Manner: Accident


To my utter shock, I learnt from Dr. Melinek that A16-0520 was an accident and she asked me why I would call one a homicide and the other an accident, since both cases were similar. I totally agreed with her and told her that I had made it a homicide but the Sheriff had apparently over-ruled my opinion and made A16-0520 an accident without even consulting me. I told her that this will fit into the same pattern I have observed with the Sheriff. On this day I was convinced that it was time for me to leave the Sheriff's office as a physician-employee. The only way I can continue to work in such an office would be solely as a part time consultant detached from the office. I am afraid if I continue to work in the office, I stood a big chance of ruining my hard-earned reputation and professional credibility and trustworthiness. This is unacceptable to me. There is no reason whatsoever any of these cases should be made an accident. This is simply ridiculous.

## MEMORANDUM

**From:** **[1] Susan Parson, MD, MSC, DABP-AP,FP**
      **[2] Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP**

**To:**   **Sergeant Mike Reynolds**

**Re:**   **Scheduling of work hours of physicians, physician independence, physician professional judgement and unbiased credibility**

**Date:  Hand-Delivered; August 20, 2017**

You have ordered us to surrender the scheduling of physician work hours and coverage to you beginning immediately. You have also ordered us to immediately submit to you the days we may not be available in September 2017 so that you can draft the physician work schedule and coverage for the month of September 2017. According to your order please find below the days we will not be available in September 2017:

1.     Bennet Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP:   September 1, 26 and 27
2.     Susan Parson, MD, MSc, DABP-AP,FP:                              September 9 to September 23 [vacation]


As physicians who hold unlimited licenses to practice medicine and surgery in four states, combined, in the United States [California, Pennsylvania, Indiana and Hawaii], we want to place the following on record through this memorandum in order to protect our physician privileges and licenses across the United States from any perception or allegation of aiding the unlicensed practice of medicine:

1.     We are being ordered by you to surrender our physician privileges to you to schedule and determine when we work or not work, what time we do cases or not do cases, and what cases we do or not do.
2.     We have succinctly and clearly expressed to you our strong professional objections to this new development in the Sheriff's office in both verbal and written formats in meetings and in internal memoranda.
3.     By submitting to you the days we are available or not available, we are bowing and yielding to your law enforcement authority as the Sheriff sergeant in the coroner's office and as our "boss" and "supervisor" as you have clearly and repeatedly instructed us. We are simply carrying out an order you have given us according to the chain of command in the Sheriff's Office, which you have described to be a "paramilitary organization".
4.     We are physicians. We are neither police officers nor law enforcement and should not be treated as law enforcement or abide by law enforcement standards. As licensed physicians, the only professional standards we have to adhere to, judged and evaluated by would be the standards of practice of medicine and surgery and the generally accepted principles of medicine.
5.     We require a conducive milieu to independently do our work and sustain the unbiased credibility of our professional judgement, opinions and conclusions, for the good of every consumer of our work product especially the justice and public health and policy systems.
6.     As physicians we are beginning to feel extremely intimidated, harassed, threatened and controlled by some of the practices, cultures and traditions of the Sheriff's Office.
7.     This new development amongst some other practices, cultures and traditions in the Sheriff's Office are beginning to erode our independence as physicians and are beginning to influence our professional judgements, analyses, conclusions and opinions on each and every case we do in the office.
8.     We also have to advise you that there are standards of practice and guidelines for the scheduling of pathologists, case management and work-load ratios, which we have to adhere to as physicians.
9.     We are sending a copy of this memorandum to the San Joaquin County Representative of the Union of American Physicians and Dentists [UAPD], which we are members of.

## MEMORANDUM OF EVENTS

## MUTILATION OF BODIES WITHOUT THE KNOWLEDGE OF THE PATHOLOGIST

May 25, 2017, 4:00 a.m.

Case #A17-1146

It was brought to my attention by Deputy Coroner Ted Brooks that Sergeant Mike Reynolds has been making the deputy coroners and autopsy technicians dissect out the hands of decedents for identification purposes and since he, Deputy Brooks joined the coroner's division for two-three months, he knew about five of such cases that the hands had been dissected and sent to the crime laboratory in Sacramento for finger-printing. This case [A17-1146] was one of them. These individuals were found dead at their residencies and were positively identified by either a neighbor or a family member. The medical records correlated with the characteristics of the body. The medical concept and principle of "Contextual Identification" would apply to these cases and no other work would need to be done including finger printing or DNA. Many times these bodies are decomposed and the hands and fingers are mummified. Fingerprinting frequently cannot be performed. I spoke to the autopsy technicians and Deputy Brooks to find out why we are suddenly doing this, which I did not want to be part of, since it may jeopardize my license, privileges and credibility. In my opinion, taking out the hands of these cases, was a form of body mutilation, which we should not be doing. Removing the hands of a body is not part of a standard autopsy protocol and should only be performed on special cases, when justifiably indicated. I reviewed this case, A17-1146, and in my medical opinion, there was no need to do any further analysis for positive identification purposes [see attached scanned preliminary autopsy sheet]. We had all we needed for a contextual identification. The sergeant unilaterally decided to begin cutting out hands of decedents without consulting me, and since this involved a prosection of the body, I did not think he had the professional jurisdiction, competence or privilege to be ordering the autopsy technicians to dissect the body and remove the hands. This falls under the purview of the pathologist. I told everyone involved that I did not want to be part of this body mutilation and should be kept out of it. I performed an external examination on the case, reviewed the medical records and issued a death causation form with the rightful name of the deceased [see attached]. The medical records confirmed that she was who her neighbor said she was. She was not skeletonized and the body was in sufficiently good condition for a positive identification.

**MEMORANDUM OF EVENTS**

MEDICAL GUIDELINES AND STANDARDS ARE IGNORED IN THE HANDLING OF BODIES IN THE
CORONER'S OFFICE: AUTOPSY PROSECTIONS BY AN UNLICENSED PERSON

July 9, 2017, 4:12 A.M.

The coroner's office or medical examiner's office is a medical office that determines the causes,
mechanisms and manners of death based on medical and scientific principles and guidelines.
Physicians are not law-enforcement officers and should never be treated as one. o the State of
California.

A good illustrative event in the San Joaquin County Sheriff's Department happened in the week
of July 3rd. It turned out that for several months at the coroner's office, the sergeant [Mike
Reynolds] decided at whim to begin cutting out the hands of bodies he felt were decomposed
and according to him were not identifiable. He believed that as a police officer he had the
authority to do that. He totally ignored the medical standards of practice and principles and
simply because he was the coroner sergeant he believed, in his mind, that he had the authority
to do it. He began asking autopsy technicians at the office to cut out the hands of bodies days
after the forensic pathologist had completed the autopsy without the knowledge of the forensic
pathologist. Apparently, these hands were sent to some crime laboratory for finger-printing,
and sometimes the laboratory does not succeed in finger-printing these hands. This was
actually illegal. A forensic pathologist had to be present to supervise, direct and guide autopsy
technicians on every prosectional procedure performed on every human body. Cutting out the
hands of a body after an autopsy would qualify as mutilation of the body and is unnecessary.
This illicit trend in the office was brought to my attention by one of the autopsy technicians
after the hands of about the fifth body had been removed within several months in the office. I
was so appalled that I called four different forensic pathologists across the country to find out if
they performed the same procedure in their offices, since I had never heard of such a
procedure being done on routine bases. All of these forensic pathologists confirmed that they
never perform such mutilating procedures in their offices. All advised me to stop or not to be
involved otherwise my license and privileges as a physician may be jeopardized.

The autopsy technicians refused to remove the hands of the next case [A17-1471] that the
sergeant asked them to remove after I had made them aware that removing the hands of any
body without the direction of a physician may be illegal. The sergeant now asked me to remove

the hands. I said I could not do that, he responded that the sheriff had the authority to do that, and I responded that I would not order him or the sheriff not to remove the hands but that I did not want to be involved because it went against basic and fundamental medical principles, guidelines and standards of practice. I had a lengthy phone conversation with the sergeant in the afternoon of July 6, 2017 at approximately 2:34 P.M. for about 17 minutes. I educated him on these principles and advised him that as a physician and forensic pathologist, I believed we had sufficient and reasonable contextual information on the case to reasonably make a positive identification, and we should go ahead and make a positive identification without any further testing. Medical decision making requires a reasonable degree of medical certainty and not an absolute degree of medical certainty. He could not understand what I was telling him because his mind had been cast that as a police officer and going by police standards we needed absolute proof or evidence that the body was who she was believed to be. He wanted to proceed with DNA analysis if I would not remove the hands and the body would have to be in the county morgue for a couple of months. By that time the body will be markedly decomposed. I told him that if we did DNA based identification on every decomposed body, that within one year, our morgue will be filled with decomposed bodies. It was neither pragmatic nor feasible. After my conversation with him, I believed the case had been settled that he would identify the body and release the body to the family. I reassured him that we took tissue samples and blood on the case to archive and if there would be any problem in the future, which was less likely, that we had something to fall upon.

Meanwhile the office was spending so much time on this one case, consuming our resources and eventually leading to increasing costs and increasing delay in completing cases. Look at the amount of time we are spending on only one case, which was not even necessary. There is so much wastage in this office simply by not adhering to the standards of practice of medicine.

As surprising as anyone could be, Sgt Reynolds called me early in the morning on July 7, 2017 at approximately 9:48 A.M. and instructed me that the Sheriff [Steve Moore] needed to speak to me immediately that I should call him. As a physician, this is way outside our culture. No one should call me at work and order me to do anything unless it was an emergency or patient safety or health was at stake. I called the Sheriff immediately, and in his typical bullish self, he raised his voice on the phone at me to remind me that he is the elected coroner at the office and he has the authority to make decisions in the office and not me, and that I worked for him. He ordered me to come see him immediately. He told me that he heard that I am refusing to do what I was being told to do in the office, I was so dumbfounded by this exchange that I could not utter any word. By the way this is not the first time I am having the Sheriff yell at me on the phone. No physician simply deserves this. We are not law enforcement and should not be ordered around like law enforcement. This is way outside the cultures and traditions of physicians. My blood pressure went through the roof. At times like this I would want to simply

resign and go somewhere else, but just like I made a promise to Mike Webster to do the right thing, I believed the right thing in this instance for the good, medically underserved people of the county would be for me to stay, suffer sacrificially and hopefully make things better.

Although I had seven autopsies to perform that morning, I ignored all the bodies and went to the Sheriff's office and spent a very precious one hour talking about and defending medical principles. It was a very difficult meeting for me. The sheriff as always, was very condescending and verbally abusive. He did not waste time to place me where I belonged reminding me that he was the boss and I am his employee. And that if and whenever I needed anything that I should go through the sergeant who would pass it up the chain of command to him. That I worked in a para-military organization and should respect that organizational structure. This was mental torture for me.

Anyway, at the meeting when I told the Sheriff that I could not do anything I deemed unethical that may place my physician license in danger he sternly told me that I had to do whatever he wanted me to do in the office, that I worked for him. I simply stared at him. But I still informed him that it would place my license in danger, and I would not do it, and I was doing it not for myself but in the interest of the office. He went on and on and on to soothe his ego pretty much. That day I did only three autopsies, because my sense of focus had been undermined. I left other bodies for the next day Saturday, July 8, 2017.

When I went back to the morgue later that afternoon, after the meeting, I discovered four more cases that had been in the morgue for several days because the cases were either not typed or the medical records were not available. Families are compelled to wait longer than they should to receive the bodies of their loved ones and many times are even made to pay several hundreds of dollars. This is simply not acceptable. I can stay and wait for the system to change, but I do not know if our new doctor, Dr. Parson, would stay. I have begged her to stay because of me. I really hope she will stay. If she leaves, it will become very difficult for me.

The four cases I referred to above are the following;

1. A17-1495: Came into the office on July 4, 2017 and was not ready for the pathologist until July 7, 2017

2. A17-1499: Came into the office on July 4, 2017 and was not ready for the pathologist until July 8, 2017

3. A17-1509: Came into the office on July 5, 2017 and was not ready for the pathologist until July 7, 2017

For over two weeks, I have not been able to review these additional three cases [A17-0657, A17-0637, A17-0651] and close the cases for the families because transcriptions of my autopsy dictations have not been completed. We have only one office secretarial support for two pathologists who does everything for us like scheduling court and deposition appearances, transcribing our autopsy dictations, reviewing our reports, taking phone calls for us, speaking to attorneys, and at the same time doing other secretarial work in the office. This is grossly insufficient and inadequate. I spoke to the staff in question [Barbara Hafley] and she is simply overwhelmed because of gross neglect of the needs of the coroner's office. Attention is being paid and focused on the wrong areas and issues. She said she will not be allowed to work over-time to catch up with the cases. In the Sheriff's office, coroner services are not deemed important. They are typically relegated. We simply do not matter, like the Sheriff frequently reminds me. He is the one who says what happens and what does not happen. On July 9, 2017 I finally got two of the three cases sent to me, still waiting on the third case. This was the e-mail I received:

From: Hafley, Barbara [mailto:bhafley@sjgov.org]
Sent: Sunday, July 9, 2017 4:09 PM
To: 'Bennet Omalu' <bennetomalu@outlook.com>
Subject: Emailing: 17-651, Anderson, Mark, bh

 Only got these two done. Barb

She sent me the Microsoft word attachments of the transcriptions [see attachments].

Several days later I received another e-mail for the third case I was waiting for:

From: Hafley, Barbara [mailto:bhafley@sjgov.org]
Sent: Tuesday, July 11, 2017 3:15 PM
To: 'Bennet Omalu' <bennetomalu@outlook.com>
Subject: Emailing: 17-657, King, Michel, bh

 Here is report.  Barb
Your message is ready to be sent with the following file or link attachments:

 17-657, King, Michel, bh

---

I was scheduled to leave for my annual family summer vacation with my family on July 19th to be back on August 3rd, 2017. July 19th was a Wednesday. On July 14th, 2017, which was the preceding Friday, I

noticed later in the night, after work that Sgt. Reynolds had called my cell phone about twice, and did not leave any message. On July 15th, 2017, which was a Saturday, I was at work in the morgue in the morning when I noticed another missed call from Sgt. Reynolds. I wondered why he was calling me repeatedly so I called him back. He told me that he and the Sheriff have finally identified surviving family members of the A17-1471 case. I thought that was rather ironic, so I asked him, if the deceased woman had no identity, how come they were able to identify surviving family members? I reiterated to him again, that going by the standards of practice of medicine, we had sufficient data to make a positive identification of the body based on the concept and principle of contextual identification. I continued that we should look at how much time, energy and resources we were expending on just one case. We could not afford to be doing this on every single case of a decomposed body. Over the centuries, brilliant physicians and scientists that came before us, encountered and recognized this same problem we are having today and developed the principle of contextual identification. I confirmed again to him that in my opinion as a physician, we should identify the body and release the body to the family without doing anything further. He dismissed what I had to say and said that he and the Sheriff spoke to the Coroner in a small county in the State of Ohio where some of the surviving family members resided and they told him that he should assist them to collect specimens from at least five different family members for DNA analysis and a possible match. The coroner of this small county told the Sgt and the Sheriff that they do not usually get involved in such medical procedures, that such procedures are left for, and performed by their forensic pathologist, that they should speak to their forensic pathologist. I said back to the Sgt. on the phone, okay, what do you need me to do for you? The Sgt. said he and the Sheriff want me to speak to the forensic pathologist and guide him on what to do, since the coroner had told them that they have never done the type of request and specimen collection the Sgt and Sheriff were requesting from him. I responded to the Sgt. and told him that I was not going to do it, that I did not have a license to practice as a physician in the State of Ohio and could not be involved in any medical procedure within the State of Ohio. The Sgt. insisted and said that I should at least speak to him to explain to him what we needed, that he the Sgt. could not speak to him since he was not a physician. I thought that was rather ironic. The Sgt. recognized that he could not speak to a physician in another State to tell him what to do and how to do his work as a physician, yet, he was speaking to a physician in the State of California and telling him what to do and how to do his job. I told him calmly that I was not going to speak to the physician. He said okay, that he would like us to meet on Monday, July 17, 2017 at his office, so we can discuss this more, and may be he and the Sheriff will compel me to remove the hands on the case. I said okay, let us meet on Monday. I waited for him on Monday, he never got back to me. This is yet another example of the Sheriff and the Sgt practicing medicine without a license and instructing a physician on how to do his job.

