1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BENJAMIN SERRATOS III,                    No.  2:18cv0077 MCE KJN P

12                    Petitioner,

13        v.                                   FINDINGS & RECOMMENDATIONS

14   THE PEOPLE OF THE STATE OF
     CALIFORNIA,
15
                     Respondent.
16

17

18   I.  Introduction[1]

19        Petitioner is a state prisoner, proceeding with counsel,[2] with an application for a writ of

20   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2012 convictions for

21   second degree murder, gross vehicular manslaughter, driving while intoxicated and causing

22   injury, driving with a blood alcohol content greater than .08 percent and causing injury, and hit

23

24   ----------------
     [1] "ECF" refers to this court's case management and electronic case files; "LD" refers to the
25   Lodged Documents filed by respondent on November 19, 2018.  All page number references are
     to those assigned by the CM/ECF system.

26
     [2] Petitioner filed the original petition without counsel.  (See ECF No. 1.)  Thereafter, on January
27   11, 2019, attorney Jason Thomas Campbell filed a notice of appearance on petitioner's behalf.
     (ECF No. 39.)  Later, in May 2020, Mr. Campbell withdrew as counsel of record for petitioner.
28   (ECF Nos. 45-46.)

                                            1

1  and run resulting in death or injury.  Petitioner was sentenced to forty-eight years, four months in

2  state prison.  Petitioner claims as follows:  (1) convictions were obtained with insufficient

3  evidence of guilt beyond a reasonable doubt; (2) convictions based "on less than proof beyond a

4  reasonable doubt of each and every element of the charged crime;" (3) trial counsel was

5  ineffective for a failure to conduct reasonable pre-trial investigation regarding victim's cell

6  phone; (4) trial counsel was ineffective for failing to argue prior counsel provided ineffective

7  assistance of counsel by agreeing to the release and destruction of the victim's vehicle; (5) trial

8  counsel's failure to adequately investigate and prepare for trial "was the functional equivalent of a

9  guilty plea;" (6) by improperly restricting the right to present evidence, the trial court denied

10  petitioner a fair trial; (7) cumulative state court errors worked to deny petitioner a fair trial; (8) the

11  conviction was obtained as a result of outrageous government conduct; (9) insufficient evidence

12  regarding prior murder advisement in 2006 driving under the influence conviction; (10) petitioner

13  was punished more than once for the same offense; and (11) the great bodily injury enhancements

14  were "illegally imposed."  (ECF No. 1 at 3-76.)  After careful review of the record, this court

15  concludes that the petition should be denied.

16  II.  Procedural History

17          On March 2, 2012, a jury found petitioner guilty of second-degree murder (Cal. Pen.

18  Code, § 187 [count 1]), vehicular manslaughter while intoxicated with gross negligence (Cal. Pen.

19  Code, § 191.5(a) [count 2]), driving under the influence of alcohol causing injury (Cal. Veh.

20  Code, § 23153(a) [count 3]), driving with .08 percent blood alcohol causing injury (Cal. Veh.

21  Code, § 23153(b) [count 4]), driving under the influence of alcohol causing injury (Cal. Veh.

22  Code, § 23153(a) [count 5]), driving with .08 percent blood alcohol causing injury (Cal. Veh.

23  Code, § 23153(b) [count 6], hit and run resulting in death or injury (Cal. Veh. Code, § 20001

24  [count 7]), and misdemeanor driving when privilege was suspended or revoked (Cal. Veh. Code,

25  § 14601.2(a) [count 8]); numerous related findings concerning great bodily injury and multiple

26  victims were also found true by the jury.  (LD 3 at 244-53; LD 12 at 69-75.)  On August 28, 2012,

27  petitioner was sentenced to an indeterminate term of thirty years to life for second degree murder

28  (count 1), as well as a total determinate term of eighteen years, eight months for the other crimes

1   (counts 2-8), resulting in a total of forty-eight years and eight months to life in state prison.  (LD

2   4 at 189-92; LD 13 at 34-41.)

3    Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

4   District.  (LD 16-18.)  On May 5, 2016, the Court of Appeal vacated petitioner's convictions as to

5   counts 3 and 4, but otherwise affirmed the judgment.  (LD 19.)[3]

6    Petitioner filed a petition for review in the California Supreme Court, which was denied

7   on August 15, 2016.  (LD 20.)

8    On November 13, 2017, petitioner filed a petition for writ of habeas corpus with the

9   California Court of Appeal, Third Appellate District; the petition was denied without prejudice to

10  the filing in the superior court on November 21, 2017.  (LD 23.)

11   On November 14, 2017, petitioner filed a petition for writ of habeas corpus with the

12  California Supreme Court; the petition was denied February 14, 2018.  (LD 24.)

13   On January 8, 2018, while his petition was pending in the state's highest court, petitioner

14  filed a petition for writ of habeas corpus with the San Joaquin County Superior Court; that court

15  denied his petition on March 22, 2018.  (LD 25.)

16   Petitioner filed the instant petition with this court on January 12, 2018.  (ECF No. 1.)

17   Thereafter, on April 23, 2018, petitioner again filed a petition for writ of habeas corpus

18  with the Third District Court of Appeal; the petition was denied July 6, 2018.  (LD 26.)

19   Then, on July 19, 2018, petitioner filed a petition for review with the California Supreme

20  Court; review was denied August 19, 2018.  (LD 27.)

21   In this proceeding, respondent filed an answer on November 19, 2018.  (ECF No. 33.)

22  Petitioner, then represented by counsel, filed a traverse on May 8, 2019.  (ECF No. 44.)

23  //

24  //

25  //

26

27   [3] The amended abstracts of judgment, filed August 29, 2016, reflects a total sentence of 47 years
    to life in state prison.  (LD 21.)

28

3

III.  Facts[4]

In its unpublished memorandum and opinion vacating in small part, but otherwise affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> On the afternoon of June 12, 2010, defendant celebrated his daughter's fifth birthday with family and friends at a park in Lodi. Defendant brought a 20–pack of beer to the party and was seen drinking beer that afternoon. Later that evening, defendant, his common law wife, and their four daughters went to defendant's nephew's house where defendant continued to drink beer. At approximately 11:30 p.m., defendant left his nephew's house in his Honda. His wife left separately with their daughters because she and defendant had arrived in separate cars.
>
> Defendant drove southbound on West Lane, exceeded the posted 55–mile–per–hour speed limit, and rear-ended an Oldsmobile. The impact sent the Oldsmobile spinning, and it slammed into a signal pole on the shoulder of the intersection, killing the driver Destanee Little and injuring her two passengers.
>
> Pablo Sanchez, Jovito Garcia, Daniel Garcia, and Michael Nava were in oncoming traffic when they observed the collision. Sanchez approached the Honda. Defendant was still in the driver's seat and appeared dazed and confused. His eyes were glassy and red, and he smelled like alcohol. Defendant eventually got out of his car and began to walk away from the scene. He was later contacted by law enforcement officers as he was walking down the road away from the scene. He had a very strong odor of alcohol and his eyes were red, watery, and glassy looking.
>
> Two hours after the collision, defendant's blood-alcohol content was 0.21 percent. An expert estimated defendant's blood-alcohol content at the time of the collision to have been 0.25 percent.
>
> The California Highway Patrol Multidisciplinary Accident Investigation Team (MAIT) inspected the scene, both vehicles, and the physical evidence and determined that the Oldsmobile was travelling in the number two, slow, lane at an estimated 55 miles per hour when it was struck from behind by the Honda, which was also travelling in the slow lane but at an estimated 95.5 miles per hour. The estimated post-impact speed of the vehicles was approximately 75.7 miles per hour, indicating a change in speed of about 20 miles per hour for each vehicle. The speed limit on that section of West Lane is 55 miles per hour.
>
> The Honda's supplemental restraint system (SRS) control unit

---

[4]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Serratos, No. C072041, on May 5, 2016, a copy of which was lodged by respondent as LD 19 on November 19, 2018.

4

1   indicated a change in speed of 33.8 miles per hour at the time of the
collision, indicating a pre-impact speed of approximately 109 miles
2   per hour for the Honda and approximately 40 miles per hour for the
Oldsmobile. The Honda's SRS control unit also revealed that
3   defendant attempted to start his vehicle 10 times after the collision.

4   Dr. Russell Darnell testified as an accident reconstruction expert for
the defense. He opined that at the time of the collision, the Honda
5   was travelling approximately 68 miles per hour, and the Oldsmobile
was travelling approximately 50 miles per hour. He further opined
6   that the initial point of impact occurred in the number one lane, and
that the Honda did not enter the number two, slow, lane until after
7   the initial impact.

8   Phone records for Little's cell phone showed that there was a text
message sent at 11:42 p.m. and data usage consistent with a social
9   networking connection at 11:51 p.m. on the night of the collision. It
was not known who actually used the phone at those times.
10
In 2006, defendant pleaded no contest to driving under the influence
11   of alcohol in violation of Vehicle Code section 23152, subdivision
(b). As part of his plea agreement, defendant expressly
12   acknowledged in writing that he understood "being under the
influence of alcohol or drugs, or both, impairs my ability to safely
13   operate a motor vehicle. It is extremely dangerous to human life to
drive while under the influence of alcohol or drugs, or both. If I
14   continue to drive while under the influence of alcohol or drugs, or
both, and as a result of that driving, someone is killed, I can be
15   charged with murder." As a result of his conviction, defendant's
driver's license was suspended, and he was ordered to complete an
16   alcohol education course. Defendant enrolled in a three-month
program but attended just one class, and his driver's license was
17   never reinstated as a result of his failure to complete the program and
remained suspended at the time of the collision.
18
19   (LD 19 at 3-5; People v. Serratos, slip op. at *2.)

20   IV.  Standards for a Writ of Habeas Corpus

21      An application for a writ of habeas corpus by a person in custody under a judgment of a

22   state court can be granted only for violations of the Constitution or laws of the United States.  28

23   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

24   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

25   U.S. 62, 67-68 (1991).

26      Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

27   corpus relief:

28   ////

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's

1  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [5] Lockyer v.

2  Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

3  997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

4  because that court concludes in its independent judgment that the relevant state-court decision

5  applied clearly established federal law erroneously or incorrectly.  Rather, that application must

6  also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550

7  U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

8  'independent review of the legal question,' is left with a '"firm conviction"' that the state court

9  was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal

10  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

11  decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

12  U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

13  court, a state prisoner must show that the state court's ruling on the claim being presented in

14  federal court was so lacking in justification that there was an error well understood and

15  comprehended in existing law beyond any possibility for fair-minded disagreement."  Richter,

16  562 U.S. at 103.

17          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

18  court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

19  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

20  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

21  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

22  considering de novo the constitutional issues raised").

23          The court looks to the last reasoned state court decision as the basis for the state court

24  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

25  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

26  _____

27  [5]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98.  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

8

1   decision of [the Supreme] Court." Id. at 101.  The petitioner bears "the burden to demonstrate

2   that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

3   925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

4          When it is clear, however, that a state court has not reached the merits of a petitioner's

5   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

6   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

7   F.3d 1099, 1109 (9th Cir. 2006).

8   V.  Petitioner's Claims

9          A. *Insufficiency of the Evidence: Second Degree Murder & Vehicular Manslaughter*

10          Petitioner claims there is insufficient evidence to support his convictions for second

11   degree murder and vehicular manslaughter.  More specifically as to second degree murder,

12   petitioner contends there is insufficient evidence to prove implied malice as it relates to

13   knowledge of the dangerousness of driving under the influence in the form of the murder

14   admonishment related to his 2006 DUI conviction.  With regard to the conviction for vehicular

15   manslaughter, petitioner argues "speeding alone does not support implied malice" for that charge

16   and the evidence presented in that regard was insufficient to support his conviction.  (ECF No. 1

17   at 3-12.)  Respondent maintains the state court's determination was reasonable.  (ECF No. 33 at

18   7-8.)  In reply, petitioner contends the state appellate court's finding that there was sufficient

19   evidence of malice was unreasonable, entitling him to relief.  (ECF No. 30-37.)

20          The last reasoned rejection of petitioner's first claim, as it concerns second degree murder

21   specifically, is the decision of the California Court of Appeal for the Third Appellate District on

22   petitioner's direct appeal.  The state court addressed this claim as follows:

23                      Defendant's Second Degree Murder Conviction is Supported by
                                          Substantial Evidence
24

25                                                  I

26              Defendant claims there was insufficient evidence of implied malice
                to support his conviction for second degree murder. According to
27              defendant, the People failed to prove that he was subjectively aware
                of the risks of drunk driving. We disagree.
28

9

In reviewing a challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Unless it is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "In this state, 'malice' is defined by statute as 'express' if the defendant intended 'unlawfully' to kill his victim, and 'implied' if the killing was unprovoked or the circumstances showed 'an abandoned and malignant heart.' (§ 188.) ... But the quoted portion of the California statutory definition of implied malice has given way to a definition more meaningful to juries, so that malice is now deemed implied '"when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."' [Citations.] Such conduct amounts to second degree murder...." (*People v. Martinez* (2003) 31 Cal.4th 673, 684 (*Martinez*).) Implied malice requires that the defendant acted with a wanton disregard of a high probability of death. (*People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*); *People v. Moore* (2010) 187 Cal.App.4th 937, 941.)

A finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, in effect employing a subjective standard. (*Watson, supra*, 30 Cal.3d at pp. 296–297.) The defendant must know the conduct endangers another yet act with a conscious disregard for life. (*Martinez, supra*, 31 Cal.4th at p. 684.) The prosecution may prove implied malice by circumstantial evidence, and even if the act causes an accidental death, the circumstances surrounding that act may evince implied malice. (*People v. James* (1998) 62 Cal.App.4th 244, 277–278; *People v. Contreras* (1994) 26 Cal.App.4th 944, 954.) Malice may be implied where an intoxicated driver who kills someone appreciated the risk involved in the act. (*Watson, supra*, 30 Cal.3d at pp. 296–297.)

In *Watson*, our Supreme Court found the following evidence sufficient to support a conclusion that the defendant acted wantonly and with a conscious disregard for human life: "Defendant had consumed enough alcohol to raise his blood[-]alcohol content to a

level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated. As we stated in *Taylor v. Superior Court of Los Angeles County* (1979) 24 Cal.3d 890, 897: 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created." (*Watson, supra*, 30 Cal.3d at pp. 300–301.)

Here, defendant's blood-alcohol level was measured at 0.21 percent two hours after the collision, and an expert testified it would have been 0.25 percent at the time of the collision. Defendant drove to his nephew's house separate from his wife and daughters, where he continued to consume beer. Thus, the jury reasonably could infer that defendant must have known that he would have to drive the Honda later. Defendant had previously been convicted in 2006 for driving under the influence of alcohol. As part of his plea agreement, defendant expressly acknowledged in writing that he understood "being under the influence of alcohol or drugs, or both, impairs my ability to safely operate a motor vehicle. It is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving, someone is killed, I can be charged with murder." From that evidence, the jury could reasonably presume defendant was aware of the hazards of driving while intoxicated. Defendant was driving between 95 and 109 miles per hour, nearly double the speed limit, when he rear-ended the Oldsmobile. In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life. Accordingly, the jury's finding of implied malice is supported by substantial evidence.