<u>October 5, 2017, 5:25 A.M.</u>

On Tuesday, October 5, 2017, Sgt. Reynolds sent me the text message below:

| • AT&T Wi-Fi 🛜    4:31 AM | ∗ 97% ▬▬ |
| :--- | :--- |

⟨   **Mike**   ⓘ

> Good morning Dr
> Omalu. What time will
> you be in the office
> today? I need to discuss
> one of your cases with
> you, thanks.

> Perfect. Thanks.

> What time will you be
> back from lunch?

I had just come out of a meeting with Ted Cwiek, the director of human resources of the county, with
Patricia Hernandez, the representative of the Union of American Physicians and Dentists, and with Sue
Parson, MD, forensic pathologist at San Joaquin County. <u>The meeting was to discuss completely false
representations made to human resources to cover up the Sheriff's attempt to control how and when
forensic pathologists work and influence our professional judgement.</u> I drove to the office and met
with Sgt. Reynolds in my office. He brought up again the case, A17-1471, a woman who had died in
June 2017. What this means is that for about 3-4 months we have held unto this body for no medically
justifiable reason whatsoever. He said they did DNA identification analysis on the case, without my

knowledge or involvement, and it was inconclusive, and that the Sheriff ordered him to order me to cut out the thumb of the woman for fingerprinting. I got flustered and explained to the sergeant that as a physician I did not feel comfortable becoming involved in this case, and I would not remove the thumb of the woman, that it went against every standard of practice and principle of practice of medicine. I told him that DNA, more often than not, is inconclusive and creates more problems for you than solutions. It is a technology that should not be applied rampantly, but prudently. I explained to him that this woman's hands were autolyzed as far back as June, 2017, and would not be appropriate for fingerprinting because of the autolysis. If her hands had been mummified, then fingerprinting would have been feasible, but not guaranteed. I told him that I felt extremely uncomfortable having the Sheriff give me instructions on how I should practice medicine, when he is not a physician. I would not stop them from doing whatever they wanted to do, but please they should keep me out of it. I needed to protect my license. I asked him why they now want to do fingerprinting after they have done DNA analysis. In the hierarchy of medical evidence, DNA analysis is much higher than fingerprinting, it would be counterproductive to go backwards and downwards. I told him that it would be unethical for me to get involved at this time, since right from the beginning I had provided the opinion that we had sufficient medical evidence to make a positive identification of the body based on the concept of contextual identification. The sergeant further told me that the family of the woman was becoming very furious because the body is not being released to them. So I asked him why they are still holding unto the body and not wanting to release it to the family when there is a family that wants the body of their loved one. This is what contextual identification is all about. I should not be practicing medicine under the guidance of the Sheriff, an unlicensed person, so I quietly told him to tell the sheriff that I could not do what he was asking me, and please they should keep me out of the case. I had provided my opinion to them right from the beginning in June/July, and that is the extent that I would be involved with this case. I warned him that this was a ticking time bomb, that the family may decide to go public with this and possibly go to the county administration, and I did not want to be part of this.

## MEMORANDUM OF EVENTS

### ANTHROPOLOGICAL AUTOPSY REQUESTED BY FORENSIC PATHOLOGIST DENIED BY SHERIFF LIEUTENANT AND SKELETAL REMAINS RELEASED WITHOUT THE AUTHORIZATION OR KNOWLEDGE OF THE FORENSIC PATHOLOGIST

October 11, 2017, 8:30 A.M.

On June 13, 2016 I performed an autopsy on the incomplete and skeletonized remains of a woman whose identity was unknown at the time of the autopsy. I had visited the scene where her remains were found. The skull was absent as well as many components of her skeleton. Her identity was later confirmed and she was a 44 year old Hispanic female [A16-1224].

During the autopsy prosection of the skeletonized remains, I further confirmed that the skeletonized remains were not complete, and would need a comprehensive anthropological autopsy of the residual skeleton, as part of the established standards of care, guidelines, and generally accepted principles of forensic pathology, in reference to the full autopsy of skeletonized human remains, especially when the remains are incomplete. An anthropological autopsy, would in part, enumerate the skeleton that is present, and the skeleton that is absent, and identify patterns of trauma and post-mortem activities and effects that may be present on the skeleton.

During the autopsy prosection, I carefully and meticulously separated the adipocere, autolytic soft and visceral tissue remains from the skeletal remains, assembled the skeletal remains, took pictures, placed them in a body bag as stated in the autopsy narrative and documented by the autopsy pictures.

At the end of the autopsy prosection, I informed the deputy coroner on the case, Deputy Daniel Victoria, that the skeletal remains should be sent to the consulting forensic anthropologist for the coroner's office, for an anthropological autopsy. In good faith, I believed the skeletal remains were sent to the forensic anthropologist for the anthropological autopsy.

Several months later, while I was finalizing and completing the autopsy report I requested for the anthropology report and was told by Barbara Hafley, a secretarial staff at the coroner's office, that there was no anthropology report on this case. I enquired upon the status of the anthropological autopsy of the skeletal remains and Deputy Daniel Victoria informed me that the skeletal remains were never sent to the anthropologist. Deputy Daniel Victoria said he was instructed by Lieutenant Toby Farnsworth to hold off on the anthropological autopsy. I enquired upon the current status and location of the skeletal remains and Deputy Daniel Victoria informed me that the skeletal remains had been released to the family of the deceased, and the skeletal remains had been

cremated by the family. I was neither consulted before the skeletal remains were released to the family, nor before the skeletal remains were cremated.

At this juncture, and going by the generally accepted principles and standards of care of forensic pathology, the autopsy was incomplete without the anthropological autopsy and examination of the skeletal remains. The lieutenant who was not a licensed physician chose to over-ride my request, instead of clarifying with me, he went ahead to release the skeletonized remains and took over the role of the physician. An incomplete autopsy undermines, and does not pass the reasonable degree of medical certainty threshold and standard. I could not provide an opinion in regard to the mechanisms of death and causes of death in this case with the prerequisite and required reasonable degree of medical certainty. At this juncture, there was only a prevailing toxicological autopsy evidence of a terminal acute amphetamine intoxication. I could not reasonably inculpate or exculpate other plausible forensic propositions in this case given the incomplete autopsy. The cause of death, therefore was made "Undetermined". I closed the case and autopsy report on October 4, 2016.

About one to two weeks later, Lieutenant Farnsworth called me into his office to discuss the case and stated that he felt that I was "throwing him under the bus" that he thought we worked as a "team" in the office. I told him that I understood what he was saying, however, as a physician I had to state the facts as they are, otherwise, I would be engaging in unethical behavior. He requested that I tone down my opinion to mitigate the perceived incrimination of anyone in the office. I took the report and in order to give a perceived sense of compromise on my part, so that I do not face any subtle retaliation in the office, I altered what I had written originally, but kept to the facts, and took out the real names of the persons involved [see attached reports].

One or two months later, and again the Sheriff summoned me into his office to discuss this case. And instead of admonishing the acts of his deputies in over-riding my request, he told me that he had asked the sergeant to write an addendum to my autopsy report to blame me that I was not the one who requested for an anthropological autopsy. In other words, he asked the sergeant to compose an autopsy report to amend or challenge my opinion in an autopsy report. The sergeant is not a physician, and should not be writing an addendum to any autopsy report a physician has authored. The premise of the sergeant's autopsy addendum is critically flawed for even if I had failed to request for an anthropological autopsy, why then did they release the skeletonized remains without my knowledge or authorization. This further shows that the Sheriff inserts himself in the work of physicians, and exerts subtle influence and control on how they do their work, and on their professional judgment. No sheriff deputy should over-ride any laboratory and specialist consult request of any licensed physician.

MEMORANDUM OF EVENTS

**CASES AND REPORTS WILL NOT BE COMPLETED IN A TIMELY MANNER AND WILL ALWAYS BE DELAYED, INEFFICIENCY RULES, STANDARDS OF PRACTICE AND CARE ARE NOT ADHERED TO**

July 13, 2017, 4:08 A.M.

At the office, we do not have credentialed, trained and certified death investigators to perform competent death investigations. Non-medically credentialed deputies are assigned coroner duties and they do not have the expertise, education or training to competently provide services related to the medical investigation of causes, mechanisms and manners of death. Since they do not have the basic and fundamental understanding of the medical principles that underlie these services, the office is not competently run. Mistakes are always made, costs remain high, and cases will always be delayed and not completed in a timely fashion.

Take for example the following events:

1. On July 12, 2017 I reported to work at about 8:00 A.M. There were three cases in the morgue that morning that I was told required my attention and evaluation by the autopsy technicians. The three cases were A17-1548, A17-1550 and A17-1551. By 8:00 A.M. none of the reports on the circumstances of death was ready or typed. There was nothing I could do, so I decided to examine brains. I examined and cut three brains. I got done at about 10:45 A.M. yet none of the three reports were ready. At 11:00 A.M. I left the morgue and went to my office to sign out and complete autopsy reports. By 2:00 P.M. I left the office for lunch. None of these reports were ready. So for the entire day I could neither evaluate these cases nor do any autopsy. I pushed them off to the next day. There was nothing I could do about it, because I am frequently reminded by the Sheriff that he is the elected coroner and has the authority and power and not me. And if I needed anything I should go through the chain of command beginning first with the Sergeant. The medical standard of practice is that autopsies should be performed within 24 hours of a body arriving at the office. At the office standards of practice are not the order of the day.

2. On July 10th, 2017, when I got to work, the autopsy technicians informed me of a case, A17-1532, that was in the morgue, a 44-year-old woman who had died after a long medical history, and Sheriff deputies had opined that she suffered from Muscular Dystrophy. I felt uncomfortable accepting this diagnosis, so I requested for the medical



records. I was told that her physician did not want to sign the death certificate. I requested that the medical records be secured so I could confirm what her medical history was. Her physician was a local physician here in Stockton and I expected that the medical records would be secured that same day. To my utter shock the medical records were not provided to me until July 15th, 2017. So this case came into the office on July 8, 2017 and the pathologist could not review the case and complete the autopsy for one week because we failed to simply secure the medical records and provide them to the pathologist. On July 15, 2017, when I was finally provided the medical records, it turned out that the diagnosis provided to me by the deputies was wrong. She did not suffer from any muscular dystrophy, she suffered from Dermatomyositis/Polymyositis, and inflammatory myopathy. I examined her body, confirmed the diagnosis on her body since she had numerous cutaneous, soft tissue and visceral calcinosis and signed out the case. It took me less than 20 minutes to complete my examination. There was no reason whatsoever this body should have been kept in the morgue for one week.

August 24, 2017, 5:54 A.M.

I reported to work on August 23, 2017 and was informed by the autopsy technicians that there were two bodies that had been in the morgue for over one week and the sheriff deputies were not getting us the medical records to review and sign the death certificate. The two cases were the following [see attached]:

1. A 45-year-old man [A17-1772] who had a long history of coronary artery disease, hypertensive cardiovascular disease and diabetes mellitus. I needed to review the medical records and sign out the case without doing an autopsy since the physician refused to sign the death certificate. This case had been held in the morgue for eight days without anything being done. I examined the sparse medical records we had and simply decided to examine the body externally to exclude any evidence of trauma, and signed out the case, which is beneath the set standards of practice of medicine. In desperate situations you do desperate things. I had to do what I had to do because I simply could not stand it any longer, this is simply unethical. The body was beginning to decompose. I should not be signing out cases like this one without reviewing the medical records in detail.

2. A 69-year-old man [A17-1755] who had a long history and attended the VA Hospital System. His body had been in the morgue for eleven days. No medical information or records had been obtained on him. I had to do what I had to do, so I proceeded to open his chest to document his heart disease, adding un-necessary costs to the office. I could have simply reviewed the medical records and signed out the case, but now I have to

perform a partial autopsy that I should not have performed. This is one of the ways we are increasing the costs of running the office because of inefficiency. And of course, the body was beginning to decompose. It is unacceptable that a body would come into the morgue intact and beautiful, and leave the morgue decomposed.

August 30, 2017, 5:07 A.M.

Two of the nine cases I did on August 29, 2017 at the morgue were A17-1844 and A17-1838. These two bodies, a 79-year-old man and a 64-year-old man respectively died on August 24, 2017 and August 23, 2017 respectively. Nothing was done whatsoever to prepare these cases for the pathologist to review for five and six days respectively. Medical records were not obtained until August 29, 2017. As soon as I received the medical records, within 1 hour, these two cases were completed and the bodies were ready to be released to the families. The office held these bodies for almost one week without anything being done, and yet there are two employees of the office who are in-house pathologists.

September 8, 2017, 5:33 P.M.

On September 7, 2017, upon arriving at work, a secretarial staff at the coroner's office informed me of some autopsy reports that needed minor typographical corrections. I invited her into my office to make these corrections and when she provided me the list of cases, these cases were very old cases that I had completed, signed and closed many months ago. I asked her why it was taking the office such a long time to close these cases. She said that the sergeant was choosing to close the cases at his pace without any question. While it takes the forensic pathologist 2-4 months to finalize the autopsy reports, it takes the coroner's office an additional 4-6 months and even longer to finalize the coroner reports thereby causing extensive delays of cases and providing very sub-standard services to the communities and people of the county that we serve.

For example, A16-2457, was completed and closed by the forensic pathologist on March 7, 2017, and six months later, by September 7, 2017, the case had not been closed by the office.

Another example, A16-2602, was completed and closed by the forensic pathologist on March 15, 2017, and about six months later, by September 7, 2017, the case had not been closed by the office.

Another example, A17-0243, was completed and closed by the forensic pathologist on April 14, 2017, and about five months later, by September 7, 2017, the case had not been closed by the office.

Another example, A17-0345, was completed and closed by the forensic pathologist on May 1, 2017, and about four months later, by September 7, 2017, the case had not been closed by the office.

These delays happen routinely; however I do not have the time to be documenting each and every one of the delayed cases. They are simply too many of them.

September 10, 2017

I was performing autopsies on September 8, 2017, and the autopsy technicians presented a case to me, A17-1908, a 47-year-old man who had died in the intensive care unit of a local hospital from a drug overdose. He had been in the intensive care unit and died on September 3, 2017. By the standards of practice of medicine, this body should not have been brought into the morgue. All the medical evidence had been already established, the cause of death was very well known, and a death certificate should have been signed by the forensic pathologist without bringing the body to the morgue and creating expenses for the family, and increasing tangible and intangible operational costs for the county. The body was brought to the morgue instead of being released to the family from the hospital on September 3, 2017. Yet, no medical records were brought to the morgue with the body. Dr. Parson requested for the medical records and it took another five days to provide the medical records. I did not receive the medical records until September 8, 2017. So this body stayed in the morgue for five days without any cause or need.