As the court found in *People v. Moore, supra*, 187 Cal.App.4th at page 941, "Whether [defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be

11

1
2
3
4
5
6
7
8
9

> aware of the risk, [defendant] was aware of the risk." Indeed, "[o]ne who drives a vehicle while under the influence after having been convicted of that offense knows better than most that his conduct is not only illegal, but entails a substantial risk of harm to himself and others. As recognized by the court in *McCarnes*, driving under the influence constitutes a criminal offense precisely because it involves an act which is inherently dangerous. (*People v. McCarnes* [(1986)] 179 Cal.App.3d 525, 532.) That simple fact has been made well known to all segments of our society through virtually every form of mass media. Considering today's heightened level of public awareness, we cannot believe that any person of average intelligence who has suffered a 'drunk driving' conviction would be oblivious to the risks caused by driving while intoxicated." (*People v. Brogna* (1988) 202 Cal.App.3d 700, 709.)

10

(People v. Serratos, slip op. at *2-4.)

11

### Applicable Legal Standards

12     The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from

13 conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

14 crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who

15 alleges that the evidence introduced at trial was insufficient to support the jury's findings states a

16 cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless,

17 the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to

18 obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274

19 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact

20 could have found the essential elements of the crime beyond a reasonable doubt." Jackson v.

21 Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court

22 determination that the evidence was sufficient to support a conviction was an "objectively

23 unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

24     Habeas claims based upon alleged insufficient evidence therefore "face a high bar in

25 federal habeas proceedings because they are subject to two layers of judicial deference."

26 Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

27
28

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence

1
2
3
4

admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

5      Id. (citations omitted).

6          The Jackson standard "must be applied with explicit reference to the substantive elements

7   of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16.  In performing a

8   Jackson analysis, a jury's credibility determinations are "entitled to near-total deference." Bruce

9   v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  When the factual record supports conflicting

10  inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of

11  the prosecution, and must defer to that resolution.  Jackson, 443 U.S. at 326.

12         A federal court reviewing collaterally a state court conviction does not determine whether

13  it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982

14  F.2d 335, 338 (9th Cir.1992).  The federal court "determines only whether, 'after viewing the

15  evidence in the light most favorable to the prosecution, any rational trier of fact could have found

16  the essential elements of the crime beyond a reasonable doubt.'"  Id. (quoting Jackson, 443 U.S.

17  at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable

18  doubt, may the writ be granted.  Jackson, 443 U.S. at 324.

19              Analysis

20         The record below reveals the state court's determination was reasonable.

21         Criminalist Vincent Keokut testified that petitioner's blood alcohol content following the

22  collision was .21.  (LD 9 at 5-6, 8.)  Keokut opined that petitioner's blood alcohol content at the

23  time of the collision, approximately two hours prior to petitioner's blood being drawn, was .25.

24  (LD 9 at 12-14.)  Further, with regard to petitioner's intoxication at the time of the collision, CHP

25  Officer Coffman testified petitioner's body emitted a very strong odor of alcohol, his eyes were

26  red, watery, and glassy, and his gait was slightly unbalanced, slow, and shuffling.  (LD 8 at 267-

27  68, 292-93.)  Coffman believed petitioner was under the influence of alcohol as a result.  (LD 8 at

28  284, 293-94.)  CHP Officer Jeff Rhodes testified petitioner was "kind of lethargic," "kind of

staggering as he was walking," and had an unsteady gait.  (LD 10 at 28.)  Officer Garcia smelled the odor of alcohol on petitioner.  (LD 9 at 28.)  The officer believed petitioner to be highly intoxicated.  (LD 10 at 40-41.)  Witness Pablo Sanchez testified petitioner "looked a little dazed and confused," his eyes were "droopy, glassy [and] red," and Sanchez could smell alcohol.  (LD 9 at 243-44.)  Witness Daniel Garcia testified petitioner "seemed confused, worried" and smelled of alcohol; it seemed as though petitioner was under the influence.  (LD 9 at 271-72.)

The record establishes petitioner's intent to drive after consuming alcohol.  He drove separately from his wife to the park where his daughter's birthday party was held the afternoon of the collision.  He drank beer while at the park.  (LD 10 at 161-64, 166, 174, 176, 179 [Israel Rodriguez's testimony]; LD 10 at 213-14, 219-21, 237-38, 250-52, 254 [Stephanie Loya's testimony].)  Then, when the party concluded, petitioner drove separately to his nephew's home to return some tables and chairs, again consuming beer, prior to leaving his nephew's home in order to drive to his own home.  (LD 10 at 167-71, 179-84, 208 Rodriguez's testimony]; LD 10 at 240-42, 244-45 [Loya's testimony].)

Regarding petitioner's knowledge that driving under the influence was extremely dangerous to human life, evidence of petitioner's prior DUI conviction, the result of a guilty plea in 2006, was admitted as People's Exhibit No. 40.  (LD 4 at 229-41; LD 5 at 41-50; LD 11 at 3-9, 155-65.)  More particularly, in the written plea form, petitioner acknowledged as follows:  "I understand the following: being under the influence of alcohol or drugs, or both, impairs my ability to safely operate a motor vehicle.  It is extremely dangerous to human life to drive under the influence of alcohol or drugs, or both.  If I continue to drive while under the influence or alcohol or drugs, or both, and as a result of that driving, someone is killed, I can be charged with murder."  (LD 4 at 236; LD 5 at 48.)  A minute order corresponding to the 2006 prior DUI, notes: "Defendant's written plea signed, filed & incorporated by reference."  (LD 4 at 232; LD 5 at 44.)  The minute order also provides: "Defendant advised of, understood and knowingly and voluntarily waived all of the following rights: … the possible range of penalties and other consequences of the plea …."  (LD 4 at 232; LD 5 at 44.)  Mack Myles, custodian of records with the Department of Motor Vehicles, testified that petitioner's driver's license was suspended on

14

1   the date of the collision for a failure to complete the required driving program required for a

2   restricted license.  (LD 9 at 220.)  Petitioner's license was originally suspended on July 20, 2006,

3   as the result of a prior DUI of June 3, 2006.  (LD 9 at 220, 224.)  Petitioner received notice of the

4   suspension on September 18, 2007, when he visited a DMV office; petitioner's signature

5   acknowledged receiving verbal notice of same.  (LD 5 at 68; LD 9 at 221-22.)  The certified

6   DMV records were admitted into evidence.  (LD 11 at 13; LD 5 at 66-77.)  Further, after the

7   collision, Officer Coffman noted petitioner did not carry a driver's license; petitioner had a

8   California identified card only.  (LD 8 at 294.)   Sam Beasley, director of the Alcohol Recovery

9   Center, testified that petitioner signed up for a three-month first offender DUI course on August

10  14, 2006.  (LD 9 at 228.)  During intake or initial sign up, participants are advised "that if a

11  person has been in, say, a three-month program and then they go kill somebody, that it's quite

12  possible they will be charged with manslaughter, and there have been a couple of attempts to

13  charged them with murder."  (LD 9 at 233.)  Petitioner attended the intake and one class on

14  September 29, 2006.  (LD 9 at 233-34.)  Petitioner failed the program and the DMV was notified.

15  (LD 9 at 235.)  The jury was instructed concerning the foregoing as follows:

16
17          Evidence has been introduced establishing that the defendant had
            been previously convicted of driving under the influence and boating
18          under the influence, and as a result was offered by the court to attend
            a drinking driver program.  Such evidence was not received and may
            not be considered by you to prove that the defendant is a person of
19          bad character or that he has a disposition to commit crimes.  Such
            evidence was received and may be considered by you only on the
20          issue of the existence of implied malice.

21          You are the sole judges of whether or not such evidence reasonably
            tends to prove the existence of implied malice, and if so, the weight
22          to be given such evidence.  You are not committed to consider such
            evidence for any other purpose.

23  (LD 12 at 4; see also LD 3 at 147.)

24          Finally, there was evidence that petitioner was traveling at an excessive speed at the time

25  of the collision.  (LD 8 at 228-32, 238-40, 243; LD 9 at 114-20, 132-33, 178-79, 194; LD 10 at

26  282.)

27          Under California law, "'[s]econd degree murder is the unlawful killing of a human being

28  with malice aforethought but without the additional elements, such as willfulness, premeditation,

15

and deliberation, that would support a conviction of first degree murder.'" People v. Elmore, 59 Cal.4th 121, 133 (2014) (quoting People v. Knoller, 41 Cal.4th 139, 151 (2007)); People v. Beltran, 56 Cal.4th 935, 942 (2013). Malice may be express or implied. Cal. Pen. Code, § 188. "Express malice is an intent to kill." People v. Gonzalez, 54 Cal.4th 643, 653 (2012); Beltran, 56 Cal.4th at 941. "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." Elmore, 59 Cal.4th at 133; Beltran, 56 Cal.4th at 941-42; see also People v. Olivas, 172 Cal.App.3d 984, 987-88 (1985) ("Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed'"). "A person who, knowing the hazards of drunk driving, drives a vehicle while intoxicated and proximately causes the death of another may be convicted of second degree murder under an implied malice theory." People v. Batchelor, 229 Cal.App.4th 1102, 1112 (2014), disapproved in part on other grounds by People v. Hicks (2017) 4 Cal.5th 203, 214, fn.3; People v. Watson, 30 Cal.3d 290, 300-01 (1981) ("'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others'' (citation omitted)); see also People v. Jimenez, 242 Cal.App.4th 1337, 1358 (2015); People v. Johnigan, 196 Cal.App.4th 1084, 1090 (2011). "However, a finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved . . .." Watson, 30 Cal.3d at 296-97; Batchelor, 229 Cal.App.4th at 1112-13.

California law does not require evidence of extended dangerous driving for second degree murder. For example, in People v. Sanchez, 24 Cal.4th 983 (2001), a drunk driver drove into oncoming traffic and struck a car, killing the passenger and seriously injuring the driver. The drunk driver was convicted of second degree murder. Id. at 986-87.

In arguing he was not subjectively aware of the risks of drinking and driving, petitioner merely disputes the inferences a jury may draw from the record. This jury could reasonably infer

1    from the evidence presented that petitioner was aware of risks attendant to driving while

2    intoxicated, and thus find implied malice.  "[A] reviewing court 'faced with a record of historical

3    facts that supports conflicting inferences must presume—even if it does not affirmatively appear

4    in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and

5    must defer to that resolution.'"  McDaniel v. Brown, 558 U.S. 120, 133 (2010).

6         Reviewing the evidence in the light most favorable to the prosecution, a rational trier of

7    fact could have found beyond reasonable doubt that petitioner was guilty of second degree

8    murder.  Petitioner's attempt to re-argue the evidence adduced at trial does not alter this

9    conviction.  See Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (a reviewing court "must

10   respect the province of the jury to determine the credibility of witnesses, resolve evidentiary

11   conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all

12   conflicts in a manner that supports the verdict").

13        Finally, concerning petitioner's related argument that there was insufficient evidence to

14   support his conviction for gross vehicular manslaughter, the undersigned reviewed the record to

15   determine whether the state court's denial of relief was reasonable.  Richter, 562 U.S. at 98.  It

16   was.

17        "'[G]ross negligence is the exercise of so slight a degree of care as to raise a presumption

18   of conscious indifference to the consequences. [Citation.] "The state of mind of a person who acts

19   with conscious indifference to the consequences is simply, 'I don't care what happens.'"

20   [Citation.] The test is objective: whether a reasonable person in the defendant's position would

21   have been aware of the risk involved.'"  People v. Ochoa, 6 Cal.4th 1199, 1204 (1993).  It "may

22   be shown from all the relevant circumstances, including the manner in which the defendant

23   operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct."

24   Id. at 1207-1208 (evidence was sufficient where the defendant had attended traffic school and

25   alcohol-awareness class as a result of a prior DUI, but nonetheless drove with a 0.15 blood

26   alcohol level at illegal speeds, wove in and out of adjoining lanes, made abrupt and dangerous

27   lane changes without signaling, and did not brake to avoid colliding with his victims' car).

28   However, a jury may also consider the driver's subjective knowledge, for if a "defendant actually

1  appreciated the risks involved in a given enterprise, and nonetheless proceeded with it, a finding

2  of gross negligence (as opposed to simple negligence) would be appropriate." <u>Ochoa</u>, at 1205.

3      Here, as cited in the record and reflected above, the evidence adduced at trial reflects

4  petitioner was driving with a blood alcohol content approximately three times the legal limit at

5  the time of the collision.  He had previously been convicted of driving under the influence and his

6  license had been suspended when he failed to complete the required class.  Additionally, there

7  was evidence petitioner was speeding at the time of the collision.  <u>Jackson</u>, 443 U.S. at 319.  On

8  these facts, the state court could have reasonably concluded there was sufficient evidence to

9  support petitioner's conviction for the crime of gross vehicular manslaughter.

10      The state courts' rejection of this claim was neither contrary to, nor involved an

11  unreasonable application of, <u>Jackson</u> or other clearly established federal law.  Nor was it based on

12  an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not

13  entitled to habeas relief on his insufficiency of the evidence claim.  Therefore, the undersigned

14  concludes petitioner is not entitled to relief and the claim asserted in ground one should be

15  denied.

16      B.    *Insufficiency of the Evidence: Hit and Run*

17      In ground two of his petition, petitioner claims there was insufficient evidence to support

18  his conviction for hit and run; he cites to testimony given at the preliminary hearing.  (ECF No. 1

19  at 14-18.)  Respondent contends the claim is procedurally barred and lacking in merit, barring

20  relief in these proceedings.  (ECF No. 33 at 8.)  The traverse does not address ground two.

21      Petitioner presented this claim in a state habeas petition rather than on direct review.  (LD

22  27.)  Therefore, this court reviews the record to determine whether there was "any reasonable

23  basis for the state court to deny relief."  <u>Richter</u>, 562 U.S. at 98.  It will "determine what

24  arguments or theories . . . could have supported . . . the state court's decision; and then it must ask

25  whether it is possible fairminded jurists could disagree that those arguments or theories are

26  inconsistent with the holding in a prior decision" of the United States Supreme Court.  <u>Id.</u> at 102.

27      Initially, the undersigned acknowledges respondent's assertion of a procedural bar, but

28  notes that a reviewing court need not invariably resolve the question of procedural default prior to

1   ruling on the merits of a claim.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also

2   Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not

3   infrequently more complex than the merits issues presented by the appeal, so it may well make

4   sense in some instances to proceed to the merits if the result will be the same"); Busby v. Dretke,

5   359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should

6   ordinarily be considered first, a reviewing court need not do so invariably, especially when the

7   issue turns on difficult questions of state law).  Where deciding the merits of a claim proves to be

8   less complicated and less time-consuming than adjudicating the issue of procedural default, a

9   court may exercise discretion in its management of the case to reject the claim on the merits and

10  forgo an analysis of procedural default.  See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S.

11  at 525).  Because it is less time consuming to address the merits of petitioner's claim, the

12  undersigned exercises his discretion to forego an analysis of any applicable procedural default.

13                          Applicable Legal Standards

14          The standards pertaining to a sufficiency of the evidence claim have been previously

15  noted in the court's discussion concerning ground one.