September 12, 2017, 6:15 A.M.

Case A17-1926, a 72-year-old woman who had died on September 5, 2017 at a local hospital. She had voluminous medical records. Nothing was done about this case and the body laid in the refrigerator in the morgue for six days until September 11, 2017 when the medical records were finally provided to me. As soon as I obtained the medical records, I signed out the case and released the body to the family. There is no reason whatsoever this should be happening. This body should never have been brought into the morgue in the first place. We should have been able to competently speak to the treating physician using the appropriate professional language, etiquette and syntax to persuade him to sign the death certificate. Additional costs would have been avoided if the physician had signed the death certificate.

September 19, 2017, 4:45 A.M.

While I was at work on Monday, September 18, 2017, the autopsy technicians informed me in the morning that our cases were being delayed for too long. That it has become routine

for bodies to remain in the morgue and in the refrigerator for seven days and longer because we are awaiting on the deputies to provide us with complete information and materials on the cases. I asked them how long this has been happening, they said for about two months, and that they have brought it to the attention of the sergeant and he has not done anything about it. Well, the Sheriff had ordered me not to come to him directly to report any issues any longer and if I needed anything to go to the coroner sergeant. So I asked the autopsy technicians to begin documenting these cases and providing them to me. There is no reason why any human body should be in the morgue for seven days without an autopsy being performed. They told me about a case that day [A17-1958], a 41-year-old African-American male who died on September 10, 2017 and was brought into the morgue, and eight days later, the body was still in the morgue and we were still awaiting the medical records. This means that before even the physician learns about this case, there is already a delay of eight days, and the body would be decomposing in the morgue. I requested to see the body, and when it was brought out to me, the body was completely frozen! This meant that I could no longer do the autopsy since there would be freezing artifacts and distortions in the body. I had to do an external examination only. I attempted cutting open the body and the scalpel blade broke because the body was frozen like a rock! The medical records were later provided to me the same day. This is simply a disaster when it comes to standards of practice of medicine.


September 24, 2017, 4:51 A.M.

I testified in court on a first-degree murder trial on September 21, 2017. The case was the State of California vs. Richard Howard Watkins. I had performed the autopsy on the deceased, Kelly Marelich, a 22-year-old woman [A14-0639]. The defense attorney on the case, Adam Grace, a public defender, alleged that I intentionally delayed this case, and the autopsy report was not made available to him until December of 2014 when I performed the autopsy on March 17, 2014. I responded that it was not true, that I completed the autopsy on August 19, 2014 because I examined the brain, and performed some sophisticated tissue analyses on the case, which took several months. He asked me why they received the report then in December, I responded that I was not involved with the administrative issues in the office. I later confirmed from the assistant district attorney on the case, Kevin Mayo, via e-mail that they actually received the autopsy report on December 19, 2014, four months after I had completed the autopsy report. This is where the problem lies. I have actually noticed that it takes the police officers in the coroner's office several months to over a year to complete coroner reports after autopsy reports are completed. This case is only one example. There is no reason whatsoever why it should take four months to complete and release an autopsy report after the autopsy report is completed by the pathologist.

September 30, 2017, 7:21 A.M.

On Thursday, September 28, 2017 I was made aware of a case, a 97 year old woman who had died on September 10, 2017. She suffered a ground level fall at her residence on September 5, 2017 and was transported to San Joaquin General Hospital, where she died on September 10, 2017. Nothing was done on this case for another eighteen days [two weeks, four days]. On September 28, 2017 I was finally made aware of the case, and I immediately reviewed the medical records and signed it out [A17-2031]. What bothered me was that this patient died in San Joaquin General Hospital and there was no reason whatsoever why it should be difficult to obtain the medical records the same day she died, and the case closed the same day of death. I have been told by the Sheriff that I had no authority in the office and should not come to him to present any complaint, that I should go to the sergeant. All I can do is to document this case. In my opinion, this is the height of gross incompetence and reckless inefficiency.

October 3, 2017, 1:13 P.M.

I performed an autopsy on a 37-year-old woman, A17-0727, who had been stabbed multiple times and died from her wounds. The autopsy was performed on March 24, 2017 beginning at approximately 2:30 P.M. and ending at approximately 3:51 P.M. I did not receive the transcription of the autopsy dictation until October 2, 2017, six months later. Meanwhile the Sheriff is so busy focused on fighting with the doctors about control and influence, wanting to take over the scheduling of physicians and other inconsequential issues. There is no reason why this should happen, especially when this case was a homicide. Simply unacceptable. There is nothing I could do, since the Sheriff constantly tells me that he is the elected coroner and decides what happens in the office, and my opinion does not and should not matter, and if I ever needed anything to go to the sergeant and not to him since his office is a paramilitary organization.

I completed and signed out an autopsy report [A17-0035] on March 25, 2017. It was the case of a 38-year-old woman who had died of an acute drug overdose. By October 2, 2017, the sergeant had not closed this case, and this was over six months later. Why this should be happening I do not know.



## MEMORANDUM OF EVENTS

**The Sheriff is controlling how physicians work, and what cases we do to influence and control our professional judgment**

August 22, 2017, 5:00 A.M.

As a physician working in a county I should be given the space to do my work in order to protect my independence and avoid influencing or controlling my professional judgment, in any subtle way possible. Physicians should not in any way collaborate with any unlicensed person in determining how that physician sees patients does cases and provides differential diagnoses. In the Sheriff's office, this is not the case, and the culture in the office does not even recognize this concept.

A good example is that of case A17-1799. I went to work on Saturday, August 19, 2017 and this case was one of the cases I had to do for that day. I asked the autopsy technician to pull out the body from the refrigerator so we could begin the autopsy. The deputy on duty that day, Dan Victoria, called the autopsy technician, Kathryn Moreno, just as we were about beginning the autopsy to instruct and order that we do not do the case, that Sgt Mike Reynolds had ordered that the case be left for Monday, August 22, 2017. No reason was provided to me why the case has to be left for Monday and I was not even consulted. I was simply ordered. I had a book signing event later that day, so I did not have any time to engage in any aggravating argument that will impact my state of mind, focus and judgment, so I honored the order and asked the autopsy technician to place the body back into the body bag and move it back into the refrigerator. We did another autopsy instead. The problem with such an action is that it goes against the standards of practice of autopsy medicine. The standard is that autopsies should be done within 24 hours of death whenever possible since many of the proteins we need for analysis and differential diagnosis may be permanently altered and compromised when the post-mortem interval becomes longer than 24 hours and the integrity and validity of the autopsy as a diagnostic procedure are compromised. This woman died on Friday, August 18, 2017 at approximately 9:13 A.M. so we have to leave her body for three more days to do the autopsy for no known reason.

On Monday morning, Sgt. Mike Reynolds called me and said he wanted me to do the autopsy [A17-1799] first thing in the morning before any other case. I was on my way to a meeting with the district attorney, Tory Verber, so I was not in the state of mind to argue or fight with

anyone, I agreed. By the standards of practice of medicine, no unlicensed person, should be telling me when and how I should do my work. Every day the first thing I would do when I arrive at work is to see what cases I had for the day, review the types of cases they were and what would be needed for each case, before I schedule what order to do them. When I began the autopsy later that morning, there were two deputies who attended the autopsy to observe. They were Sergeant Lindemann of the Sheriff's Office and Deputy Grubb of the Sheriff's Office. When I asked them why they delayed this autopsy, they said that they wanted to keep the autopsy until Monday so that they could attend and watch. It turns out that a lieutenant at the Sheriff's Office, Lt. Toby Farnsworth was the one who called Sgt. Mike Reynolds and told him he wanted the autopsy held until Monday. I confirmed this from Deputy Dan Victoria. What is going on?

MEMORANDUM OF EVENTS

**STANDARD OF CARE DISASTER AT THE SHERIFF'S OFFICE: Medical Standards of Care and Guidelines are not Adhered to**

August 14, 2017, 4:05 A.M.

I arrived at work on Saturday August 12, 2017 at approximately 9:00 A.M. to do autopsies. When I arrived, I met the only autopsy technician who was scheduled to work that day with me, Kathryn Moreno. I asked her about the cases we had for that day, she said we had three cases, viz: A17-1746, A17-1747 and A17-1748. The three cases all died in motor vehicle accidents.

The autopsy technician told me that the tissue recovery organization wanted to recover tissues on case A17-1747 and the sergeant had called requesting that we did it first. It turned out that the sergeant authorized that the organs be surgically removed for transplantation purposes without even informing me or seeking my consent and authorization, which goes against the standards of practice of medicine. I began the autopsy on A17-1747 at approximately 9:15 A.M. The Sheriff deputy assigned to the coroner's office that morning and who was on duty was Taylor Hosmer. It turned out that Taylor Hosmer did not type the narrative about the circumstances of death. He did not know anything whatsoever about the case. He did not even know the date and time of death, and the date and time of the crash. He did not have any medical record whatsoever and did not know anything whatsoever about the circumstances surrounding the death of this individual. I picked up the phone and called him to speak to him and enquire about the case. Taylor Hosmer did not have any information for me whatsoever outside that the individual suffered a car crash and had spent some days on admission in a hospital. He did not know how long he spent in the hospital, and he was not making any attempt to retrieve any of this information for me, and did not know what to do. When I completed the autopsy, I completed the "causation sheet" and left instructions on the sheet [see attached] in this regard.

I began the next case, A17-1746 at approximately 10:29 A.M. For this case, the narrative about the circumstances of death had been typed but outside the narrative there was no other materials provided to me and Taylor Hosmer, again knew nothing about the case, and could not answer any question for me.



I wanted to begin the third case, A17-1748, a 76-year-old man who had been involved in some type of car accident at approximately 11:40 A.M. There was no information on this case whatsoever except that he was a passenger in a car that struck a cow. There was no other information for me whatsoever, nothing. And Mr. Hosmer knew nothing else about the case. This was simply too much for me to take. I stopped and did not perform this autopsy. I left it for Monday, August 14, 2017, when I believe the information I needed would be gathered for me. It was time wasted for me and I was so flustered that I left and went home. In my opinion, this is simply a disaster. Rather than things getting better in the office, things are actually getting worse and worse each and every day.

This goes way outside and beneath the standards of practice of medicine in the State of California and across the world. For every patient, autopsy or case, information, medical records, police reports and other professional reports must be ready for the physician to review before the physician begins a procedure or an autopsy. Every medical procedure performed within the State of California must adhere to the standards of practice of medicine.

August 18, 2017

On August 16, 2017 when I reported to work and enquired about the case, A17-1747, and the hospital admission blood sample I had requested for, Taylor Hosmer, told me that he did not call the hospital on August 12, 2017, the day I requested for the blood sample, and he waited to call on August 16, 2017, four days later. By this time the hospital had discarded the hospital sample. I was simply blown away. He waited for four days to make a request for a blood sample I had requested. Well, there was nothing I could do, afterall the Sheriff constantly reminds me that I have no power in the office and he is the coroner. But what has happened here is that we have undermined the integrity of the autopsy and actually undermined the quality and accuracy of the autopsy. This was a motor vehicle crash case, because he waited for four days to call the hospital the blood sample was discarded by the hospital, and now there is no way I can tell if there were drugs and alcohol and what the levels were in the blood of this individual at the time of the crash.



To even make matters worse, when I got to work on August 14, 2017 the cases from Saturday August 12, 2017 which I did not do because the coroner reports had not been typed and there was no information on them whatsoever [A17-1754 and A17-1748, see attached]; those same cases still did not have the coroner reports typed. I proceeded to do the autopsies without any information whatsoever. I did the autopsies blindly. In desperate times you do desperate things. This is a total disaster. The standard of care is being critically impacted. If not for my

47

high levels of core competence, there is no question in my mind that mistakes would be made by a less qualified pathologist working in such a substandard environment.

September 10, 2017

I worked and performed autopsies on Friday, September 8, 2017; and on Saturday, September 9, 2017. On Friday I noticed that the autopsy saw was not working properly and was about to break down. I asked for a new saw and the autopsy technicians informed me that there was no other saw available. The autopsy saw is such a vital autopsy instrument that without a saw, an autopsy cannot be performed. As the forensic pathologist in the office, I had given a standing instruction that at every point in time, we must have at least two spare saws to use at the autopsy room, so that if one breaks down we would have back-up saws. But like the Sheriff has told me repeatedly, he is the elected Sheriff-Coroner, and runs the office, and my opinion does not matter, and I should never come to him. He runs the office anyhow he wants to in spite of set standards of practice of medicine because he is the "boss". Meanwhile, in the ten years I have been in this office, the Sheriff has never come down to the autopsy room to observe an autopsy or to learn about what we do and how an autopsy is performed.

While I was performing a homicide autopsy on Saturday, the autopsy technician, Etta Johnson informed me that the saw had broken down. I was very flustered. We did what we had to do to complete opening the skull and harvesting the brain for examination. I immediately asked her to call Sgt Reynolds to inform him that we did not have any saw to perform autopsies with on Monday September 11, 2017, and he should immediately make a saw available for us. San Joaquin County SHOULD NOT be asking for and borrowing autopsy saws from anyone, or any other county. This is simply an embarrassment and extremely substandard. This is what happens when the long-established standards of practice of medicine are not adhered to. This is simply a disaster. What I plan to do is to take my own personal autopsy saw to work on Monday, September 11, 2017.

September 12, 2017, 6:23 A.M.

It was a disaster for me yesterday, September 11, 2017 at the Sheriff's office. I reported to perform autopsies at 10:00 A.M. and there were six new bodies for me to examine. There were three bodies that died in one motor vehicle crash. I quickly completed the first three cases before noon, and wanted to begin the three motor vehicle crash cases. At noon there were no reports transcribed for these cases [A17-1960, A17-1961, A17-1962]. I had nothing else to do, so I took time off and ran some professional errands and came back and yet none of these cases had been transcribed. I called the office secretary, Barbara Hafley to ask why these reports had not been transcribed and she said the reports had not been dictated by the police

 officers. I went ahead to perform these autopsies without knowing anything about these cases outside that they died in one motor vehicle crash. This is grossly beneath the standards of practice of medicine, and grossly negligent. I should not be performing autopsies like these ones without knowing who is who, who the drivers were, and who the passengers were and the circumstances surrounding the crash. There is no justifiable reason why case reports from the prior day should not be typed and ready for the pathologist by 7:00 A.M. the next morning. This is the standard of practice of medicine. We must and should adhere to the generally accepted principles and standards of medicine and science, and should not do whatever we want at whim. At the end of the day at 5:00 P.M. as I was leaving the morgue, these cases were still not yet typed. Simply a disaster.

October 31, 2017, 3:02 A.M.

I reported to work yesterday, October 30, 2017 at approximately 10:00 A.M and to my utter shock and bewilderment, there was no single coroner report that was fully typed. There were a total of nine bodies [two left overs and seven new bodies]. I waited around the office, grossed and examined one brain [A17-1312] until 11:00 A.M. and there still was no single report ready for me to review. There is no reason whatsoever whereby coroner death investigation reports on bodies that came into the office during the night should not be transcribed and ready for the physician review by 7:00 A.M. the next morning. This is the standard of practice. San Joaquin County is a relatively big county with a very busy and complex case load at the coroner's office. The numbers and complexity of the case load, I believe have overwhelmed the office for the way it is being administered. I could only do two autopsies the entire day. I began once some reports were ready around 12:30 P.M., and did a suicide [A17-2309], a 38 year old prison inmate who had hanged himself, and a homicide [A17-2307], a 42 year old woman, who was stabbed multiple times. I finished just before 5:00 P.M. for the autopsy technicians to leave for the day. All the other bodies had to wait for the next day, or the day after that.