16          Subdivision (a) of California Vehicle Code section 20001 provides:  "The driver of a

17  vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in

18  the death of a person shall immediately stop the vehicle at the scene of the accident and shall

19  fulfill the requirements of Sections 20003 and 20004."  Subdivision (c) states: "A person who

20  flees the scene of the crime after committing a violation of Section 191.5 of, or paragraph (1) of

21  subdivision (c) of Section 192 of the Penal Code, upon conviction of any of those sections, in

22  addition and consecutive to the punishment prescribed, shall be punished by an additional term of

23  imprisonment of five years in the state prison. This additional term shall not be imposed unless

24  the allegation is charged in the accusatory pleading and admitted by the defendant or found to be

25  true by the trier of fact. The court shall not strike a finding that brings a person within the

26  provisions of this subdivision or an allegation made pursuant to this subdivision."

27          California Vehicle Code section 20003 requires the following:  "The driver of any vehicle

28  involved in an accident resulting in injury to or death of any person shall also give his or her

                                             19

name, current residence address, the names and current residence addresses of any occupant of

the driver's vehicle injured in the accident, the registration number of the vehicle he or she is

driving, and the name and current residence address of the owner to the person struck or the

driver or occupants of any vehicle collided with, and shall give the information to any traffic or

police officer at the scene of the accident. The driver also shall render to any person injured in the

accident reasonable assistance, including transporting, or making arrangements for transporting,

any injured person to a physician, surgeon, or hospital for medical or surgical treatment if it is

apparent that treatment is necessary or if that transportation is requested by any injured person."

<u>Analysis</u>

Significantly, petitioner's conviction does not stem from the testimony given at the

preliminary hearing.  Rather, his conviction is the result of the testimony given during petitioner's

jury trial.  That is the testimony this court reviews when considering a claim of insufficient

evidence to support a conviction.

This record reveals sufficient evidence to support petitioner's conviction.  CHP Officer

John Schatmeier testified that upon approaching the scene of the collision, bystanders directed he

and his partner to a man walking away from the scene.  (LD 8 at 129-31.)  Using the patrol

vehicle's public address system, and approaching the man from thirty to forty yards away,

petitioner was directed to stop walking.  (LD 8 at 131-32.)  Petitioner turned, looked at the

officers, and continued walking away.  (LD 8 at 132.)  Petitioner was stopped when the officers

"basically centered his body between [the patrol car's] push bumpers."  (LD 8 at 132.)  CHP

Officer Rhodes testified similarly.  (<u>See</u> LD 10 at 24-28, 43.)  Further, Sanchez testified that he

witnessed a collision, pulled over and approached a Honda involved.  (LD 9 at 241-42.)  The man

inside the Honda eventually got out of the vehicle.  (LD 9 at 243.)  Sanchez and his friend stayed

with the man briefly, before Sanchez noticed the other vehicle involved.  (LD 9 at 244.)  After

checking on that vehicle, Sanchez noted petitioner was no longer standing near the Honda, but off

the side of the road about forty to forty-five feet away.  (LD 9 at 248-49.)  When Sanchez did not

respond to petitioner's two requests to use Sanchez's cell phone, petitioner "started to walk away

from the scene."  (LD 9 at 250.)  Petitioner eventually stopped walking, bent over and looked to

1   be "dropping something." (LD 9 at 251.)  After retrieving a set of keys from the ground, Sanchez

2   noted that petitioner was walking away, further south. (LD 9 at 251-252.)  Sanchez told

3   petitioner to stop, that "walking away and leaving the scene is just going to make it worse." (LD

4   9 at 252.)  Petitioner told Sanchez that he – Sanchez – had been the driver involved. (LD 9 at

5   252-53.)  Sanchez continued to follow petitioner as he walked south. (LD 9 at 253-54.)  At that

6   point, petitioner was about 200 feet further south of the Honda. (LD 9 at 261.)  Eventually CHP

7   officers arrived on scene. (LD 9 at 254.)   Witness Garcia testified pulled over after the collision.

8   (LD 9 at 265.)  After first checking on the occupants of the Oldsmobile, Garcia ran towards Pablo

9   Sanchez, whom he knew. (LD 9 at 268-69.)  A man was walking or back and forth, "saying that

10  he didn't do anything." (LD 9 at 271.)  The man continued walking south until the CHP arrived.

11  (LD 9 at 272.)  Garcia estimated the man to be about 200 feet from the Honda at that point. (LD

12  9 at 272-73.)

13          Reviewing the evidence in the light most favorable to the verdict, there is sufficient

14  evidence to conclude petitioner sought to leave the scene of the collision in which he was

15  involved: he walked a significant distance away from the collision, attempted to discard the keys

16  to the Honda, claimed a witness to the collision was the involved driver, and ignored law

17  enforcement directives to stop.  Nor did petitioner attempt to render aid of any sort or provide

18  identifying information.  Jackson, 443 U.S. at 314; People v. Vela, 205 Cal.App.4th 942, 952

19  (2012) (sufficient evidence where defendant walked 30 to 45 yards away from her vehicle in the

20  opposite direction of the victim and backed up and turned away from an individual who identified

21  himself as off-duty police officer); People v. Powell, 181 Cal.App.4th 304, 316 (2010) (conduct

22  prohibited by the statute prohibiting leaving the scene of an injury accident is not the causing of

23  an accident or injury but leaving the scene without presenting identification or rendering aid).

24  The foregoing establishes there was a reasonable basis for the California Supreme Court's denial

25  of the claim.  Richter, 562 U.S. at 98.  At a minimum, fairminded jurists could disagree.  Id. at

26  102.

27          In sum, the state court determination is neither unreasonable nor contrary to Supreme

28  Court precedent.  28 U.S.C. § 2254(d).  Hence, petitioner is not entitled to relief and it is

1    recommended ground two be denied.

2         C.    *Ineffective Assistance of Counsel: Victim's Cell Phone*

3         In ground three of his petition, petitioner claims trial counsel was ineffective concerning

4    the investigation and presentation of evidence regarding the victim's cell phone.  (ECF No. 1 at

5    19-24.)  Respondent contends the claim was not fairly presented to the state's highest court and

6    lacks merit, barring relief in this court.  (ECF No. 33 at 8-10.)  In reply, petitioner argues the

7    claim was fairly presented and reasserts trial counsel provided ineffective assistance of counsel

8    warranting relief in these proceedings.  (ECF No. 44-1 at 38-43.)

9         Again, the undersigned elects to exercise his discretion to forego an analysis of any

10   procedural default, in favor of addressing the merits of petitioner's claim.  See Franklin, 290 F.3d

11   at 1232 (citing Lambrix, 520 U.S. at 525).

12        The last reasoned rejection of petitioner's third claim is the decision of the California

13   Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

14   addressed this claim as follows:

15                 Defendant Failed to Show His Trial Counsel Was Ineffective

16             Defendant next contends that his trial counsel was ineffective in
17             failing to (1) have Little's cell phone forensically examined ….
               Again, we are not persuaded.

18             As previously discussed, defendant's trial counsel did not pursue
               having Little's cell phone examined after the trial court denied
19             defendant's motion to continue. In addition, prior to trial, defendant's
               trial counsel filed a *Trombetta*[fn. omitted] motion to dismiss the
20             information based on the prosecution's release of the Oldsmobile. In
               a declaration filed in support of the motion, defendant's trial counsel
21             stated that "[t]he prosecution is in possession of a letter purportedly
               allowing the destruction by an attorney who did not have express
22             permission of the defendant to authorize destruction." The trial court
               denied the motion, finding defendant failed to establish the
23             prosecution acted in bad faith, where defendant's prior counsel,
               Charles Pacheco, signed a document consenting to the release of the
24             vehicle.

25             "To prevail on a claim of ineffective assistance of counsel, the
               defendant must show counsel's performance fell below a standard of
26             reasonable competence, and that prejudice resulted. [Citations.]
               When a claim of ineffective assistance is made on direct appeal, and
27             the record does not show the reason for counsel's challenged actions
               or omissions, the conviction must be affirmed unless there could be
28             no  satisfactory  explanation.  [Citation.]  Even  where  deficient

                                            22

performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that, "' 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 [80 L.Ed.2d 674].) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, at p. 697.)

Defendant contends that a forensic examination of Little's cell phone was critical to the defense's theory that defendant was travelling in the number one lane when the Oldsmobile veered into that lane, causing defendant to collide with the Oldsmobile. According to defendant, "any actions by Ms. Little that directly precipitated the accident are relevant and potentially exculpatory," but "without having the phone evaluated by [a] forensic examiner, the defense was unable to solidify the testimony, which allowed the district attorney to minimize this testimony."

There are at least two problems with defendant's claim. First, the record does not disclose why defendant's trial counsel did not pursue having Little's phone examined. In such instances, the claim of ineffective assistance of counsel will be rejected unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Here, there is no indication that defendant's trial counsel was asked for an explanation. Moreover, counsel could have determined that a forensic examination was unnecessary after conferring with defense expert Beegle, who was able to interpret the phone records and opined that a forensic examination of the phone could not establish who, in fact, was using the phone at 11:51 p.m. on the night in question.

Second, defendant has failed to show that he was prejudiced by counsel's failure to have the phone examined. While he contends that such an examination was necessary to "solidify the testimony," he does not specify the testimony to which he is referring. Nor does he explain how an examination of the phone otherwise would support the defense theory that Little was using the phone at the time of the collision. Absent such evidence, we must reject defendant's claim that his trial counsel was ineffective in failing to have Little's cell phone examined.

(*People v. Serratos*, slip op. at *6-7.)

////

////

23

Applicable Legal Standards

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

Under the first prong of the Strickland test, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689). Petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of "sound trial strategy." Strickland, 466 U.S. at 688-89. Judicial scrutiny of defense counsel's performance is "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at the time it occurred, without the benefit of hindsight. Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

The second prong of the Strickland test requires a petitioner to show that counsel's conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. at 693. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." Id.

////

////

24

1

Analysis

2

*Relevant Background Information*

3

On January 26, 2012, defense counsel filed a motion to continue the trial after allegedly

4

learning a few days prior that the AT&T records pertaining to the victim's phone indicated "some

5

usage during the time of the accident," and claiming that discovery of its usage "necessitates a

6

continuance to fully investigate the usage of the phone" and to "examine the phone." (LD 2 at

7

91-96.) After argument, and in-chambers discussion, the court denied the motion. (LD 2 at 117;

8

LD 7 at 24-42.)

9

On that same date, trial counsel filed a Motion to Dismiss for Intentional Destruction of

10

Evidence, citing California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488

11

U.S. 51 (1988), noting the victim's uncle, a deputy with the San Joaquin County Sheriff's

12

Department, "retrieved a cell phone from the tow yard where the vehicle was being stored" in the

13

absence of a "formal request from the court" or in accordance with "CHP protocol . . . for the

14

release of" that evidence. Counsel asserted the evidence "had obvious exculpatory value for the

15

accused and was intentionally not preserved in police custody and released from police custody

16

without regard to its exculpatory value." (LD 2 at 111-16.) On February 7, 2012, the court held a

17

hearing and testimony was taken. (LD 7 at 62-96 [defense cell phone expert Beegle], 179-208

18

[Officer Coffman], 209-13 [John Nesbitt, victim's uncle], 214-28 [Officer Petricevich].) The

19

court heard arguments on February 9, 2012. (LD 7 at 240-55.) The motion was denied that same

20

date. (LD 2 at 155; LD 7 at 255-61.)   The trial court found in relevant part: "Starting with the

21

phone, as was indicated from the evidence, no one at the scene saw the phone. My understanding

22

from reading the preliminary hearing transcript that none of the individuals in the car with Ms.

23

Little also saw the phone being used. And they were asked that question specifically. [¶] No one

24

at the scene had any idea that that particular phone was potentially exculpatory evidence.

25

[¶] And the car, because not impounded, it was proper for someone to retrieve personal items

26

from that car. … [¶] But I do not find, with respect to the phone, that that was potentially

27

exculpatory evidence. And I don't find any bad faith on the part [of] law enforcement in allowing

28

25

1  that phone to be retrieved by [a] family member and returned to Ms. Little's mother."  (LD 7 at

2  259.)

3        The cell phone was surrendered to the court by the victim's mother on February 15, 2012,

4  to allow for analysis by either party.  (LD 2 at 165; LD 3 at 293 [Court Exhibit D]; LD 8 at 179-

5  81.)[6]

6                                          *Findings*

7        In his original petition, petitioner asserts trial counsel provided ineffective assistance for a

8  failure to have the cell phone examined.  (ECF No. 1 at 20-24.)  Particularly, according to

9  petitioner, "for specific social media, content, and to adhere to the prosecutors and Judges

10  reasoning that no such results could have determined who was actually on the phone at the time

11  of the accident" and that the "specific details" of such an examination "might reveal specifically

12  who was on the phone and who wasn't on the phone."  (ECF No. 1 at 23.)  In his traverse,

13  petitioner argues defense counsel's failure to have the cell phone forensically evaluated fell below

14  the standard of a reasonable attorney, because had defense counsel done so, he could have

15  demonstrated the victim was using it at the time of the collision.  (ECF No. 44-1 at 38-43.)

16        More specifically, in his traverse, petitioner contends he suffered prejudice because the

17  cell phone expert "testified unequivocally, however, that had he been given access to the phone to

18  conduct a forensic examination, he could have determined who was using the phone at that time,

19  if not with 100% certainty, at least to a far better degree of certainty than he was able to absent a

20  forensic evaluation.  4 RT 1031."  (ECF No. 44-1 at 42-43.)  The record, despite petitioner's

21  assertion, is not unequivocal in this regard.  Beegle testified that a "wealth of information" can

22  come from an examination of a smartphone, including "the entire phone history up to a specific

23  limit."  (LD 7 at 73.)  A determination could have been made as to the content of the access and

24  download that took place at 11:51 p.m. on the night of the collision.  (LD 7 at 74, 93.)  There was

25  "a potential" to figure out "how it was activated" at that time, but Beegle could not say with

26

27  _____

[6] The record reveals the People had no interest in a forensic examination of the cell phone
believing its usage irrelevant because the user could not be determined.  (See, e.g., LD 7 at 30,
28  35-36.)

1   "absolute certainty" that it could be determined.  (LD 7 at 87.)

2          Yet on cross-examination, Beegle acknowledged he could not determine who used the cell

3   phone either to send a text message at 11:42 p.m. or to access an internet application at 11:51

4   p.m.  (LD 7 at 76-77, 92.)  Beegle acknowledged the internet application access could have

5   occurred with "one step" if the phone were "unlocked" at that time.  (LD 7 at 83, 94.)  And

6   Beegle indicated that if he had access to the cell phone "immediately after the incident" he "very

7   likely" could "find some things" on the phone, but that if the phone had been in use in the

8   intervening eighteen months, it was "very unlikely."  (LD 7 at 86, 89.)

9          Reviewing the record, the undersigned concludes the state court's determination that the

10  record does not reveal the reason for trial counsel's apparent election not to proceed with a

11  forensic examination of the phone, but that it could have been the result of Beegle's testimony

12  that an examination would not have established who was actually using the phone at 11:51 p.m.

13  on the evening of the collision.  Strickland, 466 U.S. at 688-89.  Moreover, the state court's

14  determination that petitioner did not establish prejudice because no examination would support

15  the defense theory that the victim was using the phone at the time of the collision was reasonable.

16  Because a forensic examination would not reveal who was using the phone at the time of the

17  collision, there was no reasonable probability that, but for defense counsel's alleged failure to

18  have such an examination conducted, the result of the proceeding would have been different.