## MEMORANDUM OF EVENTS

**Continuing Pattern of Harassment of Physicians, Unethical Behavior and Practicing Medicine without a License**

July 30, 2017, 4:56 A.M., Coconut Bay Resort, St. Lucia

I am currently on my annual vacation with my family in St. Lucia, West Indies. My vacation began on July 19 and will end on August 2nd, 2017. Every year I take my wife and two children to an island in the Caribbean for two weeks to spend time together as a family without any work-related or school related activities. However, I let the coroner's office know that they can contact me via cell phone only on emergency basis especially regarding case management and autopsies. Dr. Parson would typically contact me directly to advise her on what to do or how to manage some of her cases.

Due to my dedication to my job, I was still able to draft a physician coverage schedule for the month of August while on vacation, and I forwarded it via e-mail on July 27, 2017 at exactly 8:42 A.M. EST. I forwarded the e-mail to my secretarial assistant, the coroner sergeant and Dr. Parson.

On July 28, 2017 I did what families do on vacation, go to the beach, the swimming pool and walk around the resort etc. I got back to our suite around 6:00 P.M., took a shower with the family in order to go to a dinner buffet. After the buffet we went and saw a musical life performance and got back to the suite to sleep. In the suite, I noticed that I had a missed call on my cell phone, and I checked to see who had called me and it was Sgt. Reynolds. He did not leave any message and did not send me a text. I wondered why he would be calling me and would not leave a message or send me a text since I had previously told him that the best way to get hold of me was to send me a text and let me know what he may need me for, that way I could always text him back, no matter what I was doing. He called at exactly 6:12 P.M. on July 28, 2017. Again, on July 29, 2017 he called me again at exactly 2:20 P.M. while I was on a private tour with my family up in the mountains of St. Lucia. Again, he did not leave a message or text me. Again, I wondered why he would be calling me twice while I was on a vacation. I then sent him a text when I got back to the resort and asked if everything was okay. He responded and stated that it was in regard to the August schedule, which I had sent to him. So I replied at 10:24 P.M. on July 29, 2017 and stated the following to him: "Can this wait till I come

back on the 3rd, my wife is upset that I am dealing with work while on vacation. I do not want her to divorce me please. Sue will take care of any contingencies until I get back. Cheers!!"

He replied immediately and said the following: "I would recommend you check your e-mail. Just trying to help you out before the book is released that's all.".

Why the Sgt would be contacting me on vacation I do not really know. He is not a physician and should not be immersing himself on the scheduling and working hours of a physician according to Law of the State of California. Meanwhile I had gotten back to Dr. Parson and realized she had actually filled a harassment complaint against the same sergeant at the office several days after I left for vacation [see attached]. I felt so harassed by this experience that I could not sleep all night. Early in the morning I chose to get out to the balcony of the suite and write this memorandum to myself to give me some mental relief. This fits into a pattern of unethical behavior in the coroner's office. If there was anything he may have needed, Dr. Parson was there with him to provide it to him, and if she could not provide the service, she would call me to seek advice. I cannot be practicing medicine with the sergeant who does not have the license to practice medicine in the State of California.

# MEMORANDUM

## ADVERSE CONSEQUENCES OF THE SHERIFF BEING HELL-BENT ON TAKING OVER THE CASE MANAGEMENT AND SCHEDULING OF PHYSICIANS WHICH GOES AGAINST THE STIPULATED STANDARDS AND CODES OF THE MEDICAL BOARD OF CALIFORNIA

October 8, 2017, 6:50 A.M.

The Sheriff has been hell-bent on taking over the scheduling of physicians and determining when and how physicians will work or not work for no other reason but to have control of the physicians. Beginning October 1, 2017, Sgt. Reynolds released a schedule for the physicians without involving or considering other duties physicians are involved with. The result was a total disaster.

Between Sunday October 1, 2017 and Wednesday October 4, 2017, there were approximately 13 new bodies in the office, including one child, three homicides, and one in-custody death. The sergeant had scheduled Dr. Parson to perform autopsies Monday through Wednesday without consulting her on other professional engagements she had like attending a professional interview and attending a professional medical evaluation. Dr. Parson had to attend to her other professional duties and could perform only a limited number of autopsies. Between Monday and Wednesday she could only perform 7 autopsies, prioritizing the three homicides, the child, and two older cases where she finally received medical records and that funeral homes were calling about. By Thursday, October 5, 2017, Dr. Omalu had over nine bodies waiting for him. And some of the bodies had been at the morgue since Sunday October 1, 2017. This is simply not acceptable and goes against every standard of practice of medicine. Physicians should be the ones handling their scheduling while evaluating the cases available since autopsies should be performed within 24 hours of a body arriving at the morgue.

The same trend happened with Dr. Omalu, who had family engagements at his children's school on Friday, October 6, 2017, and had scheduled Dr. Parson to perform autopsies on Friday. The sergeant changed it in the schedule and because of that Dr. Omalu could not perform autopsies until late afternoon when he got back from the school. Cases were delayed. On October 7, 2017, upon arriving at work, Dr. Omalu performed an autopsy on a body, which had been in the morgue since October 1, 2017; the case of a 48 year old woman [A17-2116] who had died suddenly and unexpectedly. The autopsy was performed six days after the body came into the office. This means that at autopsy, Dr. Omalu could not collect any sample of blood to perform laboratory analyses to find out if this woman may have suffered an anaphylactic reaction to any type of drug or allergen, and other tests that Dr. Omalu may have wanted to perform because of the prolonged post-mortem interval, which was 6 days. This is grossly below every standard of practice of medicine.

This trend is bound to occur again this coming week, as Dr. Parson is scheduled to perform autopsies on Monday, Tuesday Wednesday. However, the Sgt. failed to consult with Dr.

Parson, as she has a meeting with separate DDAs on Monday and Wednesday and is scheduled to appear in court on Tuesday, possibly on Wednesday, and also on Thursday, which will undoubtedly impact the autopsy service. When Dr. Omalu originally created the October schedule, he took these dates into account in order to ensure full coverage of the autopsy service.

## MEMORANDUM OF EVENTS

**Adverse Effects of Physicians Not Scheduling Their Work Hours**

October 17, 2017, 4:10 A.M.

The Sheriff is not a trained or licensed physician and cannot fully comprehend what it takes to be a physician and how a physician does his or her work. He has ignored these facts and chose to take over the scheduling of physicians who work in the coroner's office against the advice of Dr. Kapre [medical director] and Dr. Matolo [chairman of the department of surgery] of San Joaquin County General Hospital, and against the strong rejection of the two physicians who work at the coroner's office.

Since October 1, 2017 the Sheriff overruled the monthly schedule put together by the two physicians in the office and began to determine when the physicians in the office are scheduled, what cases they do and when they do their cases. And obviously they are immediate consequences. Cases are being delayed. On Monday October 16, 2017 I had a didactic lecture to give at the University of California, Davis, Medical School at noon. As a clinical professor of medical pathology and laboratory medicine at the medical school, I have to teach medical students, resident physicians and fellows for about 50 hours every year without any pay, but with the full academic privileges of a faculty staff of the medical school, which facilitate and enhance my duties as a physician.

The Sheriff did not consider that I had this lecture and still scheduled me to perform autopsies on Monday October 16, 2017. I had to prepare for my lecture, drive down to Sacramento to give my lecture. I could not complete all the autopsies for that day. I could do only one autopsy before my lecture, and only one other autopsy after my lecture. All other cases had to wait for the next day including one homicide. In the month of October, I have not been able to co-ordinate my scheduling because someone else who is not a physician has chosen to schedule me and control my time at whim, so what this has done is that I have lost control of my independence and control of my timing and scheduling so I am scrambling. For the very first time in my professional life, I have not been able to sign out as many cases as I could have, or as I wanted for almost two weeks because I have lost the ability to tie together my multifaceted duties and functions as a forensic pathologist and neuropathologist. Scheduling my work involves so many facets. Every month I confer with the doctors I work with, we put heads together and come up with a schedule that will be effective and efficient and permit us to do as

many cases as we can. With the Sheriff taking over our schedule we have lost this ability and are completely lost. There was no reason whatsoever for me to have been scheduled on Monday October 16, 2017 to perform autopsies. I conferred with Dr. Parson to see if she was experiencing the same thing and confirmed that yes, too, she has not been able to sign out cases in a timely fashion, as well, because she has lost her independence and control of her timing as well.

Again on October 18, 2017 I was scheduled to travel for a conference in South Carolina on October 19, 2017, yet the Sheriff scheduled me to perform autopsies on October 18, 2017. How can that be possible? What I do not really understand is that the Sheriff should be doing all he can to create an optimal environment for we, the physicians, to do our work to the best of our abilities, yet he is doing all he can to make us fail. The Medical Board of California, when they made these rules, made them for a reason to protect the duties and functions of physicians, and not at whim.

October 30, 2017, 3:19 A.M.

Since the Sheriff took over doing our schedules not considering the craft of our trade, my professional rhythm and productivity has been totally disrupted. I can no longer co-ordinate my multifaceted duties and responsibilities, and I have become less efficient and less productive. My turnaround time for the completion of my cases has now been extended by two months. I am a much senior forensic pathologist than Dr. Parson and I supervise and mentor her and her work. I am also a neuropathologist, and in addition to doing autopsies I examine brains, generate neuropathology reports and testify in court on both my cases and Dr. Parson's cases. In spite of all these the Sheriff schedules me equally with Dr. Parson, and schedules me on the days with the heaviest loads of autopsies and cases. The standard of practice guides that if I examine brains and perform other duties in the office, I should be scheduled less on autopsies and perform less autopsies at a ratio of about 3:4 autopsies [about 75% compared to 100% of the autopsies other pathologists do]. The Sheriff choses to assume physician duties and schedule us at whim, thereby impeding our productivity and efficiency as physician employees.

## MEMORANDUM OF EVENTS

**BODIES ARE ALLOWED TO DECOMPOSE AT THE SCENE IN HOMICIDE CASES DESTROYING MEDICAL EVIDENCE ON THE BODY AND UNDERMINING THE VALIDITY AND RELIABILITY OF AUTOPSY FINDINGS**

July 18, 2017, 6:07 A.M.

Case #A17-1566

This was the case of a 45 year old man who had been shot and killed. The Sheriff's office left the body at the scene after it had been discovered for so many hours in the ambient heat that the body became decomposed partially obliterating the unique features of his wounds and other autopsy findings. All his tissues and organs were showing moderate degrees of autolysis [see attached autopsy worksheet]. When I asked the detective from the City of Stockton Police Department, who was present at the autopsy, what caused the decomposition, he stated that the Sheriff-Coroner's Office left the body at the scene for long hours before it was removed.

This has happened many times in the past and I have always reiterated that leaving a body for many hours at the scene goes against every medical standard of practice, is inhumane and is substandard because such practice decomposes bodies and obliterates medical evidence and findings, which are the primary objectives of the autopsy. Bodies should be removed from the scene as soon as possible and placed in a refrigerator as soon as scenes pictures have been taken, in order to preserve medical evidence. For a great majority of homicides, the body is not at the scene. The body is typically removed from the scene by paramedics and transported to the emergency room where the individuals frequently die. So removing the body from the scene does not in any way affect the scene. But my opinions are not important, I do not have the authority and as the Sheriff frequently reminds me, he is the boss and decides what happens in the office, whether it goes against the standards of practice of medicine or not.

36

MEMORANDUM OF EVENTS

**FREQUENT AND RAMPANT TURNOVER OF STAFF AT THE CORONER'S OFFICE UNDERMINES CONSISTENT AND STEADY QUALITY OF SERVICE AND INCREASES TANGIBLE AND INTANBILE COSTS TO THE COUNTY AND FAMILIES OF DECEASED**

June 18, 2017, 4:50 P.M.

Case #A17-1343

One of the primary objectives of a medical office like a coroner's office is to ensure and guarantee the highest quality of service that adheres to the best practices and highest standards of medical care, which are within the generally accepted principles of medicine and science, and highest levels of bioethics. One fundamental method of attaining this objective is to hire, retain and train staff who learn the prerequisite skills and knowledge and work under the guidance and leadership of the doctors. A high turnover of staff will most definitely undermine this objective and increase costs. At the coroner's office exactly the opposite is done. There is a high turnover of all levels of staff especially the managing staff who are sergeants, lieutenants and captains.

It takes about one to two years for a sheriff deputy to fully grasp and comprehend the medical standards and principles that are required in the coroner's office. When these deputies come to the office they absolutely have no good or comprehensive knowledge of the medical standards and principles. I do not expect them to know because they are not trained to be medical officers. Mistakes are made, retraining is done and they learn reluctantly because medicine was not what they were trained to practice. As soon as they are becoming experienced in the job, and operations begin to become effective and efficient, they are reassigned to another division by the Sheriff.

Working at a coroner's office is a career medical job whereby assigned staff are medical professionals who are competently trained and knowledgeable in the basic and fundamental principles of medicine. With such staff, the office will be run most efficiently and competently. Costs will be reduced abundantly. The case load in the office can be reduced by over 40% if competent and knowledgeable staff work in the office. Over 40% of the cases that are brought

into the office should never have been brought in. This increases the cost of running the office as well as the budget.

Take for instance case #A17-1343, an 83-year-old man who had been found dead at his home on June 14, 2017. His step daughter stated that he had heart problems. The circumstances surrounding his death showed no involvement of any external factors whatsoever. It was an obvious natural death. His body was brought into the morgue. Nothing else was done. The physician was never contacted to sign the death certificate. The easiest thing to do was to bring in the body to the coroner's office at a cost to the family of the deceased [once the body is moved to the coroner's office, the family is charged $350], and at a cost to the county. A physician is more likely to sign a death certificate if he or she is appropriately and professionally approached and the appropriate medical language is spoken to him or her.

The body of this man was brought into the coroner's office in the morning of June 14, 2017. The first time I got to learn about the body was after it was brought into the coroner's office. I immediately reviewed the case and knew that the body should not have been brought into the coroner's office. A physician should have signed the death certificate after a preliminary inspection of the body at the scene. Since the body had been made a coroner's case, just like many other bodies that come into the coroner's office, I had to examine it and sign the death certificate. As it typically happens, the medical history and records were not sought after, and were not provided to me. I requested for the medical records, in order to make it a medical records review case and not do an autopsy, or at most do an external examination only. On June 17, 2017, three days later, the body was still in the morgue, no medical records had been provided to me. On June 19, 2017, five days later the body was still in the morgue, no medical records had been provided to me. Meanwhile the body was beginning to decompose in the morgue showing early decompositional changes. THERE IS NO REASON WHATSOEVER THIS SHOULD HAPPEN EVEN ON ONE CASE. But this happens routinely.

Many times I am compelled to do a full or a partial autopsy on cases like this because I cannot do magic and determine a cause of death without examining the medical records. Doing a partial or a full autopsy, or even an external examination only will increase costs by several thousands of dollars per case, both in tangible and intangible costs. Some deputies will tell me "Why don't you just do an autopsy so we can get it done with". But that is not what the standards of practice stipulate. I cannot, as a physician, do what is expedient or easier, or whatever I want. I have to adhere to, and I must adhere to the standards of practice and generally accepted principles of medicine.