19  Strickland, at 691-92, 694.  At a minimum, "'fairminded jurists could disagree.'"  Richter, 562

20  U.S. at 101.

21          In sum, petitioner has not shown the state court's ruling to be "so lacking in justification

22  that there was an error well understood and comprehended in existing law beyond any possibility

23  for fairminded disagreement."  Richter, 562 U.S. at 103.  The state appellate court's

24  determination of petitioner's ineffective assistance of counsel claim concerning the victim's cell

25  phone did not result in a decision that was contrary to, or involved an unreasonable application of,

26  Strickland, nor was its decision based upon an unreasonable determination of the facts in light of

27  the evidence presented in the state court.  28 U.S.C. § 2254(d).  Therefore, ground three should be

28  denied.

D.    *Ineffective Assistance of Counsel: Release of Oldsmobile*

In ground four of his petition, petitioner asserts trial counsel rendered ineffective assistance of counsel by failing to argue that prior counsel was ineffective for agreeing to the release of the victim's Oldsmobile, thus precluding defense expert examination.  (ECF No. 1 at 25-32.)  Respondent maintains petitioner's claim lacks merit and is procedurally barred.  (ECF No. 33 at 10.)  In his traverse, petitioner argues to the contrary.  (ECF No. 44-1 at 43-53.)

The last reasoned rejection of petitioner's fourth claim by the state appellate court on direct review was as follows:

> Defendant next contends that his trial counsel was ineffective in failing to … (2) argue defendant's former counsel was ineffective in agreeing to release the Oldsmobile. …
>
> …
>
> Next, we consider defendant's contention that his trial counsel was ineffective in "fail[ing]" to argue that the release of the Oldsmobile was ineffective assistance by prior counsel." Defendant asserts that counsel's filing of the *Trombetta* motion was "nonsensical" because to prevail on such a motion, a defendant must show bad faith on the part of the prosecution, which was impossible here because defendant's former counsel, Pacheco, consented to its release. (*People v. Pastor Cruz* (1993) 16 Cal.App.4th 322.) Defendant argues that a motion based on Pacheco's ineffective assistance of counsel would have had merit, and that his trial counsel was ineffective in not bringing such a motion. We are not persuaded.
>
> First, the record does not disclose why Pacheco consented to a release of the Oldsmobile, and there is no indication that Pacheco was asked for an explanation. Moreover, Pacheco could have determined that the evidence gathered by MAIT, including numerous photographs of the Oldsmobile, was sufficient and that an actual inspection was unnecessary. (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266 [claim of ineffective assistance of counsel will be rejected unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation].) Second, defendant failed to show he was prejudiced by the release of the Oldsmobile. While he claims in general terms that the release of the Oldsmobile inhibited his ability to attack the MAIT team's analysis or present a defense as to what actually occurred, he makes no attempt to explain why an examination of the car itself was necessary. Absent a showing that Pacheco rendered ineffective assistance, defendant is unable to establish that he would have received a more favorable result had his trial counsel moved to dismiss based on Pacheco's ineffective assistance.

(People v. Serratos, slip op. at *6-7.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Applicable Legal Standards

The applicable legal standards were provided previously in the undersigned's consideration of petitioner's ground three.

Analysis

*Relevant Background*

Attorney Charles Pacheco represented petitioner prior to the preliminary hearing.  (See LD 1 at 61-62, 79-92, 104-18, 126-31.)  Defense counsel Schulz, at the same time the court was considering the Motion to Dismiss for Intentional Destruction of Evidence citing Trombetta/ Youngblood (LD 2 at 111-16), sought to call CHP officers to testify concerning the exculpatory value of the victim's Oldsmobile and the conduct surrounding its storage and subsequent release.  (LD 7 at 53-54.)  At the February 7, 2012, hearing defense expert Russell Darnell also testified concerning the importance of having available the victim's car for purposes of inspection and examination.  (LD 7 at 102-13 [direct], 140 [cross], 163 ["I'm limited a little bit by the absence of the Olds, but I'm trying work with the other things that are there" – cross], 172 ["The difficulty with, with predicting the speed of the Oldsmobile is complicated by not having the Oldsmobile to look at what damage came from the pole and what damage came from the impact, first impact" – cross], 175.)  CHP Officer Coffman testified he was not involved in having the Honda and Oldsmobile removed from the scene of the collision and towed.  (LD 7 at 186, 195, 205.)  The victim's uncle, John Nesbitt, a deputy sheriff with the San Joaquin County Sheriff's Department, testified that he was asked by the victim's mother to retrieve personal property from the Oldsmobile.  (LD 7 at 210.)  Those items included the victim's cell phone, a dress, and shoes.  (LD 7 at 210.)   Nesbitt contacted the CHP dispatcher and was advised there was no hold on the vehicle and that it was located at a tow company in Lodi.  (LD 7 at 210-11.)  CHP Officer Petricevich testified the Oldsmobile was not impounded as evidence following the collision.  It was taken to "Plummer's Tow in Lodi."  (LD 7 at 216.)  Vehicles impounded as evidence are taken to "Lodi Heavy Haul," with whom the CHP has a contract.  (LD 7 at 216, 221-22.)  Petricevich testified each CHP Office has its own policy concerning the impound of vehicles involved in collisions for cause determinations and examination.  (LD 7 at 217.)  In this particular

29

1   case, Petricevich indicated CHP Sergeant Pini chose not to impound the Oldsmobile for evidence.

2   (LD 7 at 217.)[7]  Eventually, the Oldsmobile was moved from Plummer's Tow to Heavy Haul, but

3   that was done at a later date.  (LD 7 at 214-15, 217, 224-25.)  Petricevich contacted Nesbitt to

4   confirm the fact Nesbitt had retrieved items from the Oldsmobile; the retrieval occurred at a time

5   when the Oldsmobile "was not under impound, it was technically - - because the storage status, it

6   still belonged to the family, their responsibility."  (LD 7 at 228.)

7        In denying the <u>Trombetta</u> motion, particularly with regard to storage and retention of the

8   Oldsmobile, the trial court ruled:

9   
10       With respect to the car, again, based on the testimony, the evidence presented, I do not find that the - - that law enforcement acted in bad faith. That the sergeant - - as Officer Petricevich testified, the CHP policy varies from county to county.  Certainly, there could be an argument that normally that car would have been impounded. However, it is - - it was not presented from the evidence that the police knew that night that there was going to be material exculpatory evidence that might be expected to play a significant role in the suspect's defense that night when the sergeant made the decision to not impound the car.

11   
12   
13   
14   

15       At some point, there was a decision made to take that car and to impound it.  And at that point, certainly it could be argued that the - - that the prosecution team knew that it might have exculpatory evidence.

16   

17       At this point, the car was in police custody.  There was never, at least as far as the evidence was presented, there was never a request by the defense to examine that car, to conduct any tests on that car. Certainly, if Mr. Serratos - - his prior attorney did not request a protective order to preserve the evidence which the law does allow for. Also, there is marked in Court's Exhibit 1 [*sic*: A], the prior attorney consented to the release of the vehicle.

18   
19   
20   

21       As far as this federal case is concerned [<u>Phillips v. Woodford</u>, 267 F.3d 966 (9th Cir. 2001)], in the federal case, not only did the - - not only was the defense and the defendant not notified prior to the destruction, here we had the District Attorney that did provide notice to the defense attorney.  There has not been any authority that has been provided me that a defense attorney cannot act on behalf of his client and authorize the release of a vehicle.  There has not been any authority provided to me that the defendant would have to provide an express waiver for that.

22   
23   
24   
25   

26       And so at this point, I have no reason to believe that Mr. Schultz (sic),

27   _____

28   [7] At trial, Pini was not asked, either on direct or cross examination, any questions concerning this issue.  (<u>See</u> LD 9 at 280-301 & LD 10 at 3-23.)

1       Mr. Serratos's prior attorney, was not acting on his behalf and - - when he signed the letter consenting to the release of that vehicle.

2

3       And so I do not find bad faith on behalf of law enforcement, nor the prosecution.  I do not find that when they released the vehicle that they acted in bad faith since they were - - the prosecution team had a letter from Mr. Serratos's attorney.

4

5       Also, I do not find - -

6       MR. SCHULTZ:  If I may, Your Honor.

7       THE COURT:  No.  I gave you a lot of opportunity to argue. So at this point, I'm making my ruling.

8

9       And I do not find that at that point that the - - that at that point the evidence was evidence that would be material exculpatory evidence.

10       So that is my ruling.  The motion to dismiss based on both the cell phone and the car, those two motions are denied.

11

12 (LD 7 at 259-61.)  Defense counsel then asked to be heard briefly.  He expressed concern that the

13 letter purportedly signed by Mr. Pacheco consenting to the release of the Oldsmobile (Court

14 Exhibit A [ECF No. 48-1 at 111]) was not in fact signed by Mr. Pacheco.  (LD 7 at 261-62.)

15 Counsel asked the court to withhold making a final decision until a witness was permitted to

16 testify that the signature on the letter was "not his signature on that document."  (LD 7 at 262.)

17 After hearing further from both parties, the trial court indicated it would "come back to this

18 issue," and that it was "probably going to allow the testimony."  (LD 7 at 265-66.)

19     Following a recess, the People called Gil Somera to the stand.  (LD 7 at 267.)  Somera has

20 practiced with his law partner Pacheco for seven years and was familiar with his initials and

21 signature.  (LD 7 at 268.)  Shown Court Exhibit A, Somera testified that the "signature on the

22 page, on the bottom, . . . certainly looks like Chuck Pacheco's signature."  (LD 7 at 269.)  On

23 cross-examination, Somera testified that he could not be 100 percent certain the document

24 contains Pacheco's signature since he was not present when it was signed, but that "it looked like

25 [Pacheco's] signature," and he had advised petitioner's family of his opinion.  (LD 7 at 271.)

26 Next, Nanette Barto, a forensic document examiner called by the defense, testified that it is

27 "highly unlikely" the signature on Court Exhibit A belongs to Pacheco as compared to exemplars

28 she was provided.  (LD 7 at 276.)

On February 14, 2012, defense attorney Pacheco testified that the signature and initials on Court Exhibit A are his.  (LD 8 at 65-66; see also ECF No. 48-1 at 111 [Court Exhibit A].) Pacheco recalled signing the document.  (LD 8 at 65.)  On cross-examination by defense counsel, Pacheco explained he and the prosecutor had been having "ongoing conversations regarding" the matter and the status of discovery, and that Pacheco had "elected not to inspect the - - the Little's vehicle, the Oldsmobile, further, and agreed to allow the CHP to release the car from impoundment."  (LD 8 at 66.)  As to the content of the document, the cursive text was performed by the prosecutor in Pacheco's presence; Pacheco then added "an X and an initial" near some of the language to ensure nothing could be written before and after those words, and then he signed the document.  (LD 8 at 67.)  Shown an exemplar by defense counsel, Pacheco indicated the signature on the exemplar was made by his secretary of twenty-seven years with his permission; he did so after his secretary read the content of the declaration to him, and because he was in court at the time, Pacheco directed her to "sign it, send it out."  (LD 8 at 69-70.)  Thereafter, the trial court ruled as follows: "So at this point, based on the testimony provided, and also based on my previous ruling, I am not finding that there was any bad faith, nor that the prosecution team, including the CHP, had what they believe was material exculpatory evidence, once the vehicle was taken into evidence - - or taken, I guess, and impounded.  I do find the defense waived any Trombetta claim based on the - - Mr. Chuck Pacheco's consent to release the vehicle.  [¶] And so, as previously ruled, the motion to dismiss based on a Trombetta/Youngblood violation, that motion is denied."  (LD 8 at 70-71.)

Discussion

Petitioner complains Schulz was ineffective for failing to timely file a motion and argue that Pacheco was ineffective for "concurring and agreeing to release and destroy a 1988 Oldsmobile vehicle in a traffic collision where homicide is alleged and the vehicle is exculpatory in nature."  (ECF No. 1 at 26.)  Petitioner asserts Pacheco's action "defied reason as there was no conceivable tactical reason" to agree to the vehicle's release.  (ECF No. 1 at 31.)  In the traverse, petitioner complains Pacheco "failed to offer a strategic reason for agreeing to the destruction of the car before he personally viewed the vehicle, reviewed the MAIT report, or consulted with an

32

1    expert in accident reconstruction." (ECF No. 44-1 at 44-45.) He contends the state appellate

2    court's opinion involves "an obviously unreasonable interpretation of the facts" for determining

3    that "'Pacheco could have determined that the evidence gathered by MAIT, including numerous

4    photographs of the Oldsmobile, was sufficient and that an actual inspection was unnecessary.'"

5    (ECF No. 44-1 at 46.) Petitioner contends "Schulz's handling of the case exacerbated the

6    prejudicial effect of Pacheco's error." (ECF No. 44-1 at 55.)

7          To reiterate, the task before this court is to determine whether the state court's

8    adjudication of petitioner's claim was reasonable. 28 U.S.C. § 2254(d). A review of this record,

9    even if citations are not expressly referenced herein, reveals the state court's adjudication to be

10   reasonable; it is neither contrary to, nor did it involve an unreasonable application of, Supreme

11   Court precedent. 28 U.S.C. § 2254(d)(1). Moreover, the state appellate court's adjudication of

12   the claim did not result in a decision that was based on an unreasonable determination of the facts

13   in light of the evidence presented during the trial proceedings. 28 U.S.C. § 2254(d)(2).

14         The state appellate court's determination that the record does not disclose why Pacheco

15   consented to the release of the vehicle, and that there is no indication Pacheco was asked for an

16   explanation, is supported by the record. During cross-examination by defense counsel, Pacheco

17   was asked "how is it that that document was presented to you?," to which Pacheco responded that

18   he and the prosecutor had "had ongoing conversations" about the case and the status of discovery,

19   and that Pacheco knew "some of the stuff was sent back to one of the automobile company's labs

20   to be - - for a computer to be tested. He approached me about the - - this item here that the

21   defense - - *I elected not to inspect the - - the Little's vehicle, the Oldsmobile, further*, and agreed

22   to allow the CHP to release the car from impoundment." (LD 8 at 66, italics added.) Pacheco

23   was never asked to explain his election not to inspect the vehicle further. (LD 8 at 67-70.) The

24   state court's determination that the record does not disclose why Pacheco consented, nor indicate

25   Pacheco was asked to explain, was not unreasonable.

26         Where the record does not reveal counsel's actual reason for making a tactical decision,

27   the court need not determine counsel's actual reason so long as that decision falls within the range

28   of reasonable representation. See Morris v. California, 966 F.2d 448, 456-57 (9th Cir. 1991),

1   <u>cert. denied</u>, 506 U.S. 831 (1992).  Further, the undersigned notes that where an attorney has

2   consciously decided not to conduct further investigation because of reasonable tactical

3   evaluations, his or her performance is not constitutionally deficient.  <u>See</u> <u>Babbitt v. Calderon</u>, 151

4   F.3d 1170, 1173 (9th Cir. 1998).

5         Nor was the state court's determination that Pacheco could have concluded that the

6   evidence "gathered by MAIT, including numerous photographs of the Oldsmobile, was

7   sufficient," unreasonable.  Record references indicate MAIT took hundreds and hundreds, if not

8   more than a thousand, photographs.  (<u>See, e.g.</u>, LD 7 at 251; LD 8 at 21.)  It would not necessarily

9   be unreasonable to elect to depend upon extensive photographic evidence depicting the

10  Oldsmobile.

11        Pacheco commenced representation of petitioner on July 7, 2010; further arraignment

12  proceedings were scheduled for July 12, 2010.  (LD 1 at 61 [CT 1].)  Reporter's Transcripts of

13  proceedings held prior to January 2012 are not a part of the record lodged with this court.  On

14  July 12, 2010, the proceedings were continued to July 19, 2010.  (LD 1 at 62.)  On July 16, 2010,

15  the date set for a bail review hearing, a copy of the amended complaint was provided to defense

16  counsel and the matter was continued as to bail review and further arraignment.  (LD 1 at 79.)