In fact, on June 17, 2017, Dr. Parson, the other forensic pathologist in the office told me that Sgt. Reynolds, the sergeant of the coroner's office came into her office the preceding week to tell her that she was requesting for too many medical records on her cases. I cannot understand how someone who is not even a medically trained professional can be evaluating a physician and telling a physician how she should be doing her job. The standard of practice actually is that a forensic pathologist must review the medical records of every case he or she does.

While I worked in the morgue on Wednesday, June 14, 2017, with the autopsy assistants, grossing tissues of the autopsies I did [cutting tissues for histological and microscopic analysis], I noticed the Coroner Lieutenant [Lt. Farnsworth] and the Coroner Sergeant [Sgt. Reynolds] showing and walking another individual around the morgue. I minded my business because I am frequently not informed of most things going on in the office. As the Sheriff reminds me frequently, he is the elected Sheriff-Coroner, and I am nothing but one of his employees. However, when the three men walked into the morgue I noticed that the third man was Lt. Brian Barnes whom I knew to be a detective. I greeted them warmly and Lt. Barnes told me casually that he was replacing Lt. Farnsworth who was being reassigned to Latrobe Police Department. I was astounded. And the wheel continues to roll. I had thought that Lt. Farnsworth, who has been at the coroner's office for some years, had finally turned around the corner after having made several big mistakes, was beginning to fully grasp the fundamental medical principles of death investigation, and BAAM!; he is being moved to another assignment.

MEMORANDUM OF EVENTS

WE ARE WASTING SO MUCH MONEY AND TANGIBLE AND INTANGIBLE RESOURCES AND
EXPENSES AT THE CORONER'S OFFICE DOING WHAT WE SHOULD NOT BE DOING

July 2, 2017, 5:24 A.M.

Case #A17-1471

A partially decomposed body was brought into the coroner's office on June 29, 2017. I was not
informed of the body until June 30, 2017 when I came to work. The body was not identified
because she was decomposed. I requested for a whole body digital CT scan as the standard of
practice requires. The CT scan disk was not presented to the morgue until July 1, 2017 when I
came to work on Saturday morning. By Saturday morning, two days later, the body was not yet
identified. The name on her wrist band and on her coroner's report was still "Jane Doe 177". I
asked why two days later the body has not been identified with a tentative identification. No
reason was provided to me. It turns out that, like it always happens in the office, somebody
decided at whim to do whatever he or she felt like doing with this body, ignoring the standards
of practice of medicine and the generally accepted principles of medicine. It was my
understanding that it was decided at whim by the Sheriff that everybody that showed any
significant decomposition would be treated as an unknown identity in the coroner's office. I
was not consulted on this policy. This baffled me. This was way outside the standards of
practice of medicine. There is a medical concept we call "Contextual Identification". This
concept recognizes that medicine is not an absolute science and you cannot always rely on
absolute answers in medicine. Once sufficient information was available for reasonable
derivative analysis, a diagnosis or decision can be provided or made with a reasonable degree
of certainty, and not an absolute degree of certainty. Therefore, if neighbors, friends or families
of a person report the person to be missing, and the person is eventually found deceased in his
or her home, and the deceased body satisfies basic anthropometric features of the missing
person, found in his or her own home, there is sufficient information to make a tentative
positive identification of the body and move forward with the forensic management of the case
in an effective, efficient and expedient manner avoiding any unwarranted delays, expensive
testing and analyses and other unnecessary post-mortem handling of the body, which result in
increased financial costs, increased tangible and intangible human resource costs and other
costs per body, which eventually accumulate to very high cost levels for tens and hundreds of
bodies in one year.

So for this case, the body was held on for many days, and I believe it will be held on for at least one week in the morgue. On Monday morning, July 3rd, four days after the body was brought into the morgue, I checked on the case again and the body was still in the morgue, it had not been identified. When I examined the body on July 1, 2017, the body was not actually markedly decomposed. The body was still sufficiently intact for identification purposes. As a physician and forensic pathologist, this body should have been identified the day it was found at home, lying in a bed or sofa. The medical records of the person should have been requested immediately for my review the same day before I examined the body. But four days later the body was not yet identified, the medical records had not been requested and the body had not been released to the family. And the costs and expenses are piling up, unnecessarily. To make matters worse, when I examined the body on July 1, 2017, the liver showed micronodular cirrhosis, which means this woman had a medical history and a certain life style, which should and could have been confirmed right there at the scene. This body could have been identified, examined and released to the family the same day at minimal added cost to the office. Now four days later, we are still holding unto the body, it has not been identified and is adding onto the case load and work load and expense of the office.

To make matters even worse, when I read the coroner's report, I was not only dumbfounded, I became angry and extremely frustrated. The coroner's report was extremely skeletal and lacked the vital information especially the vital medical information we needed on cases like this one. In fact, the report made misrepresentations like "There is no hospital care records". This case is a sentinel case that reflects what goes on in the office on routine basis. I simply do not have the time to be documenting each and everyone of them.

This did not even end here. On Monday July 3rd, at about 12 noon, Deputy Daniel Victoria from the coroner's office called me about this case, and said that they wanted me to cut out the right and left hands so they can send them to the Department of Justice for fingerprinting. I asked him why. He said that we needed to identify the body. I told him that I did not feel comfortable doing that because it fell under unnecessary mutilation of the body, which was unethical, and was grossly outside the standards of practice of autopsy pathology, and that we had sufficient contextual information we needed to identify the body. He was very upset and frustrated on the phone, and raised his voice at me. I told him clearly that as a physician I could not do something that was unethical and outside the standards of practice. I informed him that there was nothing I could do about it, that I had actually spoken to four different forensic pathologists across the country and confirmed what the standards of practice were. I further told him that I was not telling them not to cut out the hands at their wish, but that I did not want to be part of it. Another instance of unnecessary wastage of county resources and money on practices and

tests that are neither necessary nor needed. Meanwhile the body is in the morgue and continues to decompose.

On Wednesday, July 5, 2017 at about 4:30 P.M. and the end of the day, after performing about five autopsies including two homicides, I was walking to my car when Alejandra Gamboa and Kathryn Moreno, two of the autopsy room assistants ran out to me to ask me if I was going to take out the hands on this case, that Deputy Daniel Victoria had stated in the case file, that although Dr. Omalu did not want to cut out the hands on this case, that it will still be done. I told them that although it was illegal, that I did not want to be involved with it since it was mutilation of the body, and actually by law, that autopsy technicians should not be performing any dissection of the human body without a physician being present and supervising them, but hey, as long as I am not involved, I did not know what they were doing. A body being kept for unjustifiable long periods in the morgue and wasting tangible and intangible expenses including laboratory costs and human resource and time costs. Simply unbelievable. No accountability whatsoever.

The last time I checked on this body on July 10, 2017, this body was still in the morgue, decomposing.

12

MEMORANDUM OF EVENTS

**PHYSICIANS HAVE NO SAY ON THE SCHEDULING OF AUTOPSY ASSISTANTS WHO ASSIST THEM, AND ON HOW THE AUTOPSY SERVICE IS COVERED AND ADMINISTERED**

June 14, 2017, 3:10 A.M.

Case #A17-1312, A17-1313, A17-1314, A17-1320

On Monday, June 12, 2017 I called the autopsy room at about 9:33 A.M. on my way to work and Kathryn Moreno, the autopsy room assistant, told me she was the only one on duty and was being assisted by an intern called Renae. We have three autopsy room assistants, and every Saturday and Monday, there is frequently only one scheduled to work. I have sent an e-mail to the coroner sergeant and lieutenant asking that they make sure that there are always two autopsy assistants scheduled to work everyday because of safety and medical reasons. It is not safe for an autopsy assistant to move and lift bodies without assistance. When there is only one autopsy assistant, the pathologist is compelled to assist in moving and lifting bodies, and could get injured. The pathologist is not meant to move and lift bodies, it is not a prescribed duty of the pathologist. Additionally, having only one female autopsy assistant with a male pathologist could result in 'inappropriate' events and accusations, which have happened in the past with Michelle Hernandez and another pathologist, Dr. Chittenden. Nothing was done, and no actions were taken to make sure that two autopsy assistants work everyday. What the pathologist suggests in the office is second rate in spite of the pathologist being the expert. Working with only one autopsy assistant actually delays the pace of autopsies and increases the amount of time spent on each autopsy and increases the cost of operations at the coroner's office. Because Kathryn worked by herself that day, Renae, had to assist us during a homicide because Kathryn could not keep up with the work and case load. Renae should not have been present during a homicide, but she needed to assist Kathryn because she was becoming overwhelmed. It was better for Renae to assist us, than for us to make mistakes during the autopsy for example placing the wrong specimen type in the wrong specimen bottle.

When I asked Ms. Moreno how many cases we had, she said that at 9:30 A.M. only three cases had been typed and transcribed and were ready for the pathologist. There were a total of 6 cases. This totally goes against the standards of practice of forensic pathology. All the death investigation reports of the office in the morning should be typed and ready for the pathologist before 8:00 A.M. when the autopsy assistants arrive. This way the cases can be expeditiously

4.3

managed, autopsies are performed in a timely manner, the test kits and bottles for the laboratory tests needed for each case will be secured and prepared in a timely manner to reduce costs. But this is not the standard in the office. In fact when I joined the office in 2007 case reports were typed and ready by 8:00 A.M. when I came to work. However, as the years rolled by the standards of practice deteriorated and sometimes I come to work at 11 A.M. and no report may be ready for me to review and perform an autopsy. Therefore, bodies are held longer than they should be held in the coroner's office and the costs increased tremendously, both tangible and intangible costs, and sometimes the costs are passed onto the community and family members. The longer the post-mortem interval, the less accurate and precise autopsy findings may be.

Take for instance another case, Case #A17-1320, a 16 year old girl who died at home and was discovered in her bedroom by her father early in the morning on June 12, 2017 at about 5:54 A.M. She had been admitted into the hospital several days prior and was discharged home. She was witnessed to have exhibited a seizure-like episode at home. The case was brought into the coroner's office on June 12, 2017, and I was never made aware of it, in spite of being the pathologist on duty. For every hour we waste after her death, the less likely we would be to accurately determine her cause of death. The longer we wait the more difficult the autopsy would be and the more tests we will need to perform. The longer the post-mortem interval, the greater the post-mortem re-distribution of drugs. The longer the post-mortem interval the greater the re-distribution of gut bacteria into her blood stream, and the greater the tissue autolysis. The longer the post-mortem interval the greater the proteomic re-distribution precluding us from accurately determining protein and peptide levels in the blood to determine, for example, if she suffered a hypersensitivity reaction or a hypertroponinemia and other protein disorders.

I came to work at about 10:00 A.M. on Monday June 12, 2017 and one of the cases that day was A17-1312, a man who had been pushed by another person at a bar. He suffered severe traumatic brain injury, spent two days at the hospital and died two days later on Friday, June 10, 2017. Dr. Parson was on duty on Saturday June 11, 2017 but she was never told about the case and was never made aware of the case. It turned out that the coroner lieutenant, a police officer, decided that the autopsy should not be done on Saturday, because a detective from the Sheriff's department did not want to attend the autopsy on Saturday and did not want the autopsy to be done on Saturday. In fact, the coroner sergeant had called Dr. Parson and told him that we only had one case for Saturday, which was a motor vehicle crash victim and there was no coroner deputy available to assist her that day. The case, A17-1313, was also not done on Saturday.

There is no justifiable reason whatsoever why an autopsy of a homicide should be delayed by three days because a detective simply did not want or could not attend the autopsy. But his happens frequently and the Sheriff continues to allow it. In fact he told me once at my face, that he was the elected coroner and there was nothing I could do about how he runs his office. He is the one who decides when an autopsy is done or not done.

Delaying that autopsy at the whim of a detective undermined the quality and accuracy of the autopsy. It made the autopsy more difficult for me. This was a man who had suffered severe traumatic brain injury, underwent surgery, suffered diffuse congestive grain swelling and cerebral edema, cerebral herniation and diffuse axonal, vascular and membrane injuries of his brain. The brain was already very friable before his death. Delaying the autopsy for three days further autolyzed and pulpified his brain so much that at autopsy his brain was semifluid. In spite of my expertise in brain pathology, it was such a difficult autopsy for me. Instead of examining the brain during the autopsy, I had to save the brain and fix it in formalin for at least one month so that it could harden sufficiently for me to examine the brain. But the quality and accuracy of the findings cannot compare to findings if the autopsy had been done within 24 hours. The guiding medical standard is that such an autopsy should have been done within 24 hours of death, but medical standards are not the paramount standards at the coroner's office. This delay did not only undermine the quality and accuracy of the autopsy findings, it also increased the cost of the autopsy by at least several thousand dollars. The market rate and cost for examining a brain fixed in formalin is about $5000.

MEMORANDUM OF EVENTS

MEDICAL STANDARDS ARE NOT ADHERED TO, AND PHYSICIANS ARE CONTROLLED AND INFLUENCED ON HOW THEY DO THEIR WORK AND MANAGE THEIR CASES

June 14, 2017, 2:48 A.M.

Case #A17-1312

I came to work at about 10:00 A.M. on Monday June 12, 2017 and one of the cases that day was A17-1312, a man who had been pushed by another person at a bar. He suffered severe traumatic brain injury, spent several days at the hospital and died several days later on Friday, June 10, 2017. Dr. Parson was on duty on Saturday June 11, 2017 but she was never told about the case and was never made aware of the case. It turned out that the coroner lieutenant, decided that the autopsy should not be done on Saturday, because a detective from the Sheriff's department did not want to attend the autopsy on Saturday and did not want the autopsy to be done on Saturday. In fact, the coroner sergeant had called Dr. Parson and told her that we only had one case for Saturday, which was a motor vehicle crash victim and there was no coroner deputy available to assist her that day. The case, A17-1313, was also not done on Saturday.

There is no justifiable reason whatsoever why an autopsy of a homicide should be delayed by three days because a detective simply did not want to attend the autopsy. This happens frequently. Delaying that autopsy at the whim of a detective undermined the quality and accuracy of the autopsy. It made the autopsy more difficult for me. This was a man who had suffered severe traumatic brain injury, underwent surgery, suffered diffuse congestive brain swelling and cerebral edema, cerebral herniation and diffuse axonal, vascular and membrane injuries of his brain. The brain was already very friable before his death. Delaying the autopsy for three days further autolyzed and pulpified his brain so much that at autopsy his brain was semifluid. In spite of my expertise in brain pathology, it was such a difficult autopsy for me. Instead of examining the brain during the autopsy, I had to save the brain and fix it in formalin for at least one month so that it could harden sufficiently for me to examine the brain. But the quality and accuracy of the findings cannot compare to findings if the autopsy had been done within 24 hours of death. The guiding medical standard is that such an autopsy should have been done within 24 hours of death, but medical standards are not the paramount standards at the coroner's office. This delay did not only undermine the quality and accuracy of the autopsy

findings, it also increased the cost of the autopsy by at least several thousand dollars. The market rate and cost for examining a brain fixed in formalin is about $5000. So the cost of this autopsy was increased by $5000 simply because a detective did not want an autopsy to be performed on a Saturday.

MEMORANDUM OF EVENTS

INCREASING TANGIBLE AND INTANGIBLE COST BURDENS OF THE OFFICE, GROSS INEFFICIENCY AND DELAY IN COMPLETION OF CASES

July 11, 2017, 4:20 A.M.