17  Pacheco filed a motion to have petitioner released on his own recognizance, or, alternatively, to

18  reduce bail.  (LD 1 at 80-92.)  At the bail review hearing of July 28, 2010, the matter was argued

19  and submitted; ultimately, the motion or request was denied, and bail was increased.  Further

20  arraignment was continued to August 18, 2010.  (LD 1 at 104-05.)

21        On August 10, 2010, Pacheco signed a release concerning the Oldsmobile.  (<u>See</u> LD 8 at

22  66; LD 23 at 181; ECF No. 48-1 at 111.)  A minute order from the proceedings held August 18,

23  2010, reflects a pretrial conference was held and further arraignment was continued to September

24  15, 2010.  (LD 1 at 106.)  Following appearances of September 15, 2010, October 1, 2010 and

25  October 22, 2010 (LD 1 at 107-09), at further arraignment proceedings of November 9, 2010,

26  petitioner entered pleas of not guilty as to all counts and denied all allegations.  A pre-preliminary

27  hearing was set for January 3, 2011.  (LD 1 at 110.)  On January 10, 2011, the matter was

28  transferred from Department 23 to Department 35 for further proceedings.  (LD 1 at 112.)

1     In a declaration dated January 24, 2011, as a part of a motion to continue the preliminary

2  hearing then scheduled for January 31, 2011, Pacheco stated he "requires additional time to allow

3  his traffic reconstruction expert to examine the [MAIT] reports in this matter and consult with

4  defense counsel." (LD 1 at 115.)  Pacheco's defense motion to continue was granted and the

5  preliminary hearing was set for February 28, 2011. (LD 1 at 118.)  On February 25, 2011,

6  Pacheco again moved to continue the preliminary hearing. (LD 1 at 126-30.)  On February 28,

7  2011, in what was Pacheco's last appearance, the trial court set the matter for a confirmation of

8  prelim hearing on March 19, 2011, and for preliminary hearing on March 28, 2011. (LD 1 at

9  131.)  On February 28, 2011, attorney Schultz was retained to represent petitioner. (See LD 1 at

10 134.)

11    There is evidence in the record that discovery was provided to the attorney representing

12 petitioner prior to Pacheco: "discovery was made first to Jeff Silvia who was the defendant's

13 original attorney."  LD 7 at 27.  So while it's not clear what was discovered, by the time Pacheco

14 undertook representation of petitioner,[8] discovery materials had been received and continued to

15 be received.

16    It cannot be said that Schultz was ineffective for filing a Trombetta motion where the

17 record indicates his belief that, prior to any testimony being taken at the hearing on the motion,

18 CHP Officer Coffman "was the investigating officer on the scene.  And he's the one that ordered

19 the - - the vehicle to be towed.  And he certainly knew of the exculpatory value of that …." (LD

20 7 at 53.)  Later, Schultz continued to assert his belief that law enforcement actions related to the

21 handling of the Oldsmobile were improper. (LD 7 at 63.)  Schultz also believed at that time that

22 if "somebody from the Deputy DA's Office or from the - - the District Attorney's Office who

23 then released the vehicle, and that may become - - may become necessary for [the prosecutor]

24 then to testify." (LD 7 at 54.)  When the prosecutor responded that he had "a letter signed by the

25 defendant's attorney at the time, Charles Pacheco" allowing for "the release of the vehicle,"

26 Schultz immediately replied, "Well, that's a matter of dispute." (LD 7 at 54.)  The prosecutor

27 

28 [8] In his August 28, 2012, declaration, petitioner declared, "I did have a portion of the discovery
from the time Mr. Pacheco represented me." (LD 4 at 94-95.)

1    then states: "You told me that you filed that because the family told you to file it.  And you said

2    that you believed that that was Charles Pacheco's signature.  You told me that."  Schultz

3    responded, "It doesn't make any difference."  (LD 7 at 54.)  The legitimacy of Pacheco's

4    signature was clearly an issue even after Pacheco himself testified it was in fact his signature

5    appearing on the release document, or Court Exhibit A, as Schultz's cross-examination of

6    Pacheco makes clear.  (LD 7 267-83 & LD 8 at 64-70; see also LD 4 at 87.)  After testimony

7    concluded and the court denied the motion, when the trial court was considering whether the

8    defense "would be precluded from stating that [the Government] had the evidence destroyed in

9    their opening and their closing argument" (LD 7 at 71), Schultz told the court "the fact that the

10   prosecution even approached the defense to destroy evidence that had exculpatory value to - - is -

11   - is suspect.  I mean, their duty under Trombetta is to preserve the evidence, not destroy it.  The

12   very fact that they sought out maybe a defense attorney who did not understand the significance

13   of it or who made a mistake leads itself to the argument, certainly, that the prosecution was

14   motivated by - - by the - - by purposes that were not necessarily in the best interest of Mr.

15   Serratos."  (LD 8 at 72.)  Co-counsel Engel suggested Pacheco might "have made a different

16   decision if he knew that the car was properly stored" and that "Pacheco's release is tainted by that

17   mistake on the part of the Government."  (LD 8 at 74.)

18           This record establishes Schultz believed at the time he filed the Trombetta motion, that the

19   prosecutor had acted with bad faith, both as to a failure to impound the Oldsmobile as evidence

20   and as to the authenticity of the document it maintained bearing Pacheco's signature.

21           Petitioner cannot show prejudice for Schultz's failure to allege ineffective assistance of

22   counsel by Pacheco where petitioner cannot establish the motion would have been granted, or that

23   had such a motion been granted, the jury would have rejected the evidence as offered by the

24   prosecution's expert as it concerned the Oldsmobile.[9]

25           In sum, petitioner has not shown the state court's ruling to be "so lacking in justification

26

27   _____

     [9] The undersigned notes that the expertise, training, and knowledge specific to accident
28   reconstruction was rather dissimilar as between the prosecution expert (LD 9 at 76-78) and the
     defense expert (LD 10 at 48-49, 69-70).

1   that there was an error well understood and comprehended in existing law beyond any possibility

2   for fairminded disagreement." Richter, 562 U.S. at 103.  The state appellate court's

3   determination of petitioner's ineffective assistance of counsel claim concerning the victim's

4   vehicle, its release by Pacheco, and Schulz's actions to follow, did not result in a decision that

5   was contrary to, or involved an unreasonable application of,  Strickland, nor was its decision

6   based upon an unreasonable determination of the facts in light of the evidence presented in the

7   state court.  28 U.S.C. § 2254(d).  Therefore, ground four should be denied.

8          E.       *Denial of Counsel: Cronic Claim*

9          In his fifth ground for relief, petitioner complains trial counsel "so utterly failed to defend

10  against the charges that the trial was the functional equivalent of a guilty plea."  (ECF No. 1 at

11  33-38.)  Respondent maintains petitioner's claim was not fairly presented and lacks merit, barring

12  relief in these proceedings.  (ECF No. 33 at 11.)  Petitioner responded in his traverse.  (ECF No.

13  44-1 at 54-55.)

14         For purposes of analysis, and without specifically addressing respondent's assertion, the

15  undersigned treats the claim as fairly presented.

16                          Applicable Legal Standards

17         In United States v. Cronic, the Supreme Court identified three ineffective-assistance-of-

18  counsel circumstances "so likely to prejudice the accused that the cost of litigating their effect in

19  a particular case is unjustified."  466 U.S. 648, 659-60 (1984).  Such circumstances are present

20  when (1) there is a complete denial of counsel; (2) "counsel entirely fails to subject the

21  prosecution's case to meaningful adversarial testing"; and (3) counsel is called on to render

22  assistance under circumstances where "the likelihood that any lawyer, even a fully competent

23  one, could provide effective assistance is so small that a presumption of prejudice is appropriate

24  without inquiry into the actual conduct of the trial."  Id. at 659-60; see also Bell v. Cone, 535 U.S.

25  685, 695-96 (2002).  "[T]he adversarial process protected by the Sixth Amendment requires that

26  the accused have 'counsel acting in the role of an advocate.'  The right to the effective assistance

27  of counsel is thus the right of the accused to require the prosecution's case to survive the crucible

28  of meaningful adversarial testing.  When a true adversarial criminal trial has been conducted—

37

1   even if defense counsel may have made demonstrable errors—the kind of testing envisioned by

2   the Sixth Amendment has occurred.  But if the process loses its character as a confrontation

3   between adversaries, the constitutional guarantee is violated."  Cronic, 466 U.S. at 656-57

4   (citations & footnotes omitted).  The high court held "only when surrounding circumstances

5   justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without

6   inquiry into counsel's actual performance at trial."  Cronic, at 662.  In Cronic, the court found

7   neither the time afforded for investigation and preparation, the experience of counsel, the gravity

8   of the charge, the complexity of possible defenses, nor the accessibility of witnesses to counsel,

9   amounted to a presumption of ineffectiveness of counsel.  Id. at 663-67.

10   The Cronic exception to the requirement of showing prejudice is "narrow" and the

11   presumption of ineffectiveness is "infrequently" justified.  Florida v. Nixon, 543 U.S. 175, 190

12   (2004).

13   Analysis

14   To the degree petitioner references, or "[i]ntegrate[s]," the ineffective assistance of

15   counsel claims raised in grounds three and four and argues those claims amount to a lack of

16   meaningful adversarial testing, or those that amount to the functional equivalent of a guilty plea,

17   he is wrong.  The undersigned has recommended grounds three and four be denied, and even

18   cumulatively, the claims do not amount to a successful Cronic claim.

19   Here, none of the three situations described by the Supreme Court apply to the instant

20   case.  First, the record shows petitioner was plainly afforded counsel.  Second, counsel did not

21   entirely fail to subject the prosecution to meaningful adversarial testing.  Counsel filed numerous

22   pretrial motions.  (See, e.g., LD 2 at 74-78, 79-84, 85-90, 91-96, 98-102, 111-16.)  He cross-

23   examined nearly every prosecution witnesses.[10]  (See LD 8 at 117-18, 125, 155-74, 185-207, 217-

24   18, 233-37, 240-41, 243-44, 284-91, 297; LD 9 at 16-32, 37-38, 60-65, 68-69, , 73, 134-70, 194-

25   201, 223, 224-25, 236-38, 256-60, 274-75, 301; LD 10 at 3-7, 11-12, 16-17, 18-19, 21-22, 34-40,

26   _____

27   [10] Defense counsel elected not to cross-examine prosecution witness James Pursell who testified
briefly concerning retrieval and removal of the SRS/EDR box from petitioner's Honda.  (LD 8 at
257-261.)  Nor did he cross-examine orthopedic surgeon Thomas McKenzie who briefly testified

28   about victim David Heredia's injuries.  (LD 9 at 202-07.)

41.)  And, thereafter, defense counsel presented the testimony of four witnesses.  (See LD 10 at 48-67, 123-27, 133, 135, 138-43, 157-59, 161-72, 204-07, 212-22, 234-46, 259-62.)  Prosecution witnesses were also cross-examined during the prosecution's rebuttal.  (LD 10 at 283-86, 288-89, 294-95; LD 11 at 42-44.)  Third, the instant case does not at all resemble the circumstances set forth in Powell v. Alabama, 287 U.S. 45 (1932), wherein counsel was called upon to render assistance under circumstances where competent counsel very likely could not.  Extraordinary circumstances simply did not exist that would call into question trial counsel's conduct.

At a minimum, fairminded jurists could disagree that trial counsel's representation amounted to the functional equivalent of a guilty plea.  Richter, 562 U.S. at 98, 101.  Petitioner has not shown that counsel was ineffective under either Strickland or Cronic.  The state court's rejection of the claim was neither contrary to nor an unreasonable application of federal law. 28 U.S.C. § 2254(d).  Therefore, it is recommended that ground five of the petition be denied.

F.      *Denial of Continuance Re Investigation of Newly Discovered Evidence*

In his sixth claim for relief, petitioner contends he was denied the right to a fair trial when the trial court improperly restricted the presentation of evidence by denying a defense motion for continuance of the trial to allow for further investigation into the victim's cell phone.  (ECF No. 1 at 39-47.)  Respondent complains petitioner's claim is procedurally barred and that the state court's determination was not unreasonable.  (ECF No. 33 at 11-12.)  This claim is not addressed in the traverse.

As before, the undersigned elects to address the merits of the claim for expediency's sake. See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525).

This claim was considered and rejected by the Third District Court of Appeal, in a reasoned opinion following the direct appeal, as follows:

> The Trial Court Did Not Abuse Its Discretion in Denying
> Defendant's Request for a Continuance, and Even If It Did,
> Defendant Has Failed to Show He Was Prejudiced Thereby

> Defendant claims the trial court abused its discretion in denying his motion to continue the trial, and as a result, "rendered his counsel unprepared and ultimately ineffective." We disagree.

> On January 26, 2012, defendant filed a motion to continue the trial

39

based on the need to investigate newly discovered evidence. In a supporting declaration, defendant's trial counsel explained that on January 23, 2012, he was informed by the People that the cell phone possessed by the victim Destanee Little "did show some usage during the time of the accident." According to defendant's trial counsel, prior to that time both parties had been under the impression that the phone had not been in use. Counsel asserted that such evidence was relevant to the issue of causation because "usage of the phone while driving is careless and negligent driving and presents the victim as a contributing causal factor and perhaps a substantial factor in her death." Counsel requested the trial be continued to allow both sides to "examine the phone" and "to fully investigate [its] usage."

At the hearing on the motion, defendant's trial counsel explained that it was his understanding that the People "are claiming that there was an Internet connection. There was an upload and download sequence, and not vocal telephonic communication, nor texting. Again, that needs to be looked into. We have not had the opportunity to do so." Counsel continued, "[T]here may be other mechanisms on the cell phone itself from which memory can be retrieved. And we have not had time to—to get an expert appointed to examine the cell phone to allow us to do that and find out additional information as to the usage of that cell phone. [¶] And that's why we are seeking additional time."

The People opposed a continuance, arguing that the motion was untimely and the evidence sought was nonexculpatory. The People explained that a subpoena duces tecum had been served on AT & T "that was correctly filled out asking for the correct date and time; however, ... they fulfilled that subpoena with the wrong date." Initially, neither party caught the error. In December 2011, however, defendant's trial counsel did catch it, but failed to inform the People of the error until January 20, 2012. At that point, the People contacted AT & T and were advised that there was some usage on the phone on the date and time in question. The People provided defendant's trial counsel with a copy of the phone records a week before the hearing. Those records revealed an "Internet download" at 11:51 p.m. on the evening of the collision. As for the defense's purported need to examine the cell phone, the People argued that such an examination was not necessary given the existence of the cell phone records. The People further asserted that even if the defense were somehow able to show that Little was on the phone at the time of the collision, despite the fact that there were two other people in the car, such evidence would not be exculpatory because "[t]he negligence of one person does not exculpate and absolve the proximate cause in this case, which is the defendant rear-ending Ms. Little's vehicle."