CASES #A17-0395, A17-1433

The coroner's office provides medical services to the community and not law enforcement services. These medical services should be provided within the stipulations of the generally accepted medical standards and principles, and standards of practice. When these standards of practice are not applied there will always be deleterious consequences like delay of the completion of cases. Cases are grossly delayed at the San Joaquin County Coroner's Office. Priority is not given to the coroner services at the office because these services are outside law enforcement services and are routinely relegated.

Take for example, case #A17-1433, an 87-year-old African-American man whose body was brought into the office on June 26, 2017. He had a long medical history and was found dead in bed. Nothing was done about this body until July 10, 2017 when the family called and requested for the body of their loved family member. The autopsy technicians in the morgue did not know why the body was still there. The coroner's office did not adhere to the standards of medical practice to call the treating physician or primary care physician to sign the case out. The autopsy technicians believed the case had been signed out by the treating physician. So this body had been in the coroner's office for two weeks!! Obviously the body had decomposed extensively in two weeks. And yet nothing was done whatsoever. None of the pathologists in the office was informed of the body being in the morgue. The pathologists are not part of the administration of the office, and are never informed on daily basis what bodies we have or not have. The pathologists only know what they are told because as the Sheriff always says, he is the coroner and is in charge. So the pathologists are intentionally kept out of the administration of cases in the office. As of July 11, 2017 I was not informed of this body. I learnt about the body when an autopsy technician, Etta Johnson, came to me to ask me if I had done an autopsy on the case and forgot to complete the causation sheet. I told her no, that I was not aware of the body. This is just one example of many cases and bodies that are treated this way. Many months ago, when a wrong body was released to a funeral home, I had advised Sergeant Reynolds and Lieutenant Farnsworth at the coroner's office about purchasing the software and

hardware [information technology system] for managing bodies in an autopsy suite so that bodies are adequately managed and accounted for. However, because the forensic pathologist has no authority in the office they ignored my advice. In this day and age, in the 21st century, there is no justifiable reason why we should not have an information technology system in the morgue that manages the inflow and outflow of bodies in the morgue.

Another case is A17-0395. It was a case of a 55-year-old African-American male whose neck had been incised by another person and killed. I performed the autopsy, completed and signed my autopsy report on May 9, 2017. The Assistant District Attorney who was prosecuting the case, Angela Hayes, did not receive a copy of the coroner's report until July 10, 2017. So it took the coroner sergeant two months to close the case after the forensic pathologist had completed and signed the autopsy report. Because this report was not received by the assistant district attorney she sent a subpoena to me to testify in the preliminary hearing. Barbara Hafley, the coroner secretarial staff, spent time at the office to prepare a testimony file for me including burning autopsy pictures on a disk, provided me with the file, and I spent time reading and studying the case to prepare for testimony the next day, only to realize early in the morning that the defense attorney stipulated to my autopsy report and I was no longer needed. If the assistant district attorney and defense attorney had received my autopsy report in a more timely manner, I would never have received any subpoena and we would not have spent precious and valuable time working on the case preparing for testimony. This wastage of time, on case by case bases, add up over time, and over the years and increase both tangible and intangible costs in the office.

On July 11, 2017, when I went to work, I followed up on case A17-1433 with the autopsy technician, Etta Johnson, and she confirmed that the physician on the case was not contacted to sign out the death certificate, and the funeral home was not contacted to be informed that this was a physician sign out, so the body was in the morgue for two weeks, the family waited for two weeks, and nothing whatsoever was done about this body until the funeral home called enquiring about the body.

49

MEMORANDUM OF EVENTS

**Sergeant Acting on Behalf of the Sheriff is Reviewing Medical Records to Offer Medical Opinions**

August 2, 2017, 4:30 A.M., Miami International Airport Hotel

On August 1, 2017 while I was packing our luggage in our hotel rooms in the Coconut Bay Resort, St. Lucia, with my wife and children hurrying to check out of the rooms by 1:00 P.M. and go to the airport to catch our flight back home, first to Miami, and then San Francisco, my wife informed me that I had a text on my phone and it was from Sgt. Reynolds [see attached]. The text came in at 11:45 A.M.

I read the text hurriedly, it was a very confrontational text, throwing a false accusation at me, questioning my professional judgment as a physician and claiming that he Sgt. Reynolds, a police office, without any medical education whatsoever reviewed medical records on a case, and based on that he was questioning me. In the first place, he should not be reviewing medical records and be making professional physician judgments on these medical records according to State Law because he is not a licensed physician.

The truth of the fact is that a deputy district attorney, Kristine Reed, who is also a good personal friend of mine called me the preceding day several times. I noticed she called me and returned her call as I would return a call of every good friend of mine. She was not aware that I was on vacation. I informed her that I was in St. Lucia. She apologized for calling me but still told me that there was a child abuse case that she would be prosecuting and that she did not want the organs to be harvested and donated for transplantation purposes. I asked her to contact the coroner's office and the family, that she can speak to the family and have them withdraw the consent for the organ donation. She thanked me, apologized again for calling me and said she will follow up on that. That was the last time I heard back from DDA Reed.

## MEMORANDUM OF EVENTS

### SUBSTANDARD PRACTISE OF MEDICINE AND DELETERIOUS OUTCOMES

<u>August 30, 2017, 4:53 A.M.</u>

I performed an autopsy on a 61 year old man [A17-0873] on April 13, 2017. He had died suddenly at home and had a long medical history including a neck injury and cancer. At the end of the autopsy I requested for the medical records to be obtained for me. I completed the case and waited and waited and waited for the medical records to be obtained for me. On August 20, 2017, I got tired of waiting and had to sign out the case. There was nothing else I could do because of the most intimidating and harassing environment in the Sheriff's department where the Sheriff has ordered us not to come to him and not to complain and if we needed anything to go to the Sergeant. He has ordered us not to contact other physicians or hospitals directly to obtain medical records, that we must go through the Sergeant and other Sheriff deputies who work in the coroner's office.

There are two things here, I am now practicing medicine beneath the set standards of practice. There is no way I should sign out this autopsy report without reviewing the medical records especially on a case like this with a long medical history. But I did not want to make the family wait and cause the family more distress for losing a loved one, so I had to complete and sign the autopsy report. I can get away with this on this case, but there will be a case where I may get the cause of death wrong because I failed to review the medical records. This is simply unacceptable especially in 21st century State of California. The waiting for medical records also delayed the completion of this case, and this is just one of many. I am now choosing the cases I can document because I do not have the time to document all the cases that are going wrong. I feel so helpless.

MEMORANDUM OF EVENTS

FLIPPANT WASTE OF MONEY AND EXTREMELY PAINFUL MEDICAL INCOMPETENCE

June 28, 2017, 5:05 A.M.

Case #A17-1398, 1407, 1415, 1418, 1419, 1420, 1421, 1422, 1423

I reported to work on Monday June 26, 2017 at about 9:30 A.M. and there were NINE BODIES in the morgue for me to evaluate and perform autopsies on. Out of the nine bodies, honestly speaking, only two bodies should have been there that morning for me to do. Only two bodies. The seven additional bodies that were there were strictly medical cases that a physician should have signed out; the bodies should not have been brought into the morgue, families should never have been charged any fees for body storage and transportation. So, for the additional seven bodies, money, manpower hours and time have been wasted on each body, and just for one day this would add up to over $10,000 in waste. Once these bodies have been brought into the morgue, and presented to the forensic pathologist, the forensic pathologist would have to spend time to evaluate them and apply the standards of medicine and will be compelled most times to at least do external examinations or partial autopsies with toxicologic analyses, which may have been avoided, further increasing the cost to the tax payers. As a physician I find this extremely frustrating. So rather than spending my time and focusing on true forensic cases, I am spending time and wasting money reviewing cases that should never have come into the office. This delays and extends the turn around times for me to complete autopsy reports.

The bodies were the following:

1. A17-1398: a 78 year old person, a known diabetic and double amputee, died at home.
2. A17-1407: a 54 year old man with hepatitis C who had been sick for 4 weeks at home, died at home.
3. A17-1415: a 73 year old man with a lung disease who was coughing out blood, died at home.
4. A17-1418: a 57 year old man with HIV infection and hypertension, found dead at home.
5. A17-1419: a 75 year old woman who had been sick for 6 months, abused alcohol, found dead at home.
6. A17-1420: a 45 year old man with end-stage cirrhosis of the liver, died at home.

7. A17-1421: an 81 year old woman with hypertension and diabetes mellitus, found dead at home.
8. A17-1422: a 37 year old man, chronic alcoholic with end-stage liver disease, who police officers mis-diagnosed at the scene as a possible homicide!
9. A17-1423: a 74 year old man who was hit by a truck on the freeway.


By 10:00 A.M. this day, there was no single medical record on all these cases. The only bodies that should be in the morgue this morning would be cases #8 and #9. I cannot imagine that an individual with TUBERCULOSIS coughing out blood and another individual with HIV infection were brought to the morgue and no physician or medical record was sought. And guess what, I was compelled to open up the chest of the patient with Tuberculosis before I discovered that he had Tuberculosis, and avoidably exposed the staff to tuberculosis infection. If we had the medical records, I would not have opened him up, because I would have discovered that he had Tuberculosis.


Case #8 had been interpreted at the scene to be a possible homicide. A detective and an evidence technician from the City of Stockton Police Department attended the autopsy because they believed it was a homicide. The young man was an alcoholic with end-stage liver disease. There was nothing about the case that would make a suspected homicide. Sun burns on his skin were wrongly interpreted as contusions and abrasions, yet the forensic pathologist's opinion on the case was never sought at the scene because the Sheriff does not like the forensic pathologists going to the scene.

MEMORANDUM OF EVENTS

**THE CORONER'S OFFICE AND DEATH INVESTIGATION SERVICES ARE NOT RECEIVING ADEQUATE ATTENTION, RESOURCES AND PRIORITY**

July 6, 2017, 7:52 A.M.

Cases #A17-1479 and 1482

I reported to the county morgue on July 5, 2017 at approximately 10:00 A.M. and only one coroner report for all the cases on that day had been typed. At 10:00 A.M.!! By the standards of practice of medicine, the coroner reports for the cases to be done that day should be typed during the night or very early in the morning, and all reports should be ready before the autopsy technicians arrive to work in order to begin the case evaluations and prepare for the materials, specimen containers, specimens and laboratory analyses that may be performed on all cases. The autopsy technicians should be ready to begin work on all cases before the pathologist arrives. There are certain cases that may require some specialized handling, which would be prepared, and there may be cases that require further research and additional reading by the pathologist. This was how it used to be at this office when I began in 2007 and  for some reason by 2010 this was changed at whim against every standard of care and practice of medicine and pathology. I was not involved whatsoever with this decision-making process, just like I am rarely involved with any decision making process in the office, although I am the pathologist in the office.

To even make matters worse, there were two additional cases that day:

1. A17-1479, a 71 year old man who had committed suicide and was brought to the office on Saturday July 1, 2017. The body had been in the office for four days [for this case, I had to perform the autopsy without any coroner report- see attached].
2. A17-1482, a 44 year old man who had died of an acute myocardial infarction who was also brought into the office on July 1, 2017 and had been in the office for four days [for this case, the coroner report was presented to me while I was preparing to do the autopsy. Dr. Parson confirmed that on July 3, 2017 when she performed autopsies the coroner report was not ready. That day out of nine bodies, she was able to review only one case and perform only one autopsy because the coroner reports were not ready, so she wasted the entire day just hanging around the office- see attached].

Coroner services in a big county like ours with a population of over 750,000 should be a 24/7 operation. The coroner reports of these two cases had not been typed as of 10:00 A.M. July 5, 2017!! Four days later! There is no justifiable reason whatsoever for this to happen. The only reason is negligent incompetence. Since I joined the office in 2007 I have seen services deteriorate progressively.

These two cases this day are sentinel cases which highlight a trend. At the office, autopsy technicians are rarely allowed to work overtime even when our case load is very heavy. When autopsy technicians ask for overtime pay to stay later than 5:00 P.M. and sometimes come in on weekends to expedite the management of autopsy cases, they are routinely denied and told that they cannot waste money.

For these two cases, I actually shed a tear. Why should a family be compelled to wait for five days to receive back the body of their loved one? A forensic pathologist cannot perform an autopsy without a description and documentation of the circumstances surrounding the death. This is the standard of practice that must be adhered to.

MEMORANDUM OF EVENTS

**The Sheriff Does not Understand the Basic Concepts of Generally Accepted Principles of Medicine and Standards of Practice**

July 4, 2017, 5:30 P.M.

A coroner's office is a medical office that investigates and determines the causes, mechanisms and manners of death based on generally accepted principles, common knowledge and standards of practice of medicine as a science. It is not a law enforcement office. However, as the California Law states, in instances where the coroner's office is consolidated with a sheriff's department, the coroner's office must be run separately and not like a law enforcement office.

It has taken us ten years to hire a young and competent and qualified board-certified forensic pathologist. She is a young woman, Dr. Parson, who trained in Baltimore, and actually joined our office because she wanted to work with me and learn from me. If I had not been in this county, she would not have joined us. Since she joined us I have supervised her based on the generally accepted principles of the practice of medicine and the traditions of medical practice across the world. One of those traditions is to support and mentor younger physicians to become the great physicians of tomorrow. So I have closely mentored her and monitored her progress since this is her very first year outside her training as a forensic pathologist, and this is the very first time she is working as an attending forensic pathologist. After six months of being in the office I recognized that she was becoming overwhelmed and her cases were taking about six months to be completed. We had to work on her speed, efficiency and level of confidence. She was doing extremely well but all she needed was some guidance and some time. I decided to schedule her less at autopsies and cover more days myself performing more autopsies. In fact, the workload I assigned myself was about two to three times the workload I assigned her. I am much more experienced than her, and I am more efficient and effective.

In July 2017, I was to take a two week family summer vacation with my family to travel to St. Lucia in the Caribbean. I asked Dr. Parson if she could cover two weeks on the schedule while I was away and perform autopsies everyday for two weeks. She told me that she could not, that she would become overwhelmed. I said okay, that I would schedule the part-time and back-up doctors, Dr. Lawrence and Dr. Josselson for four days of those two weeks. I do not want the poor woman to become more overwhelmed and then she would leave our office, and then we would be back to the predicament we were in. San Joaquin County Coroner's Office is a very

busy office and the cases in this county can be complicated and sophisticated. Good forensic pathologists like her are highly sought after, and in fact I am aware of another county that may be interested in her, and even offer her more money than she is making in San Joaquin County.

I put together the July 2017 schedule [see attached], and sent to the coroner sergeant, Mike Reynolds. This was the e-mail he sent to me [see attached]. The e-mail speaks for itself. Extremely unprofessional and arrogant. I simply could not understand the reasoning behind this e-mail. But all I can perceive is that this is a police officer who is treating we physicians as fellow police officers and totally incognizant and ignorant of the standards of medical practice. Everything about this e-mail goes against the Hippocratic Oath, the oath every physician swears to and adheres to. I did another schedule [see attached]. I did not even respond to the e-mail because it was not worth responding to. Apparently the Sheriff did not care of these medical standards and simply ordered us not to use any back-up pathologist, even when we need them. He, the Sheriff, is the only person who will decide when and if we would use back-up pathologists, because, according to him, he was the elected coroner in charge.