Defendant responded that proximate cause was an issue for the jury and insisted that the defense needed an expert to interpret the phone records.

The trial court denied the motion to continue without prejudice to renewing it at a later date. The court determined that the defense had failed to meet its burden of establishing good cause for a continuance, finding that there had not been "a sufficient offer of proof that there would be potential exculpatory evidence based on

40

1
2
3

the theory in the case." The court noted, however, that the defense would not put on its case for at least three weeks, and that it would entertain another motion to continue at that time "based on a more sufficient offer of proof." At no time did defendant renew his request for a continuance.

4
5
6
7
8
9
10
11
12
13
14

At trial, Robert Beegle testified for the defense as an expert in the analysis of call detail records. Beegle reviewed the mobile usage records for Little's phone from 11:30 to 11:59 p.m. on June 12, 2010, and testified that there were two records of usage during that time period: data usage at 11:51 p.m. and a record of a text message originating from the phone at 11:42 p.m. Based on the ratio of "the data that was sent up to the network versus the data that was received from the network back down to the cellular phone," Beegle opined that the data usage at 11:51 p.m. was consistent with a social networking connection, very likely Facebook or MySpace. He could not tell from the mobile usage records who was using the cell phone at 11:42 or 11:51 p.m. on the night in question. On cross-examination, he testified that a forensic examination of the phone could reveal a "forensic fingerprint" or "personally identifying information," such as a password or PIN number, that "may help to correlate or confirm that it was a particular person using it." Even with such information, he explained that there would be no way to tell whether a specific person was, in fact, using the phone at that time, or "whether or not that particular person ever loaned that password out, or the PIN number out, or something like that."

15
16
17
18
19
20
21
22
23

A continuance in a criminal proceeding is to be granted only upon a showing of good cause. (§ 1050, subds. (b)-(e).) In a criminal case, counsel " '[must be] given a reasonable time in which to prepare the defense.' [Citation.] Failure to respect these rights constitutes a denial of due process." (*People v. Courts* (1985) 37 Cal.3d 784, 790.) We review a trial court's denial of a motion to continue for abuse of discretion. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 287.) Discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) No mechanical test determines if a denial is so arbitrary as to violate due process, rather it is determined based on the case's circumstances " ' " "particularly in the reasons presented to the trial judge at the time the request is denied." ' " ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1181.) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.]" (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

24
25
26
27
28

On appeal, defendant contends that the trial court's denial of his motion to continue was arbitrary and capricious and deprived him due process and a fair trial because it is clear from the record that his trial counsel "had only recently received the information and was frantically trying to investigate the new records to demonstrate to the trial court their value." While the call records were admitted later in the trial, defendant contends that "defense counsel was unprepared and unable to establish their value as he had insufficient time to prepare."

41

As a preliminary matter, defendant's argument ignores the fact that the trial court, in denying the motion to continue, expressed a willingness to consider a subsequent motion to continue after the defense had some additional time to investigate the phone records. The defense did not begin to put on its case until February 21, 2012, three weeks after the hearing on the motion to continue. During that time, the defense retained Beegle who was able to interpret the phone records and opine on what information could be obtained from a forensic examination of the cell phone. Nevertheless, defendant failed to renew his motion for a continuance. "As a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed." (*People v. Mills* (2010) 48 Cal.4th 158, 170.)

Even assuming for argument's sake that the claim were properly before us, it would be meritless. Defendant makes no attempt to explain how he was prejudiced by the trial court's denial of his motion to continue. As discussed above, defendant was able obtain an expert and investigate various issues related to Little's cell phone. Significantly, Beegle was able to translate the phone records and opine on what information could be derived from a forensic examination of the cell phone. Defendant fails to elaborate on what additional information or evidence he would have obtained had the trial been continued or how his counsel otherwise was unprepared as a result of the denial of his motion. Absent such a showing, defendant's claim fails. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1126 ["In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction."].)

(People v. Serratos, slip op. at *4-6.)

*Applicable Legal Standards*

The denial of a continuance violates the constitution only if the trial court's ruling "[was] so arbitrary as to violate due process." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Id. Instead such claims are evaluated on a case-by-case basis based on all of the relevant circumstances at trial with special consideration given to "the reasons presented to the trial judge at the time the [continuance was] request is denied." Id. at 589-90 (citations omitted). Since trial courts have broad discretion when considering whether to continue a trial, the denial of a motion for more time violates due process only in rare cases, "even if the party fails to offer evidence or is compelled to defend without counsel" as a result. Id. at 589; see also Morris v.

42

1   Slappy, 461 U.S. 1, 11-12 (1983) (only unreasonable and arbitrary "'insistence upon

2   expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of

3   counsel").

4          *Analysis*

5          First, the undersigned notes the state court's factual references and determinations are

6   reasonable in light of the evidence presented in the state court proceeding.  (See LD 2 at 91-96

7   [filed motion]; LD 7 at 24-42 [transcript of hearing on motion].)  28 U.S.C. § 2254(d)(2).

8          Next, federal habeas relief is limited to addressing violations of federal law and does not

9   lie for errors of state law.  Estelle v. McGuire, 502 U.S. at 67-68.  Thus, insofar as petitioner's

10  claim is based on errors under California law it fails to state a basis for relief here.  See Langford

11  v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) (petitioner "may not[ ] transform a state-law issue

12  into a federal one merely by asserting a violation of due process"); Laborin v. Clark, 2010 WL

13  3835778, at *4 (E.D.Cal. Sept.30, 2010) (no cognizable federal habeas claim where petitioner

14  claimed state court's denial of continuance motion constituted an abuse of discretion).

15         In any event, the undersigned's review of the record and the state court's determination

16  reveals nothing unreasonable nor arbitrary.  Ungar v. Sarafite, 376 U.S. at 589-90.  Simply put,

17  the court carefully considered the basis for the requested continuance and found it lacking.

18  Defense counsel addressed the court on at least seven separate occasions during the course of

19  arguing the motion, and the court also entertained an in-chambers, off the record discussion of the

20  matter, before making its ruling.  (LD 7 at 24-42.) The trial court has broad discretion in its

21  consideration of the requested continuance and a review reveals this is not a rare case resulting in

22  a violation of due process.  Ungar, at 589.

23         And, petitioner suffered no prejudice as a result of the court's denial of the requested

24  continuance.  Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).  Forensic expert Robert

25  Beegle testified for the defense concerning the victim's cell phone records and the usages

26  reflected in those records, as well as what information may have been retrieved had the cell phone

27  itself been available for inspection.  (LD 10 at 138-43, 157-59.)  Beegle acknowledged on cross-

28  examination that even had the cell phone been available for examination, the only way he could

43

1  have learned who was using the cell phone at the time of the collision would have been "if the

2  phone was actually taken into evidence and forensic fingerprints have been taken from the

3  phone." (LD 10 at 144.)  Later, the following colloquy occurred on the subject:

4   > [PROSECUTOR] Q.  And when you said a "forensic fingerprint,"
   > you didn't mean an actual fingerprint from a thumb or index finger?

5

6   > A.   There is two different types.

   > Q.  Okay.

7

8   > A.  One is physical contact from a finger or DNA, something like
   > that, of which I'm not an expert on.

9   > The other would be to go through and examine the usage
   > characteristics of the phone to look for personally identifying

10  > information.

11  > Now, whether or not that specific person was using the phone at the
   > time, I don't know.  However, if a certain application was being

12  > accessed that required a specific password or a specific pattern swipe
   > on the screen, that would be a - - a private number, like a PIN number,

13  > something like that, that may help to correlate or confirm that it was
   > a particular person using it.

14

15  > But I would not know whether or not that particular person ever
   > loaned that password out, or the PIN number out, or something like

16  > that.

17  (LD 10 at 145-46; see also LD 10 at 156-57 [no idea who was using phone at time of collision].)

18  It is clear that the additional time sought by the defense to "investigate that cell phone" (LD 7 at

19  25) would not have resulted in anything more than what Mr. Beegle in fact testified to at the time

20  of trial.

21      Concerning petitioner's assertions he was denied a meaningful opportunity to present a

22  complete defense, citing distracted driving by the victim, Supreme Court precedent holds that

23  defendants have a constitutional right to present relevant evidence in their own defense.  See

24  Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal

25  defendants a meaningful opportunity to present a complete defense.") (internal quotation marks

26  omitted).  The Supreme Court has indicated that a defendant's right to present a defense stems

27  both from the right to due process provided by the Fourteenth Amendment, see Chambers v.

28  Mississippi, 410 U.S. 284, 294 (1973), and from the right "to have compulsory process for

44

1  obtaining witnesses in his favor" provided by the Sixth Amendment, see Washington v. Texas,

2  388 U.S. 14, 23 (1967) (explaining that the right to compulsory process would be meaningless if

3  the defendant lacked the right to use the witnesses whose presence he compelled).

4       However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is

5  subject to reasonable restrictions," such as evidentiary and procedural rules.  United States v.

6  Scheffer, 523 U.S. 303, 308 (1998).  In fact, "state and federal rulemakers have broad latitude

7  under the Constitution to establish rules excluding evidence from criminal trials," id., and the

8  Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial

9  judges to exclude evidence if its probative value is outweighed by certain other factors such as

10 unfair prejudice, confusion of the issues, or potential to mislead the jury," Holmes v. South

11 Carolina, 547 U.S. 319, 326 (2006).  Evidentiary rules do not violate a defendant's constitutional

12 rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or

13 disproportionate to the purposes they are designed to serve."  Id. at 324 (alteration in original)

14 (internal quotation marks omitted); see also Scheffer, 523 U.S. at 315 (explaining that the

15 exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it

16 "significantly undermined fundamental elements of the accused's defense").  In general, it has

17 taken "unusually compelling circumstances . . . to outweigh the strong state interest in

18 administration of its trials."  Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983).

19      Here, as explained above, the trial court's denial of the requested continuance, and any

20 related restriction affecting the presentation of distracted driving evidence, did not amount to a

21 constitutional violation of petitioner's due process rights.  Lastly, as this record makes clear, there

22 was no evidence of judicial bias, despite petitioner's cursory assertion to the contrary.

23       For the foregoing reasons, the undersigned recommends denying the claim asserted in

24 ground six of the petition, for it does not involve a decision that was contrary to, or an

25 unreasonable application of, established federal law; nor did the decision involve an unreasonable

26 determination of the facts in light of the evidence in the state court record.  28 U.S.C. § 2254(d).

27 //

28 //

1    G.   Cumulative Error

2        Petitioner's seventh claim is that the cumulative effect of the state court errors constitute a

3    denial of due process.  (ECF No. 1 at 48-56.)  Respondent contends the claim is procedurally

4    barred and lacks merit.  (ECF No. 33 at 12-13.)  The traverse does not address this claim.

5        As before, the undersigned elects to address the merits of the claim for expediency's sake.

6    See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525).

7        The Ninth Circuit has concluded that under clearly established United States Supreme

8    Court precedent the combined effect of multiple trial errors may give rise to a due process

9    violation if it renders a trial fundamentally unfair, even where each error considered individually

10   would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly

11   v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410 U.S. 284, 290

12   (1973)).  "The fundamental question in determining whether the combined effect of trial errors

13   violated a defendant's due process rights is whether the errors rendered the criminal defense 'far

14   less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

15   influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht v. Abrahamson, 507 U.S.

16   619, 637 (1993)).  See also Hein v. Sullivan, 601 F.3d 897, 916 (9th Cir. 2010) (same).

17       The undersigned has addressed each of the claims asserted by petitioner thus far, and has

18   concluded that no error of constitutional magnitude occurred.  The undersigned also concludes

19   that those alleged errors, even when considered together, did not render petitioner's defense "far

20   less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's

21   verdict."  Accordingly, petitioner is not entitled to relief on his claim of cumulative error.

22   Therefore, the undersigned recommends the claim asserted in ground seven be denied.

23   H.   *Conviction Obtained As A Result of Outrageous Government Misconduct*

24       In his eighth claim for relief, petitioner argues his conviction was obtained through

25   outrageous government misconduct, entitling him to relief in these proceedings.  (ECF No. 1 at

26   57-65.)  In reply thereto, respondent asserts the claim is untimely and lacking in merit, thus

27   barring relief.  (ECF No. 33 at 13-14.)  This claim was not addressed in the traverse.

28

1    Because this claim was presented in a state habeas petition, the undersigned reviewed the

2    state court record to determine whether there was any reasonable basis for the state court's denial

3    of relief. Richter, 562 U.S. at 98.

4    Again, the undersigned elects to address the merits of the claim for expediency's sake,

5    rather than address respondent's argument that the claim is untimely. See Franklin, 290 F.3d at

6    1232 (citing Lambrix, 520 U.S. at 525).

7                            Summary of the Claim

8    In this broad sweeping claim of "outrageous government conduct," petitioner contends:

9    the prosecutor admitted petitioner "had no subjective awareness" he could be charged with

10   second degree murder; the prosecutor encouraged perjured testimony; the prosecutor "put a blind

11   eye to the deliberate removal" of the victim's cell phone by her uncle; the prosecutor "did little to

12   nothing to have [the victim's] phone returned" and engaged in deception; the prosecution

13   "deliberately provided incorrect AT&T records;" the prosecution "continued a sham trial" even

14   after it was learned the victim's phone records reflected usage at the time of the collision; the

15   prosecution admitted "'approaching (soliciting)" counsel Pacheco about releasing or destroying

16   the Oldsmobile; the prosecution's "agencies concede to numerous errors and many hiccups;" and

17   the prosecution had "tunnel vision to obtain a sham conviction through a sham trial." (ECF No. 1

18   at 58-62.)

19                          Applicable Legal Standards

20   In Brady v. Maryland, the United States Supreme Court held "that the suppression by the

21   prosecution of evidence favorable to an accused upon request violates due process where the

22   evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

23   the prosecution." 373 U.S. 83, 87 (1963). The duty to disclose such evidence is applicable even

24   though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107

25   (1976). A Brady violation may also occur when the government fails to turn over evidence that is

26   "known only to police investigators and not to the prosecutor." Youngblood v. West Virginia,

27   547 U.S. 867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 438 (1995) ["the

28   individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

47

1    the government's behalf in the case, including the police"]).

2          As stated in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), three components are

3    required to establish a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused,

4    either because it is exculpatory, or because it is impeaching; the evidence must have been

5    suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>See</u>

6    <u>also</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir.

7    2005).  "The prosecutor, although not required to deliver his entire file to defense counsel, is

8    required to turn over evidence that is both favorable to the defendant and material to the case."

9    <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1134 (9th Cir. 2014) (internal quotations omitted).  A

10   defendant is prejudiced by a <u>Brady</u> violation if the evidence that was not produced is material.

11   <u>Id.</u>, at 1134.  Evidence is material if "'there is a reasonable probability' that the result of the trial

12   would have been different if the suppressed documents had been disclosed to the defense."