There is a prevailing medical standard of practice that a forensic pathologist should not do a certain number of autopsies every year. Once this number is surpassed, the probability of errors and mistakes increase exponentially, and the physician also possesses a much higher risk of burn-out and psychological issues including depression, drug and alcohol abuse. So we were ordered that only the two of us will cover the case load of the office, including the examination of brains without any assistance whatsoever. This is simply not feasible. San Joaquin County has a very heavy and complex case load, which can only be covered by 3-4 pathologists. I would have left the county a while back, and even Dr. Parson was beginning to express her intention to leave. But if I leave or she leaves who is going to effectively serve the people of the county and enhance death investigation in the county when we leave? I convinced her to stay, that change does not come easy and change takes time to come. We only have to be patient and do our very best. Our commitment is to the good people of the county, and we must serve the people of the county with all we have got. But it is not easy. Good things are not easy to come by. Let us remain hopeful and patient and enduring.

57

ONLINE REPORTS OF DR.OMALUS ALLEGATIONS

CITING ILLEGAL CHANGING OF FINDINGS "COVER UP"

CO EXPERT ASSERTING OTHER PRIOR CASES POSSIBLY CORRUPT.

# Exhibit 2 P

# Recordnet.com
News worth sharing *online*

# Doctors' allegations rock Sheriff's Office

**By Michael Fitzgerald**
**Record columnist**
Posted Dec 4, 2017 at 3:54 PM
Updated Dec 4, 2017 at 7:33 PM

People, including cops, may be getting away with murder in San Joaquin County, owing to Sheriff Steve Moore's interfering in forensic autopsies, say bombshell allegations released Monday.

In 113 pages of detailed memoranda, San Joaquin's chief medical examiner Dr. Bennet Omalu and forensic pathologist Dr. Susan Parson say Moore won't let them do their job.

"The Sheriff does whatever he feels like doing as the coroner, in total disregard of bioethics and standards of practice of medicine ..." wrote Omalu.

Moore categorically denied all allegations.

"Let me make it very clear: I'm the Coroner," said Moore. "I have done nothing but ruled on what I believe the official manner of death should be."

The allegations date to May, when both Omalu — best known as the doctor who identified the disease behind the NFL's brain injury problem, subject of the movie "Concussion" — and Parson began documenting what they allege are instances of Moore's mismanagement and medically unethical interference.

The memos broaden allegations first made last week by Parson upon announcing her resignation.

Omalu chronicles several instances in which Moore allegedly changed his findings to cover for officers.

He cites an Aug. 21 case in which a man died from traumatic brain and spinal cord injury suffered during police arrest. When Omalu ruled it a homicide, he alleges, a sergeant called him in.

"He said that the Sheriff wanted to change the manner of death to an accident since it was an officer-involved death," Omalu wrote. "I was shocked."

Not so, said Moore. "No one has countermanded anyone's medical position. No one has countermanded any doctor's findings."

However, Moore said, he has had to restrain Omalu from overstepping his authority.

The forensic pathologist's job is to determine the medical *cause* of death, Moore said. But the government code authorizes the Sheriff/Coroner to determine the manner of death, be it natural, accident, suicide, homicide or "undetermined."

The Sheriff must make the call based on "the totality of the circumstances," of which the forensic pathologist's report is just one part, Moore said.

Every officer-involved death is reviewed in a multi-agency protocol investigation, Moore said.

"If somebody's getting away with murder I don't see how," Moore said. "The investigations are totally conducted outside Coroner's Office."

The doctors also allege Moore wrongly stuck them at the bottom of the Sheriff's Office pecking order, so they are told what to do or even overruled by officers ignorant of medicine.

Parson details an Aug. 1 drowning. A husband reported finding his wife floating in the pool. Suspicious circumstances clouded the case. The couple had been fighting over his infidelity. He reportedly warned the wife he'd kill her if she tried to take his money. Days before her death, she withdrew money from their joint account.

Autopsy determined acute drug toxicity. The husband had an empty bottle of the fatal drug. She had shoulder injuries consistent with being held under.

But other interpretations were possible. Parson ruled the murky case "undetermined" pending more evidence. When she checked the case later, the cause had been changed to "accidental."

"This is now the second time (that I'm aware of) where the manner of death classification has been changed without consulting me," Parson wrote.

"It is entirely possible that there are additional cases," she added.

The duo's memos further allege the Sheriff's Office is rife with deputies so untrained for death scenes that key evidence is routinely omitted from the preliminary reports they send forensic pathologists.

Moore countered that deputies receive six months field training and a manual instructing them on death scene protocols.

The doctors' place in the hierarchy is necessary so superiors can coordinate the efficient flow of autopsies, Moore said.

The doctors argue medical necessity alone, as determined by them, must govern timing of autopsies so that decomposition does not spoil medical evidence.

Moore said many of the doctor's allegations are untrue. Of others he said he was unaware. The Sheriff said he has improved Coroner's office performance, for instance, by securing money for a new morgue.

"Overall," he said, "we have run the Coroner's Office in the manner I believe is most appropriate to how my responsibilities are."

Chuck Winn, Chair of the Board of Supervisors, said he had not seen the memoranda. But said Winn, "Nobody is above the law. I would expect no less than a complete and thorough investigation."

Moore's rival for Sheriff in 2018, Pat Withrow, faulted melding the offices of Sheriff and Coroner. At the least, the dual roles can create the impression of conflict, he said.

"I think it would just be better if the coroner's division was a separate division," Withrow said. "I just think it would be cleaner."

The District Attorney's office posted a comment on its Facebook page.

"The District Attorney's Office is in receipt of information relating to the allegations made by our San Joaquin County forensic pathologists," it reads in part. "This office is in the process of gathering information concerning homicide cases, including deaths relating to law enforcement officer involvement."

*Contact columnist Michael Fitzgerald at (209) 546-8270 or* _____.

*Follow him at recordnet.com/fitzgeraldblog and on Twitter* _____.

---

 **SIGN UP FOR DAILY E-MAIL**
Wake up to the day's top news, delivered to your inbox

**MOST POPULAR STORIES**

3/4



http://www.recordnet.com/news/20171204/doctors-allegations-rock-sheriffs-office

u/u

HISTORY OF GOVERNMENT MISCONDUCT..

DR.BENNET OMALU CHIEF MEDICAL EXAMINERS...

IMPLICATES SAN JOAQUIN COUNTY STOCKTON DISTRICT ATTORNEY

CALIFORNIA HIGHWAY PATROL AND SAN JOAQUIN COUNTY SHERIFFS IN

WITH HOLDING CRITICAL INFORMATION AND MISLEADING HIM ...AND

PRESSED HIM TO DETERMINE CAUSE OF DEATH ON FALSE INFO....


THE CONDUCT OF THE DISTRICT ATTORNEY OFFICE AND CHP AND THE HIDING

OF CRITICAL INFO   WAS WELL WITHIN   THE CASE OF SERRATOS...


# EXHIBIT P

(3 PAGES)

Case 2:18-cv-00077-MCE-KJN   Document 25   Filed 07/26/18   Page 82 of 94

# Recordnet.com
News worth sharing *online*

---

## Questions linger in '08 death

**By Jason Anderson**
Posted Feb 27, 2014 at 12:01 AM

STOCKTON - San Joaquin County's chief medical examiner said in a sworn deposition that investigators misled him, withheld critical information and pressed him to determine a cause of death in a case involving a man who died after being tased by a California Highway Patrol officer.

STOCKTON - San Joaquin County's chief medical examiner said in a sworn deposition that investigators misled him, withheld critical information and pressed him to determine a cause of death in a case involving a man who died after being tased by a California Highway Patrol officer.

Dr. Bennet Omalu conducted an autopsy on Daniel Lee Humphreys, who died July 26, 2008. Humphreys was tased by Officer Roberto Iniguez when he attempted to flee on foot after leading CHP officers on a high-speed pursuit that ended when he crashed his motorcycle on Interstate 5.

"There's a story behind this case," Omalu said in a sworn deposition dated Feb. 7. "When I did the autopsy, the entirety of the story was not revealed to me. ... At the time of the autopsy, what I was told was he was tased only twice."

About two years later, Omalu learned that Humphreys had been tased 31 times over a span of about 7 minutes and 30 seconds, according to the deposition.

"That changed the game for me," said Omalu, who subsequently amended the cause of death from mild traumatic brain injury caused by the motorcycle collision to "repeated conducted electrical excitation."

Attorney Peter Williamson is representing Humphreys' daughters in a wrongful death lawsuit against the state of California and the California Highway Patrol. Williamson is seeking more than $1 million in damages. The case is set for trial April 14, but there is a settlement conference scheduled for Monday, Williamson said.

Williamson is accusing the CHP, the San Joaquin County Sheriff's Office and the San Joaquin County District Attorney's Office of engaging in a cover-up. Each of those agencies is involved in a standard multiagency protocol investigation into Humphreys' death, and all three were aware that Humphreys was tased more than twice before Omalu conducted the autopsy, Williamson said.

"I think all three are complicit in covering up the information and failing to disclose it to the medical examiner," Williamson said.

Williamson said the officer's actions were criminal, but the District Attorney's Office has yet to rule whether the use of force was justified. Robert Himelblau, a spokesman for the District Attorney's Office, said the report has not been completed because of pending litigation and a staff shortage in the District Attorney's Office.

"I don't think this is a murder, but it's probably manslaughter," Williamson said. "One of our theories - and I want to stress that this is a theory - is that they don't want to charge the officer with a crime and they're waiting for the statute of limitations to run out before they issue a report."

Williamson said he doesn't know when the statute of limitations will expire.

Melissa Humphreys, 24, said her father's death and the ongoing investigation have shaken her faith in law enforcement officers.

"It just hurts to know that you can't trust any of them anymore," she said. "If they're willing to cover up something as bad as this, what else would they do?"

The California Highway Patrol declined to comment, saying only that the matter is under review. The Sheriff's Office and the District Attorney's Office denied Williamson's allegations.


"Cover-up is a pretty strong term to use, and I wouldn't use that term lightly," Himelblau said. "In this particular case, (Omalu) was given a certain amount of information at the autopsy itself, and then at a later time he was given further information, which then had an impact on his report, so what was withheld from him?"

Omalu said he had not yet completed his autopsy when Detective Brian Barnes, a member of the Sheriff's Office who led the protocol investigation, visited him in his office.

"(Barnes) said, 'Oh, the case has been closed. They determined that tasing was not involved,' " Omalu said. "And I was troubled by that. I said to him ... 'How could you close a case without the autopsy report being completed?' "

Williamson said Iniguez stated that he tased Humphreys "a lot" in a recorded interview about five hours after the incident. The next evening, CHP investigators downloaded information showing how many times the Taser had been discharged, but that information was not given to Omalu, Williamson said.

"The number of times he was tased was very forensically significant," Omalu said. "And (Barnes) said, 'Well, they have determined that he was tased only twice.' I asked him, 'Could somebody give me a report?' It was never given to me. I kept on asking for the report. ... No report was given.

"To be honest with you, I did not have a cause of death. I didn't really have a reasonable cause of death. So I examined his brain. There was mild traumatic brain injury, so-called concussion, grade-one concussion. The blunt force trauma of his trunk and extremities were of no forensic significance. They were all superficial, ... but I couldn't call it an undetermined cause of death because we had trauma. Concussions can kill. Concussions are very well established to cause sudden, unexpected death. So I put that in as my cause of death in the original report."

Omalu said he changed the cause of death after receiving new information from Assistant District Attorney Tori Verber Salazar, "who may have suspected that some information (was) kept back from me."

"(Verber Salazar) reached out to me and asked me ... if I had been made aware of a report from Taser. And I said, 'No.' She said she thought as much."

Omalu amended Humphreys' death certificate in July 2010, about two months after he received the Taser report.

In his sworn deposition, Omalu opined that the manner of death was homicide, noting that homicide is defined as death as a result of the actions of another human being. But Sheriff Steve Moore, in his role as coroner, concluded that the manner of Humphreys' death was accidental, explaining Wednesday that Iniguez's intent was to gain compliance and not to kill.

Williamson said it's time for authorities to release their official findings, asserting that the District Attorney's Office, the Sheriff's Office and the CHP are committing "obstruction of justice.

"Those are harsh words, but I believe this was a crime," Williamson said. "Those officers had an obligation to disclose that information to Dr. Omalu, and they failed to do so."

Contact reporter Jason Anderson at (209) 546-8279 or **janderson@recordnet.com**. Follow him at recordnet.com/crimeblog or on Twitter **@Stockton911**.

**MOST POPULAR STORIES**

‹ Previous                    Next ›

SAN JOAQUIN COUNTY CHIEF MEDICAL EXAMINER FORENSIC PATHOLOGIST
RESIGNATION LETTER ASSERTING "MISCONDUCT" ON BEHALF OF SHERIFF
CORONER STEVE MOORE ET ..AL.. AS IN PRIOR CLAIMS ...THIS
DEMONSTRATES LACK OF INTEGRITY OF GOVERNMENT OFFICIALS.. IN
SAN JOAQUIN COUNTY,...

SUPPORTS AND MERITS AN EVIDENTIARY HEARING...

# EXHIBIT V



"The sheriff does whatever he feels like doing as the coroner, in total disregard of bioethics, standards of practice of medicine and the generally accepted principles of medicine," Omalu wrote in a memo dated Aug. 22.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

Omalu is a nationally recognized forensic pathologist best known for his work on concussion-related brain injuries sustained by many football players. He is also a volunteer associate clinical professor at the University of California, Davis. His work was turned into the 2015 film "Concussion," starring Will Smith as Omalu.

"The sheriff is interfering with the doctors' ability to do their job and he is trying to influence their decisions," said Patricia Hernandez, the union representative for both Omalu and Parson, who declined to be interviewed. "I would call it rogue mismanagement."

San Joaquin County Sheriff's office public information officer Dave Konecny did not return a call for comment. Moore posted a statement on Facebook on Nov. 28 that said he takes "my job extremely seriously."

"As Coroner, the law requires me to make the final determination in the manner of death of each case processed here at the Office," Moore wrote. "I want to make it clear that at no time did I attempt to control or influence (Parson's) professional judgment and conclusions."

Moore has served as the county sheriff since 2007. He will be up for re-election in November 2018.

Omalu alleges the sheriff on multiple occasions asked him to change his findings on the manner of death in officer-involved cases – including three officer-involved deaths in 2016.

"Before I began my documentation in May 2017, I had observed long before this that the sheriff was using his political office as the coroner to influence the death investigation of persons who die while in custody or during arrest by the police," Omalu wrote in the Aug. 22 memo. "I had thought that this was initially an anomaly, but now, especially beginning in 2016, it has become routine practice."

Omalu said the first time Moore asked him to change his finding in an officer-involved case was in 2008, when Omalu wrote that "information was intentionally withheld from me by the sheriff in order to mislead me from determining the case was a homicide."

Omalu ruled that death an accident, but revised his finding to homicide after receiving the additional information.

In 2016, Omalu said the sheriff again pressured him to change his finding in an officer-involved case, this one involving the death of Filberto Valencia, 26.

Valencia's family told media he was a schizophrenic having a mental episode. The family called police for help, but Valencia left the home and attempted to enter other nearby houses before eventually gaining access to a residential facility. There, he barricaded himself in a bathroom with a 10-year-old girl and three women, according to the family's attorney, Walter Walker.