13   <u>Strickler</u>, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not

14   have received a different verdict with the evidence, but whether 'in its absence he received a fair

15   trial, understood as a trial resulting in a verdict worthy of confidence."  <u>Id.</u> (quoting <u>Kyles</u>, 514

16   U.S. at 434); <u>see also</u> <u>Silva</u>, 416 F.3d at 986.  Once the materiality of the suppressed evidence is

17   established, no further harmless error analysis is required.  <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416

18   F.3d at 986. "When the government has suppressed material evidence favorable to the defendant,

19   the conviction must be set aside."  <u>Silva</u>, 416 F.3d at 986.

20                    <u>Analysis</u>

21         As noted above, petitioner alleges that the prosecution or government violated <u>Brady</u> in

22   numerous ways.  The undersigned will not address each <u>Brady</u> allegation separately, but discusses

23   the issues generally, having carefully reviewed the entire record, and focuses on a few of the

24   more prominent issues raised by petitioner. In the end, the undersigned concludes that no <u>Brady</u>

25   violations occurred.

26                    *The Assertion Concerning Awareness of Murder Admonition*

27         Petitioner points to words uttered by the prosecutor during a bail hearing to contend the

28   prosecutor's "own admission" reveals petitioner had no subjective awareness he could be charged

                                              48

1   with murder were he to kill someone while driving intoxicated following an earlier DUI

2   conviction. (ECF No. 1 at 58, 132-35 [Ex. E].)  Petitioner takes the prosecutor's words

3   completely out of context.

4   　　　　Defense counsel Pacheco filed a motion for bail reduction.  More particularly, counsel's

5   motion argued that public safety consideration should not be taken into account in setting bail and

6   that petitioner did not present a flight risk.  (See LD 1 at 80-92.)  The People opposed any bail

7   modification.  (LD 1 at 93-103.)  During argument on the motion, and after the People submitted,

8   Pacheco asked to be heard further.  (ECF No. 1 at 132:4-5.)  He stated, "And Mr. Rasmussen put

9   on the record that - - that Mr. Serratos' bail now, knowing that he had a 187 and knowing he had

10  the priors and knowing that he was charged with 191 of the Penal Code, yet Mr. Serratos didn't

11  make an attempt to get a passport, get on an airplane, get out of here.  He stayed in this county,

12  subjected himself to the jurisdiction of this court."  (ECF No. 1 at 132:8-14.)  Pacheco further

13  argued that the count of second degree murder was "unusual" and "a different kind of case" and

14  "it's just been recently" that cases such as his were charged in that manner, to support his

15  assertion that petitioner's circumstance warranted consideration of bail reduction.  (ECF No. 1 at

16  132:15-133:14.)  In response to Pacheco's argument, the prosecutor responded directly to

17  Pacheco's comments, and in particular Pacheco's assertion that petitioner did not present a flight

18  risk even when he knew he faced murder charges, as follows:  "The defendant never knew that he

19  had a 187 charge because the moment that I charged him with that, an arrest warrant was signed

20  and he was - - he went and picked him up.  So he did not know.  He could not possibly have

21  known unless he was in my office, that murder charge was coming down."  (ECF No. 1 at 134:3-

22  7.)

23  　　　　The prosecutor's statement does not serve as an admission that petitioner was not

24  subjectively aware of the fact he could be charged with murder.  Rather, fairminded jurists could

25  readily conclude that the prosecutor was directly addressing the timing of that charge and

26  petitioner's willingness to remain within the court's jurisdiction without presenting a flight risk as

27  it related to the bail reduction request.  Richter, 562 U.S. at 98, 101.

28  ////

1

*The Assertion of Perjured Testimony*

2      Petitioner contends the prosecutor "encouraged perjured testimony by [a] CHP Officer"

3   concerning the hit and run allegation, knowing "the testimony was exaggerated and contrary to

4   witness accounts."  Petitioner relies on his exhibits A1 and A2.  (ECF No. 1 at 58.)  Petitioner

5   points to the preliminary hearing testimony of witness Joseph Rickner and how that testimony

6   purportedly differs from another witness.  (ECF No. 1 at 81-114.)

7      The transcript from the preliminary hearing is a part of the state court record.  (LD 1 at

8   143-301 & LD 2 at 2-50.)  A review of the transcript does not support petitioner's claim.  Witness

9   Pablo Sanchez testified he first encountered petitioner as he sat in the damaged Honda.  (LD 1 at

10   173.)  Petitioner eventually walked away from his car, "went off to the side of the road, and then

11   kind of started walking.  Just started walking away."  (LD 1 at 177.)  Sanchez followed petitioner

12   and tried to get him to stop.  (LD 1 at 178.)  When petitioner denied being the driver of the

13   Honda, and told Sanchez he – Sanchez – was the driver, petitioner was "like 200 feet" away from

14   the Honda.  (LD 1 at 178:25-179:5.)  Sanchez testified that until the CHP arrived on scene,

15   petitioner continued to walk away from the scene.  (LD 1 at 180.)  On redirect, Sanchez testified

16   that when petitioner was detained by the CHP he was "maybe something like 30 feet" "further

17   south from his car."  (LD 1 at 192.)  Witness Joseph Rickner testified after pulling to the side of

18   the road, he saw petitioner "walking in the middle of the two lanes;" when Rickner asked

19   petitioner who was driving the car, petitioner "said he didn't know."  (LD 1 at 196.)  At that

20   point, Rickner indicated petitioner was "like, 10 feet or so" from the driver's side of the Honda,

21   walking "[b]ack south."  (LD 1 at 197.)  When petitioner asked Rickner to use Rickner's cell

22   phone, petitioner was "still walking."  (LD 1 at 197.)  When Rickner allowed petitioner to use his

23   cell phone, they were "still walking southbound."  (LD 1 at 198.)  When Rickner went to check

24   on the other vehicle, petitioner was "still in the middle of the intersection," walking "[k]ind of

25   back and forth."  (LD 1 at 198-99.)  Rickner eventually took back his cell phone and began

26   speaking with others at the scene; petitioner continued walking, "[b]ack north, this time towards

27   our parked vehicle."  (LD 1 at 199-200.)  After leaving the area near Rickner's car, petitioner

28   ////

1    continued walking south.[11]  (LD 1 at 201.)  CHP Officer John Schatmeier testified that when he

2    and his partner arrived on scene, "several people standing on the shoulder" pointed "southbound

3    on West Lane, saying, 'He's going that way.  He's going that way.'"  (LD 1 at 213.)  Those

4    individuals were standing "[m]aybe 25 yards south of the intersection."  (LD 1 at 213.)  When the

5    officer approached petitioner, petitioner was walking "[m]aybe 200 yards" or "[t]wo football

6    fields" from the Honda.  (LD 1 at 214.)  The officers used the public address system to direct

7    petitioner to stop.  He did not do so, rather, "he continued walking away" from the officers.  (LD

8    1 at 214-215.)  On cross-examination, Schatmeier testified when he first saw petitioner, petitioner

9    "was on the west shoulder of West Lane, south of the collision scene."  (LD 1 at 239.)

10   Schatmeier confirmed petitioner continued to walk despite being asked to stop.  (LD 1 at 240-41.)

11   The officer acknowledged petitioner was not "running."  (LD 1 at 241.)  When asked "from the

12   Honda, he was only about 30 to 50 feet from the Honda if you consider the distance from the

13   shoulder where the Honda was parked, the front of the Honda, from where you first saw him,

14   correct?  He was only about 30 feet?," Schatmeier replied, "No, he was about - - … Two or 300

15   yards away" or "three football fields away."  (LD 1 at 242.)

16          Included in the People's motions in limine (LD 2 at 103-09) was a list of "Potential

17   Witnesses to be called by the PEOPLE" (LD 2 at 107-08).  That list included "Joseph Rickner."

18   (LD 2 at 108.)[12]  Yet, a prosecutor is under no obligation to call the same witnesses at trial as

19   those he or she called at the preliminary hearing.  And to infer the prosecutor's election not to call

20   Rickner at trial was done for the "sole purpose" of prejudicing petitioner is nothing more than

21   speculation.

22    ////

23   _____

24   [11] Rickner acknowledged on cross-examination that he was confused as to north and south
     direction during direct examination.  (LD 1 at 203-04.)  The issue here is not direction, but rather
25   distance.

26   [12] The record does not include a defense witness list.  The undersigned notes that Petitioner's
     declaration in support of his motion for new trial includes an assertion that petitioner "informed
27   Mr. Schultz that [he] wanted Mr. Rickner called as a witness" and that petitioner "believed he
     would support [his] defense and impeach some of the prosecution witnesses," but that "Schultz
28   refused to subpoena or call this witness."  (LD 4 at 96; see also LD 12 at 232-33, 240-43.)

1        In any event, the fact Rickner did not testify at trial does not amount to a <u>Brady</u> claim

2  because Rickner's preliminary hearing testimony was not exculpatory on the issue of whether

3  petitioner was guilty of hit and run.  Regardless of any distance discrepancies, Rickner

4  consistently testified that petitioner continued walking.  A careful review of Rickner's testimony

5  finds it more likely that had Rickner testified at trial, his testimony would have been more

6  harmful than helpful to petitioner.  (<u>See</u> LD 1 at 194-211.)

7        Further, there is absolutely no basis to believe perjured testimony was given by any CHP

8  officer nor any that the prosecutor knew it to be false.  The testimony Schatmeier gave at the

9  preliminary hearing was consistent with his trial testimony, and supported at trial by the

10  testimony of CHP Officer Jeff Rhodes.  (LD 1 at 211-47; LD 8 at 126-54; LD 10 at 23-43

11  [Rhodes].)  The same can be said of witness Sanchez's preliminary and trial testimony.  (LD 1 at

12  168-93 & LD 9 at 238-55; <u>see also</u> LD 9 at 262-74 [witness Daniel Garcia's testimony consistent

13  with Sanchez].)

14        There were reasonable bases for the state court to deny the claim.  <u>Richter</u>, 562 U.S. at 98.

15                              *The Victim's Cell Phone*

16        Petitioner contends the prosecutor "put a blind eye to the deliberate removal of [the

17  victim's] cell phone by [her] uncle . . . who concealed fact and evidence specifically that the

18  phone was in use at the precise time the accident occurred . . . ."  (ECF No. 1 at 58-59.)

19        Petitioner's claim is belied by the record.  As previously addressed in these findings, the

20  victim's cell phone was not collected as evidence.  (LD 7 at 210-11 [Nesbitt], 216, 224 & 228

21  [Petricevich].) And the victim's vehicle had been towed to a non-contracted tow yard because it

22  had not been designated for evidence collection by CHP authorities.  (LD 7 at 216.)  It was

23  entirely proper for the victim's uncle, a San Joaquin County sheriff's deputy, to go to the tow

24  yard and retrieve property from the damaged vehicle, to wit: the cell phone, a dress, and a pair of

25  shoes.  (LD 7 at 216, 228.)  There was no "concealment" by the victim's uncle.  In fact, he

26  testified that he telephoned the CHP dispatcher about retrieving the property before attempting to

27  do so and was provided with contact information.  (LD 7 at 210-11.)  The victim's uncle spoke

28  with Petricevich, explaining his actions, and a report was generated as a result of that

1    conversation.  (LD 7 at 216, 224.)  The report was discovered to the defense.  (LD 8 at 4-5.)

2        And, the record reveals the trial court carefully considered all aspects of the actions

3    surrounding the victim's cell phone, including whether there was any indication the government

4    acted improperly.  It found no misconduct, and the record supports the trial court's determination

5    of the issue.

6        Petitioner's contentions that the "prosecution did little to nothing and made no effort to

7    have the phone returned," "attempted to deceive the defense and courts," and "deliberately

8    provided incorrect AT&T records" (ECF No. 1 at 59), are also all contradicted by this record.

9    (See, e.g., LD 2 at 94, 101; LD 7 at 24-25, 28-29, 35-37, 205, 223; LD 8 at 5; LD 12 at 174, 196,

10   260.)  The state court's denial of relief on these bases was reasonable.  Richter, 562 U.S. at 98.

11       In sum, the state court's determination of petitioner's Brady claims are neither

12   unreasonable nor contrary to Supreme Court holdings.  28 U.S.C. § 2254(d).  As such, petitioner

13   is not entitled to relief and the undersigned recommends the claim asserted in ground eight of the

14   habeas petition be denied.

15       I.    *Insufficiency of the Evidence: Prior 2006 DUI*

16       In his ninth ground for relief, petitioner realleges insufficiency of the evidence concerning

17   his 2006 DUI conviction and asserts he was "convicted of violating a statue [*sic*] that was

18   unconstitutionally vague and overbroad."  (ECF No. 1 at 67-70.)  Respondent does not separately

19   address the claim in the answer.

20       The undersigned has previously found the state court's determination that the evidence

21   was sufficient to support petitioner's conviction to be reasonable and will not revisit the issue.

22   See discussion regarding ground one, *ante*.

23       Regarding petitioner's claim the state statute is vague and overbroad (ECF No. 1 at 69-

24   70), wherein he complains the Watson advisement is plagued "by vagueness and ambiguity,"

25   citing the language "'Can' be charged . . . with Murder" and the Ninth Circuit Court of Appeals

26   decision in United States v. Rodriguez-Vela, 797 F.3d 781, 790 (9th Cir. 2015), his claim is

27   unavailing.

28   *////*

First, petitioner's citation to <u>Rodriguez-Vela</u> is of no assistance.  In that case, the court was considering a warning related to immigration consequences associated with a plea of guilt, in the context of an ineffective assistance of counsel claim, and the fact the court's "advisement and the statements in the plea agreement" called for the "possibility of removal, when in fact her removal was virtually certain." <u>Rodriguez-Vela</u>, 797 F.3d at 790.  That is simply not the case here.  The Watson advisement *does* involve the "possibility" of an individual being charged with murder in the event that individual has suffered a prior DUI and later kills someone while driving drunk.  But the advisement *does not* make a murder charge "virtually certain," unlike the situation in <u>Rodriguez-Vela</u>.  Prosecutors in the State of California have charging discretion in a case such as this, whereas discretion was not a reality in <u>Rodriguez-Vela</u> and the immigration consequences faced by the petitioner in that case were not discretionary.

Next, the test for vagueness is whether the statute fails "to give a person of ordinary intelligence fair notice that it would apply to the conduct contemplated." <u>United States v. Rearden</u>, 349 F.3d 608, 614 (9th Cir. 2003); <u>Melugin v. Hames</u>, 38 F.3d 1478 (9th Cir. 1994); <u>see also</u> <u>Coates v. City of Cincinnati</u>, 402 U.S. 611, 614 (1971).  "To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"  <u>Skilling v. United States</u>, 561 U.S. 358, 402-03 (2010) (quoting <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983)); <u>United States v. Kilbride</u>, 584 F.3d 1240, 1256-57 (9th Cir.  2009) (even under heightened standards of clarity for statutes involving criminal sanctions, "due process does not require impossible standards of clarity," quoting <u>Kolender v. Lawson</u>, 461 U.S. at 361); <u>see also</u> <u>Maynard v. Cartwright</u>, 486 U.S. 356, 361 (1988) ("[o]bjections to vagueness under the Due Process Clause rest on lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.").  When determining if a statute is vague, a court should look at the common understanding of the statute's terms. <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 608 (1973); <u>United States v. Fitzgerald</u>, 882 F.2d 397, 398 (9th Cir. 1989).  In addition, a statute must establish "minimal guidelines for law enforcement" and not grant law enforcement undue discretion.  <u>Kolender</u>, 461

U.S. at 358; United States v. Sorenson, 914 F.2d 173, 174 (9th Cir. 1990); United States v. Van Hawkins, 899 F.2d 852, 854 (9th Cir. 1990). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." Kolender, 461 U.S. at 358 (citation, quotations and brackets omitted). Finally, alleged vagueness should be judged in light of the conduct involved. See, e.g., United States v. Powell, 423 U.S. 87, 92-93 (1975).