**RELATED STORIES FROM THE SACRAMENTO BEE**

'Concussion' doctor Omalu receives top sports medicine award

12/6/2017    'Concussion' doctor quits San Joaquin County job; says sheriff interferes in death investigations | The Sacramento Bee

Case 2:18-cv-00077-MCE-KJN   Document 25   Filed 07/26/18   Page 87 of 94





UC Davis researchers: It doesn't take a concussion to cause long-term brain injury

Walker said a Stockton police officer hit Valencia over the head twice with the butt of a gun before repeatedly punching him. A second officer hit him with a baton, while a third officer shot him four times with a Taser, said Walker. Valencia became unresponsive and died.

Omalu found Valencia's death was due to blunt force trauma and ruled it a homicide – a medical finding meaning death at the hands of another human. The medical ruling of homicide is different from a legal ruling, but Omalu wrote that the sheriff wanted it changed.

"The sheriff called me into his office and told me that he wanted to make it an accident since officers were involved," wrote Omalu. "I told him that he may have died from the trauma he suffered in the first fight involving other citizens who were not police officers. ... He said that I should amend my report and state that he died from the civilians and not the police officers. I told him I could not do it, first it was unethical and wrong."

The Valencia family has filed a federal civil rights lawsuit in the case.

Then, on Aug. 21, Omalu alleged Moore came to him again, asking him to change his finding in a case that had happened about a year earlier, in 2016. Samuel Augustine, 57, died after what media described as a "violent fight" with officers. Augustine, a sex offender, had been attempting to light a fire near a bridge and was armed with a sledgehammer and machete, though he dropped them as officers approached, according to media reports.

Omalu found Augustine had died as a result of "traumatic brain and spinal cord injury during police arrest." Moore disputed that.

Omalu recalled that Moore told him in a meeting that "he did not see what the police did wrong in their arrest of the individual, and there was nothing in the medical records to support the autopsy findings," he wrote. "In his mind, he seems to believe that every officer involved death should be ruled an accident because police did not mean to kill anyone."

Parson and Omalu also allege that the sheriff's staff ordered the hands be cut off of at least five corpses this year to be sent to a forensics lab to identify the deceased. Omalu and Parson both said that in some instances, the victims' identity was already known and in others, police failed to attempt to identify the dead by investigative means.

"These individuals were found dead at their residences and were positively identified by either a neighbor or a family member," Omalu wrote in a May 25 memo. "In my opinion, taking out the hands of these cases, was a form of body mutilation, which we should not be doing."

Independent forensic pathologist Judy Melinek, who consults on legal cases from San Francisco, said removing the hands for identification was "bizarre" and confirmed it was not a standard practice.

"I have no idea why that would be medically necessary or forensically necessary," Melinek said. "You don't need to do this for identification purposes. You could just take fingerprints."

12/6/2017       'Concussion' doctor quits San Joaquin County job; says sheriff interferes in death investigations | The Sacramento Bee

Case 2:18-cv-00077-MCE-KJN   Document 25   Filed 07/26/18   Page 88 of 94

Omalu also charged that staff at the coroner's office, under the sheriff's control, often took months to do routine paperwork and at times failed to account for the bodies in the morgue. In dozens of instances, the two pathologists said sheriff's staff failed to provide even basic information about deceased people such as the circumstances and location where they were found, impeding the ability of the doctors to investigate.

Parson wrote that she was told she was requesting too many medical records on her patients.

Omalu and Parson said the delays meant families regularly had to wait weeks or even months to claim bodies, and that the corpses often decomposed before proper autopsies could be done – making it harder for the pathologists to determine the cause of death.

"This goes way outside and beneath the standards of practice of medicine in the State of California and across the world," Omalu wrote. "For every patient, autopsy or case, information, medical records, police reports and other professional reports must be ready for the physician to review."

Parson and Omalu allege the sheriff and his staff tried to intimidate and harass the pair into cooperating.

In an email from Omalu and Parson to Sgt. Mike Reynolds with the subject line "scheduling of work hours of physicians, physician independence, physician professional judgment and unbiased credibility" sent Aug. 20, Parson and Omalu objected to the sheriff's office forcing them to surrender planning of their schedules, among other conflicts.

"As physicians we are beginning to feel extremely intimidated, harassed, threatened and controlled by some of the practices, cultures and traditions of the Sheriff's Office," the email said. "(They) are beginning to erode our independence as physicians and are beginning to influence our professional judgments, analyses, conclusions and opinions on each and every case we do in the office."

Omalu will continue serving in his role through March 5, according to his letter of resignation. He plans to stop performing autopsies effective immediately to focus on 150 pending and open cases before his departure. Hernandez said both Omalu and Parson have spoken with other counties about new jobs.

Dr. Reed Mellor, a Stockton-based pediatrician and president of the San Joaquin County Medical Society, called the allegations "alarming" and urged authorities to conduct a full investigation of Moore's actions in a statement distributed via the California Medical Association.

"Physician independence is paramount to avoid improper influence on the practice of medicine," Mellor said in the statement. "Physicians have the unique obligation to put the patient first, and thus, they must be empowered to work independently in serving the best needs of the patient."

The San Joaquin County District Attorney's office issued a statement that said it was in receipt of the doctors' allegations and "is in the process of gathering information concerning homicide cases, including deaths relating to law enforcement officer involvement."

## Omalu's resignation letter

NEWS    SHOWS    VIDEO    CBSN    MORE

WATCH LIVE
**TRUMP'S ANNOUNCEMENT**

CBS/AP / *December 6, 2017, 11:22 AM*

# Famous pathologist resigns, says sheriff ordered hands cut off corpses

CBSN Live





Sheriff-Coroner Steve Moore / **CBS SACRAMENTO**

**31** Comments /   Share /   Tweet /   Stu

*Last Updated Dec 6, 2017 11:22 AM EST*

**SACRAMENTO, Calif. --** San Joaquin Co
nationally as the doctor depicted in the mov
among football players, resigned Tuesday ov
the sheriff that has become so invasive that
medicine.

Dr. Bennet Omalu accused Sheriff-Coroner
with death investigations to protect law enfo



Dr. Bennet Omalu / **CBS SACRAMENTO**

"I had obser
was using h
influence th
die while in custody or during arrest by the
police," Omalu wrote in documents he provided to
the Associated Press and other media. He said the
interference "has become routine practice" since
last year.

Omalu said he will stop conducting autopsies immediately and noted his
departure won't take effect for three months under his county contract.



*Sponsored by Microsoft*

"Dr. Omalu resigned his forensic position because it was met by hostility and a flat-out denial from the sheriff," Patricia Hernandez from Union of American Physicians and Dentist, who represents both doctors, told CBS Sacramento.

The coroner's division referred calls to sheriff's department spokesman Deputy Dave Konecny, who did not return messages seeking comment Tuesday.

Pathologist Resigns After He Says Sheriff
Removed Hand From Corpse

Moore told radio station KQED that he doesn't interfere in death investigations, but as the elected coroner he can make the final decision on whether to rule the manner of death an accident, homicide, suicide or the result of natural causes.

In the documents, Omalu and his assistant, Dr. Susan Parson, a forensic pathologist who resigned last week, said the interference at times included ordering that hands be cut off corpses without telling the pathologists.

Moore told the radio station that he would sometimes order the hands removed from corpses that were too decomposed to identify so they could be sent to the California Department of Justice's crime lab for fingerprinting.

Omalu declined to comment beyond what was included in the documents.

Omalu and Parson said they turned over voluminous memos to county supervisors and the district attorney. The district attorney's office said it is gathering information on homicide cases, including deaths involving law enforcement officers.

Last year, Omalu said, he ruled the death of a 26-year-old man a homicide by blunt force trauma after the man fought with police and with other residents.

"The sheriff called me into his office and told me that he wanted to make it an accident since officers were involved," Omalu wrote. "He said that I should amend my report and state that he died from the civilians and not the police officers."

He cited similar cases in 2013 and another in 2016 where he said he later learned the sheriff changed a homicide ruling involving an officer to an accidental death.

He also cited a 2007 case, early in his time in California, when he said a 47-year-old man died while being arrested.

"Information was intentionally withheld from me by the sheriff in order to mislead me from determining the case to be a homicide," Omalu wrote. "The sheriff still went behind my back months later and changed the manner of death to an accident to minimize the seriousness of the case."

The San Joaquin County Medical Society called the allegations "alarming."

Windows 10 is working to be the most secure Windows platform for IT and users today. To discover the five security risks to avoid, download the eBook.

Watch CBSN Live

President Trump Is Expected To Recognize Jerusalem As Israel's Capital

Two Planes Almost Collided Today

What Does Russia's Doping Ban Mean For The 2018 Olympics

A Lawyer Was Arrested After A 10 Year Social Security Fraud Scheme

Rep. John Conyers Announces Retirement After Allegations

Follow Us

Popular on CBS News

01 Rep. John Conyers announces retirement, endorses son to run for seat
219330 *views*

02 Netflix fires Danny Masterson amid rape allegations
142595 *views*

03 "They told me I was ugly": Girl attempts suicide, put on life support
133349 *views*

04 Teenager in California admits to molesting 50 children, police say
129470 *views*

05 Fugitive lawyer behind $550M Social Security fraud captured 1,500 miles away
99048 *views*

From "60 Minutes"

50 years of "60 Minutes"

"Physician independence is paramount to avoid improper influence on the practice of medicine," said Dr. R. Grant Mellor, president of the San Joaquin County Medical Society. "We urge the proper authorities to conduct a full investigation."

A statement issued by the office of District Attorney Tori Verber Salazar said prosecutors do not rely on coroner's reports when they decide whether to file criminal charges. The office does its own independent review of the pathology reports as well as reports from other law enforcement agencies.

Earlier in his career, Omalu discovered chronic traumatic encephalopathy in a former NFL football player.

His findings ultimately led the league to adopt new safety rules designed to prevent concussions.



**NFL players with CTE**

© 2017 CBS Interactive Inc. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed. The Associated Press contributed to this report.

*31* Comments /   Share /   Tweet /   Stumble /   Email

SHOW COMMENTS +


50 years of "60 Minutes" in pictures


Feeding Puerto Rico


Wounds of War


The Isle of Eigg


The little spacecraft that could


When food is used as a weapon


A team rebuilds after the ultimate loss

Aly Raisman: I am a victim of sexual abuse

Sponsored Links by Taboola

**Is This America's Next Big Bankruptcy?**
Stansberry Research

**Don't Like Guns? Carry This Instead**
Safesound Personal Alarm

**12 Insanely Cool Holiday Gift Ideas Under $60**
Lifed

**Little-Known Veteran Benefit Eliminates Mortgage Payments in California**
Morning Finance | LendingTree Quotes

**This Holiday Season See If You Are Pre-Qualified To Apply**
Citi

**These Pickup Trucks Are The Cream Of The Crop!**
Yahoo Search

**Unsold Car Inventory Crisis in Stockton**
Car Lease | Sponsored Links


*play* VIDEO
**Relentless California wildfires**

# U.S. vehicle deaths top 40,000 for second year

## National Safety Council: 'We're treading water'

**Nathan Bomey**
USA TODAY

U.S. vehicle deaths barely declined in 2017 but remained notably higher than in 2015, according to a new report.

The National Safety Council estimated automotive fatalities topped 40,000 for the second consecutive year.

The estimates are not the official federal figures, which will be released later this year by the National Highway Traffic Safety Administration. They also include deaths that NHTSA does not classify as roadway deaths.

Regardless, the report underscores the emerging consensus among policymakers that traffic deaths constitute a public health crisis that should not be tolerated.

While automakers have dramatically improved car safety in recent decades, with advancements such as strategically placed air bags and high-tech collision avoidance systems, other factors have kept the death toll high.

Key to the crisis is distracted driving, speeding and people who still don't use their seat belts.

The National Safety Council estimated 40,100 people were killed in 2017 accidents, down about 1% from its 2016 estimate but up about 6% from 2015. "We're treading water, essentially," National Safety Council spokeswoman Maureen Vogel said. "We're not making progress."

NHTSA estimated that car accidents killed 37,461 people in 2016, up 5.6% from 2015. The government counts only deaths on public roads, while the council includes parking lots, driveways and private roads.

*Contributing: The Associated Press*

EXHIBIT

4

# He Lost His Daughter, Now He's an Advocate for the Prevention of Teen Driving Tragedies

**After losing his own daughter, a father offers heartfelt advice and change regarding the heightened risks and dangers of distracted teen driving.**

"I remember everything about that night," says San Jose Fire Captain Chris Salcido recounting the night that his daughter, Natalia, died in a car crash in 2015. For Chris, his wife, Andora, and their second daughter, Noelle, telling Natalia's story is a way of keeping her spirit alive.

**There was no parent in the car.** It was the night before Mother's Day, and just a week before Natalia's sixteenth birthday. She said she was going out with some friends, and one of the girl's mother would be driving them. But in truth, there were four teenage girls in the car, and no parent. The girl driving had earned her provisional license less than a month before and was not legally allowed to have other teen passengers in the car.

**No substances were involved.** Alcohol and drugs were not involved in the car crash that took Natalia's life. It was the result of just one brief moment of distracted driving. Natalia was in the front passenger seat as the car sped along a dark and winding road. A girl in the rear seat leaned forward to share something on Snapchat. The driver turned to see the illuminated screen and within seconds, at 73 miles per hour, with no brakes, the car slammed head on into an oak tree. Natalia had on her seatbelt and the airbag was deployed, but despite frantic efforts by paramedics and a desperate race to a nearby hospital, Natalia was gone.

In the weeks leading up to the accident, Chris had actually been involved in the car crash that took teaching Natalia to drive. One of his rules was that the phone always goes in the glove compartment. During their conversations, Chris told Natalia about a teen-driver educational program called "Every Fifteen Minutes." Organized by the California Highway Patrol and local public safety agencies, the program was designed to graphically illustrate, for high school students, the potentially deadly dangers of drinking and driving or distracted driving. Natalia even encouraged Chris to help bring the program to her own Christopher High School in Gilroy, CA.

"There has to be a strong, strong influence and push by parents to say you cannot be distracted. You cannot have this with you. I know it's a big part of your life, I know it is almost like breathing for you. But when you are behind the wheel, being distracted by a little ding — any loss of focus or distraction — can be a death sentence."

**By Michael Flocker** ∎

to Christopher, the school was apprehensive. But Chris persisted and the elaborately staged program was very well received. Today, he continues to offer advice from a parent's perspective and tells Natalia's story to anyone willing to listen.

**Offer advice**

Just three days after Natalia died, another car crash took the life of a student from the same high school. So, when discussions began about bringing the "Every Fifteen Minutes" program

## PROOF OF SERVICE BY MAIL

(C.C.P. Sec. 101a #2015-5, U.S.C. Sec. 1746)

I, __Benjamin Serratos__, am a resident of Pelican Bay State Prison, in the County of

Del Norte, State of California. I am over the age of eighteen (18) years and am a party to this action.

My State Prison address is: Pelican Bay State Prison, P.O. Box 7500, Housing Unit __B-1__ Cell

Number __132__, Crescent City, CA  95532-7500.

On the __5th__ day of __July__, I served the following (set forth the exact

title of document[s] served):

Motion Request for Counsel
_____

Discovery
_____

Evidentiary Hearing
_____

On the party(s) herein by placing a true copy(s) thereof, enclosed in a sealed envelope(s), with

postage thereon fully paid, in the United States mail, in a receptacle so provided at Pelican Bay State

Prison, Crescent City, CA  95532, and addressed as follows:

United States District Court

Eastern District Of California
501  I st STE 4-200

Sacramento, California 95814

I declare under penalty of perjury that the foregoing is true and correct:

Inmate Signature                    Date   7/12/18

Page Number: _____

_Facility A Law Library_