"[W]hen the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. ([Cal. Pen. Code,] § 188.) In such cases, a murder charge is appropriate." People v. Watson, 30 Cal.3d at 298. A review of the language employed in both California Penal Code section 188 and the Watson advisement reveals no vagueness nor ambiguity. Persons of ordinary intelligence would be on notice, and understand, that were that individual to commit the crime of driving under the influence in the future, and on that occasion cause the death of another person, the individual could face a murder charge. Nor does it encourage arbitrary or discriminatory enforcement. Skilling v. United States, 561 U.S. at 402-03 (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).

In any event, fairminded jurists could conclude the statute at issue, and the Watson advisement, are neither vague nor ambiguous. Richter, 562 U.S. at 98, 101. Therefore, the state court's determination was a reasonable one, not contrary to any Supreme Court authority. 28 U.S.C. § 2254(d). As such, the undersigned recommends petitioner's ninth ground for relief in these proceedings be denied.

J.    *Double Jeopardy*

In his tenth claim, petitioner argues he was punished "more than once for the same offense," citing his convictions for second degree murder and vehicular manslaughter, and alleging he "was given unconstitutional multiple sentences for committing a single act." (ECF No. 1 at 71-74.) Respondent maintains the claim lacks merit. (ECF No. 33 at 14.) Ground ten is not addressed in the traverse.

////

1    The claim was presented in a state habeas petition that was denied on the merits without a

2    reasoned opinion.  The undersigned considered whether there was a reasonable basis for the state

3    court's denial of relief.  Richter, 562 U.S. at 98.

4                                  Legal Standards and Analysis

5    The Double Jeopardy Clause protects "an individual from being subjected to the hazards

6    of trial and possible conviction more than once for an alleged offense."  Burks v. United States,

7    437 U.S. 1, 11 (1978) (quoting Green v. United States, 355 U.S. 184, 187 (1957)).  "With respect

8    to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than

9    prevent the sentencing court from prescribing greater punishment than the legislature intended."

10   Missouri v. Hunter, 459 U.S. 359, 366 (1983).  The Double Jeopardy Clause permits cumulative

11   punishments for a single act when the state legislature has authorized such a result.  Id. at 367-69.

12   Where the same act constitutes a violation of two distinct statutes, the test to determine whether

13   there are two offenses or only one for double jeopardy purposes is whether each offense "requires

14   proof of a fact which the other does not."  See Blockburger v. United States, 284 U.S. 299, 304

15   (1932).

16   Here, petitioner was convicted of both gross vehicular manslaughter and second degree

17   murder, resulting from the death of Destanee Little.  Under California law, gross vehicular

18   manslaughter while intoxicated requires proof of facts which need not be proved when the charge

19   is murder, namely, intoxication and use of a vehicle.  See People v. Sanchez, 24 Cal.4th at 988-

20   989; cf. Brown v. Ohio, 432 U.S. 161, 167 (1977) (stating that a state court has the final authority

21   to interpret its own statutes).  Second degree murder and gross vehicular manslaughter, as defined

22   by the California Supreme Court, do not constitute the "same offense" under Blockburger.

23   Therefore, fairminded jurists could conclude multiple convictions for those offenses did not

24   violate the Double Jeopardy Clause.  See Blockburger, 284 U.S. at 304.

25   Notably too, petitioner was sentenced to thirty years to life for the second degree murder

26   count.  (LD 13 at 36; LD 3 at 191 [Abstract of Judgment; count 1].)  However, as to the crime of

27   vehicular manslaughter, imposition of sentence was stayed pursuant to California Penal Code

28   ////

56

1   section 654.[13]  (LD 13 at 38-39 [count 2: "total term will be 25 years, that will be stayed also

2   pursuant to 654 because Mr. Serratos is being punished 30 years to life on Count Number 1,

3   murder, and the same victim, Destanee Little is mentioned in Count Number 2, he cannot by law

4   be sentenced to both Count Number 1 and Count Number 2.  Count Number 2, the sentence will

5   be become permanent, stayed to become permanent once the judgment becomes final on

6   appeal"]; LD 4 at 189 [Abstract of Judgment; count 2].)

7           Given the above, the claim asserted in ground ten of the petition for writ of habeas corpus

8   should be denied. The state court's determination was neither contrary to, nor an unreasonable

9   application of, Supreme Court precedent, as no double jeopardy violation occurred.  28 U.S.C.

10  § 2254(d).

11          K.      *The Enhancements*

12          Finally, in ground eleven, petitioner argues the great bodily injury enhancements imposed

13  regarding the second degree murder and vehicular manslaughter convictions were illegally

14  imposed.  (ECF No. 1 at 75-76.)  Respondent asserts the claim is untimely and lacking in merit.

15  (ECF No. 33 at 14.)  Ground eleven is not addressed in the traverse.

16          The claim was presented in a state habeas petition that was denied on the merits without a

17  reasoned opinion.  The undersigned considered whether there was a reasonable basis for the state

18  court's denial of relief.  Richter, 562 U.S. at 98.

19          As before, the undersigned elects to address the merits of the claim for expediency's sake.

20  See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525).

21          As to count six, petitioner's sentence was enhanced three years and one year, respectively,

22  pursuant to California Penal Code section 12022.7(a) and California Vehicle Code section 23558,

23  and by a period of four months pursuant to California Vehicle Code section 23558 as it related to

24  count four (Cal. Veh. Code, § 23153(b)/23540), for a total enhancement term of four years, four

25  _____

26  [13] Subdivision (a) of that section provides as follows: "An act or omission that is punishable in
    different ways by different provisions of law shall be punished under the provision that provides

27  for the longest potential term of imprisonment, but in no case shall the act or omission be
    punished under more than one provision. An acquittal or conviction and sentence under any one

28  bars a prosecution for the same act or omission under any other."

1  months.  (LD 13 at 36-37; LD 4 at 189.)

2  Further, petitioner's sentence was enhanced pursuant to California Penal Code section

3  667(a) as a result of his having been previously convicted of a serious felony and/or serving a

4  prior prison term.  (LD 4 at 189.)  As for the second degree murder conviction, no enhancement

5  was imposed as to that count.  Rather, the court doubled the fifteen years-to-life because

6  petitioner had been previously convicted of serious or violent felony or "Strike prior," as found

7  by the trial court.  (LD 13 at 36; LD 4 at 191.)

8  Specifically, the trial court stated:

9  Because of the great bodily injury enhancement pursuant to 12022.7,
   this is as to David Heredia, it will be a 3 year - - an additional 3 year
10  term.

11  Because of the prior serious felony offense, the mayhem, prior from
   1999, there will be a mandatory 5 year term.
12

13  Also, pursuant to Vehicle Code section 23558, there will be an
   additional 1 year term.

14  The total term as to Count Number 6 will be 15 years state prison,
   that's ordered to run - - by law, it will be separate from the
15  indeterminant term.

16  And,

17  As to Count Number 4, charging a violation of Vehicle Code section
   23153(b), as to Chaunnel Renberg, I have selected, this will be one-
18  third the mid-term, the mid-term is 2 years.  So one-third the mid-
   term will be 8 months, that 8 months will be doubled to 16 months
19  because of the Strike prior.

20  Also, because of the multiple victim allegation, pursuant to Vehicle
   Code section 23558, there will be an additional 1 year.  However, it's
21  also subject to the one-third mid-term rule.  So one-third of 1 year is
   4 months.
22

23  So the total term on Count 4 will be 20 months, that's ordered to run
   consecutive to the other counts because this is a separate and distinct
   victim, Chaunnel Renberg.
24

25  (LD 13 at 36-38.)

26  Following direct appeal, in May 2016, the Third District Court of Appeal vacated the

27  convictions in counts three and four and directed the trial court to prepare an amended abstract of

28  judgment reflecting same.  (LD 19.)  The amended abstract reflects the convictions as to counts

58

1   three and four were vacated and no sentence was imposed as to those counts.  (See LD 21.)

2        At issue then is the great bodily injury enhancement imposed as to count six only.

3   Petitioner cites to Blakely v. Washington, 542 U.S. 296 (2004), in support of his claim.  In that

4   case, the petitioner's sentence was enhanced by more than three years "because he had acted with

5   'deliberate cruelty,' however, the "facts supporting that finding were neither admitted by

6   petitioner nor found by a jury."  Blakely, at 303.  Unlike Blakely however, here, the jury found

7   true the great bodily injury enhancement related to the injuries sustained by David Heredia.  (LD

8   3 at 250 ["We further find that in the commission and attempted commission of the above

9   offense, the said defendant, inflected great bodily injury upon DAVID HEREDIA, within the

10  meaning of Penal Code section 12022.7"].)

11       Next, petitioner complains he "was sentenced to the upper term of the three terms . . .

12  without supporting jury findings to justify the upper term," citing to Cunningham v. California,

13  549 U.S. 270 (2005).  Disregarding count three, for which an upper term was originally imposed,

14  due to the state appellate court having vacated petitioner's conviction on this count, the trial court

15  imposed an upper term on counts two, five and six.  (LD 4 at 189.)  The trial court explained its

16  selection of the upper terms:

17          I have selected the upper term for counts I mentioned, based on
            California Rule of Court 4.421(b)(1):
18
            The defendant engaged in violent conduct that indicates a serious
19          danger to society, a serious danger to society; two, the defendant's
            prior convictions as an adult or juvenile are numerous or have
20          increased in seriousness.

21  (LD 13 at 40.)

22       In Apprendi v. United States, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther

23  than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

24  prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

25  doubt."  530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296, the Supreme Court clarified

26  that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may

27  impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."

28  542 U.S. at 303 (emphasis in original).  However, "when a trial judge exercises his discretion to

1    select a specific sentence within a defined range, the defendant has no right to a jury

2    determination of the facts that the judge deems relevant."  United States v. Booker, 543 U.S. 220,

3    233 (2005).

4            Applying the Apprendi-Blakely line of cases, the Supreme Court found unconstitutional

5    California's determinate sentencing law, which prescribed lower, middle, and upper term

6    sentences and required courts to impose the middle term unless the court found that mitigating or

7    aggravating circumstances, established by a preponderance of the evidence, justified a lower or

8    upper term.  Cunningham v. California, 549 U.S. at 277-278.  The Supreme Court distinguished

9    Booker, noting that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the

10   judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is

11   not satisfied."  Cunningham, 549 U.S. at 290.

12           In response to Cunningham, the California Legislature amended the state's Determinate

13   Sentencing Law such that imposition of an aggravated term is now discretionary and does not

14   depend on the finding of any aggravating factors.  Cal. Penal Code § 1170(b) (2007); Butler v.

15   Curry, 528 F.3d 624, 652 n.20 (9th Cir. 2008) (acknowledging amendment).  Under the amended

16   statute, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three

17   possible terms, the choice of the appropriate term shall rest within the sound discretion of the

18   court."  Cal. Penal Code § 1170(b).  The amended statute took effect on March 30, 2007.  See

19   Cal. Stats. 2007, ch. 3, § 7.  Therefore, after March 30, 2007, a trial court still exercises its

20   discretion in choosing the upper, middle or lower terms, but no additional fact finding is required

21   to impose the term.  See Butler v. Curry, 528 F.3d at 652 n.20 ("Imposition of the lower, middle

22   or upper term is now discretionary and does not depend on the finding of any aggravating

23   factors"); Creech v. Frauenheim, 800 F.3d 1005, 1009 (9th Cir. 2015).  An upper-term sentence

24   has become the maximum sentence for Apprendi purposes.  Creech, 800 F.3d at 1016.

25           Here, petitioner was sentenced in 2012, after section 1170(b) was amended.  Therefore,

26   the trial judge had discretion to sentence petitioner to the maximum term for vehicular

27   manslaughter (count 2 [stayed]) and driving while intoxicated and causing injury with a prior

28   DUI (counts 5 [stayed] & 6).  Petitioner's sentence did not violate the Constitution or Apprendi.

1   Creech, 800 F.3d at 1017 (citing Booker).

2          Lastly, petitioner merely contends his sentence "was disproportionate to other sentences

3   for the same conduct," citing Solem v. Helm, 463 U.S. 277 (1983).

4          A criminal sentence that is grossly disproportionate to the crime for which the defendant

5   was convicted violates the Eighth Amendment's prohibition against cruel and unusual

6   punishment.  Solem v. Helm, 463 U.S. at 285.  However, "[s]trict proportionality between crime

7   and sentence" is not required.  Harmelin v. Michigan, 501 U.S. 957, 1001 (1991).  Rather, the

8   Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the

9   crime."  Harmelin, 501 U.S. at 1001; see also Ewing v. California, 538 U.S. 11, 23 (2003).

10  Therefore, with the exception of capital cases, successful Eighth Amendment challenges to the

11  proportionality of a sentence have been "exceedingly rare."  Rummel v. Estelle, 445 U.S. 263,

12  272 (1980).  Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a

13  sentence that fits within the scope of the proportionality principle—the precise contours of which

14  are unclear."  Lockyer v. Andrade, 538 U.S. at 76 (internal quotations and citations omitted).

15         In light of petitioner's current and prior convictions, petitioner's sentence is not one of the

16  "exceedingly rare" sentences found to be grossly disproportionate.  Cf. Andrade, 538 U.S. at 73-

17  75 (holding that the defendant's sentence of two consecutive terms of 25 years to life for two

18  current convictions of petty theft with a prior and three prior convictions for residential burglary

19  was not grossly disproportionate).

20         To the degree petitioner's claim can be interpreted to request a comparison of his sentence

21  to other sentences for similar crimes, the undersigned declines.  Where the nature of a petitioner's

22  crime is serious, "no such comparative analysis is necessary."  Harmelin, 501 U.S. at 1004.  At

23  bottom, petitioner's sentence was not grossly disproportionate to the crimes committed.

24         For the foregoing reasons, the state court denial of this claim was not an unreasonable

25  application of clearly established Supreme Court authority.  28 U.S.C. § 2254(d).  Accordingly,

26  the claim asserted as ground eleven in the petition for writ of habeas corpus should be denied.

27  ////

28  ////

1    VI.  Conclusion

2          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

3    habeas corpus be denied.

4          These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6    after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."   If petitioner files

9    objections, he shall also address whether a certificate of appealability should issue and, if so, why

10   and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

11   the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

12   § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

13   service of the objections.  The parties are advised that failure to file objections within the

14   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

15   F.2d 1153, 1156 (9th Cir. 1991).

16   Dated:  February 19, 2021

17

18                                                    KENDALL J. NEWMAN
                                                      UNITED STATES MAGISTRATE JUDGE
19   /serr077.157

20

21

22

23

24

25

26

27

28

                                                    62